# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Srinivasan Venkataraman, Individually and on Behalf of All Others Similarly Situated,<br><br>        Plaintiff,<br><br>  vs.<br><br><br>Kandi Technologies Group, Inc., Xiaoming Hu~~Hu Xiaoming~~, Cheng Wang, Bing Mei, Liming Chen, Jerry Lewin, and Henry Yu,<br><br>        Defendants. | Civil Action No. 20 CIV. 8082 (LGS)<br><br><br>**AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br><br>DEMAND FOR JURY TRIAL |

Lead Plaintiff Tom Brooks ("Plaintiff") alleges the following based upon the investigation of Plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Kandi Technologies Group, Inc. ("Kandi" or the "Company"), as well as securities analysts' reports and advisories about the Company, press releases, media reports, and other public statements issued by, or about, the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a securities class action on behalf of all persons and/or entities who purchased or acquired the Company's common stock between June 10, 2015 and March 13, 2017, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 ("Exchange Act") and SEC Rule 10b-5 promulgated thereunder.

2. Kandi designs, manufactures, and distributes electric vehicles ("EV"), EV parts, and off-road vehicles in the People's Republic of China and internationally.

3. Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose that: (1) certain areas in the Company's previously issued financial statements for the years ended December 31, 2015 and 2014, and the first three quarters for the year ended December 31, 2016, required adjustment; (2) in turn, the Company lacked effective controls over financial reporting; and (3) as a result, Defendants' statements about the Company's business, operations, and prospects, were materially false and misleading and/or lacked a reasonable basis at all relevant times. Defendants also failed to disclose that: (1) Kandi artificially inflated its reported revenues

1

through undisclosed related-party transactions; (2) a substantial amount of Kandi's previous sales had been to undisclosed related parties; and (3) as a result, the Company's public statements were materially false and misleading at all relevant times.

4.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

5.     The claims asserted herein arise under, and pursuant to, Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

6.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act.

7.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b).  Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred, in substantial part, in this District.

8.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of an electronic securities exchange located in this District.

## PARTIES

9.     Lead Plaintiff Tom Brooks, as set forth in the previously-filed certification, incorporated by reference herein, purchased Kandi securities during the Class Period, and

2

suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

10.    Defendant Xiaoming Hu ("Hu") has been the Company's Chief Executive Officer ("CEO"), President, and Chairman of the Board throughout the Class Period.

11.    Defendant Cheng Wang ("Wang") was the Company's Chief Financial Officer ("CFO") from May 1, 2015 until his resignation on November 14, 2016.

12.    Defendant Bing Mei ("Mei") was the Company's CFO from November 14, 2016 until January 29, 2019.

13.    Defendant Liming Chen ("Chen") has served as a director of the Company since May 1, 2012, as Chair of the Compensation Committee, and as a member of the Audit Committee and the Nominating and Corporate Governance Committee.

14.    Defendant Jerry Lewin ("Lewin") has served as a director of the Company since November 2010 and as a member of the Company's Audit Committee.

15.    Defendant Henry Yu ("Yu") has severed as a director of the Company since July 1, 2011, the Chair of the Audit Committee, and as a member of both the Compensation Committee and the Nominating and Corporate Governance Committee.

16.    Defendants Hu, Wang, Mei, Chen, Lewin, and Yu are collectively referred to herein as the "Individual Defendants."

17.    During the Class Period, the Individual Defendants, as senior executive officers and/or directors of the Company, were privy to confidential and proprietary information concerning the Company, its operations, finances, financial condition, and present and future business prospects. Additionally, as set forth more fully below, the Individual Defendants had access to material adverse non-public information concerning the Company. Because of their

3

positions within the Company, the Individual Defendants had access to non-public information about the Company's business, finances, products, markets, and present and future business prospects via internal corporate documents, conversations, and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof, and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew, or were deliberately reckless in not knowing, that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

18.     The Individual Defendants are liable as direct participants in the wrongs alleged herein. In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct alleged. Because of their positions of control, the Individual Defendants were able to, and did, directly or indirectly, control the conduct of the Company's business.

19.     The Individual Defendants, because of their positions within the Company, controlled and/or possessed the authority to control the contents of the Company's reports, press releases, and presentations to securities analysts and, through them, to the investing public. The Individual Defendants were provided with copies of the Company's reports and press releases alleged to be misleading herein, prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

20.     The Individual Defendants, as senior executive officers and/or directors – and as controlling persons of a publicly-traded company whose common stock was, and is, governed by

4

the federal securities law – had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

21.    The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud and/or deceit on purchasers of the Company's common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. This scheme: (1) deceived the investing public regarding the Company's business, operations and management, and the intrinsic value of the Company's common stock; (2) enabled the Company to obtain additional capital at favorable prices, create a public market for its common stock, and gain access to the public equity markets; and (3) caused Plaintiff and members of the Class to purchase the Company's common stock at artificially inflated prices.

## SUBSTANTIVE ALLEGATIONS

22.    Kandi designs, produces, manufactures, and distributes EV, EV parts, and off-road vehicles in the People's Republic of China and internationally. Founded in March 2004, the Company went public in June 2007 through a reverse merger with Stone Mountain Resources Inc., a Nevada company that had been pursuing a gold-mining venture. The Company changed its name to "Kandi Technologies Group, Inc." in December 2012. Although Kandi is headquartered in the People's Republic of China, the Company purports to maintain an office at

230 Park Avenue, 10th Floor, New York, NY 10169.  The Company's shares trade on NASDAQ under the ticker symbol "KNDI."

23.    On March 16, 2015, the Company filed a Form 10-K for the fiscal year ended December 31, 2014 ("2014 10-K") with the SEC.  The 2014 10-K was signed by Defendant Hu. Attached to the 2014 10-K was a certification pursuant to the Sarbanes Oxley Act of 2002 ("SOX") signed by Defendant Hu attesting to the accuracy of the financial statements, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.  Specifically, Defendant Hu represented:

I, [Hu Xiaoming], certify that:

1.    I have reviewed this annual report on Form 10-K of Kandi Technologies Group, Inc.;

2.    ***Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report***;

3.    ***Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report***;

4.    The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a.    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

6

b.  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and;

d.  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  ***The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):***

a.  ***All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and***

b.  ***Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.***

24.  Defendants also represented in the 2014 10-K the Company's internal controls over financial reporting, stating in relevant part:

Management conducted an assessment of the effectiveness of our system of internal control over financial reporting as of December 31, 2014, the last day of our fiscal year. This assessment was based on criteria established in the framework Internal Control—Integrated Framework (2013), issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") and included an evaluation of elements such as the design and operating effectiveness of key financial reporting controls, process documentation,

7

accounting policies, and our overall control environment. ***Based on management's evaluation under the 2013 COSO framework, management concluded that the Company's internal controls over financial reporting were effective as of December 31, 2014.[1]***

25.     As to related-party transactions, Defendants represented in the 2014 10-K that:

***Other than as set forth below, for fiscal years ended December 31, 2014 and 2013, the Company was not involved in any related party transactions.***

\* \* \*

During fiscal year ended December 31, 2014, 2013 and 2012, the Company sold products to Kandi USA Inc. carrying trade name of Eliteway Motorsports ("Eliteway") amounting to $2,981,944, $6,906,807 and $5,297,548, respectively. As of December 31, 2014 and 2013, outstanding receivable due from Eliteway was $620,410 and $2,800,958, respectively.

Mr. Hu Wangyuan was the sole shareholder and officer of Eliteway which served as a US importer of the Company's products.  Mr. Hu Wangyuan is the adult son of the Company's chairman and Chief Executive Officer, Mr. Hu Xiaoming.  For the year ended December 31, 2014, 2013and 2012, Eliteway and Mr. Hu Wangyuan were financially independent from the Company.  The transactions between the Company and Eliteway were carried at arm's-length without preferential terms comparing with other customers at the comparative order size or volume.

26.     The 2014 10-K also represented the following regarding Kandi's procedures for

related-party transactions:

In May 2014, we adopted a written Management Policy of Related-Party Transaction (the "Policy"). According to the Policy, a "Related Transaction" is "any transaction, includes, but not limited to, any financial transaction, arrangement, relationship (including any indebtedness or guarantee of indebtedness) or any series of similar transactions, arrangements or relationships, since the beginning of the Company's last fiscal year, or any currently proposed transaction, and the amount involved exceeds $120,000, and in which any related party had or will have a direct or indirect material interest". The Policy's definition of a "Related Party" is in line with the definition set forth in the instructions to Item 404(a) of Regulation S-K promulgated by the SEC.

Under the Policy, The Company's proposed material related transaction with related person shall be submitted to the Board for consideration and discussion

---

[1]     Unless otherwise indicated, all emphasis is added.

8

after independent director presents his/her approval opinion beforehand. The Audit Committee shall conduct audit on the related transaction and develop a written opinion, and can engage independent finance advisor to issue a report as a basis of its judgment, then submit it to the Board. The Policy states that the Board meeting can be held as long as non-affiliated directors over half of the Board attend, and any resolution made by the Board must be approved by over half of non-affiliated directors.

27.    The Class Period begins on June 10, 2015.

28.    On August 10, 2015, the Company filed a Form 10-Q quarterly report for the second quarter of 2015 ended June 30, 2015 ("2Q15 10-Q") with the SEC.  The 2Q15 10-Q was signed by Defendants Hu and Wang.  Attached to the 2Q15 10-Q were signed SOX certifications signed by Defendants Hu and Wang attesting to the accuracy of the financial statements, the disclosures of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

29.    Defendants represented in the 2Q15 10-Q the Company's related party transactions, reporting no changes in cashflow attributable to related party transactions.  The 2Q15 10-Q discussed the Company's internal controls over financial reporting, stating in relevant part:

**Changes in Internal Control over Financial Reporting**

There was no change to our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) that occurred during the period covered by this report that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

30.    On November 9, 2015, the Company filed a Form 10-Q quarterly report for the third quarter of 2015 ended September 30, 2015 ("3Q15 10-Q") with the SEC. The 3Q15 10-Q was signed by Defendants Hu and Wang. Attached to the 2Q15 10-Q were signed SOX certifications signed by Defendants Hu and Wang attesting to the accuracy of the financial

statements, the disclosures of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

31.     Defendants represented in the 3Q15 10-Q the Company's related party transactions, reporting no changes in cashflow attributable to related party transactions.

32.     The 3Q15 10-Q discussed the Company's internal controls over financial reporting, stating in relevant part:

**Changes in Internal Control over Financial Reporting**

There was no change to our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) that occurred during the period covered by this report that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

33.     On March 14, 2016, the Company filed a Form 10-K for the fiscal year ended December 31, 2015 ("2015 10-K") with the SEC.  The 2015 10-K was signed by Defendants Hu and Wang.  Attached to the 2015 10-K were signed SOX certifications signed by Defendants Hu and Wang attesting to the accuracy of the financial statements, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

34.     Defendants represented in the 2015 10-K the Company's internal controls over financial reporting, stating in relevant part:

Management conducted an assessment of the effectiveness of our system of internal control over financial reporting as of December 31, 2015, the last day of our fiscal year. This assessment was based on criteria established in the framework Internal Control—Integrated Framework (2013), issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") and included an evaluation of elements such as the design and operating effectiveness of key financial reporting controls, process documentation, accounting policies, and our overall control environment. ***Based on management's evaluation under the 2013 COSO framework, management concluded that the Company's internal controls over financial reporting were effective as of December 31, 2015.***

10

35.     As to related-party transactions, Defendants represented in the 2015 10-K that:

***Other than as set forth below, for fiscal years ended December 31, 2015 and 2014, the Company was not involved in any related party transactions.***

\* \* \*

During the fiscal years ended December 31, 2015, 2014 and 2013, the Company sold products to Kandi USA Inc., a company that operates under the trade name of Eliteway Motorsports ("Eliteway"), amounting to $0, $2,981,944 and $6,906,807, respectively.

36.     On May 10, 2016, the Company filed a Form 10-Q for the quarterly period ended March 31, 2016 ("1Q16 10-Q") with the SEC.  The 1Q16 10-Q was signed by Defendants Hu and Wang.  Attached to the 1Q16 10-Q were signed SOX certifications by Defendants Hu and Wang attesting to the accuracy of the financial statements, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

37.     The 1Q16 10-Q discussed the Company's internal controls over financial reporting, stating in relevant part:

**Changes in Internal Control over Financial Reporting**

There was no change to our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) that occurred during the period covered by this report that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

38.     On August 9, 2016, the Company filed a Form 10-Q for the quarterly period ended June 30, 2016 ("2Q16 10-Q") with the SEC. The 2Q16 10-Q was signed by Defendants Hu and Wang.  Attached to the 2Q16 10-Q were SOX certifications signed by Defendants Hu and Wang attesting to the accuracy of the financial statements, the disclosure of any material

11

changes to the Company's internal control over financial reporting and the disclosure of all fraud.

39.     The 2Q16 10-Q discussed the Company's internal controls over financial reporting, stating in relevant part:

> **Changes in Internal Control over Financial Reporting**
>
> There was no change to our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) that occurred during the period covered by this report that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

40.     On November 9, 2016, the Company filed a Form 10-Q for the quarterly period ended September 30, 2016 ("3Q16 10-Q") with the SEC. The 3Q16 10-Q was signed by Defendants Hu and Wang. Attached to the 3Q16 10-Q were SOX certifications signed by Defendants Hu and Wang attesting to the accuracy of the financial statements, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

41.     The 3Q16 10-Q discussed the Company's internal controls over financial reporting, stating in relevant part:

> **Changes in Internal Control over Financial Reporting**
>
> There was no change in our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) that occurred during the period covered by this report that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

42.     The above statements in ¶¶28-41 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, as set forth in ¶¶44-55, Defendants failed to disclose that: (1) certain areas in the Company's previously issued financial statements for the years ended December 31,

2015 and 2014, and the first three quarters for the year ended December 31, 2016 required adjustment; (2) in turn, the Company lacked effective controls over financial reporting; and (3) as a result, Defendants' statements about the Company's business, operations, and prospects, were materially false and misleading and/or lacked a reasonable basis at all relevant times. Additionally, the above statements in ¶¶28-41 were also materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects because as set forth in ¶¶56-63, Defendants failed to disclose that: (1) Kandi artificially inflated its reported revenues through undisclosed related-party transactions; (2) a substantial amount of Kandi's previous sales had been to undisclosed related parties; and (3) as a result, the Company's public statements were materially false and misleading at all relevant times.

43.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

**<u>The Truth Begins to Emerge</u>**

44.    On November 14, 2016, the Company announced the abrupt resignation of Defendant Wang as the CFO.  On this news, shares of Kandi fell $0.40 per share, or more than 10% from their previous closing price, to close at $3.50 per share on November 14, 2016, damaging investors.

45.    On March 13, 2017, the Company filed a Form 8-K with the SEC revealing that its previously issued financial statements for the years ended December 31, 2015 and 2014, and the first three quarters for the year ended December 31, 2016 will need to be restated, stating in relevant part:

> **Item 4.02 Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review.**

13

During the course of Kandi Technologies Group, Inc.'s (the "Company") preparation of its Annual Report on Form 10-K for the year ended December 31, 2016, and during preparation of responses to comments from the staff of the Securities and Exchange Commission ("SEC"), Division of Corporate Finance, *the Company's management identified certain areas in the Company's previously issued financial statements for the years ended December 31, 2015 and 2014, and the first three quarters for the year ended December 31, 2016 (the "Previously Issued Financial Statements"), that require adjustment as described below and in more detail in the Company's annual report on Form 10-K/A for the fiscal year ended December 31, 2015 ("Form 10- K/A"), to be filed with the SEC. As a result, on March 7, 2017, the board of directors (the "Board") of the Company, based on the recommendation of the Company's audit committee, and in consultation with management, concluded that the Company's Previously Issued Financial Statements should no longer be relied upon. The Company will, in the Form 10-K/A, restate the Previously Issued Financial Statements, which restatement will include separate audited financial statements for the JV Company (the "Restatements").* The Restatements will have no effect on the net income of the Company as reported in the Previously Issued Financial Statements. The Company will endeavor to file its Annual Report on Form 10-K for the fiscal year ended December 31, 2016, pursuant to SEC's rules (including timing guidelines), and will file the Form 10-K/A as soon as practicably possible.

The Restatements will include separate audited financial statements for the Company's equity investment in the JV Company, corrections to the classification of notes receivable and notes payable in the Company's statements of cash flow, revisions in the Company's financial statement presentation to separately identify certain related party accounts on the face of the Balance Sheets and the Consolidated Statements of Income (Loss) and Comprehensive Income (Loss), certain amendments to Note 20 – Taxes of the Notes to the Company's Consolidated Financial Statements, the adjustment of previously recorded construction-inprogress back to prepayment in Note 16 - Construction-in-Progress of the Notes to the Company's Consolidated Financial Statements, expansions of two tables of sales to and purchases from the JV Company in Note 24 - Summarized Information of Investment in the JV Company of the Notes to the Company's Consolidated Financial Statements from two years to three years, and the removal of "unaudited" labels from certain tables in Note 20 - Taxes of the Notes to the Company's Consolidated Financial Statements.

The Company will also amend its unaudited quarterly data for the first three quarters ended December 31, 2016, as set forth in its upcoming Annual Report on Form 10-K for the year ended December 31, 2016.  The Company has not filed and does not intend to file amendments to its Quarterly Reports on Form 10-Q for the quarterly periods affected.  Accordingly, investors should no longer rely upon the Company's previously released financial statements for those periods or any

14

earnings releases or other communications relating to those periods. The Company's Quarterly Reports on Form 10-Q for fiscal year 2017 will include restated results for the corresponding interim periods of fiscal year 2016.

***In addition, in conjunction with the Restatements, the Company is reassessing its internal controls over its financial reporting and compliance programs. The result of this reassessment could lead the Company to conclude that there were deficiencies in its internal controls over financial reporting that constitute material weaknesses and could therefore affect its conclusions regarding effectiveness as previously expressed in Item 9A, Controls and Procedures, of the Company's Annual Report on Form 10-K for the year ended December 31, 2015.*** Accordingly, management's report on internal controls over financial reporting as of December 31, 2015, and the associated report of AWC (CPA) Limited, the Company's former principal accountant ("AWC"), should no longer be relied upon. The Public Company Accounting Oversight Board revoked the registration of AWC on May 18, 2016. The Company dismissed AWC and engaged BDO China Shu Lun Pan Certified Public Accountants LLP ("BDO China") as its new independent registered public accounting firm on April 12, 2016, as previously reported. The Company is committed to maintaining an effective control environment and making all necessary changes to enhance control effectiveness.

The chair of the Company's audit committee, on behalf of the audit committee, and the management have discussed the matters disclosed in this Item 4.02(a) of this Current Report on Form 8-K with BDO China.

46.     On this news, shares of Kandi fell $0.30 per share, or approximately 6%, from its previous closing price to close at $4.05 per share on March 14, 2017, further damaging investors.

47.     On March 16, 2017, the Company filed its Form 10-K for fiscal year 2016 ("2016 10-K"), restated its 2014 – 3Q 2016 Financials, and admitted that there were material weaknesses in the Company's internal controls.

48.     Kandi conceded in the 2016 10-K that, among other things, it had made "errors" in the classification of notes receivable and notes payable in its statement of cash flows, it had failed to separately identify certain related party accounts on the face of the Company's balance sheets and income statements, and it had improperly accounted for the Company's equity investment in the JV Company.

15

49.     While the 2016 10-K also included a purported plan for remediating the material weaknesses in Kandi's internal controls, the Company warned that it could not "provide assurance that we will not fail to achieve and maintain an effective internal control environment on an ongoing basis, which may cause investors to lose confidence in our reported financial information and have a material adverse effect on the price of our common stock."

50.     Defendants' lack of meaningful internal controls resulted in numerous unreported related party transactions, such as in 2010 when the Company's auditors at the time, AWC, discovered that Defendant Hu was holding $1.6 million of the Company's reported year-end cash balance in a personal account.  AWC did not take steps determine why this was so.  Nor did AWC explore whether this was a related-party transaction that needed to be disclosed in the Company's financial statements.

51.     On November 2, 2016, the Company disclosed for the first time that it had engaged in material transactions in 2012 with Kandi USA, owned by Wangyuan Hu, the son of Defendant Hu, using its trade name, Eliteway.  The Company also disclosed that it had engaged in material transactions in 2013 and 2014 with Kandi USA, again using the trade name Eliteway. The total amount of the transactions was identified as $9,888,751.  The Company claimed that all the transactions had been at arm's length.

52.     The Company also disclosed additional related-party transactions with the Zhejiang ZuoZhongYou Electric Vehicle Services Co., Ltd. (the "Service Company"), in which the Company has a 9.5% ownership, resulting in additional receivables due from the Service Company.  As of December 31, 2014, the receivables totaled over $40 million.  As of December 31, 2016, the receivables totaled $10.4 million.  Defendants further represented, however, that

16

other than these transactions, "for the fiscal years ended December 31, 2017 and 2016, the Company was not involved in any related party transactions."

53.     On May 10, 2017, William Hughes, Jr. ("Hughes"), a shareholder of the Company, through his counsel, initiated a 220 demand on Kandi, pursuant to 8 Del. C. § 220, for certain books and records of the Company (the "220 Demand"). The 220 Demand sought documents concerning the restatement of the Company's 2014 – 3Q 2016 Financials, as well as related breaches of fiduciary duties and wrongdoing by the Company's management and the board of directors, mismanagement, waste, and other corporate wrongdoing at the Company. Kandi ultimately refused to produce any documents in response to Hughes's 220 Demand, and on October 2, 2017, Hughes filed in the Delaware Court of Chancery a Verified Complaint Pursuant to 8 Del. C. Section 220 to Compel Inspection of Books and Records (the "220 Complaint"). *See Hughes v. Kandi Technologies Group, Inc.*, C.A. No. 2017-0700 JTL (Del. Ch.).

54.     Based on his findings, Hughes filed a complaint against Kandi in the Court of Chancery of Delaware on February 14, 2019. *See Hughes v. Hu, et al.*, C. A. No. 2019-0112-JTL. Defendants moved to dismiss the complaint pursuant to Rule 23.1, contending that the Hughes failed to make a demand on the board or plead that demand would have been futile. The court ruled against the defendants, stating in relevant part:

> The plaintiff obtained books and records before filing suit. The fruits of that investigation—and, just as important, what the Company conspicuously failed to produce—have enabled the plaintiff to plead a complaint that supports a reasonable pleading-stage inference of a bad faith failure of oversight by the named director defendants. Four of the defendants comprise a majority of the board that would have considered a demand, and the substantial threat of liability renders them incapable of disinterestedly considering a demand. Demand would have been futile, so the Rule 23.1 motion is denied.

17

The defendants also have moved to dismiss the complaint pursuant to Rule 12(b)(6), contending that the plaintiff failed to state a claim on which relief can be granted. Both sides treated the analysis of the Rule 23.1 motion as dispositive of the Rule 12(b)(6) motion. That motion is also denied.

55.     On March 16, 2018, the Company filed a Form 10-K for the fiscal year ended December 31, 2017 ("2017 10-K") with the SEC confirming that its internal controls over financial reporting ("ICFR") were not effective as of December 31, 2017, stating in relevant part:

Management conducted an assessment of the effectiveness of our system of ICFR as of December 31, 2017, the last day of our fiscal year of 2017.  This assessment was based on criteria established in Internal Control—Integrated Framework, issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") in 2013 (the "2013 COSO Framework") and included an evaluation of elements such as the design and operating effectiveness of key financial reporting controls, process documentation, accounting policies, and our overall control environment. ***Based on management's evaluation under the 2013 COSO framework, management concluded that the Company's internal controls over financial reporting were not effective as of December 31, 2017. Certain control deficiencies existed in the internal control over financial reporting as of December 31, 2017, including lack of adequate knowledge of US GAAP and SEC rules and inaccurate accounting for income taxes. These material weaknesses existed as of December 31, 2015 and had not yet been fully remediated as of December 31, 2017.***

### The Full Truth Emerges

56.     On November 30, 2020, Hindenburg Research published a report on Kandi entitled "Kandi: How This China-Based NASDAQ Listed Company Used Fake Sales, EV Hype to Nab $160 Million From U.S. Investors."  A copy of the report is attached hereto as Exhibit A and incorporated herein by reference.

57.     Among other things, the comprehensive Hindenburg Report detailed the following:

·        Today we reveal what we believe to be a brazen scheme by China-based, NASDAQ-listed Kandi Technologies Group to falsify revenue using fake sales to undisclosed affiliates.

18

· Our investigation included extensive on-the-ground inspection at Kandi's factories and customer locations in China, interviews with over a dozen former employees and business partners, and review of numerous litigation documents and international public records.

· We unmasked Kandi's "unnamed" top customers and found that almost 64% of Kandi's last twelve months (LTM) sales have been to undisclosed related parties.

· The company's largest customer, representing ~55% of last twelve months (LTM) sales, shares a phone number with a Kandi subsidiary, and shared an executive with Kandi.

· We visited the "customer". It is based in a tiny building right next to Kandi's factory with a sign indicating that it's a Kandi company. The same building housed another entity used by Kandi as part of a separate fake sales scheme to collect illegitimate subsidies from the Chinese government, for which it was fined and sanctioned.

· Kandi's second largest customer, representing ~9% of LTM sales, was once wholly owned by the company. Its website still integrates the Kandi logo with the customer name. Export records show that 91% of the U.S. exports by the "customer" went to undisclosed related party entities based out of Kandi's U.S. headquarters and warehouses.

· To support this, we have photographic evidence of one such Kandi "customer's" inventory sitting in Kandi's own warehouse.

· Kandi's financials corroborate our concerns. The company has consistently booked revenue it cannot collect, a classic hallmark of fake revenue. Its Days Sales Outstanding (DSO) a common measure of revenue collection, was 278 days in the previous quarter, about 5.6x worse than its closest auto peer.

· Kandi's top financial ranks have been a revolving door; another key sign of accounting irregularities. The company has had 3 auditors in the past 5 years, and 4 Chief Financial Officers in the past 4 years.

· Kandi's current auditor, Marcum, was just handed a 3-year ban from auditing Chinese companies by the Public Company Accounting Oversight Board (PCAOB). Rather than firing the auditor, Kandi just reported its intention to renew the engagement.

· Kandi's latest issues are part of a long-running pattern, rather than an isolated incident. The architects of Kandi's original go-public transaction were charged with fraud by the SEC in 2014 for, among other things,

19

engaging in a scheme with Kandi's (still) Chairman/CEO to artificially inflate its stock price.

· In 2016, Kandi's long-serving prior auditor was ejected from the industry by the PCAOB specifically for failure to catch obvious signs of fraud at Kandi, including misappropriation by company management and undisclosed related party transactions.

· Kandi's latest pitch to investors is focused on an imminent U.S. launch. We show that Kandi has been "launching" in the U.S. for 12 years. Its first U.S. vehicles were imported illegally and seized by customs. A former distribution partner said every single car that eventually made it into the country broke.

· Kandi has a reputation in China for poor quality vehicles and failing to honor service warranties. The company has reported no domestic EV sales for years outside of its minority stake in a joint venture. We expect its U.S. efforts will continue to sputter.

· We also review Kandi's partnership with a Chinese rideshare company, which it has repeatedly claimed could lead to up to 300,000 EV sales. We show that the rideshare partner's app is mostly vaporware; it has almost no users and isn't even ranked among China's top 50 rideshare apps.

· Lastly, we address the company's much-touted battery swap program, which is preliminary and hopelessly behind peers, including Kandi's own partner Geely. Without a meaningful number of cars on the road Kandi's battery swap efforts simply don't make sense.

· Kandi raised $160 million from U.S. investors this month alone. All told, we think Kandi has engaged in a major fake revenue scheme, hyping its story to U.S. investors, in order to take advantage of regulatory gaps enabling China-based companies to siphon cash from U.S. capital markets with impunity.

58.    The Hindenburg Report "unmasked Kandi's unnamed top customers and found that almost 64% of Kandi's last twelve months (LTM) sales have been to undisclosed related parties."  In connection with the preparation of the Hindenburg Report, representatives visited "[t]he company's largest customer, representing ~55% of last twelve months (LTM) sales." Analyzing various sources of information, the Hindenburg Report identified the Company's largest customer as Jinhua Chaoneng Automobile Sales Co. Ltd. ("Chaoneng").  The Hindenburg

20

Report found that Chaoneng was located in the same industrial park as Kandi and in "[t]he same building [that] housed another entity used by Kandi as part of a [prior] separate fake sales scheme to collect illegitimate subsidies from the Chinese government, for which it was fined and sanctioned."  The Hindenburg Report also discovered that Chaoneng previously shared an executive with Kandi, the same phone number as a Kandi subsidiary, and that Chaoneng had signage outside of its building with the name "KANDI" appearing on one sign and the words "Jinhua Kandi Electric Vehicle Chaoneng" on another.

59.    The Hindenburg Report also identified Kandi's second largest customer as former Kandi subsidiary Zhejiang Kuke Sports Technology Co., Ltd. ("Kuke"), which accounted for "11% of last quarter's sales and 9% of Kandi's LTM sales."  According to the Hindenburg Report, "corporate records on QCC.com still refer to [Kuke] as being a part of Kandi." Additionally, the Hindenburg Report found that Kuke's "website still shows close ties to Kandi," that "[t]he homepage features a large image of Kandi's factory and that [Kuke's] logo integrates Kandi with its corporate name."  The Hindenburg Report found further that Kuke's website "features the brand name 'Jasscol', which is a registered trademark *owned by Kandi*."  The Hindenburg Report found further that 30% of Kuke's historical exports were to Massimo Motor Sports LLC ("Massimo"), an entity based out of Kandi America's Headquarters and owned by the Founder and Manager of Kandi America.  According to the Hindenburg Report, Massimo was therefore a top customer and top supplier to the Company.  The Hindenburg Report stated further that 52% of Kuke's historical exports went to Jass Motorsports, Inc., an entity that shared an executive with Kandi and was based out of the same address as a branch of Kandi USA.  The Hindenburg Report further noted that 9% of Kuke's historical exports went to Lil Pick Up, Inc., an entity that also leased warehouse space at Kandi America's Headquarters.

21

60.     On December 7, 2020, Kandi issued a letter from the Company's Chairman

("Chairman's Letter") that attempted to dispute the findings contained in the Hindenburg Report.

The Chairman's Letter stated as follows:

Jinhua, China, Dec. 07, 2020 (GLOBE NEWSWIRE) – Kandi Technologies Group, Inc. (NASDAQ GS: KNDI) (the "Company" or "Kandi") today issued a letter to its shareholders from the Chairman as below:

Dear Kandi Shareholder,

On November 30, 2020, a firm with an acknowledged short position in Kandi stock issued a "research report" that leveled a series of inaccurate allegations regarding Kandi and its management team.  The firm that issued the report is shorting our stock and will profit if the stock price declines.  In contrast, the Company's motive is to create value for all shareholders by building a durable and profitable leader in a dynamic growth industry.   It is clear from this review that the report contains a variety of misleading accusations that are either thinly veiled assertions of opinion, or based on previously reported historical events. As one example, they question the odds of success of our ride-sharing initiative. Anyone, you included, is free to assess the likelihood of success of our business strategy.  Merely asserting an opinion on our strategy proves nothing about our trustworthiness.  Assertions like this, we will ignore.  While the entire report lacks merit, the Company and its management believe that it would be helpful to our shareholders to address the inaccuracies that have received significant press attention.

1.     By mischaracterizing certain documents from 2014, the report insinuates that I participated in a scheme to inflate the price of our stock during the reverse merger process.   This is inaccurate because, as the report acknowledges, neither I nor the Company were ever charged with any such violations.  This is not new information and was previously disclosed in our regulatory filings.

2.     The Company's participation in Chinese government subsidy programs through a joint venture (the "JV Company") is well documented in public filings.  Contrary to the report's allegations, the JV Company properly received subsidy payments for all electric vehicles sold prior to 2016 and the JV Company's dual production licenses were approved in August 2019. According to government policy, any company that improperly participated in the subsidy program would not receive any subsidy payments nor dual production licenses.

3.     As with other aspects of the report, the Company's decision to change auditors was previously disclosed and resulted from Kandi's growth rather

22

than any sort of alleged "fraud". For example, in 2019 we changed to an auditor that is subject to inspection by the Public Company Accounting Oversight Board ("PCOAB"). Our current auditor is a leader in providing accounting services to Chinese companies listed in the United States.

4.    The report's assertions of "related party" transactions and "fabricated sales" suffer from a number of defects:

a.    Chaoneng's legal representative (Hu Yiheng) is not currently an executive of Kandi as the report contends. In fact, Mr. Hu Yiheng resigned from Kandi in April 2011 to start Chaoneng. The report uses misleading quotes from an October 2010 article as support for its contention that Mr. Hu Yiheng is still with Kandi.

b.    When it was first established in 2011, Chaoneng rented office space from Kandi and listed its landlord's phone number (0579-82239276) for business registration purposes. This is not Chaoneng's current telephone number.

c.    Chaoneng is located in the same industrial park complex as Kandi, but not at the same address (as the report contends). Chaoneng is the fourth building on the lot while Zhejiang Kandi Smart Battery Swap Technology Co., Ltd (formerly Jinhua An Kao Power Technology Co., Ltd) is located at the north side of the first factory building. Chaoneng provides maintenance services to vehicles manufactured by Kandi at that location. The reference to "Kandi" in the signage refers to their services for Kandi vehicles, not Kandi as a company. Kandi and Chaoneng are not related parties.

d.    The report mistakenly contends that Massimo Motor Sports and its owner David Shan are undisclosed related parties of Kandi. Mr. Shan left SC Autosports (formally named Sportsman Country) when Kandi acquired it in 2018 and no longer has any affiliation with Kandi.

e.    Kuke was a subsidiary of Kandi until January 2008. In February 2008, Kuke was spun-off from Kandi and has been an independent entity since that time. While Kuke has been the exclusive agent of Kandi's products in the United States since August 2015, Kandi plans to end this exclusivity in 2021 based on the expected growth in the United States of Kandi's subsidiary SC Autosports.

f.    The report mistakenly contends that KANDI USA and JASS MOTORSPORTS have the same address. KANDI USA closed in November 2015. There is no affiliation between Kandi USA and JASS MOTORSPORTS.

23

g.     Finally, Kandi's financial reports are audited, and care is taken to properly record sales.

Accordingly, and contrary to the report's allegations, we are enthusiastic about the progress we made in 2020. Our ATV sales achieved substantial growth, while unit sales of the Scrou-produced balancing scooters should exceed 500,000 in 2020 and we expect sales to exceed 3 million units in 2021.  Prospects for EV parts sales are strong. Our K23 and K27 EV models received the required clearance from the United States Environmental Protection Agency (EPA) via Certificates of Conformity.  Our K27 model recently met the safety regulations of the U.S. Department of Transportation FMVSS 500 and is scheduled to be launched on the market soon.  Safety certification for the K23 is being finalized and we anticipate customer deliveries in the first quarter of 2021. The "300,000 government-accredited pure EV within 5 years rideshare" program has officially started in the city of Shaoxing in Zhejiang province, and in the city of Haikou in Hainan province.  We strongly believe that the program will drive sales growth of our EV and battery swap equipment in 2021. In addition, our new 1 million plus square feet (100,000 square meters) facility will be completed in January 2021 and is expected to start production in the first quarter of 2021.

To conclude, we strongly believe that this report is laced with innuendo and supposition, which are countered by our proven prospects for future growth.  Rest assured that we will continue to operate with the highest standards in order to maximize shareholder value.

Most sincerely,

Hu Xiaoming
Chairman and Chief Executive Officer
Kandi Technologies Group

61.     Contrary to its intention to dispute the contentions regarding Kandi's related parties contained in the Hindenburg Report, the Chairman's Letter actually admitted facts that confirm the related nature of such entities.  For instance, with respect to Chaoneng, the Chairman's Letter admitted, among other things, that: (1) Chaoneng rented office space from Kandi; (2) Chaoneng and Kandi previously shared the same telephone number; (3) Chaoneng is located in the same industrial park complex as Kandi, adjacent to a Kandi factory; (4) Chaoneng provides maintenance services to vehicles manufactured by Kandi in the same industrial park

24

complex; (5) Chaoneng has Kandi's name in its signage at the industrial park complex; and (6) Chaoneng's legal representative, Hu Yiheng, was previously an executive of Kandi who resigned from Kandi in April 2011 to start Chaoneng.

62.    Similarly, with respect to Kuke, the Chairman's Letter admitted, among other things, that: (1) Kuke was a subsidiary of Kandi until January 2008; (2) in February 2008, Kuke was spun-off from Kandi; and (3) Kuke has been the exclusive agent of Kandi's products in the United States since August 2015.

63.    Additionally, the Chairman's Letter failed to dispute – and therefore impliedly conceded – that: (1) the Chinese government previously sanctioned Kandi and its JV partner over a scheme to collect illegitimate government subsidy payments through fake EV sales and the entity used to generate the fake sales in the scheme – Left Middle Right, Co. Ltd. – is based out of the same building as Chaoneng; (2) corporate records on QCC.com still refer to Kuke as being part of Kandi; (3) Kuke's website shows close ties to Kandi and feature the brand name Jasscol, which is a registered trademark owned by Kandi; (4) Kuke is buying from Kandi and then selling right back to undisclosed related parties of Kandi; (5) Massimo Motor Sports, an undisclosed related-party entity of Kandi America, is both a top customer and a top supplier of Kandi; (6) 52% of Kuke's historical exports were to Jass Motorsports, Inc., an entity that shared an executive with Kandi and was previously based in the same address as a branch of Kandi USA; and (7) 9% of Kuke's historical exports went to Lil Pickk Up, Inc., and entity that also leases warehouse space at Kandi America's headquarters.

## CLASS ACTION ALLEGATIONS

64.    Plaintiff brings this action as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of all those who purchased

the Company's common stock during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have, or had, a controlling interest.

65. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's common stock was actively traded on NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

66. Plaintiff's claims are typical of the claims of the members of the Class, since all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law alleged herein.

67. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

68. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether Defendants' acts constituted violations of the federal securities laws;

(b)      whether Defendants' statements made to the investing public during the Class Period misrepresented material facts concerning the Company's business, operations, and financial condition;

(c)      whether the price of the Company's common stock was artificially inflated during the Class Period; and

(d)      to what extent the members of the Class have sustained damages and the proper measure of damages.

69.      A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  Additionally, there will be no difficulty in the management of this action as a class action.

## LOSS CAUSATION

70.      During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of the Company's common stock.  Defendants' conduct, moreover, operated as a fraud or deceit on Class Period purchasers of the Company's common stock by failing to disclose, and misrepresenting, the adverse facts detailed herein.  As Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of the Company's common stock declined significantly as the prior artificial inflation dissipated from the Company's stock price.

71.      For example, on November 14, 2016, the Company announced the abrupt resignation of Defendant Wang as the CFO.  On this news, shares of Kandi fell $0.40 per share,

27

or more than 10% from their previous closing price, to close at $3.50 per share on November 14, 2016, damaging investors.

72.    Additionally, on March 13, 2017, the Company filed a Form 8-K with the SEC revealing that its previously issued financial statements for the years ended December 31, 2015 and 2014, and the first three quarters for the year ended December 31, 2016 will need to be restated.  On this news, shares of Kandi fell $0.30 per share, or approximately 6%, from its previous closing price to close at $4.05 per share on March 14, 2017, further damaging investors.

73.    As a result of the purchases of the Company's common stock during the Class Period, Plaintiff and the other members of the Class suffered economic loss (damages) under the federal securities laws.  Defendants' false and misleading statements had the intended effect, and caused, the Company's common stock to trade at artificially inflated levels throughout the Class Period.

74.    By concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of the Company's business and prospects.  As the truth regarding the Company was revealed to the market, the price of the Company's common stock fell significantly.  These declines removed the inflation from the price of the Company's common stock, causing real economic loss to investors who purchased the Company's common stock during the Class Period.

75.    The declines in the price of the Company's common stock after the corrective disclosures came to light were a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market.  The timing and magnitude of the price declines in the Company's common stock negate any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions,

28

macroeconomic, or industry factors, or by Company-specific facts unrelated to defendants' fraudulent conduct.

76.     The economic loss (damages) suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of the Company's common stock and the subsequent significant decline in the value of the Company's common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

### APPLICABILITY OF PRESUMPTION OF RELIANCE:<br>FRAUD ON THE MARKET DOCTRINE

77.     At all relevant times, the market for the Company's common stock was an efficient market for the following reasons, among others:

(a)     The Company's common stock met the requirements for listing, and was listed and actively traded on NASDAQ, a highly efficient, electronic stock market;

(b)     As a regulated issuer, the Company filed periodic public reports with the SEC;

(c)     The Company regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     The Company was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

78.     As a result of the foregoing, the market for the Company's common stock promptly digested current information concerning the Company from all publicly available

29

sources and reflected such information in the prices of the Company's stock. Under these circumstances, all purchasers of the Company's common stock during the Class Period suffered similar injury through their purchase of the Company's common stock at artificially inflated prices and a presumption of reliance applies.

**NO SAFE HARBOR**

79.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements alleged herein. Many of the specific statements alleged herein were not identified as "forward-looking statements" when made, and thus are not entitled to protection under the safe harbor provision. Additionally, to the extent that there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements alleged herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of the Company who knew that those statements were false when made.

**COUNT I**
**Violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Promulgated**
**Thereunder Against All Defendants**

80.    Plaintiff repeats and realleges each and every allegation contained above as though set forth in full herein.

81.    During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew, or were deliberately reckless

30

in not knowing, were misleading.  These statements were false and misleading because they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

82.     Defendants: (1) employed devices, schemes, and artifices to defraud; (2) made untrue statements of material fact/and or omitted to state material facts necessary to make the statements made not misleading; and (3) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

83.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for the Company's common stock.  Plaintiff and the Class would not have purchased the Company's common stock at the prices they paid – or at all – if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

84.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## COUNT II
**Violation of Section 20(a) of the Exchange Act Against the Individual Defendants**

85.     Plaintiff repeats and realleges each and every allegation contained above as though set forth in full herein.

86.     The Individual Defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and/or intimate knowledge of the Company's statements filed with the

31

SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements alleged to be false and misleading herein.

87.    The Individual Defendants, moreover, were provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings, and other statements alleged to be false and misleading herein.  The Individual Defendants were provided with, or had unlimited access to, such documents and statements prior to, and/or shortly after these statements were issued, and therefore had the ability to prevent the issuance of the statements and/or cause the statements to be corrected.  Additionally, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and had the power to control or influence the particular transactions giving rise to the securities violations.

88.    The Individual Defendants all had ultimate authority over the Company's statements, including controlling the content of such statements and whether and how to communicate such statements to the public.

89.    By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff, and certifying Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.     Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Respectfully submitted,

DATED:  December 18, 2020          **GLANCY PRONGAY & MURRAY LLP**

By:   *s/ Charles H. Linehan*
Robert V. Prongay (admitted *pro hac vice*)
Ex Kano S. Sams II (*pro hac vice* pending)
Charles H. Linehan (admitted *pro hac vice*)
Pavithra Rajesh (admitted *pro hac vice*)
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: clinehan@glancylaw.com

*Counsel for Lead Plaintiff Tom Brooks and the Class*

**LAW OFFICES OF HOWARD G. SMITH**
Howard G. Smith
3070 Bristol Pike, Suite 112
Bensalem, PA 19020
Telephone: (215) 638-4847
Facsimile: (215) 638-4867

*Additional Counsel*

33

# EXHIBIT A

Case 1:20-cv-08082-DEHAQ- Document 33-1    Filed 12/23/20    Page 37 of 105

# Kandi: How This China-Based NASDAQ-Listed Company Used Fake Sales, EV Hype to Nab $160 Million From U.S. Investors

Published on November 30, 2020

## GET OUR LATEST REPORTS DELIVERED TO YOUR INBOX

| email address | SUBSCRIBE |

## (NASDAQ:KNDI)

- Today we reveal what we believe to be a brazen scheme by China-based, NASDAQ-listed Kandi Technologies Group to falsify revenue using fake sales to undisclosed affiliates.
- Our investigation included extensive on-the-ground inspection at Kandi's factories and customer locations in China, interviews with over a dozen former employees and business partners, and review of numerous litigation documents and international public records.
- We unmasked Kandi's "unnamed" top customers and found that almost 64% of Kandi's last twelve months (LTM) sales have been to undisclosed related parties.
- The company's largest customer, representing ~55% of last twelve months (LTM) sales, shares a phone number with a Kandi subsidiary, and shared an executive with Kandi.
- We visited the "customer". It is based in a tiny building right next to Kandi's factory with a sign indicating that it's a Kandi company. The same building housed another entity used by Kandi as part of a separate fake sales scheme to collect illegitimate subsidies from the Chinese government, for which it was fined and sanctioned.
- Kandi's second largest customer, representing ~9% of LTM sales, was once wholly owned by the company. Its website still integrates the Kandi logo with the customer name. Export records show that 91% of the U.S. exports by the "customer" went to undisclosed related party entities based out of Kandi's U.S. headquarters and warehouses.

Case 1:20-cv-08082-DEH Document 33-1 Filed 12/23/20 Page 38 of 105

- To support this, we have photographic evidence of one such Kandi "customer's" inventory sitting in Kandi's own warehouse.
- Kandi's financials corroborate our concerns. The company has consistently booked revenue it cannot collect, a classic hallmark of fake revenue. Its Days Sales Outstanding (DSO) a common measure of revenue collection, was 278 days in the previous quarter, about 5.6x worse than its closest auto peer.
- Kandi's top financial ranks have been a revolving door; another key sign of accounting irregularities. The company has had 3 auditors in the past 5 years, and 4 Chief Financial Officers in the past 4 years.
- Kandi's current auditor, Marcum, was just handed a 3-year ban from auditing Chinese companies by the Public Company Accounting Oversight Board (PCAOB). Rather than firing the auditor, Kandi just reported its intention to renew the engagement.
- Kandi's latest issues are part of a long-running pattern, rather than an isolated incident. The architects of Kandi's original go-public transaction were charged with fraud by the SEC in 2014 for, among other things, engaging in a scheme with Kandi's (still) Chairman/CEO to artificially inflate its stock price.
- In 2016, Kandi's long-serving prior auditor was ejected from the industry by the PCAOB specifically for failure to catch obvious signs of fraud at Kandi, including misappropriation by company management and undisclosed related party transactions.
- Kandi's latest pitch to investors is focused on an imminent U.S. launch. We show that Kandi has been "launching" in the U.S. for 12 years. Its first U.S. vehicles were imported illegally and seized by customs. A former distribution partner said every single car that eventually made it into the country broke.
- Kandi has a reputation in China for poor quality vehicles and failing to honor service warranties. The company has reported no domestic EV sales for years outside of its minority stake in a joint venture. We expect its U.S. efforts will continue to sputter.
- We also review Kandi's partnership with a Chinese rideshare company, which it has repeatedly claimed could lead to up to 300,000 EV sales. We show that the rideshare partner's app is mostly vaporware; it has almost no users and isn't even ranked among China's top 50 rideshare apps.
- Lastly, we address the company's much-touted battery swap program, which is preliminary and hopelessly behind peers, including Kandi's own partner Geely. Without a meaningful number of cars on the road Kandi's battery swap efforts simply don't make sense.
- Kandi raised $160 million from U.S. investors this month alone. All told, we think Kandi has engaged in a major fake revenue scheme, hyping its story to U.S. investors, in order to take advantage of regulatory gaps enabling China-based companies to siphon cash from U.S. capital markets with impunity.

*Initial Disclosure: After extensive research, we have taken a short position in shares of Kandi Technologies. This report represents our opinion, and we encourage every reader to do their own due diligence. Please see our full disclaimer at the bottom of the report.*

# Introduction: Electric Vehicle Euphoria

Many investors have come to the realization that electric vehicles are the future of the auto industry. In rational times, such investors might express this view by picking companies that are best-of-breed; the likely industry winners.

But this is 2020, so instead, a psychotic flood of speculative capital has lifted all companies in the sector, regardless of quality.

Readers of this piece are likely familiar with our views on Nikola, the electric vehicle brainchild of Trevor Milton, a man who has forever enshrined "gravity" in the list of zero-emission energy sources (perhaps the company's only genuine innovation to date).[1]

Many investors avoided Nikola due to its speculative status as a pre-revenue newcomer. Some of these investors may have instead found Kandi, seeing it as a revenue generating EV manufacturer with a long history.

# Background: Basics on the Business

Before we dive into the specifics, let's review the basics.

Kandi went public in the U.S. in mid-2007 (https://www.sec.gov/Archives/edgar/data/1316517/000121390007000800/f8k062807_stonemtn.htm) via reverse merger onto the Over the Counter ("OTC") market. It then uplisted and has traded on the NASDAQ since March 2008. [Pg. 14 (https://www.sec.gov/Archives/edgar/data/1316517/000114420408018680/v108504_10-k.htm)] The company has been run since its inception as a public company by Xiaoming Hu (胡晓明) who serves as Chairman, CEO & President. [Pg. 33 (https://www.sec.gov/Archives/edgar/data/1316517/000121390020010244/f10k2019_kanditechnologies.htm)]

Historically, the company manufactured and sold ATVs, go-karts, and electric vehicles. Currently, Kandi's main focus is electric cars and related parts.

Kandi has announced several initiatives that are key to its business case (which we will review thoroughly):

1. The "U.S. Launch" of Kandi's small, low-cost electric cars;

2. China's domestic rideshare market, which Kandi hopes to significantly participate in; and
3. The company's battery swap technology, which it has indicated will be spun off and taken public in Shanghai

The company's market cap has expanded to over $1 billion as of this writing, trading ~$13.62 per share, more than 6x its 52-week lows. The company has raised $160 million from U.S. public market investors this month alone. [1 (https://www.globenewswire.com/news-release/2020/11/20/2131022/0/en/Kandi-Technologies-Announces-Entry-into-Agreement-for-Registered-Direct-Placement-of-100-Million-of-Common-Stock-and-Warrants.html),2 (https://www.globenewswire.com/news-release/2020/11/10/2123937/0/en/Kandi-Technologies-Announces-Entry-into-Agreement-for-Registered-Direct-Placement-of-60-Million-of-Common-Stock-and-Warrants.html#:~:text=(the%20%E2%80%9CCompany%E2%80%9D%20or%20%E2%80%9C,price%20of%20%246.38%20per%20share.)]

# Part I: Kandi's Extensive History of Fraud Allegations

Investors in Kandi seem largely unaware of the company's history of credible fraud allegations during its tenure as a public company.

### 2014: The Architects of Kandi's Reverse Merger Deal to Go Public Were Charged With Fraud by the SEC For, Among Other Things, Engaging in A Scheme With Kandi's Chairman/CEO To Artificially Inflate Its Stock Price

According to an SEC complaint, Kandi was taken public on the OTC by a group of individuals that engaged in multiple market manipulation schemes. [Pg. 3 (https://www.sec.gov/litigation/complaints/2014/comp-pr2014-91.pdf)]

The architects of the scheme were charged with fraud by the SEC (https://www.sec.gov/litigation/complaints/2014/comp-pr2014-91.pdf) in 2014.

Case 1:20-cv-08082-DEH   Document 33-1   Filed 12/23/20   Page 41 of 105



## U.S. Securities and Exchange Commission

**U.S. SECURITIES AND EXCHANGE COMMISSION**

Litigation Release No. 22986 / May 7, 2014

*Securities and Exchange Commission v. S. Paul Kelley, et al., Civil Action No. 2:14-cv-2827 (D. N.J., filed May 5, 2013)*

**SEC Charges Toronto-Based Consultant and Four Others with Multiple Chinese Reverse Merger Schemes**

The complaint included allegations that the individuals had engaged in a fraudulent scheme to inflate the price and volume of Kandi. [Pg. 43 (https://www.sec.gov/litigation/complaints/2014/comp-pr2014-91.pdf)] According to SEC prosecutors, the scheme was concocted with the help of Kandi's CEO:

12/17/2020    Kandi: How This China-Based NASDAQ-Listed Company Used Fake Sales, EV Hype to Nab $160 million From U.S. Investors – Hinden…

Case 1:20-cv-08082-DEHAQ   Document 33-1   Filed 12/23/20   Page 42 of 105

**F.     Tazbaz, Lockhart, and Becker Orchestrated a Scheme to Defraud Through Manipulative Trading in a Third Chinese Issuer, Kandi Technologies**

132.    From approximately April 2009 through at least December 2010, Tazbaz, Lockhart, and Becker orchestrated a scheme to defraud investors of a third Chinese issuer, Kandi Technologies Group Inc., primarily through manipulative trading in Kandi's stock.

133.    The manipulative trading was done with scienter. In addition, the manipulative trading was done for the purposes of creating a false or misleading appearance of an active market in the stock and inducing the stock's sale or purchase by others.

134.    Kandi was listed on NASDAQ on March 18, 2008, and was trading as high as $6.82 per share in April 2008. However, by the end of 2008, Kandi's stock price had dropped to less than $1.00.

135.    Tazbaz and Lockhart held large positions in Kandi's securities that they sought to liquidate.

136.    In approximately September 2009, Tazbaz and Lockhart traveled to China to meet with Kandi's CEO. In that meeting, Kandi's CEO reached an oral agreement with Tazbaz and Lockhart as follows:

12/17/2020    Kandi: How This China-Based NASDAQ-Listed Company Used Fake Sales, EV Hype & Hidden $160 million From U.S. Investors – Hinden…

Case 1:20-cv-08082-DEH Document 33-1 Filed 12/23/20 Page 43 of 105

a.    Kandi agreed to provide Tazbaz and Lockhart with 350,000 additional shares of Kandi;

b.    Despite Kandi's prior oral agreement that the Kelley Group would cover certain expenses related to maintaining Kandi's public listing for the first two years after going public, Kandi agreed to cover certain additional of its own post-public expenses;

c.    In exchange, Tazbaz and Lockhart agreed to pay U.S. stock promoters to tout Kandi; and

d.    Tazbaz and Lockhart further agreed to orchestrate U.S. stock promoters to manipulate the trading of Kandi stock to increase its price to at least $3 per share within three months.

The individuals settled (https://www.sec.gov/litigation/litreleases/2019/lr24696.htm) the charges in December 2019. Despite the Chairman/CEO of Kandi being identified as playing a critical role in a conspiracy to manipulate his own stock, neither he nor the company were ever charged by the SEC.

## 2016: Kandi's Long-Serving Auditor Had Its Registration Revoked by the Public Company Accounting Oversight Board ("PCAOB") Specifically for Failing to Catch Obvious Signs of Fraud at Kandi

Kandi's auditor for most of its publicly traded existence was Albert Wong & Co. ("AWC"), a small auditor based in Hong Kong. AWC served as Kandi's auditor from mid-2009 (https://www.sec.gov/Archives/edgar/data/1316517/000114420409035677/v154050_8k.htm) until its dismissal in April 2016 (https://www.sec.gov/Archives/edgar/data/1316517/000106299316008902/form8k.htm).

A month after its dismissal, in May 2016, the PCAOB issued an order (https://pcaobus.org/Enforcement/Decisions/Documents/105-2016-016-AWC-CPA.pdf) revoking AWC's registration, fining it $10,000 and barring its principals from associating with any registered public accounting firm due to its failure to catch obvious signs of fraud at Kandi.

Case 1:20-cv-08082-DEH   Document 33-1   Filed 12/23/20   Page 44 of 105



PCAOB
Public Company Accounting Oversight Board

1666 K Street, N.W.
Washington, DC 20006
Telephone: (202) 207-9100
Facsimile: (202) 862-0757
www.pcaobus.org

)
)
ORDER INSTITUTING DISCIPLINARY )
PROCEEDINGS, MAKING FINDINGS, AND )
IMPOSING SANCTIONS )   PCAOB Release No. 105-2016-016
)
*In the Matter of AWC (CPA) Limited, WONG* )   May 18, 2016
*Chi Wai, CPA, and WONG Fei Cheung, CPA,* )
)
Respondents. )
)

The order focused on AWC's audit failures relating to Kandi, mentioning the company by name 151 times.

The PCAOB found, among other failures, that AWC failed to implement procedures designed to provide reasonable assurance of detecting material fraud or illegal acts. [Pg. 4 (https://pcaobus.org/Enforcement/Decisions/Documents/105-2016-016-AWC-CPA.pdf)]

## C.    Summary

7.    This matter concerns Respondents' violations of PCAOB rules and standards in connection with the issuance of audit reports on the consolidated financial statements of Kandi Technologies Group, Inc. ("Kandi" or the "Company") for the years ended December 31, 2010, 2011, and 2012. As detailed below, Respondents, among other things, failed repeatedly to exercise due professional care and professional skepticism, to obtain sufficient appropriate audit evidence with respect to financial statement assertions, to include procedures designed to provide reasonable assurance of detecting fraud or illegal acts that would have a direct and material effect on the determination of financial statement amounts, and to prepare and maintain adequate audit documentation.

# The PCAOB Report Went Into Detail About Obvious Signs of Theft by Kandi's Chairman/CEO And Undisclosed Related Party Transactions

The PCAOB found that AWC failed to take issue with Kandi's Chairman and at least one Kandi finance employee (referred to as "Cashier") **reporting cash held in their personal accounts as belonging to the business. The auditors simply included the cash held in personal accounts in the company's reported cash balance.**

Case 1:20-cv-08082-DEH   Document 33-1   Filed 12/23/20   Page 45 of 105

The effect of this was likely a reporting of an inflated cash balance while direct evidence of misappropriation was ignored. Per the report:

25.　Kandi management represented to Respondents that the $3.0 million temporarily held by the Cashier in her personal account was at the request of Kandi's bank. However, for all of the cash and restricted cash balances held in the personal accounts of the Cashier and Chairman, Respondents failed to consider management's rationale of having Company funds held in the personal bank accounts of the Cashier and Chairman, and whether the stated business rationale (or lack thereof) suggested that the transaction may have been entered into to engage in fraudulent financial reporting or conceal the misappropriation of assets.[24]

26.　At no time during the Kandi 2010 Audit did Respondents consider whether the cash amounts reported as restricted and held in the Chairman's personal accounts represented personal loans from Kandi that might constitute illegal acts, or for which disclosure would have been required as related party transactions. As a result,

The PCAOB report referred to Kandi's responses as "evasive" [Pg. 12 (https://pcaobus.org/Enforcement/Decisions/Documents/105-2016-016-AWC-CPA.pdf)] and repeatedly called into question the reliability of its representations and integrity. [Pgs. 8-9, 13 (https://pcaobus.org/Enforcement/Decisions/Documents/105-2016-016-AWC-CPA.pdf)]

## The PCAOB Report Went into Further Detail About Obvious Undisclosed Related Party Transactions At Kandi, Including Those Relating to Kandi USA

The report also suggested that **management made adjustments to disguise recognition of related party revenue**:

> "**Respondents failed to assess the risk of fraud related to these last-minute adjustments** to reflect the Kandi USA revenue as being from Dingji, **including whether these adjustments were motivated by management's desire to conceal Kandi's transactions with Kandi USA in order to avoid related party disclosures.**"
> [Pgs. 12-13 (https://pcaobus.org/Enforcement/Decisions/Documents/105-2016-016-AWC-CPA.pdf)]

Note that elsewhere in this report, we have detailed specific and obvious signs that Kandi is still engaging in extensive undisclosed-related party transactions through its U.S. operations.

Case 1:20-cv-08082-DEH Document 33-1 Filed 12/23/20 Page 46 of 105

Despite the PCAOB barring AWC and its principals from auditing public companies for failing to identify clear signs of fraud at Kandi, domestic regulators have not brought any enforcement action against Kandi.

## 2016: The Chinese Government Announced That Kandi Had Been Involved in a Scheme Through its Joint Venture to Obtain Illegitimate EV Subsidies Through the Use of Sham Sales to Related Parties

In 2013, the Chinese government announced (https://www.bbc.com/news/business-24140329) large subsidies to producers of electric vehicles. That same year, Kandi and Chinese EV manufacturer Geely established a joint venture (https://www.globenewswire.com/news-release/2013/02/04/520617/10020414/en/Kandi-Technologies-Forms-Joint-Venture-With-Geely-Auto-to-Create-a-New-Era-of-EV-in-China.html) to produce electric vehicles.

According to Chinese media (https://www.shangyexinzhi.com/article/1616661.html), the joint venture generated subsidies through a scheme involving buying and selling to/from related parties.

The gist of the scheme was as follows: China provided subsidies to both to producers and purchasers of electric vehicles. Kandi gained one subsidy through its manufacturing joint venture with Geely, then sold the cars to a related party entity that purported to be in the rental/car sharing business (http://news.bitauto.com/hao/wenzhang/20608), collecting the other.

The scheme worked because Kandi's cars were so cheap. The cost to build the vehicles was actually less than the subsidies, so Kandi just needed to build as many cheap cars as possible to cash in on the government money.

In 2016-2017, media reported (https://chejiahao.autohome.com.cn/info/1587848) on the results (http://www.diyiev.com/news/show-2967.html) of a Chinese government investigation which found that Kandi and its JV partner (among others) had thousands of idled vehicles and was involved in fraudulently obtaining state subsidies.

As a result, Kandi's JV partner was fined and Kandi was forced to write off $3.3 million in subsidies. (https://www.globenewswire.com/news-release/2016/12/20/899187/0/en/The-Final-Results-of-Government-Subsidy-Review-Related-to-Kandi-s-JV-Company-Released.html)

In 2019, media stumbled across a car lot (https://www.autochat.com.cn/zixun/a-1299.html) where thousands of Kandi cars were apparently sitting unused and had been deteriorating for years, believed to be part of the same scheme.



(Pictured: A car cemetery filled with thousands of unused Kandi vehicles. Source (https://www.autochat.com.cn/zixun/a-1299.html))

## 2017: Kandi Restated Its Financials to Account for Previously Undisclosed Related-Party Deals and Promised to Mend its Ways

On March 7, 2017, the company acknowledged in an SEC filing (https://www.sec.gov/Archives/edgar/data/1316517/000106299317001342/form8k.htm) that in response to questions from the SEC's Division of Corporate Finance, it needed to restate its historical financials to "separately identify certain related party accounts" and make "corrections to the classification of notes receivable and notes payable in the Company's statements of cash flow".

Case 1:20-cv-08082-DEH   Document 33-1   Filed 12/23/20   Page 48 of 105

The filing stated that investors should not rely on its financial reporting "or any earnings releases or other communications" from 2014-2016.

The same filing disclosed that Kandi's accounting may have material weaknesses and that the PCAOB revoked the registration of its prior auditor due to deficiencies.

# Part II: We Think Most of Kandi's Sales Are Fabricated

Kandi was not charged by regulators for any undisclosed self-dealing, despite extensive historical evidence suggesting a pervasive pattern.

Part of the issue, we think, is that U.S. regulators have limited access (https://www.wsj.com/articles/house-to-vote-on-booting-chinese-stocks-from-u-s-over-audit-rules-11606518590?reflink=e2twmkts) to audit and regulatory information from China, leaving them hamstrung in their overseas enforcement efforts.

In 2017, the company promised to do better going forward, but given the lack of regulatory oversight and consequences: *why would it?*

## Background: Kandi's Top "Customer" From 2014-2017, Representing 63%-97% of its Sales, Was its Joint Venture Partner

## But Following the Subsidy Scandal, Sales to the JV Partner Evaporated

Since 2014, Kandi's reported EV sales had been driven by its joint venture with domestic auto manufacturer Geely.[2] [Pg. 11 (https://www.sec.gov/Archives/edgar/data/1316517/000106299317001411/form10k.htm)] But Kandi's sales to its JV partner declined sharply by the end of 2018 following revelations of a Chinese subsidy scandal and subsequent subsidy policy adjustments (https://seekingalpha.com/article/4197919-kandi-technologies-kndi-ceo-hu-xiaoming-on-q2-2018-results-earnings-call-transcript).

Case 1:20-cv-08082-DEH   Document 33-1   Filed 12/23/20   Page 49 of 105

Through its overgenerous subsidies, the Chinese government inadvertently acted as a dedicated "buyer" of Kandi's cars (many of which ended up just rusting in a parking lot, as shown above). Without the subsidy scheme run through its joint venture entity, Kandi needed legitimate buyers for its products.

In Q1 2019, Kandi acknowledged on its quarterly investor call (https://seekingalpha.com/article/4263070-kandi-technologies-group-inc-kndi-ceo-xiaoming-hu-on-q1-2019-results-earnings-call-transcript) that it didn't sell any EV products due to a "transitional period". Kandi's financials show that its proportion of sales to its joint venture rapidly declined and have essentially vanished in 2020.



(Source: SEC filings)

This is corroborated by Chinese media sources, which reported that the company sold zero vehicles domestically in 2019 and early 2020. [1 (https://new.qq.com/omn/20200412/20200412A04CWG00.html),2 (https://www.yicai.com/news/100587986.html),3 (https://www.sohu.com/a/368093130_99984129)]

Kandi's joint venture with Geely was originally 50/50, but Geely bought most of Kandi's stake (https://www.globenewswire.com/news-release/2019/09/30/1922500/0/en/Kandi-Technologies-Announces-the-Completion-of-the-Equity-Transfer-of-the-JV-Company.html) in 2019, leaving Kandi with 22%. The entity is now focused (https://www.globenewswire.com/news-release/2020/04/13/2015102/0/en/Geely-Kandi-Affiliate-Fengsheng-Automotive-Introduces-Pure-Electric-SUV-Maple-30X.html) on manufacturing (https://www.globenewswire.com/news-

Case 1:20-cv-08082-DEH  Document 33-1  Filed 12/23/20  Page 50 of 105

release/2020/07/13/2061232/0/en/Kandi-Affiliate-Fengsheng-Automotive-Announces-Release-of-Maple-30X-City-SUV.html) an electric SUV called the Maple 30X. Given Kandi's lack of reported revenues from the affiliate, it is unclear what current role, if any, Kandi plays in its manufacturing.

## Despite the Virtual Elimination of Kandi's Major Customer, Kandi's Revenue Somehow Remained Stable… With the Help of Two Unnamed Mystery Customers

Usually sales *drop* when a firm suddenly loses its business from a customer comprising 63%-97% of sales.

Incredibly, that has not been the case with Kandi. Its sales actually rose slightly following the 2018 decline of its top customer, then leveled off.



(Source: SEC filings)

## Kandi Redacts the Names of its New Top "Customers" Which Have Accounted for Almost 64% of Last Twelve Months (LTM) Sales

Two unnamed customers have played a big role in plugging up the sales "hole" left behind by the decline of Kandi's JV. Kandi redacts the name of these key customers on its financials, referring to them as "Customer A" and "Customer B".

12/17/2020    Kandi: How This China-Based NASDAQ-Listed Company Used Fake Sales, EVs to Nab $160 Million From U.S. Investors – Hinden…

Case 1:20-cv-08082-DEH Document 33-1  Filed 12/23/20   Page 51 of 105



(Source: Kandi's SEC filings)

# We Have Identified the Names of Kandi's Top Customers

Prior to September 2019, Kandi disclosed the names of its top customers. Here is an example from June 2019 (https://www.sec.gov/Archives/edgar/data/1316517/000121390019015054/f10q0619_kanditech nologies.htm):

| Major Customers | June 30, 2019 | June 30, 2018 |
|---|---|---|
| Jinhua Chaoneng Automobile Sales Co. Ltd. | 36% | 36% |
| Zhejiang Kuke Sports Technology Co., Ltd. | 27% | 4% |
| Kandi Electric Vehicles Group Co., Ltd. and its subsidiaries | 17% | 29%[1] |

As of September 2019, the company began redacting the names of its top customers, except for the name of its related party joint venture partner:

| Major Customers | September 30, 2019 | September 30, 2018 | S |
|---|---|---|---|
| Customer A | 30% | 24% | |
| Customer B | 30% | 4% | |
| Kandi Electric Vehicles Group Co., Ltd. and its subsidiaries (related party) | 15% | 61% | |
| Customer D | 10% | - | |

The remaining customers, according to Kandi's disclosures, are sales to unrelated party customers.

We were able to identify Kandi's top customers by connecting the dots between the percentage of sales associated with each customer in the prior periods when the names were unredacted.

For example, customer concentration disclosures from June 2020 referenced the customer concentration numbers from the prior year (when the names were unredacted). [Pg. 10 (https://www.sec.gov/ix?doc=/Archives/edgar/data/1316517/000121390020021018/f10q0620_kanditech.htm), Pg. 17 (https://www.sec.gov/Archives/edgar/data/1316517/000121390019015054/f10q0619_kanditechnologies.htm)]



Once unmasked, we examined the customer relationships more closely and found alarmingly close ties to Kandi.

## Kandi's New Top Customer, Accounting for 55% of LTM Sales, Shares a Phone Number with a Kandi Subsidiary

According to Chinese corporate records available through corporate records service QCC (https://www.qcc.com/firm/38GY9SF.shtml), key customer Jinhua Chaoneng Automobile Sales (金华市超能汽车销售有限公司 (https://www.qcc.com/firm/38GY9SF.shtml)) shares its phone number with a 100% Kandi-owned subsidiary.

Here is Jinhua's corporate record, with its phone number highlighted, including an indication that it shares the number with three other entities:

Case 1:20-cv-08082-DEH   Document 33-1   Filed 12/23/20   Page 53 of 105



The second name on the list of shared numbers is Zhejiang Kangdi Intelligent Power Exchange Technology Co., Ltd. (浙江康迪智能换电科技有限公司), which is 100% owned by Kandi (https://www.globenewswire.com/news-release/2020/08/03/2071749/0/en/Kandi-Delivers-Automatic-Quick-Battery-Exchange-Equipment-to-Hainan-Rideshare-Operator.html).



We called the number to see which (if any) company the phone number belonged to. This was the conversation (which we recorded):

**HER**: Hello

**US**: Hello. Are you Jinhua Chaoneng?

**HER**: No

**US**: What company are you?

**HER**: Who are you?

**US**: I'm looking for Jinhua Chaoneng and had this number

**HER:** They moved away many years ago

12/17/2020    Kandi: How This China-Based NASDAQ-Listed Company Used Fake Sales, EVs, & Phantom $160 million From US Investors – Hinden…

Case 1:20-cv-08082-DEH- Document 33-1  Filed 12/23/20   Page 54 of 105

**US**: Oh, then are you Kandi?

**HER**: Who are you?

**US**: I'm looking for these companies.  I want to check if this phone number belongs to Chaoneng or Kandi or who?

*(HANGS UP)*

# We Visited the Address of the Customer and Found Them Based in a Small Building <u>Adjacent to a Kandi Factory</u>

# The "Customer" Had Kandi's Name in Its Signage, Indicating That it is Part of Kandi

The addresses of the 2 companies are also almost identical, per the same corporate records. Both are based at plots "G-01-03 and G-02-01" in an industrial park in Jinhua City, per QCC records.

First, we viewed the customer address <u>using Baidu maps (https://map.baidu.com/search/%E5%BA%B7%E8%BF%AA/@13317693.41,3362357.14,21z,87t,1 54.89h#panoid=09024400121709061649562977M&panotype=street&heading=161.92&pitch=- 13.65&l=21&tn=B_NORMAL_MAP&sc=0&newmap=1&shareurl=1&pid=09024400121709061649 562977M)</u>.  It shows a Kandi factory:



(Source: Baidu Maps)

Case 1:20-cv-08082-DEH　Document 33-1　Filed 12/23/20　Page 55 of 105

Then, we sent an investigator to the industrial park several months ago in order to confirm ourselves:



(Source: Hindenburg investigator, Summer 2020)

We asked the security guard working the Kandi gate about Chaoneng (the customer) and he had never heard of them.

However, we found a small building adjacent to the factory with a sign that named the purported customer as "Jinhua **Kandi Electric Vehicle** Chaoneng".

Case 1:20-cv-08082-DEH Document 33-1 Filed 12/23/20 Page 56 of 105



(Source: Hindenburg investigator, Summer 2020)

## The "Customer" Address Matched the Address of the Key Undisclosed Related Party Entity Involved Kandi's Earlier Fake Sales/Subsidy Scheme

As noted above, the Chinese government had previously sanctioned Kandi and its JV partner over a scheme to collect illegitimate government subsidy payments through fake EV sales.

The entity used to generate the fake sales in that scheme was named "Left Middle Right, Co. Ltd (https://www.shangyexinzhi.com/article/1616661.html)" (浙江左中右电动汽车服务有限公司), and is based out of the exact same small building as Kandi's new top "customer".



(Source: Hindenburg investigator, Summer 2020)

Here is an overhead view of the Kandi factory and its purported customer/subsidy scheme entities.



Kandi appears to simply be recycling its old fake sales playbook (except this time the target is U.S. investors rather than the Chinese government.)

## Kandi's New Top Customer Shared an Executive with Kandi, Further Evidencing Close Ties Between the Two Companies

Further evidencing a long connection, a 2010 <u>article</u> <u>(http://zjnews.zjol.com.cn/05zjnews/system/2010/11/02/017056090.shtml)</u> detailed how an individual named Hu Yiheng, a Kandi employee, held a senior position at Kandi acting as "办主任" or "Office Director".

Hu YiHeng[3] is the name of Chaoneng's legal representative since June 17, 2013 and is also a 30% shareholder of Chaoneng, per <u>corporate records through QCC.com:</u> <u>(https://www.qcc.com/firm/05e1e24abc3997ef95ca45f7f31a4ae5.html)</u>



In short, Kandi's largest "customer" is (a) based at a Kandi factory; (b) shares a phone number with a Kandi subsidiary; (c) integrates Kandi into its own signage; (d) is based in the same building as another entity involved in a fake sale scheme for Kandi; and (e) shares or shared a key executive with Kandi.

We do not think sales to this entity are legitimate.

## Kandi's Second Largest Customer, Named "Kuke", Accounts for 9% of LTM Sales. It Was Previously Wholly Owned by Kandi And Still Has an Unusually Tight Relationship

Kandi's 2nd largest customer is Zhejiang Kuke Sports Technology Co., Ltd. (<u>浙江酷客运动科技有限公司 (https://www.qcc.com/firm/77WSN24.shtml)</u>) ("Kuke"). The customer accounted for 11% of last quarter's sales and 9% of Kandi's LTM sales.

In an obvious link between the two entities, we found that Kandi *previously owned* Kuke up until 2008, right around the time of Kandi's IPO, when it was sold to 2 private individuals.



In fact, corporate records on <u>QCC.com (https://www.qcc.com/firm/77WSN24.shtml)</u> **still refer to the company as being a part of Kandi**:

12/17/2020
Kandi: How This China-Based NASDAQ-Listed Company Used Fake Sales, EV Hype To Rob $160 Million From U.S. Investors – Hinden…

Case 1:20-cv-08082-DEH Document 33-1 Filed 12/23/20 Page 59 of 105



Kuke's website (https://www.kukesport.com/en/aboutus.html) still shows close ties to Kandi. The homepage features a large image of Kandi's factory, and the company's logo integrates Kandi with its corporate name. The site also features the brand name "Jasscol", which is a registered trademark *owned by Kandi*. [Pg. 5 (https://www.sec.gov/Archives/edgar/data/1316517/000121390020010244/f10k2019_kanditech nologies.htm)]

Case 1:20-cv-08082-DEH　Document 33-1　Filed 12/23/20　Page 60 of 105



(Source: Kukesport.com (https://www.kukesport.com/), accessed 11/25/2020)

## Export Records Show ~91% Of Kuke's U.S. Exports Have Gone to Three Entities Based Out of Kandi America's Addresses

## In Other Words, Kuke is "Buying" From Kandi Then Selling Right Back to Obvious Undisclosed Related Parties of Kandi

Kuke's website (https://www.kukesport.com/en/aboutus.html) indicates that exports to North America comprise the vast majority of its business.

Case 1:20-cv-08082-DEH   Document 33-1   Filed 12/23/20   Page 61 of 105



# ABOUT US

| Company Name: | Business Type: |
|---|---|
| ZHEJIANG KUKE SPORTS TECHNOLOGY CO., LTD | Manufacturer |

| Year Established: | Total Employees: |
|---|---|
| 2001 | 51-100 |

| Total Annual Revenue: | Export Percentage: |
|---|---|
| 5 million US dollars- 10 million USD | 71% - 80% |

Major markets and proportions:

North America 70% , South America 5% , Eastern Europe 1% , Southeast Asia 4% , Africa 1% , Oceania 1% , Mid East 2% , Eastern Asia 4% , Western Europe 1% , Central America 5% , Northern Europe 1% , Southern Europe 1% , South Asia 1% , Domestic Market 3%

(https://www.kukesport.com/en/aboutus.html)

(Source: KukeSport About Us Web Page)

We reviewed export records through data aggregator Import Genius. Using the earliest records available, dating back to October 2017, we found that over 90.9% of Kuke's exports to the U.S. by weight went to three entities:

(1) Massimo Motor Sports LLC

(2) Lil Pick Up Inc.; and

(3) Jass Motorsports Inc.

Here is a sample of the records, showing Kuke shipping to Massimo, Lil Pick Up, and Jass:

Case 1:20-cv-08082-DEH Document 33-1 Filed 12/23/20 Page 62 of 105

| PRODUCT DESCRIPTION | CONSIGNEE | SHIPPER | ARRIVAL DATE | WEIGHT (LB) |
|---|---|---|---|---|
| GO KART | JASS MOTORSPORTS INC. | ZHEJIANG KUKE SPORTS | 02/15/2018 | 22176 |
| GO KART | JASS MOTORSPORTS INC. | ZHEJIANG KUKE SPORTS | 02/15/2018 | 22968 |
| GO KART | JASS MOTORSPORTS INC. | ZHEJIANG KUKE SPORTS | 02/11/2018 | 22968 |
| ATV ATV | LIL PICK UP, INC. | ZHEJIANG KUKE SPORTS | 04/04/2019 | 44814 |
| ATV | LIL PICK UP, INC. | ZHEJIANG KUKE SPORTS | 03/18/2019 | 25894 |
| ATV ATV | LIL PICK UP, INC. | ZHEJIANG KUKE SPORTS | 03/13/2019 | 43725 |
| LOW SPEED VEHICLE L | MASSIMO MOTOR SPORTS | ZHEJIANG KUKE SPORTS | 11/23/2020 | 69498 |
| LOW SPEED VEHICLE L | MASSIMO MOTOR SPORTS | ZHEJIANG KUKE SPORTS | 11/23/2020 | 46332 |
| LOW SPEED VEHICLE L | MASSIMO MOTOR SPORTS | ZHEJIANG KUKE SPORTS | 11/23/2020 | 69498 |
| LOW SPEED VEHICLE E | MASSIMO MOTOR SPORTS | ZHEJIANG KUKE SPORTS | 11/17/2020 | 71229 |
| LOW SPEED VEHICLE L | MASSIMO MOTOR SPORTS | ZHEJIANG KUKE SPORTS | 11/17/2020 | 70022 |
| LOW SPEED VEHICLE L | MASSIMO MOTOR SPORTS | ZHEJIANG KUKE SPORTS | 11/17/2020 | 69498 |
| LOW SPEED VEHICLE E | MASSIMO MOTOR SPORTS | ZHEJIANG KUKE SPORTS | 11/17/2020 | 23925 |
| LOW SPEED VEHICLE L | MASSIMO MOTOR SPORTS | ZHEJIANG KUKE SPORTS | 11/10/2020 | 49104 |

(Source: ImportGenius export records)

As we will show momentarily, state corporate records and litigation documents reveal that Massimo, Jass and Lil Pick Up are based out of addresses associated with Kandi America, making them clear related parties.



## 30% of Kuke's Historical Exports Were to Massimo Motor Sports LLC, An Entity <u>Based Out of Kandi America's Headquarters</u> and Owned by the Founder and Manager of Kandi America

Massimo Motor Sports is based out of Kandi's U.S. headquarters in Texas and is owned by David (Jianxun) Shan, a founder (https://www.dirttoysmag.com/2018/06/sportsman-country-enters-deal-with) and current manager (https://www2.slideshare.net/secret/8WpZ0JpoQbTFeO) of Kandi's U.S. subsidiary.

Here are Massimo's corporate records showing the address matching Kandi's U.S. headquarters:



(Source: Texas Corporate Records (https://www2.slideshare.net/secret/uexdmeSdQAHViG) and Kandi America website (https://www.kandiamerica.com/Contact-Us/))

# After Buying Kandi Product's Through Kandi's "Customer", Massimo Motor Sports Then Sells Products Right Back to Kandi.

# Massimo, An Undisclosed Related-Party Entity of Kandi America, Is Therefore Both a Top Customer and a Top Supplier Of/To Kandi.

# We View This as a Brazen, Clear Circular Sales (i.e. Fake Revenue) Scheme

12/17/2020   Kandi: How This China-Based NASDAQ-Listed Company Used Fake Sales, EV Hype to Rob $160 Million from US Investors – Hinden…

Case 1:20-cv-08082-DEH   Document 33-1   Filed 12/23/20   Page 64 of 105

Once Massimo receives product from Kandi's key "customer" Kuke, who does it sell its products to? Evidence shows that one of Massimo's key customers… is Kandi.

Kandi began redacting the names of its suppliers in late 2019. Using the same trick we used to unredact its customer names, we see that Massimo has been Kandi's "Supplier C", representing 25% of Kandi's purchases in the first six months of 2020, and 15% in the same 2019 period.



To recap, Kandi sells to top "customer" Kuke à which then exports to Massimo (based out of Kandi's U.S. headquarters) à then Massimo sells products right back to Kandi.

## 52% of Kuke's Historical Exports Were to Jass Motorsports Inc., An Entity That Shared an Executive With Kandi and Was Based Out of the Exact Same Address As a Branch of Kandi USA

Moving right along, Kandi's "customer" Kuke also exports to an entity called Jass Motorsports.

Jass Motorsports' incorporation documents list a Rancho Cucamonga, California address that matches the address previously listed (https://opencorporates.com/companies/us_in/2011060100233) for a branch of Kandi USA. Both entities shared an executive officer as well.

Case 1:20-cv-08082-DEH Document 33-1 Filed 12/23/20 Page 65 of 105



(Pictured: Jass Motorsports and Kandi USA Corporate records via California Corporate Records (https://www2.slideshare.net/secret/6u476eP8ikahOy) and OpenCorporates (https://opencorporates.com/companies/us_in/2011060100233))

# 9% of Kuke's Historical Exports Went to Lil Pick Up, Inc., An Entity That Also Leases Warehouse Space at Kandi America's Headquarters

## We Have Photographic Evidence Showing Lil Pick Up Inventory Sitting in Kandi America's Warehouse, Covered with a Tarp

Export records show that Kuke also regularly exports to Lil Pick Up (https://opencorporates.com/companies/us_ca/C3132042), a company run by Renfeng Wang, who appears to share a business relationship with Kandi America Founder & Manager David Shan. [1 (https://www.qcc.com/firm/22fc59b71e51386b6defce9e6b38894a.html),2 (https://opencorporates.com/companies/us_tx/0803661900),3 (https://opencorporates.com/companies/us_ca/C2844132)]

Recent litigation records revealed that Lil Pick Up, LLC rents space at 3101 West Miller Road in Garland Texas, the headquarters for Kandi America. [Pg. 8 (https://www2.slideshare.net/secret/4WHs4tzM8pSlEY)]

The records even include a picture of Lil Pick Up inventory sitting in the warehouse covered with a tarp, dated from July of this year.

Case 1:20-cv-08082-DEH  Document 33-1  Filed 12/23/20  Page 66 of 105



(Pictured: Inventory owned by Lil Pick Up Inc., a supposed Kandi customer, covered in a tarp at Kandi's U.S. headquarters, dated July 17, 2020, per litigation records [Pg. 9 (https://www2.slideshare.net/secret/4WHs4tzM8pSlEY)])

## Kandi Has Consistently Booked Revenue That it Can't Collect, A Classic Sign of Fake Revenue.

## Kandi Had 278 Days of Sales Outstanding—5.6x Higher Than its Closest Competitor.

Kandi's financial statements support our findings.

When most companies sell a product, they eventually collect the revenue and convert it into cash. This is especially true in the auto industry where cars are usually financed or paid for on the spot, before they are driven off the lots at dealerships.

Kandi seems to sell plenty of product, but then appears to have an incredibly difficult time collecting and converting it into cash.

The key measure of revenue collection is days sales outstanding ("DSO"), which measures the average days it takes to convert accounts receivable into cash. Kandi's DSO in the previous June quarter was 278 days, 5.6x its closest auto manufacturing competitor, making it an outrageous outlier.



(Source: Author calculations based on SEC filings)

The company has attempted to justify its revenue collection failure by stating that its credit terms are "typically 180 to 360 days after delivery." [Pg. 27 (https://www.sec.gov/Archives/edgar/data/1316517/000121390020010244/f10k2019_kanditech nologies.htm#a_002)] This doesn't add up—very few industries allow customers to pay a year after they've received a product, and as seen above, automobiles clearly aren't one of them.

In Kandi's most recent September quarter, its trade receivables balance declined, but a new category of unusual receivable that has ballooned in its place. Kandi recorded a ~$51 million "loan to third party" as an "other receivable" in the most recent quarter, up from $13.7 million in the prior quarter.

This mystery loan did not seem to exist a year ago.

Case 1:20-cv-08082-DEH   Document 33-1   Filed 12/23/20   Page 68 of 105



(Source: Kandi's SEC filings)

Most businesses generating $106 million in LTM revenue don't suddenly loan $51 million to unnamed third parties without explanation. Once again, these major balance sheet irregularities are hallmarks of fake revenue. When factoring in the new mystery receivable, Kandi's DSO in its most recent quarter is a whopping 429 days.

# Kandi's Payables Are Similarly Outrageously High at 338 Days Outstanding—1.8x Its Closest Competitor.

# Are Suppliers Awarding Kandi the Most Generous Payment Terms in the Industry—Or Are Circular Sales Resulting in Fake Payables Along with Fake Receivables?

Typically, large, established market participants can demand better terms for amounts owed to suppliers due to their size and financial strength. Kandi is a fraction of the size of its larger auto peers and is generally a cash burning enterprise.

Despite this, Kandi's financials indicate that its payment terms with suppliers are the most generous in the industry. Its Days Payables Outstanding ("DPO") in the prior June quarter was 338 days, almost a full year.

That is 1.8x its closest auto manufacturing competitor, again making Kandi a clear outlier within its industry.



(Source: Author calculations based on SEC filings)

Why might this be the case? Another hallmark of fake revenue is when companies have large unexplained payables alongside large unexplained receivables.

Companies engaging in circular sales schemes may sell and later repurchase its own product, such as appears to be the case with Kandi and its relationship with Massimo, which we have shown above to be both an undisclosed related-party customer AND supplier of Kandi's products.

The result of all this is the generation of fake revenue, fake earnings, and fake receivables/payables from/to the undisclosed related entities.

Some readers might be wondering—isn't this all the sort of thing auditors are supposed to catch?

## Kandi Has Had 3 Auditors in the Past 5 Years and Has Regularly Reported Weaknesses in Its Financial Controls

Frequent changes with a company's auditor are another red flag for accounting issues.

Case 1:20-cv-08082-DEH   Document 33-1   Filed 12/23/20   Page 70 of 105

Kandi has taken this red flag to another level. As described above, Kandi's long-serving (https://www.sec.gov/Archives/edgar/data/1316517/000114420410017502/v179305_10k.htm) auditor Albert Wong & Co. was ejected from the industry following its well documented failures to catch clear signs of fraud at Kandi. The firm was dismissed (https://www.sec.gov/Archives/edgar/data/1316517/000106299316008902/form8k.htm) as Kandi's auditor in April 2016 and was replaced by BDO.

**2016**: In BDO's first year as Kandi's auditor, it identified 5 *entire categories* of material accounting weaknesses. These included material weaknesses in its disclosure of related party transactions. [Pg. 45 (https://www.sec.gov/Archives/edgar/data/1316517/000106299317001411/form10k.htm)]

**2017**: Kandi reported that it had instituted a plan to "remediate" the material weaknesses in its internal controls over financial reporting. [Pg. F-3 (https://www.sec.gov/Archives/edgar/data/1316517/000121390018003097/f10k2017_kanditechnologies.htm)] BDO's audit opinion for the year said that the weaknesses had "not yet been fully remediated" as of the end of 2017. [Pg. F-3 (https://www.sec.gov/Archives/edgar/data/1316517/000121390018003097/f10k2017_kanditechnologies.htm)]

**2018**: BDO issued a clean audit opinion, [Pg. F-3 (https://www.sec.gov/Archives/edgar/data/1316517/000121390019004189/f10k2018_kanditechnologies.htm)] but then was subsequently replaced in October 2019 (https://www.sec.gov/Archives/edgar/data/1316517/000121390019020170/f8k100719_kanditechnologies.htm) after BDO and the company "mutually elected not to continue the engagement". BDO was replaced with Marcum Bernstein & Pinchuk, marking Kandi's 3rd auditor in under 5 years.

So, how are things going with Marcum so far?

## Two Months Ago, Kandi's Current Auditor Marcum Was Handed a 3 Year Ban From Auditing Chinese Companies by the Public Company Accounting Oversight Board Due To Violating Audit Standards

Kandi's current choice of auditor comes as no surprise. Marcum had already been disciplined and sanctioned by the PCAOB (https://pcaobus.org/News/Releases/Pages/PCAOB-Sanctions-Two-Firms-and-One-Individual-for-Auditor-Independence-Violations.aspx) in 2019 violating rules on independence:

# PCAOB Sanctions Two Firms and One Individual for Auditor Independence Violations

Washington, Sep. 10, 2019

The Public Company Accounting Oversight Board today announced the settlement of disciplinary proceedings against **Marcum LLP** 📄 and **Marcum Bernstein & Pinchuk LLP** 📄, as well as **Alfonse Gregory Giugliano, CPA** 📄. This is the first time the Board has: (1) sanctioned a registered public accounting firm for publicly advocating its audit clients as investment opportunities—a violation of auditor independence requirements; (2) sanctioned an annually inspected firm's head of independence for substantially contributing to the firm's independence violations; and (3) mandated the retention of an independent consultant.

The 2019 order (https://pcaobus.org/Enforcement/Decisions/Documents/105-2019-023%20-%20MBP.pdf) sanctioned Marcum in connection with its "China Best Ideas Investment Conference", where it "endeavored to create a perception that the China Conference was an event featuring companies—some of which were Marcum issuer audit clients—that were high-quality investment opportunities".

In September 2020, Marcum was handed a three year ban (https://news.bloomberglaw.com/securities-law/marcum-gets-three-year-ban-on-auditing-chinese-companies) on auditing Chinese companies as a result of (https://www.accountingtoday.com/news/pcaob-sanctions-marcum-from-doing-china-audits#:~:text=The%20Public%20Company%20Accounting%20Oversight,in%20China%20for%20three%20years.) violating PCAOB rules and auditing standards.

## MARCUM LLP

# PCAOB prohibits Marcum from doing China audits

By Michael Cohn　　October 02, 2020, 4:10 p.m. EDT　　3 Min Read

The Public Company Accounting Oversight Board has imposed a $250,000 penalty on Marcum LLP and its Marcum Bernstein Pinchuk unit over audits of Chinese companies and prohibited the firm from auditing clients in China for three years.

Upon seeing this news, a reputable company would have likely fired Marcum immediately so as to disassociate from its soiled reputation. But on November 17th, six weeks after the PCAOB prohibition announcement, Kandi filed proxy documents (https://www.sec.gov/Archives/edgar/data/1316517/000121390020037778/ea130076-def14a_kanditechno.htm) seeking to reappoint Marcum as its auditor for the year.

## It Hasn't Just Been Auditors That Have Been A Revolving Door: Kandi Has Had 4 CFOs Over the Past 4 Years, Another Major Red Flag

Kandi's Chairman/CEO has maintained his position since inception, but the company's top accounting rank has seen extensive turnover.

**2016**: In November (https://www.sec.gov/Archives/edgar/data/1316517/000106299316012420/form8k.htm), Kandi's CFO Wang Chen resigned and was replaced with Mei Bing.

**2019**: In January (https://www.sec.gov/Archives/edgar/data/1316517/000121390019001569/f8k012919_kanditechnologies.htm), Mei Bing resigned as CFO for "personal reasons" and was replaced with interim CFO Zhu Xiaoying.

**2020**: In May (https://www.globenewswire.com/news-release/2020/05/21/2037077/0/en/Kandi-Technologies-Appoints-New-Chief-Financial-Offer.html), Kandi appointed Jehn Ming (Alan) Lim as CFO, who is currently serving in the role, after Zhu Xiaoying was said to have "completed her responsibilities" as interim CFO.

## Kandi's New CFO: Prior Work History Included Working at (i) An Accounting Firm Ejected by the PCAOB and (ii) an Affiliate of Kandi's Current Auditor

Of the two recent firms Kandi's newly-appointed CFO worked at, one had its registration revoked by the PCAOB and the other is affiliated with Kandi's auditor.

According to his biography in SEC filings (https://www.sec.gov/Archives/edgar/data/1316517/000121390020013193/ea122229-8k_kanditechno.htm), Kandi's CFO worked at accounting firm Stonefield Josephson from 2006

to 2008. The firm later merged with Marcum (https://www.prnewswire.com/news-releases/marcum-llp-merges-with-california-based-stonefield-josephson-inc-104264698.html), Kandi's new auditor through its Chinese joint venture (https://www.marcumbp.com/firm).

Lim later served at Kabani & Company from 2008 to 2012, per his biography in SEC filings (https://www.sec.gov/Archives/edgar/data/1316517/000121390020013193/ea122229-8k_kanditechno.htm). (He left this out of his LinkedIn profile (https://www.linkedin.com/in/jehn-ming-lim-7b735b9/) for understandable reasons.)

Kabani had its registration revoked (https://pcaobus.org/Enforcement/Adjudicated/Documents/Kabani-SEC-34-80201.pdf) after PCAOB inspectors found (https://pcaobus.org/Enforcement/Adjudicated/Documents/105-2012-002-Kabani.pdf) a "wide-spread and resource-intensive effort" to alter documents in audit files in order to pass inspection in 2008:



1666 K Street, N.W.
Washington, DC 20006
Telephone: (202) 207-9100
Facsimile: (202) 862-8435
www.pcaobus.org

**PUBLIC COMPANY ACCOUNTING OVERSIGHT BOARD**

In the Matter of Kabani & Co., Inc.,
Hamid Kabani, CPA,
Michael Deutchman, CPA,
and Karim Khan Muhammad, CPA,

Respondents

) 
) 
) 
) 
) 
) 
) 
) 
) 
) 
) 
) 
) 
)

PCAOB File No. 105-2012-002

**ORDER SUMMARILY AFFIRMING FINDINGS OF CERTAIN VIOLATIONS AND IMPOSITION OF SANCTIONS FOR THOSE VIOLATIONS**

January 22, 2015

I.　Introduction

On April 22, 2014, the hearing officer issued an amended initial decision in this disciplinary proceeding, finding that the registered public accounting firm Kabani & Co., Inc., and three associated persons of the firm, Hamid Kabani, Michael Deutchman, and Karim Khan Muhammad, participated in a "wide-spread and resource-intensive effort" over several weeks in 2008 to alter documents in the audit files of three issuers in an attempt "to deceive PCAOB inspectors in an upcoming inspection about the deficiencies in the Firm's audit work papers." The decision found that Kabani's and Deutchman's misconduct was "intentional and knowing," and Khan's was "knowing, intentional, or at least reckless." The decision concluded that respondents thereby violated PCAOB Rule

# Part III: Kandi Has Been "Launching" in the U.S. for 12 Years. We Expect its Efforts Will Continue to Sputter

Investors of late have been drawn to Kandi's much-touted "U.S. launch". The pitch by Kandi is that it aims to provide a low-cost electric vehicle that is attractive to value-oriented U.S. consumers.

Typically, companies expand to new markets after they have developed a strong presence in their domestic markets. Not the case with Kandi. The company operates in China, the largest EV market (http://www.ev-volumes.com/country/total-world-plug-in-vehicle-volumes/) in the world, yet Kandi has reported a grand total of zero domestic Chinese EV automobile sales since the end of 2018. [Pg. 24 (https://www.sec.gov/ix?doc=/Archives/edgar/data/1316517/000121390020035705/f10q0920_kanditech.htm), Pg. 32 (https://www.sec.gov/ix?doc=/Archives/edgar/data/1316517/000121390020021018/f10q0620_kanditech.htm), Pg. 28 (https://www.sec.gov/Archives/edgar/data/1316517/000121390020014173/f10q0320_kanditechnologies.htm), Pg. 22 (https://www.sec.gov/Archives/edgar/data/1316517/000121390020010244/f10k2019_kanditechnologies.htm)]

We spoke with several former employees of Kandi America to learn what is going on. We were told that the latest "launch" is nothing new. For years, the company has failed to deliver the number of cars and failed to sign up the number of dealerships necessary to succeed. Several referred to Kandi's U.S. efforts as "smoke and mirrors" and openly speculated that it could be a strategy to lift its stock price.

## Kandi "Launched" in the U.S. in 2008. Its First Batch of Cars Were Seized by U.S. Customs After Being Imported Illegally. The Launch Failed

New investors in Kandi may not realize that the company has attempted to launch in the U.S. multiple times over the past 12 years. Each attempt has sputtered.

Kandi began seeking to expand its presence to the U.S. as early as 2006. [Pg. 4 (https://www.slideshare.net/secret/or0uoOeoZ3tcIq)] By late 2008/early 2009, the company introduced (https://www.prweb.com/releases/2009/03/prweb2227404.htm) the "Coco" to the U.S. market, a golf cart-like vehicle that could reach maximum speeds of about 25 mph, but was intended for street use.

One major problem emerged: the initial vehicles had been imported illegally. Customs officials identified that Kandi and its distributor had misclassified the vehicles as ATVs. The EPA intervened (https://www.epa.gov/sites/production/files/2014-03/documents/sa-imports-solus-

060509.pdf), fined Kandi $40,000, and ordered the company to destroy or export the vehicles back out of the country.

**U.S. ENVIRONMENTAL PROTECTION AGENCY**
**WASHINGTON, D.C.**

In the Matter of:                                    )
                                                      )      **ADMINISTRATIVE**
                                                      )      **SETTLEMENT AGREEMENT**
Solus International Corporation and                    )      **AED/MSEB-7809**
Kandi USA, Inc.,                                       )
                                                      )
                         Respondents.                 )

The company eventually sorted out the problem and, in 2008, a smattering of U.S. dealerships attempted to sell the car, as shown in this example video (https://www.youtube.com/watch?v=NI9IXlwJQZw):



Kandi Coco 2008

Federal and state tax credits made the car as cheap as $865 for Oklahoma residents (https://www.automobilemag.com/news/oklahoma-residents-can-buy-chinese-electric-car-for-865-2099/). (Joe Exotic from the popular Netflix series Tiger King, an Oklahoma resident, purchased a Coco (https://www.thedrive.com/news/32805/these-are-the-wild-cars-of-netflixs-tiger-king).) But the company eventually stopped reporting sales of the Coco after 2012 (https://www.sec.gov/Archives/edgar/data/1316517/000106299314001368/form10k.htm) and the car quietly disappeared from the market.

Case 1:20-cv-08082-DEH   Document 33-1   Filed 12/23/20   Page 76 of 105

## We Asked Kandi's 2008 U.S. Distribution Partner About the Vehicles: "They Didn't Run, Every Single One Broke"

To learn what happened with the company's original U.S. launch, we spoke with a founding partner of Kandi's U.S. importer and distributor for its 2008 Coco release.:

> *"We brought in our first 200 vehicles and had nothing but problems. They didn't run, **every single one broke**…The prototype was excellent but when they started shipping these vehicles nothing but problems. Engines weren't working, batteries were burning up."*

> *"I had three big distributors that took in the first allotment of cars. I had them set up to buy 2,000 vehicles in the first year from Kandi. We had the documentation but from what I understood they forged it, they faked it……Customs got them and said if you don't get these cars out of the US then you're going to be fined and they will be destroyed."*

We asked how many of Kandi's cars had issues when they finally made it into the country:

> *"Every single one…I'm a salesman and I was running round the country like a mechanic. I was flying all around the country trying to fix these things and it just got to the point 'I'm out, I can't do this anymore… I left because I the whole process was horrible, too secretive, a lot of side deals I didn't know about. I said you guys handle it, I'm out."*

## Kandi Tried to Launch U.S. Operations Again in 2018, But Plans Were Delayed

After the failure of the "Coco", Kandi planned another U.S. launch in 2018.

Kandi bought (https://www.sec.gov/Archives/edgar/data/1316517/000121390018007177/f8k053118_kanditec hnologies.htm) a U.S. company in early 2018 known for sales of ATVs and recreational vehicles, then renamed it Kandi America. In June 2018, Kandi formally announced (https://www.globenewswire.com/news-release/2018/06/12/1520355/0/en/Kandi-Pure-Electric-

Case 1:20-cv-08082-DEH Document 33-1 Filed 12/23/20 Page 77 of 105

Vehicle-Product-Pursuing-Expansion-to-the-American-Market.html) its expansion into the U.S. market, starting with 3 prototype vehicles (https://www.globenewswire.com/news-release/2018/07/02/1532434/0/en/Kandi-s-First-Three-Pure-Electric-American-Prototypes-in-Transit.html). (A Model K22 and 2 Model EX3s.)

In August, Kandi held a launch event (https://dallasinnovates.com/garlands-sc-autosports-unveils-two-ev-prototypes/) to showcase its cars to dealers in the hopes of developing a distribution network. We spoke with a former employee who worked for the company at the time, who told us:

> *"They had a press release at a hotel in Frisco and they set up the cars in a nice display room and Chamber of Commerce folks from Garland came and there was all this big to-do. And I thought great it's going to happen. **But from that point, no cars and no nothing. Nothing ever showed up and nothing ever happened".***

We asked if any dealers signed up:

> *"No not to my knowledge. **To my knowledge we never had anybody to invest and go forward with that. And luckily so, because they still wouldn't have any vehicles to sell**."*

On a conference call (https://seekingalpha.com/article/4197919-kandi-technologies-kndi-ceo-hu-xiaoming-on-q2-2018-results-earnings-call-transcript) at the time, Kandi's Chairman/CEO had alluded to U.S. sales kicking off near the end of 2018, but that didn't pan out.

## Kandi Tried a U.S. Launch Again in 2019, But Those Plans Were Again Delayed

In January 2019, Kandi's Chairman/CEO told Bloomberg (https://www.bloomberg.com/news/articles/2019-01-17/chinese-maker-of-20-000-mini-electric-cars-plans-u-s-exports) in an interview that the company planned to ship cars to the U.S. that year.

In February 2019, Kandi announced (https://www.globenewswire.com/news-release/2019/02/20/1738393/0/en/U-S-National-Highway-Traffic-Safety-Administration-NHTSA-Approves-Kandi-s-Two-Pure-Electric-Vehicle-Models.html) the National Highway Traffic Safety

Case 1:20-cv-08082-DEH   Document 33-1   Filed 12/23/20   Page 78 of 105

Administration ("NHTSA") had "approved" its two electric vehicle models, claiming:

> *"The NHTSA approval is an assurance that Kandi's two EV models conform to NHTSA standards and are registered in the U.S."*

The stock underlined soared over 40% (https://www.fool.com/investing/2019/02/20/kandi-technologies-shares-soar-more-than-40-after.aspx) on news of the government approval. Yet, despite the claims, we found that the NHTSA doesn't actually *approve* cars. Instead, manufacturers self-certify. Per the NHTSA spokesperson we contacted (emphasis added):

> *"By Federal law all vehicles sold in the U.S. must be certified **by the manufacturer** as meeting all applicable Federal Motor Vehicle Safety Standards (FMVSS). **NHTSA does not certify vehicles prior to sale – doing so is the manufacturer's responsibility.."***

In either case, investors likely expected the news would lead to an imminent U.S. sales ramp. That didn't happen.

## Kandi's Latest 2020 U.S. Launch Efforts Appear to Be Delayed

## Former Kandi America Employee: "If You Never Produce the Product Then It's Just Smoke And Mirrors…".

In July 2020, Kandi once again announced (https://www.globenewswire.com/news-release/2020/07/30/2070435/0/en/Kandi-Brings-to-Market-America-s-Most-Affordable-Pure-Electric-Automobiles-Announces-August-18-Virtual-Event-to-Kick-off-Pre-Sales.html) the "formal launch" of its vehicles in the U.S., and held a virtual launch event (https://www.globenewswire.com/news-release/2020/07/30/2070435/0/en/Kandi-Brings-to-Market-America-s-Most-Affordable-Pure-Electric-Automobiles-Announces-August-18-Virtual-Event-to-Kick-off-Pre-Sales.html) in August to re-introduce the cars.

So far, several reviewers (https://www.youtube.com/watch?v=MrVGTzM81L8) have tested the cars, and several dozen (https://youtu.be/MrVGTzM81L8?t=254) vehicles are sitting in the company's Texas lot. The company received EPA certification

Case 1:20-cv-08082-DEH  Document 33-1  Filed 12/23/20  Page 79 of 105

(https://www.businesswire.com/news/home/20201104005412/en/Kandi-America-Receives-Certification-From-EPA-Electric-Vehicles-Cleared-for-U.S.-Roads) for its vehicles this month, clearing the path to potentially sell vehicles.

Kandi targeted deliveries by year-end (http://manager.828m.icu/upload/20201019/063751191.pdf), but the company now expects to begin deliveries in early 2021, according to a recent reviewer (https://youtu.be/MrVGTzM81L8?t=990) that spoke with the company.

The company seems to be struggling to find dealer distributors. A November 23, 2020, Barron's article (https://www.barrons.com/articles/kandis-tiny-electric-vehicle-faces-big-challenges-in-the-u-s-51605898774) identified only one authorized Kandi EV dealer, a Denver pharmacist who approached the company about purchasing an EV and then decided he wanted to invest $30,000 to open his own dealership.

We spoke with a former employee this month who keeps in touch with Kandi. They described how the company has continuously struggled to bring in enough cars and to find dealers to sell them:

> *"I was talking to a gentleman there (at Kandi America) the other day and he said 'still trying to get the cars here'…**what's crazy is we're almost in 2021 and I was there in 2017, waiting and waiting and we're still waiting and still in exact same holding pattern**…*

> *"…**if you never produce the product then it's just smoke and mirrors as far as I'm concerned."***

## Kandi's Chairman/CEO Expressed Uncertainty on Its U.S. Launch "The U.S. Market Is Not Familiar with Our Products"

## Kandi is Recognized in China However, and Has a Reputation for Poor Quality

Kandi's own Chairman/CEO didn't seem to have much confidence in the reception of its cars in the U.S. market, expressing uncertainty in a recent Barron's interview (https://www.barrons.com/articles/kandis-tiny-electric-vehicle-faces-big-challenges-in-the-u-s-

51605898774):

> *"We are not very certain about it," he says. "The U.S. market is not familiar with our products."*

Domestically in China, Kandi is somewhat known, but not for the right reasons.

Multiple Chinese media outlets reported that historical customers had batteries fail after mere days (https://m.sohu.com/a/284664311_100238432/?pvid=000115_3w_a), while other customers complained that the company refused to honor warranties after various product failures. [1 (http://tousu.315che.com/tousudetail/79142/),2 (http://tousu.315che.com/tousudetail/93750/),3 (http://tousu.315che.com/tousudetail/94249/),4 (https://new.qq.com/omn/20181215/20181215A0Y8P5.html)]

## Two Years Ago, Angry Kandi Customers Held a Protest at Kandi's Headquarters, Complaining About Shoddy Vehicles and the Company's Failure to Honor Its Service Warranties

A December 2018 news article (http://www.hxxkw.org/dujia/qiche/66992.html) reported that more than 10 buyers of Kandi's EVs held a protest at its headquarters in Hangzhou because Kandi refused to provide after-sales service, despite having warranties.

Protesters brought banners to Kandi's headquarters, which read:

> *"**The quality of Kandi EVs is severely below standard**, Kandi cheated the government for subsidies and defrauded customers; we want our rights exerted, the manufacturer [Kandi] needs to take responsibility for after-sales service".*

Case 1:20-cv-08082-DEH Document 33-1 Filed 12/23/20 Page 81 of 105



(Pictured: Angry Chinese Kandi consumers protesting the company's poor quality products and failure to honor warranties at Kandi's China headquarters. Source (http://www.hxxkw.org/dujia/qiche/66992.html))

We believe this may be one reason why the company has reported no domestic auto sales in China in the past several years.

## Despite the Lack of Vehicle Sales to U.S. Customers, Kandi Appears to Be Booking Sales of Its U.S. Vehicles Through an Undisclosed Related Party Anyway

Oddly, the company appears to be booking sales from its auto exports to the U.S. despite acknowledging that sales to U.S. customers have not yet begun. [Pg. 16 (http://manager.828m.icu/upload/20201019/063751191.pdf)]

Kandi has reported $878,000 in EV Product (i.e. vehicle) sales since Q4 2018, all of which have been exports from the company's Hainan factory, per Kandi's SEC filings. [Pg. 24 (https://www.sec.gov/ix?doc=/Archives/edgar/data/1316517/000121390020035705/f10q0920_kanditech.htm), Pg. 32 (https://www.sec.gov/ix?

doc=/Archives/edgar/data/1316517/000121390020021018/f10q0620_kanditech.htm), Pg. 28
(https://www.sec.gov/Archives/edgar/data/1316517/000121390020014173/f10q0320_kanditech
nologies.htm), Pg. 22
(https://www.sec.gov/Archives/edgar/data/1316517/000121390020010244/f10k2019_kanditech
nologies.htm)]

The company has not announced entering any new markets aside from the U.S., so we can presume that all of the export sales are to the U.S. So how is the company booking years of revenue from sales that haven't happened?

Normally, companies that manufacture products will ship the products to its foreign subsidiary then sell the products to end users. Not the case with Kandi apparently.

We checked import records through ImportGenius and found that Kandi's Hainan factory has been shipping cars to Massimo Motor Sports LLC. This same entity turned up in the section above about Kandi's undisclosed related-party customer relationships.

| Product Description | Consignee | Shipper | Arrival Date | Gross Weight (LB) |
|---|---|---|---|---|
| K27 ELECTRIC CAR SOFTWARE K27 | MASSIMO MOTOR SPORTS LLC | KANGDI ELECTRIC VEHICLE HAINAN | 2020-09-13 | 22,308 |
| K27 ELECTRIC CAR K27 ELECTRIC | MASSIMO MOTOR SPORTS LLC | KANGDI ELECTRIC VEHICLE HAINAN | 2020-08-31 | 30,140 |
| LITHIUM-ION RECHARGEABLE BATT | MASSIMO MOTOR SPORTS LLC | KANGDI ELECTRIC VEHICLE HAINAN | 2020-08-30 | 25,300 |
| K27 ELECTRIC CAR K27 ELECTRIC | MASSIMO MOTOR SPORTS LLC | KANGDI ELECTRIC VEHICLE HAINAN | 2020-08-16 | 22,946 |
| K27 ELECTRIC CAR K27 ELECTRIC | MASSIMO MOTOR SPORTS LLC | KANGDI ELECTRIC VEHICLE HAINAN | 2020-08-16 | 15,092 |
| K23 ELECTRIC CAR | MASSIMO MOTOR SPORTS | KANGDI ELECTRIC VEHICLE HAINAN | 2020-02-07 | 9,847 |
| K23 ELECTRIC CAR | MASSIMO MOTOR SPORTS | KANGDI ELECTRIC VEHICLE HAINAN | 2020-01-30 | 9,847 |
| K23 ELECTRIC CAR K23 ELECTRIC | MASSIMO MOTOR SPORTS | KANGDI ELECTRIC VEHICLE HAINAN | 2020-01-30 | 19,694 |
| K27 ELECTRIC CAR | MASSIMO MOTOR SPORTS LLC | KANGDI ELECTRIC VEHICLE HAINAN | 2020-01-21 | 7,462 |
| K23 ELECTRIC CAR LITHIUM ION PC | MASSIMO MOTOR SPORTS LLC | KANGDI ELECTRIC VEHICLE HAINAN | 2020-01-15 | 26,400 |

(Source: ImportGenius)

As a reminder, Massimo Motor Sports is based out of the Kandi USA headquarters in Texas and is owned by David (Jianxun) Shan, a founder
(https://www.dirttoysmag.com/2018/06/sportsman-country-enters-deal-with) and current
manager (https://www2.slideshare.net/secret/8WpZ0JpoQbTFeO) of Kandi's U.S. subsidiary.

In sum, Kandi appears to be booking illegitimate U.S. sales to an undisclosed related party before formal U.S. customer sales have even begun.

# Part IV: Kandi's Rideshare and Battery Swap Initiatives

In addition to Kandi's much-anticipated U.S. launch, the company has repeatedly touted plans to (a) sell up to 300,000 vehicles domestically through a rideshare partner; and (b) roll out domestic quick battery swap stations to make EV charging fast and efficient.

Investors have viewed both endeavors with excitement, but a quick review shows both ventures are either devoid of substance or hopelessly behind competitors.

## Kandi's Rideshare Partner Ruibo Has Virtually No Presence in a Market Already Dominated by Didi And Other Rideshare Apps

In January 2019, Kandi announced (https://www.globenewswire.com/news-release/2019/01/22/1703463/0/en/Kandi-Signs-Framework-Agreement-with-Zhejiang-Ruibo-to-Serve-as-the-Primary-Vehicle-Provider-of-300-000-Electric-Vehicles-Within-5-Years.html) an agreement to join forces with rideshare company Ruibo (http://www.eipcar.com/home.html) to deliver 300,000 cars to the Chinese rideshare market in 5 years.

The company has repeatedly indicated that it may deliver hundreds of thousands of EVs to the venture in the coming years, an exciting prospect for investors. (1 (https://www.globenewswire.com/news-release/2019/12/30/1964962/0/en/Kandi-Announces-the-Entry-of-the-Strategic-Cooperation-Agreement-with-Jinpeng-to-Jointly-Develop-Pure-EV-Market.html),2 (https://www.globenewswire.com/news-release/2020/03/03/1994393/0/en/Operations-Resume-at-Kandi-Technologies-and-Subsidiaries.html),3 (https://www.globenewswire.com/news-release/2019/03/04/1746044/0/en/Kandi-JV-Company-Signs-Strategic-Cooperative-Agreement-with-China-Resources-Zhejiang-Vehicle-and-Ship-Natural-Gas-Co-Ltd.html),4 (https://www.globenewswire.com/news-release/2019/04/09/1799709/0/en/Kandi-Pure-EV-model-K23-Receives-MIIT-Approvals.html))

Progress has been slow. Kandi formally established the rideshare joint venture with Ruibo in October of this year (https://www.globenewswire.com/news-release/2020/10/26/2114375/0/en/Kandi-Announces-Establishment-of-Rideshare-Company.html).

Case 1:20-cv-08082-DEH Document 33-1 Filed 12/23/20 Page 84 of 105

China's rideshare market is huge, but much like the U.S., it is controlled by top players. In the U.S., the market is dominated by Uber and Lyft. In China, ~90% of the market by revenue is dominated by Didi, (1 (https://www.ebrun.com/20190919/351546.shtml),2 (https://www.qianzhan.com/analyst/detail/220/201103-1cc24c5a.html)) with the next closest competitor commanding only about 4%.

Kandi has chosen to partner with Ruibo, a company that doesn't even appear on lists of the top 77 (https://www.gmz88.com/queen/3.html) or top 50 (https://www.3454.com/ruanjian/dache_paihang) rideshare apps in China.

On China's most popular app stores like Huawei and Xiaomi we see that Ruibo's downloads barely even register.[4]

## Kandi Partner Ruibo Vs. China's Top Rideshare Apps

|  |  | Huawei Total Downloads | Xiaomi Total Downloads |
|---|---|---|---|
| Didi | 滴滴出行 | 3,200,000,000 | 1,243,370,855 |
| Dida Chuxing | 嘀嗒出行 | 300,000,000 | 110,000,000 |
| Shenzhou Zhuanche | 神州专车 | 200,000,000 | 20,739,917 |
| Caocao Chuxing | 曹操出行 | 100,000,000 | 44,906,981 |
| Shouqi Chuxing | 首汽约车 | 77,940,000 | 32,347,474 |
| T3 Chuxing | T3出行 | 20,780,000 | 6,036,284 |
| Didi ShunfengChe | 滴滴顺风 | 18,680,000 | 8,821,414 |
| Hengdao Chuxing | 享道出行 | 7,890,000 | 4,001,924 |
| Dongfeng Chuxing | 东风出行 | 3,890,000 | 1,913,386 |
| Ruibo (Yitu Chuxing) | 逸乘出行 | 10,000 | 760 |

We had a local consultant test Ruibo in major cities Beijing, Hangzhou, Jinhua and Xiamen. The app failed to find a driver each time. Here is a video of our investigator attempting (and failing) to hail a ride in Hangzhou, where Ruibo is headquartered, during normal daytime hours.

Case 1:20-cv-08082-DEH    Document 33-1    Filed 12/23/20    Page 85 of 105



(https://youtu.be/i0w11mit_Pc)

(Pictured: One of multiple Ruibo ride requests in Hangzhou that failed. Click for brief video (https://youtu.be/i0w11mit_Pc))

We reached out to customer service for help. The rep suggested we try to hail a ride through a separate app called Gaode Maps, which is an aggregator of multiple platforms (i.e. Didi, Ruibo, and other rideshare apps). In other words, they suggested we use a competitor.

We followed up by asking if the platform had really been launched yet and received no reply.

On Kandi's most recent Q3 2020 investor call (https://seekingalpha.com/article/4387295-kandi-technologies-groups-kndi-ceo-xiaoming-hu-on-q3-2020-results-earnings-call-transcript), CFO Alan Lim was asked about the 300,000 rideshare vehicle estimate and essentially walked the claim back, referring to the number as really just a conceptual goal:

> *"(It) is rather an idea of the program but not entirely or necessarily means that there will for sure put 300,000 EVs to the market. So how many EVs will be supplied to the market at the end of the program?* **We are not 100% sure. But the so-called 300,000 is sort of like a slogan or an idea.**"

Case 1:20-cv-08082-DEH Document 33-1 Filed 12/23/20 Page 86 of 105

We conclude that Ruibo is mostly vaporware, with slim to no shot at competing in China's intensely competitive rideshare market.

## Kandi's Battery Swap Program Is Well Behind Competitors Such As Nio, BJEV, And Even Its Own Partner Geely

China's domestic electric vehicle industry has heavily invested in battery swap stations in order to minimize charging wait times. Major EV manufacturers that dwarf Kandi in size and scale are well along the path.

Manufacturer NIO, for example, has already completed (https://insideevs.com/news/448165/nio-completed-1-millionth-battery-swap/) its one millionth battery swap and had (https://www.bamsec.com/filing/110465920061585?cik=1736541) – at the end of last year – swap stations in 51 cities, including Beijing, Shanghai and Guangzhou.

Manufacturer BJEV has also secured a broad footprint (https://equalocean.com/news/2020102114980) with 160 stations across the nation. Alibaba backed Xpeng Motors launched (https://cntechpost.com/2020/09/01/xpeng-launches-battery-rental-program-similar-to-nio-baas/) a battery leasing service in September 2020. Kandi's partner Geely also has a competing service (http://autonews.gasgoo.com/china_news/70017553.html), having launched (https://equalocean.com/news/2020102114980) its first battery swap station in October 2020 with plans (https://equalocean.com/news/2020091814779) to expand aggressively.

Kandi has thrust itself into this competitive part of the market as well. In January 2018, Kandi acquired (https://www.bamsec.com/filing/121390020035705/1?cik=1316517) battery swap technology company Jinhua An Kao ("An Kao")  for approximately $4 million in cash and ~2.96 million shares (valued at $20.7 million at the time). Currently the company has one pilot charging station (http://www.kandigroup.com/charging).

## Kandi Lacks Enough Vehicles on the Road for a Battery Swap Program to Make Sense

As detailed above, Kandi has reported no domestic sales of EVs in the past several years outside of its minority stake in an affiliate entity with Geely.

Case 1:20-cv-08082-DEH  Document 33-1  Filed 12/23/20  Page 87 of 105

The company is manufacturing model K23s in its Hainan facility for inventory, though until recently it lacked a sales certificate to be able to sell the cars itself, according to former employees we interviewed.

Despite a lack of cars on the road needing battery swaps, Kandi announced (https://www.globenewswire.com/news-release/2020/11/02/2118546/0/en/Kandi-Starts-Process-to-List-Battery-Swap-Subsidiary-on-Shanghai-Stock-Exchange-s-STAR-Board.html) on November 2, 2020, that it aims to list its battery swap subsidiary on Shanghai's STAR Exchange and it has already engaged CITIC to help it IPO. We do not envision this being a successful endeavor.

# We Have 25 Questions for Kandi's Management

Through the course of our research we contacted the company asking several questions about its financials and product initiatives. We received no response, so here are the questions that we think investors deserve the answers to:

1. SEC prosecutors alleged in a complaint that Kandi's Chairman/CEO participated in a scheme to inflate the price of its stock, along with several individuals that took Kandi public as part of its original reverse-merger IPO. How do you respond to these allegations?
2. Kandi's long-serving auditor, Albert Wong & Co., was ejected from the industry by the Public Company Accounting Oversight Board ("PCAOB") over its failure to detect clear evidence of misappropriation by senior management of Kandi, along with undisclosed related-party transactions. Has management ever responded to these allegations? If not, how do you respond now?
3. In 2019, Chinese media located a car lot with thousands of Kandi vehicles apparently sitting unused and deteriorating. Were these cars manufactured as part of the well-publicized subsidy scheme? What is your explanation?
4. Kandi has reported no sales to its JV/affiliate with Geely in recent quarters. What role does Kandi have, if any, in the manufacturing and sales of the Maple 30x?
5. Despite the evaporation of revenue through the JV with Geely, Kandi's revenue remained relatively flat due to the dramatic increase of sales to "Customer A" and "Customer B" (i.e. Jinhua Chaoneng Automobile Sales Co. Ltd. and Zhejiang Kuke Sports Technology Co., Ltd.) What products are you selling to these entities, and how do you explain the sudden uptick in sales to them?
6. Why does Kandi's top customer (Chaoneng) representing 55% of LTM sales, share a phone number with your subsidiary? Why is it based at the same address as your own factory, and with signage indicating it is a Kandi company?
7. Kandi's second largest customer (Kuke) represented almost 9% of LTM sales. But export records show that ~91% of Kuke's U.S. exports go directly to entities based at Kandi's U.S.

warehouse locations. How do you explain this?

8. One of Kuke's export entities, Massimo Motor Sports, is owned by David (Jianxun) Shan, founder and manager of Kandi's U.S. subsidiary. How do you explain Kandi's product sales to this obviously undisclosed related party entity?

9. Kandi's filings show that Massimo sells product right back to Kandi; it has been reported as supplier of up to 25% of Kandi's goods in recent periods. How do you explain these apparently circular sales?

10. Why is Kandi's Days Sales Outstanding (DSO) 5x-6x higher than peers? Will you name the counterparties to these uncollected receivables?

11. In its most recent quarter, Kandi reported a "loan to third party" of ~$51 million as an "other receivable." This is a massive loan, yet Kandi has not disclosed the borrower, despite its obligations to disclose material loans. Who is the borrower?

12. Why is Kandi's Days Payable Outstanding (DPO) almost 2x higher than your closest peer, and over 3x higher than the median? What are the names of Kandi's top suppliers?

13. Kandi has had 3 auditors in the past 5 years. Why the revolving door?

14. Kandi has had 4 CFOs in the past 4 years. Why the revolving door?

15. Kandi's current auditor, Marcum, was recently handed a 3-year ban from auditing Chinese companies from the PCAOB. Will Kandi continue to attempt to reappoint Marcum as its auditor, as indicated by your recent proxy filing, or will the company choose a credible auditor?

16. We spoke with a former distribution partner that worked on the company's 2008 U.S. launch. They said the prototype vehicles worked well, but every single customer vehicle broke down. How can consumers be sure that quality has improved?

17. Why has Kandi not reported any domestic sales outside of the Geely JV in the past several years? A former employee we spoke with said Kandi did not even have a sales license up until late this year. What happened? What is standing in the way of restarting domestic EV sales?

18. How is it possible that Kandi has booked EV Product sales to the U.S. for several years when EV Product sales to U.S. consumers haven't even begun, per the company's own admissions?

19. An auto reviewer recently reported that the company now aims for a Q1 2021 launch in the U.S. Are sales to U.S. customers delayed once again?

20. Export records show that Kandi has shipped its Hainan EV Products not to Kandi, but to undisclosed related party Massimo Motor Sports. Has Kandi been recording the shipments of EV products to this entity as sales?

21. David (Jianxun) Shan is founder and manager of your U.S. subsidiary. Shan controls an entity called Miller Creek Holdings which owns the Kandi America headquarters. Kandi leases the facility from Miller Creek, yet does not record the lease payments as related-party transactions. Why not, given the company's obligations to disclose all related party transactions?

22. How do you expect to sell 300,000 vehicles through your relationship with rideshare app Ruibo when Ruibo has virtually no users in a market already dominated by Didi (along with dozens of other competitors)?

23. How do you expect your battery swap program to generate any interest when Kandi has virtually no vehicles on the road in China to swap batteries into?

24. From 2014-2018, Kandi reported that ~75%-83.5% of EV Parts sales consisted of battery packs. The company stopped reporting the percentage. What percentage of EV Parts sales from 2019 and onward were battery packs?

25. Litigation records show that Kandi previously purchased batteries from Jiangsu Tianpeng Battery Co., Ltd (江苏天鹏电源有限公司), and the company recently announced a deal with CBAK Energy for its batteries. Does Kandi manufacture its own battery cells, modules, and packs, or does it simply resell them from others?

# Conclusion: How Does A Company Like Kandi Keep Getting Away With It?

Many investors assume that auditors and regulators protect investors from fraud. Such trusting, well-meaning investors might wonder: How does a company like Kandi trade on a premier U.S. exchange without any regulatory consequence when:

- Kandi was brought public by a promoter charged with fraud by the SEC over allegations of conspiring with the (still) Chairman/CEO to manipulate its stock price.
- Kandi was fined by the EPA for illegally importing its very first shipment of vehicles into the country.
- Kandi's long-serving auditor was ejected from the industry over its failure to catch obvious signs of extensive fraud at the company, and its latest auditor has been banned from auditing Chinese companies by the PCAOB.
- Kandi was sanctioned by the Chinese regulators (but not U.S. regulators) for a scheme to generate false sales through undisclosed related party transactions in order to collect illegitimate subsidies.
- Kandi admitted that its financials were false due to a failure to recognize related party transactions, and had to restate 3 years of financials.
- Kandi displays obvious hallmarks of fake revenue including a key "unrelated" customer based at its own address sharing its own phone number, having massive uncollected sales, and serial CFO/auditor turnover.

In the end, many Kandi investors won't read this report, or will simply dismiss our findings outright because we are betting against the company.

The company will likely issue some sort of press release declaring everything we say false and misleading, as they always do, while ignoring all or the vast majority of the questions we've raised. They may throw in a legal threat and a token share buyback/insider purchase for good measure.

Case 1:20-cv-08082-DEH  Document 33-1  Filed 12/23/20  Page 90 of 105

Some investors will believe management blindly—after all, these are executives at a large, public company trading on the well-respected NASDAQ exchange.

Such investors won't realize that virtually all of this report was constructed from public records, and they can simply click through the hyperlinks we've provided to recreate most of our thesis in about an hour.

If regulators do decide to pursue a case, they will likely be stonewalled by the Chinese government, and may just throw their hands up in the end—because what's the point of running a challenging international investigation just to win a default judgement that can't be collected from overseas defendants anyway?

If a regulatory action does occur, it often takes 3-5 years, because 5 years is typically the statute of limitations for cases of fraud, and regulators like to investigate near the deadline before making a decision on whether to prosecute.

In the interim, many investors will view the lack of a regulatory enforcement as a vindication of the company. And a company like Kandi only needs to fool some of the people all of the time. The company has raised $160 million from U.S. capital markets in November 2020 alone, and we have no doubt it will attempt to perpetually sell stock.

And for us, we'll keep calling it out as we see it. Best of luck to all.

## Disclosure: We are short shares of Kandi Technologies (NASDAQ:KNDI)

## Legal Disclaimer

Use of Hindenburg Research's research is at your own risk. In no event should Hindenburg Research or any affiliated party be liable for any direct or indirect trading losses caused by any information in this report. You further agree to do your own research and due diligence, consult your own financial, legal, and tax advisors before making any investment decision with respect to transacting in any securities covered herein. You should assume that as of the publication date of any short-biased report or letter, Hindenburg Research (possibly along with or through our members, partners, affiliates, employees, and/or consultants) along with our clients and/or investors has a short position in all stocks (and/or options of the stock) covered herein, and therefore stands to realize significant gains in the event that the price of any stock covered herein declines. Following publication of any report or letter, we intend to continue transacting in the securities covered herein, and we may be long, short, or neutral at any time

Case 1:20-cv-08082-DEH   Document 33-1   Filed 12/23/20   Page 91 of 105

hereafter regardless of our initial recommendation, conclusions, or opinions. This is not an offer to sell or a solicitation of an offer to buy any security, nor shall any security be offered or sold to any person, in any jurisdiction in which such offer would be unlawful under the securities laws of such jurisdiction. Hindenburg Research is not registered as an investment advisor in the United States or have similar registration in any other jurisdiction. To the best of our ability and belief, all information contained herein is accurate and reliable, and has been obtained from public sources we believe to be accurate and reliable, and who are not insiders or connected persons of the stock covered herein or who may otherwise owe any fiduciary duty or duty of confidentiality to the issuer. However, such information is presented "as is," without warranty of any kind – whether express or implied. Hindenburg Research makes no representation, express or implied, as to the accuracy, timeliness, or completeness of any such information or with regard to the results to be obtained from its use. All expressions of opinion are subject to change without notice, and Hindenburg Research does not undertake to update or supplement this report or any of the information contained herein.

---

[1] We are still very much short Nikola. For readers inclined to maintain social distance during the pandemic we recommend visiting Nikola's under construction (https://youtu.be/cFiqdf2YfUI?t=36) "factory" which, after 4 months (https://nikolamotor.com/press_releases/nikola-corporation-breaks-ground-on-coolidge-multi-product-factory-4-0-manufacturing-facility-86), appears to still be a large, empty plot of land in the middle of the Arizona desert.

[2] Unlike Kandi's other sales, these were fully disclosed as being related party sales, whereby Kandi would contribute EV parts to the venture, and the JV would complete assembly of the vehicles.

[3] Hu YiHeng shares a surname with the Chairman/CEO of Kandi, but we were unable to determine whether there is also a familial relationship.

[4] Note that these metrics include all downloads on every device through the history of the app, explaining how the download metrics (for Didi specifically) have managed to dwarf the population of China over time.

---

Posted in Uncategorized (https://hindenburgresearch.com/category/uncategorized/)  ·

Case 1:20-cv-08082-DEH Document 33-1 Filed 12/23/20 Page 92 of 105

# 75 thoughts on "Kandi: How This China-Based NASDAQ-Listed Company Used Fake Sales, EV Hype to Nab $160 Million From U.S. Investors"

Pingback: Hindenburg accuses Kandi (KNDI) of fake sales in the latest short seller attack on EV stocks – Idaho Reporter (https://www.idahoreporter.com/2020/hindenburg-accuses-kandi-kndi-of-fake-sales-in-the-latest-short-seller-attack-on-ev-stocks/)

Pingback: Kandi Stock Plunges, Hindenburg Report May See it Fall Further | Articles Archive (https://www.ar-ve.com/english-archives/archives/760321/)

 **Ali H Arar** says:

*November 30, 2020 at 11:24 am (https://hindenburgresearch.com/kandi/#comment-42252)*

Your analysis is valuable but also, similar to KNDI's practices, deceptive. The timing, viciousness, picking the rhetoric that makes your story viable and most importantly your intent are murky. You should have been present at their quarterly call and raised these concerns. I would trust the company more because they are looking for a positive future into entering the US Market, while you're looking negatively into shorting the stock in order to making couple bucks.

Reply (https://hindenburgresearch.com/kandi/?replytocom=42252#respond)

 **sacrecoeur** says:

*November 30, 2020 at 8:38 pm (https://hindenburgresearch.com/kandi/#comment-42308)*

Please enlighten the rest of us here – What is the "timing" you are referring to? Just which part of this report is "vicious"? Since when does laying out a comprehensive fraud report equate with "picking the rhetoric"? Thus, do you care to provide additional insight, since you obviously seem to be a devoted Kandi investor? You remind me of the Nikola flock who were ready to fight the truth to their dying breath.

Reply (https://hindenburgresearch.com/kandi/?replytocom=42308#respond)

**DJ** says:

*December 1, 2020 at 4:48 pm (https://hindenburgresearch.com/kandi/#comment-42403)*

The reason why its a silly report is that it doesn't show any information that is valuable, it takes information and makes judgment calls without knowing what is going on. Kandi has to import cars to sell them. They have US subsidiary companies they do this through, since Kandi has a shell of operations in North America. It is not a surprise to see Massimo Motor Sports as a sales brand to import with, this is a company they are partnering with to get a Kandi footprint.

Basically, the report seems to be a lot of hyperbole and lots of judgments based on 25% truths. Sure, they are importing the cars under these brands. The "viciousness" is with regards to the huge judgments the author is making, without their real knowledge of what these transactions are about. I've imported goods, sometimes it has to go through a number of names before the product is in North America. This is normal business, yet the author is stating something shady is going on, without evidence.

Reply (https://hindenburgresearch.com/kandi/?replytocom=42403#respond)

 **Stts** says:

*December 2, 2020 at 11:22 pm (https://hindenburgresearch.com/kandi/#comment-42477)*

I see this as a slimey line of work. But somebody has to do it. As long as what you report is true and just, I cant find an argument against it. I have been financially hit by sick players doing this over trivial claims reported at strategic times and blown way out of proportion. But when its truely crook exposures. I consider it a service. So keep doing what you do in a thorough and documented way and I will continue to be a fan. Thank you for this.

Reply (https://hindenburgresearch.com/kandi/?replytocom=42477#respond)

 **Zimbabwe** says:

*December 1, 2020 at 6:08 pm (https://hindenburgresearch.com/kandi/#comment-42409)*

Seriously? Did you even read the analysis?

Reply (https://hindenburgresearch.com/kandi/?replytocom=42409#respond)

Case 1:20-cv-08082-DEH　Document 33-1　Filed 12/23/20　Page 94 of 105

 **DJ** says:

*December 3, 2020 at 1:52 pm (https://hindenburgresearch.com/kandi/#comment-42509)*

As someone who understands how imports can be, and the names imports sometimes trade hands to get here, I am fully aware of the holes in this analysis Zimbabwe.

I'm not promoting Kandi cars, I want to see them and see what they look like after delivery. This piece is basically just anti-China, not anything to do with the cars. We're aware that Kandi has had some very cheap, low quality products in the past (some of the models they bash are over a decade in age), I'd like to see the new crop of cars and see how they can compete with the vastly overpriced North American makers like Tesla.

This report, frankly, doesn't show much. It lists a lot of trade records and then draws conclusions based on some basic facts that are kind of outlandish. Companies "sell" products to themselves all the time.

Reply (https://hindenburgresearch.com/kandi/?replytocom=42509#respond)

Pingback: After Attacking Nikola, Hindenburg Research Goes After Kandi – KIVIAC (https://kiviac.com/2020/11/30/after-attacking-nikola-hindenburg-research-goes-after-kandi/)

Pingback: After Attacking Nikola, Hindenburg Research Goes After Kandi – AutoSector.com ® (http://autosector.com/auto/e-cars/after-attacking-nikola-hindenburg-research-goes-after-kandi/)

Pingback: Tesla Model Y Gets Official Green Light For China Sales - www.blackstockstube.com (https://www.blackstockstube.com/?p=20830)

Pingback: It's Official: Tesla Model Y Gets Green Light For China Sales – Wary Fool (https://waryfool.com/its-official-tesla-model-y-gets-green-light-for-china-sales/)

Case 1:20-cv-08082-DEH    Document 33-1    Filed 12/23/20    Page 95 of 105

 **Robert C** says:

*November 30, 2020 at 2:23 pm (https://hindenburgresearch.com/kandi/#comment-42270)*

Love all the investigative reporting to help investors steer clear away from these fake publicities and hyped sales numbers. Your research is truly invaluable. Keep it the great work!

Reply (https://hindenburgresearch.com/kandi/?replytocom=42270#respond)

 **Manuel Lanza Amaro (http://None)** says:

*November 30, 2020 at 4:01 pm (https://hindenburgresearch.com/kandi/#comment-42275)*

Thank you for keeping the investing community well informed on this Chinese scam. I am shorting Kandi via a PUT option and hope their "candy" turns sour to them. These people should be delisted immediately from our markets.

Reply (https://hindenburgresearch.com/kandi/?replytocom=42275#respond)

 **DJ** says:

*December 1, 2020 at 4:53 pm (https://hindenburgresearch.com/kandi/#comment-42404)*

Again, Manuel, where is the evidence? All we're seeing are import sheets with vehicles brought in, largely during November, just before deliveries to customers occurs. Imports commonly go through several names or companies before it ends up in the hands of a customer, that isn't a scam. Furthermore, reporting about a completely unrelated product that flopped years ago where cars sit in Chinese junkyards isn't proof of the current situation. Its basically throwing mud. I'm not interested in propping Kandi up, they will fall or fail on their own accord, but this reporting is mostly junk. It is just a bunch of import sheets showing some cars being shipped, and being imported through various brand names. That isn't a scam, and just because its Chinese doesn't make it bad. I'll be waiting for the actual cars to arrive, see what reviewers get out of them, and we will see what they are made of when it actually gets into the hands of customers.

Reply (https://hindenburgresearch.com/kandi/?replytocom=42404#respond)

Case 1:20-cv-08082-DEH   Document 33-1   Filed 12/23/20   Page 96 of 105

Pingback: <u>r/shares – Kandi: How This China-Based mostly NASDAQ-Listed Firm Used Pretend Gross sales, EV Hype to Nab $160 Million From U.S. Buyers | ANALYST GOLD (http://analyst-gold.com/r-stocks-kandi-how-this-china-based-nasdaq-listed-company-used-fake-sales-ev-hype-to-nab-160-million-from-u-s-investors/)</u>

 **sacrecoeur** says:

*November 30, 2020 at 7:23 pm (https://hindenburgresearch.com/kandi/#comment-42307)*

So, basically, Yugo-meets-Nikola! Great, comprehensive research yet again, kudos. You are earning every penny on your shorts.

Reply (https://hindenburgresearch.com/kandi/?replytocom=42307#respond)

Pingback: <u>Tesla Model Y Gets Official Green Light For China Sales - The Entrepreneur Fund (https://theentrepreneurfund.com/tesla-model-y-gets-official-green-light-for-china-sales/)</u>

 **Chris Jordan (http://na)** says:

*November 30, 2020 at 11:53 pm (https://hindenburgresearch.com/kandi/#comment-42315)*

Many thanks! I thought a Kandi Coco was much newer and appeared to be ideal. I was waiting for that "new" Kandi model to reach the U.S.; but now I read that it is a 2008 model, and see hundreds of them rusting away in a Chinese field- What A Shock!!! I planned to spend lots of money for a Coco. Now- no way! Thanks for saving me a bundle of cash.

Reply (https://hindenburgresearch.com/kandi/?replytocom=42315#respond)

Pingback: <u>01 December, 2020 – Alpha Ideas - On Market News (https://onmarketnews.com/01-december-2020-alpha-ideas/)</u>

Pingback: <u>Kandi stock cost plunges right after Hindenburg accuses it of faking sales - Wilkenson Knaggs (http://wilkensonknaggs.com/kandi-stock-cost-plunges-right-after-hindenburg-accuses-it-of-faking-sales)</u>

Pingback: <u>Chinese Automaker Kandi Plunges Nearly 30% After Short-seller Hindenburg Accused It Of Fabricating Sales To Raise $160 Million From US Investors » TECHNOBUG</u>

(https://thetechnobug.info/chinese-automaker-kandi-plunges-nearly-30-after-short-seller-hindenburg-accused-it-of-fabricating-sales-to-raise-160-million-from-us-investors/)

Pingback: Chinese automaker Kandi plunges nearly 30% after short-seller Hindenburg accused it of fabricating sales to raise $160 million from US investors - The Entrepreneur Fund (https://theentrepreneurfund.com/chinese-automaker-kandi-plunges-nearly-30-after-short-seller-hindenburg-accused-it-of-fabricating-sales-to-raise-160-million-from-us-investors/)

Pingback: Chinese automaker Kandi plunges nearly 30% after brief-seller Hindenburg accused it of fabricating product sales to raise $160 million from US traders - Wilkinson Knaggs (https://wilkinsonknaggs.com/2020/12/01/chinese-automaker-kandi-plunges-nearly-30-after-brief-seller-hindenburg-accused-it-of-fabricating-product-sales-to-raise-160-million-from-us-traders/)

Pingback: Chinese automaker Kandi plunges nearly 30% after short-seller Hindenburg accused it of fabricating sales to raise $160 million from US investors - Minnesota Business Insights (https://www.minnesotabusinessinsights.com/national-news/chinese-automaker-kandi-plunges-nearly-30-after-short-seller-hindenburg-accused-it-of-fabricating-sales-to-raise-160-million-from-us-investors/)

Pingback: Kandi stock price plunges after Hindenburg accuses it of faking sales – Simba Hu (https://simbahu.com/index.php/2020/12/01/kandi-stock-price-plunges-after-hindenburg-accuses-it-of-faking-sales/)

Pingback: Chinese automaker Kandi plunges nearly 30% after short-seller Hindenburg accused it of fabricating sales to raise $160 million from US investors - NewsKrym | NewsKrym (https://newskrym.ru/chinese-automaker-kandi-plunges-nearly-30-after-short-seller-hindenburg-accused-it-of-fabricating-sales-to-raise-160-million-from-us-investors/)

Pingback: Chinese automaker Kandi plunges nearly 30% after short-seller Hindenburg accused it of fabricating sales to raise $160 million from US investors – My Blog (https://sexymanmug.com/2020/12/01/chinese-automaker-kandi-plunges-nearly-30-after-short-seller-hindenburg-accused-it-of-fabricating-sales-to-raise-160-million-from-us-investors/)

Pingback: Chinese automaker Kandi plunges nearly 30% after short-seller Hindenburg accused it of fabricating sales to raise $160 million from US investors - Techinfinitylife (https://techinfinitylife.info/chinese-automaker-kandi-plunges-nearly-30-after-short-seller-hindenburg-accused-it-of-fabricating-sales-to-raise-160-million-from-us-investors/)

Pingback: Chinese automaker Kandi plunges nearly 30% after short-seller Hindenburg accused it of fabricating sales to raise $160 million from US investors – Technology

Case 1:20-cv-08082-DLC Document 33-1 Filed 12/23/20 Page 98 of 105

(https://technology.newsbuilder.io/chinese-automaker-kandi-plunges-nearly-30-after-short-seller-hindenburg-accused-it-of-fabricating-sales-to-raise-160-million-from-us-investors/)

Pingback: Chinese automaker Kandi plunges nearly 30% after short-seller Hindenburg accused it of fabricating sales to raise $160 million from US investors | PRO Gambler (https://www.progambler.com/chinese-automaker-kandi-plunges-nearly-30-after-short-seller-hindenburg-accused-it-of-fabricating-sales-to-raise-160-million-from-us-investors/)

Pingback: Chinese automaker Kandi plunges nearly 30% after short-seller Hindenburg accused it of fabricating sales to raise $160 million from US investors – Wary Fool (https://waryfool.com/chinese-automaker-kandi-plunges-nearly-30-after-short-seller-hindenburg-accused-it-of-fabricating-sales-to-raise-160-million-from-us-investors/)

Pingback: Chinese automaker Kandi plunges nearly 30% after short-seller Hindenburg accused it of fabricating sales to raise $160 million from US investors - Busycom Consulting (https://consult.busycom.com/2020/12/01/chinese-automaker-kandi-plunges-nearly-30-after-short-seller-hindenburg-accused-it-of-fabricating-sales-to-raise-160-million-from-us-investors/)

Pingback: Chinese automaker Kandi plunges nearly 30% after short-seller Hindenburg accused it of fabricating sales to raise $160 million from US investors – Digital Access (https://daccess.net/business-insider/chinese-automaker-kandi-plunges-nearly-30-after-short-seller-hindenburg-accused-it-of-fabricating-sales-to-raise-160-million-from-us-investors/)

Pingback: Chinese automaker Kandi plunges nearly 30% after short-seller Hindenburg accused it of fabricating sales to raise $160 million from US investors - iNFO Vi (https://news.infovi.org/chinese-automaker-kandi-plunges-nearly-30-after-short-seller-hindenburg-accused-it-of-fabricating-sales-to-raise-160-million-from-us-investors/)

Pingback: Chinese automaker Kandi plunges nearly 30% after short-seller Hindenburg accused it of fabricating sales to raise $160 million from US investors – Future World Vision (http://futureworldvision.com/2020/12/01/chinese-automaker-kandi-plunges-nearly-30-after-short-seller-hindenburg-accused-it-of-fabricating-sales-to-raise-160-million-from-us-investors/)

Pingback: Chinese automaker Kandi plunges nearly 30% after short-seller Hindenburg accused it of fabricating sales to raise $160 million from US investors - Acropreneur (https://acropreneur.com/chinese-automaker-kandi-plunges-nearly-30-after-short-seller-hindenburg-accused-it-of-fabricating-sales-to-raise-160-million-from-us-investors/)

Pingback: Chinese automaker Kandi plunges nearly 30% after short-seller Hindenburg accused it of fabricating sales to raise $160 million from US investors | InvestingLab.com

Case 1:20-cv-08082-DEH Document 33-1 Filed 12/23/20 Page 99 of 105

(https://investinglab.com/chinese-automaker-kandi-plunges-nearly-30-after-short-seller-hindenburg-accused-it-of-fabricating-sales-to-raise-160-million-from-us-investors/)

Pingback: Chinese automaker Kandi plunges nearly 30% after short-seller Hindenburg accused it of fabricating sales to raise $160 million from US investors - USVI News (http://testusvi.com/chinese-automaker-kandi-plunges-nearly-30-after-short-seller-hindenburg-accused-it-of-fabricating-sales-to-raise-160-million-from-us-investors/)

Pingback: Chinese automaker Kandi plunges nearly 30% after short-seller Hindenburg accused it of fabricating sales to raise $160 million from US investors – Automotive (https://automotive.newsbuilder.io/chinese-automaker-kandi-plunges-nearly-30-after-short-seller-hindenburg-accused-it-of-fabricating-sales-to-raise-160-million-from-us-investors/)

Pingback: After Attacking Nikola, Hindenburg Research Goes After Kandi - All CyberTruck (https://allcybertruck.com/2020/12/01/after-attacking-nikola-hindenburg-research-goes-after-kandi/)

Pingback: Guncelkal.net - Chinese automaker Kandi plunges nearly 30% after short-seller Hindenburg accused it of fabricating sales to raise $160 million from US investors (https://guncelkal.net/2020/12/01/chinese-automaker-kandi-plunges-nearly-30-after-short-seller-hindenburg-accused-it-of-fabricating-sales-to-raise-160-million-from-us-investors/)

Pingback: Shorts Target Electric Vehicle Stock NIO – Kandi and Luckin Coffee Inc. – Stockmarketrevolution (http://stockmarketrevolution.com/archives/15065)

Pingback: Chinese automaker Kandi plunges nearly 30% after short-seller Hindenburg accused it of fabricating sales to raise $160 million from US investors – S1MPLE LIFE. (https://s1mple.life/index.php/2020/12/01/chinese-automaker-kandi-plunges-nearly-30-after-short-seller-hindenburg-accused-it-of-fabricating-sales-to-raise-160-million-from-us-investors/)

Pingback: Chinese automaker Kandi plunges nearly 30% after short-seller Hindenburg accused it of fabricating sales to raise $160 million from US investors | Markets Insider (https://markets.businessinsider.com/news/stocks/kandi-stock-price-hindenburg-research-accusations-fake-sales-us-investors-2020-12-1029852171)

Pingback: 米国株に挑戦！Yes,We Can!「NO.013 着々と買い増ししていたKNDIがまさかの粉飾疑惑で大幅下落（苦笑）」｜自宅でネット株 (https://kabu.jitaku-can.com/usa20201201/)

Pingback: Chinese automaker Kandi plunges nearly 30% after short-seller Hindenburg accused it of fabricating sales to raise $160 million from US investors – firearmstraininggear.com

(http://firearmstraininggear.com/2020/12/01/chinese-automaker-kandi-plunges-nearly-30-after-short-seller-hindenburg-accused-it-of-fabricating-sales-to-raise-160-million-from-us-investors/)

---

 **Göran Andersson** says:

*December 1, 2020 at 9:10 am (https://hindenburgresearch.com/kandi/#comment-42361)*

I'm a long term shareholder in Kandi (and in Tesla) and you have some interesting points, but most of it is just ridiculous FUD. But I have learn how US capitalism working and you are on top of it.

1. What happened in 2008 has nothing with to do with today.

2. You have obviously not look into the deal between Kandi and SC Autosports.

3. Also you should look more on the Kandi – Geely deal.

Kandi has a long history of pump/dump-attacks from short-sellers, so your "investigation" is nothing new.

But I thank you for helping us putting Kandi on the map.

It is positive long term and also give us shareholders a short term buying opportunity.

Reply (https://hindenburgresearch.com/kandi/?replytocom=42361#respond)

---

Pingback: Kandi Technologies Nabbed $160 Million From U.S. Investors - ValueWalk (https://www.valuewalk.com/2020/12/hindenburg-research-short-kandi-technologies/)

---

Pingback: Kandi, el fabricante chino de coches eléctricos low cost, es acusado de fraude por la empresa que 'tumbó' a Nikola – raise racing (https://raiseracing.com/kandi-el-fabricante-chino-de-coches-electricos-low-cost-es-acusado-de-fraude-por-la-empresa-que-tumbo-a-nikola)

---

 **pinocchio** says:

*December 1, 2020 at 1:25 pm (https://hindenburgresearch.com/kandi/#comment-42381)*

pictures are from Baidu, Hindenburg never went to Kandi site. How did they trace former employees, where is the telephone recording ? a lot of allegations no real proof, only interested in lowering stock to make money, timing very suspicious. Hindenburg hiding their location

Reply (https://hindenburgresearch.com/kandi/?replytocom=42381#respond)

Case 1:20-cv-08082-DEH Document 33-1 Filed 12/23/20 Page 101 of 105

 **Göran Andersson** says:

*December 3, 2020 at 12:37 am (https://hindenburgresearch.com/kandi/#comment-42480)*

Iit's normal Wall Street Capitalism.
Shortsellers Enrichment Committe (SEC) never care about shareholders, so Hindenburg can do it again and again.

Reply (https://hindenburgresearch.com/kandi/?replytocom=42480#respond)

Pingback: Kandi: How This China-Based NASDAQ-Listed Company Used Fake Sales, EV Hype to Nab $160 Million From U.S. Investors | StockMarketGo (https://stockmarketgo.com/kandi-how-this-china-based-nasdaq-listed-company-used-fake-sales-ev-hype-to-nab-160-million-from-u-s-investors)

Pingback: Kandi: How This China-Based NASDAQ-Listed Company Used Fake Sales, EV Hype to Nab $160 Million From U.S. Investors (https://www.uavcall.com/uncategorized/kandi-how-this-china-based-nasdaq-listed-company-used-fake-sales-ev-hype-to-nab-160-million-from-u-s-investors/)

Pingback: Kandi: How This China-Based NASDAQ-Listed Company Used Fake Sales, EV Hype to Nab $160 Million From U.S. InvestorsKandi: How This China-Based NASDAQ-Listed Company Used Fake Sales, EV Hype to Nab $160 Million From U.S. Investors - (https://www.palmeraadvisors.com/uncategorized/kandi-how-this-china-based-nasdaq-listed-company-used-fake-sales-ev-hype-to-nab-160-million-from-u-s-investorskandi-how-this-china-based-nasdaq-listed-com)

Pingback: Kandi: How This China-Based NASDAQ-Listed Company Used Fake Sales, EV Hype to Nab $160 Million From U.S. InvestorsKandi: How This China-Based NASDAQ-Listed Company Used Fake Sales, EV Hype to Nab $160 Million From U.S. Investors - (https://www.palmeraadvisors.com/uncategorized/kandi-how-this-china-based-nasdaq-listed-company-used-fake-sales-ev-hype-to-nab-160-million-from-u-s-investorskandi-how-this-china-based-nasdaq-listed-com)

Pingback: Kandi: How This China-Based NASDAQ-Listed Company Used Fake Sales, EV Hype to Nab $160 Million From U.S. InvestorsKandi: How This China-Based NASDAQ-Listed Company Used Fake Sales, EV Hype to Nab $160 Million From U.S. Investors - (https://www.palmeraadvisors.com/uncategorized/kandi-how-this-china-based-nasdaq-listed-

company-used-fake-sales-ev-hype-to-nab-160-million-from-u-s-investorskandi-how-this-china-based-nasdaq-listed-com)

Pingback: Kandi: How This China-Based NASDAQ-Listed Company Used Fake Sales, EV Hype to Nab $160 Million From U.S. InvestorsKandi: How This China-Based NASDAQ-Listed Company Used Fake Sales, EV Hype to Nab $160 Million From U.S. Investors - (https://www.palmeraadvisors.com/uncategorized/kandi-how-this-china-based-nasdaq-listed-company-used-fake-sales-ev-hype-to-nab-160-million-from-u-s-investorskandi-how-this-china-based-nasdaq-listed-com)

Pingback: Why Kandi Technologies Shares Continue to Slide Today (https://www.kingblvdandwallst.com/why-kandi-technologies-shares-continue-to-slide-today/)

---

**Lex Knight (https://www.CanadianCasinoGambler.ca)** says:
*December 1, 2020 at 7:15 pm (https://hindenburgresearch.com/kandi/#comment-42414)*

These rascals! Love these reports, keep them coming. Shows how much corruption and greed is out there.

Reply (https://hindenburgresearch.com/kandi/?replytocom=42414#respond)

Pingback: KNDI、粉飾疑惑で株価が37%急落！中国の電気自動車が危ない？| 初心者投資家「せーじん」の1億円貯めて早期退職！ (https://se-jinblog.com/kndifakesales/)

Pingback: Chinese automaker Kandi plunges nearly 30% after short-seller Hindenburg accused it of fabricating sales to raise $160 million from US investors – niftysuccess.com (https://niftysuccess.com/market-news/chinese-automaker-kandi-plunges-nearly-30-after-short-seller-hindenburg-accused-it-of-fabricating-sales-to-raise-160-million-from-us-investors/)

Pingback: NIO Stock Price Falls 4.04% This Week: Why It Happened (https://pulse2.com/nio-stock-price-falls-nyse-4-04-this-week/)

---

**jesus liz** says:
*December 2, 2020 at 8:25 pm (https://hindenburgresearch.com/kandi/#comment-42474)*

So.. you took a short on Kandy before publishing this?

Is that legal? I mean… How could it be legal?

Reply (https://hindenburgresearch.com/kandi/?replytocom=42474#respond)

Pingback: This Chinese EV Billionaire Has Tesla In His Sights, But Investors Are Growing Cautious — News For Finance (https://newsforfinance.com/this-chinese-ev-billionaire-has-tesla-in-his-sights-but-investors-are-growing-cautious/)

Pingback: This Chinese EV Billionaire Has Tesla In His Sights, But Investors Are Growing Cautious – Investors News (https://investorsnews.net/2020/12/04/this-chinese-ev-billionaire-has-tesla-in-his-sights-but-investors-are-growing-cautious/)

Pingback: This Chinese EV Billionaire Has Tesla In His Sights, But Investors Are Growing Cautious | InvestingLab.com (https://investinglab.com/this-chinese-ev-billionaire-has-tesla-in-his-sights-but-investors-are-growing-cautious/)

Pingback: This Chinese EV Billionaire Has Tesla In His Sights, But Investors Are Growing Cautious – Kambomatics (https://kabomatics.com/2020/12/04/this-chinese-ev-billionaire-has-tesla-in-his-sights-but-investors-are-growing-cautious/)

Pingback: This Chinese EV Billionaire Has Tesla In His Sights, But Investors Are Growing Cautious | NEWS CRATER (https://newscrater.com/this-chinese-ev-billionaire-has-tesla-in-his-sights-but-investors-are-growing-cautious/)

Pingback: この中国のEV億万長者はテスラを視野に入れていますが、投資家は慎重になっています | blaster.tokyo (https://blaster.tokyo/%e3%81%93%e3%81%ae%e4%b8%ad%e5%9b%bd%e3%81%aeev%e5%84%84%e4%b8%87%e9%95%b7%e8%80%85%e3%81%af%e3%83%86%e3%82%b9%e3%83%a9%e3%82%92%e8%a6%96%e9%87%8e%e3%81%ab%e5%85%a5%e3%82%8c%e3%8)

Pingback: Il killer delle start up elettriche ora ha Kandi nel mirino - Vaielettrico (https://www.vaielettrico.it/il-killer-delle-start-up-elettriche-ora-ha-kandi-nel-mirino/)

Pingback: This Chinese language EV Billionaire Has Tesla In His Sights, However Traders Are Rising Cautious | BlogBlogy (https://blogblogy.com/this-chinese-language-ev-billionaire-has-tesla-in-his-sights-however-traders-are-rising-cautious/)

 **Thomas** says:

*December 5, 2020 at 8:11 pm (https://hindenburgresearch.com/kandi/#comment-42618)*

I think 80% information in the report was already explained by Kndi before with SEC files. For example, Daily sales outstanding issue was explained in one SEC file mainly due to kandi normally do not sell directly to customers and they rely on their partner who again rely on chinese government subsidy payment sometime have long delay. Kandi extend the accounts Receivable Policy range 210 to maximal 720 days.

I guess HINDERBURG already covered their short position as checked current Kndi short volume dropped now to historical low.
I assumed HINDERBURG gained good profit this time. But have you thinked about retail investor, why you dont ask questions in quarterly finance meeting.

I checked some KNDI America K27 review video, for that low price and the reviewed quality and performance e.g. 6K USD, the car is good choose for some people, e.g. students, or working class or some middle class.

At least Kndi mission is positive, sell affordable EV to help the environment and less rich people while HINDENBURG mission is gain profit while very often hurt retail investors.

Reply (https://hindenburgresearch.com/kandi/?replytocom=42618#respond)

---

Pingback: This Chinese EV Billionaire Has Tesla In His Sights, But Investors Are Growing Cautious - Forbes - China Social (https://chinasocial.top/index.php/2020/12/04/this-chinese-ev-billionaire-has-tesla-in-his-sights-but-investors-are-growing-cautious-forbes/)

---

Pingback: Kandi, el fabricante chino de autos eléctricos low cost, es acusado de fraude por la empresa que 'tumbó' a Nikola – Sobre Ruedas (https://www.sobreruedas.news/negocios-y-empresas/kandi-el-fabricante-chino-de-autos-electricos-low-cost-es-acusado-de-fraude-por-la-empresa-que-tumbo-a-nikola/)

---

# Leave a Reply

Your email address will not be published. Required fields are marked *

**Comment**

Case 1:20-cv-08083-DEH Document 33-1 Filed 12/23/20 Page 105 of 105

**Name \***

**Email \***

**Website**

☐ **Notify me of follow-up comments by email.**

☐ **Notify me of new posts by email.**

POST COMMENT

© 2018 Hindenburg Research (//hindenburgresearch.com). All Rights Reserved · Legal Disclaimer (/legal-disclaimer) · Privacy Policy (/privacy-policy)
Theme by Robert DeVore (https://robertdevore.com).