**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Srinivasan Venkataraman, Individually and on Behalf of All Others Similarly Situated, | Civil Action No. 20 CIV. 8082 (LGS) |
| Plaintiff, | **AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** |
| vs. | |
| Kandi Technologies Group, Inc., Xiaoming Hu, Cheng Wang, Bing Mei, Liming Chen, Jerry Lewin, and Henry Yu, | DEMAND FOR JURY TRIAL |
| Defendants. | |

Lead Plaintiff Tom Brooks ("Plaintiff") alleges the following based upon the investigation of Plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Kandi Technologies Group, Inc. ("Kandi" or the "Company"), as well as securities analysts' reports and advisories about the Company, press releases, media reports, and other public statements issued by, or about, the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of all persons and/or entities who purchased or acquired the Company's common stock between June 10, 2015 and March 13, 2017, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 ("Exchange Act") and SEC Rule 10b-5 promulgated thereunder.

2.      Kandi designs, manufactures, and distributes electric vehicles ("EV"), EV parts, and off-road vehicles in the People's Republic of China and internationally.

3.      Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose that: (1) certain areas in the Company's previously issued financial statements for the years ended December 31, 2015 and 2014, and the first three quarters for the year ended December 31, 2016, required adjustment; (2) in turn, the Company lacked effective controls over financial reporting; and (3) as a result, Defendants' statements about the Company's business, operations, and prospects, were materially false and misleading and/or lacked a reasonable basis at all relevant times. Defendants also failed to disclose that: (1) Kandi artificially inflated its reported revenues

1

through undisclosed related-party transactions; (2) a substantial amount of Kandi's previous sales had been to undisclosed related parties; and (3) as a result, the Company's public statements were materially false and misleading at all relevant times.

4.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

5.     The claims asserted herein arise under, and pursuant to, Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

6.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act.

7.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b).  Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred, in substantial part, in this District.

8.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of an electronic securities exchange located in this District.

## PARTIES

9.     Lead Plaintiff Tom Brooks, as set forth in the previously-filed certification, incorporated by reference herein, purchased Kandi securities during the Class Period, and

suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

10.    Defendant Xiaoming Hu ("Hu") has been the Company's Chief Executive Officer ("CEO"), President, and Chairman of the Board throughout the Class Period.

11.    Defendant Cheng Wang ("Wang") was the Company's Chief Financial Officer ("CFO") from May 1, 2015 until his resignation on November 14, 2016.

12.    Defendant Bing Mei ("Mei") was the Company's CFO from November 14, 2016 until January 29, 2019.

13.    Defendant Liming Chen ("Chen") has served as a director of the Company since May 1, 2012, as Chair of the Compensation Committee, and as a member of the Audit Committee and the Nominating and Corporate Governance Committee.

14.    Defendant Jerry Lewin ("Lewin") has served as a director of the Company since November 2010 and as a member of the Company's Audit Committee.

15.    Defendant Henry Yu ("Yu") has severed as a director of the Company since July 1, 2011, the Chair of the Audit Committee, and as a member of both the Compensation Committee and the Nominating and Corporate Governance Committee.

16.    Defendants Hu, Wang, Mei, Chen, Lewin, and Yu are collectively referred to herein as the "Individual Defendants."

17.    During the Class Period, the Individual Defendants, as senior executive officers and/or directors of the Company, were privy to confidential and proprietary information concerning the Company, its operations, finances, financial condition, and present and future business prospects.  Additionally, as set forth more fully below, the Individual Defendants had access to material adverse non-public information concerning the Company.  Because of their

positions within the Company, the Individual Defendants had access to non-public information about the Company's business, finances, products, markets, and present and future business prospects via internal corporate documents, conversations, and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof, and via reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew, or were deliberately reckless in not knowing, that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

18.     The Individual Defendants are liable as direct participants in the wrongs alleged herein.  In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct alleged.  Because of their positions of control, the Individual Defendants were able to, and did, directly or indirectly, control the conduct of the Company's business.

19.     The Individual Defendants, because of their positions within the Company, controlled and/or possessed the authority to control the contents of the Company's reports, press releases, and presentations to securities analysts and, through them, to the investing public.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged to be misleading herein, prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

20.     The Individual Defendants, as senior executive officers and/or directors – and as controlling persons of a publicly-traded company whose common stock was, and is, governed by

the federal securities law – had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

21.     The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud and/or deceit on purchasers of the Company's common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. This scheme: (1) deceived the investing public regarding the Company's business, operations and management, and the intrinsic value of the Company's common stock; (2) enabled the Company to obtain additional capital at favorable prices, create a public market for its common stock, and gain access to the public equity markets; and (3) caused Plaintiff and members of the Class to purchase the Company's common stock at artificially inflated prices.

## SUBSTANTIVE ALLEGATIONS

22.     Kandi designs, produces, manufactures, and distributes EV, EV parts, and off-road vehicles in the People's Republic of China and internationally. Founded in March 2004, the Company went public in June 2007 through a reverse merger with Stone Mountain Resources Inc., a Nevada company that had been pursuing a gold-mining venture. The Company changed its name to "Kandi Technologies Group, Inc." in December 2012. Although Kandi is headquartered in the People's Republic of China, the Company purports to maintain an office at

230 Park Avenue, 10th Floor, New York, NY 10169.  The Company's shares trade on NASDAQ under the ticker symbol "KNDI."

23.     On March 16, 2015, the Company filed a Form 10-K for the fiscal year ended December 31, 2014 ("2014 10-K") with the SEC.  The 2014 10-K was signed by Defendant Hu.  Attached to the 2014 10-K was a certification pursuant to the Sarbanes Oxley Act of 2002 ("SOX") signed by Defendant Hu attesting to the accuracy of the financial statements, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.  Specifically, Defendant Hu represented:

I, [Hu Xiaoming], certify that:

1.     I have reviewed this annual report on Form 10-K of Kandi Technologies Group, Inc.;

2.     ***Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report***;

3.     ***Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report***;

4.     The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a.     Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

6

    b.    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and;

    d.    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    ***The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):***

    a.    ***All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and***

    b.    ***Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.***

24.    Defendants also represented in the 2014 10-K the Company's internal controls over financial reporting, stating in relevant part:

Management conducted an assessment of the effectiveness of our system of internal control over financial reporting as of December 31, 2014, the last day of our fiscal year. This assessment was based on criteria established in the framework Internal Control—Integrated Framework (2013), issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") and included an evaluation of elements such as the design and operating effectiveness of key financial reporting controls, process documentation,

accounting policies, and our overall control environment. ***Based on management's evaluation under the 2013 COSO framework, management concluded that the Company's internal controls over financial reporting were effective as of December 31, 2014.***[1]

25.     As to related-party transactions, Defendants represented in the 2014 10-K that:

***Other than as set forth below, for fiscal years ended December 31, 2014 and 2013, the Company was not involved in any related party transactions***.

\* \* \*

During fiscal year ended December 31, 2014, 2013 and 2012, the Company sold products to Kandi USA Inc. carrying trade name of Eliteway Motorsports ("Eliteway") amounting to $2,981,944, $6,906,807 and $5,297,548, respectively. As of December 31, 2014 and 2013, outstanding receivable due from Eliteway was $620,410 and $2,800,958, respectively.

Mr. Hu Wangyuan was the sole shareholder and officer of Eliteway which served as a US importer of the Company's products.  Mr. Hu Wangyuan is the adult son of the Company's chairman and Chief Executive Officer, Mr. Hu Xiaoming.  For the year ended December 31, 2014, 2013and 2012, Eliteway and Mr. Hu Wangyuan were financially independent from the Company.  The transactions between the Company and Eliteway were carried at arm's-length without preferential terms comparing with other customers at the comparative order size or volume.

26.     The 2014 10-K also represented the following regarding Kandi's procedures for

related-party transactions:

In May 2014, we adopted a written Management Policy of Related-Party Transaction (the "Policy"). According to the Policy, a "Related Transaction" is "any transaction, includes, but not limited to, any financial transaction, arrangement, relationship (including any indebtedness or guarantee of indebtedness) or any series of similar transactions, arrangements or relationships, since the beginning of the Company's last fiscal year, or any currently proposed transaction, and the amount involved exceeds $120,000, and in which any related party had or will have a direct or indirect material interest". The Policy's definition of a "Related Party" is in line with the definition set forth in the instructions to Item 404(a) of Regulation S-K promulgated by the SEC.

Under the Policy, The Company's proposed material related transaction with related person shall be submitted to the Board for consideration and discussion

---

[1]     Unless otherwise indicated, all emphasis is added.

8

after independent director presents his/her approval opinion beforehand. The Audit Committee shall conduct audit on the related transaction and develop a written opinion, and can engage independent finance advisor to issue a report as a basis of its judgment, then submit it to the Board. The Policy states that the Board meeting can be held as long as non-affiliated directors over half of the Board attend, and any resolution made by the Board must be approved by over half of non-affiliated directors.

27.     The Class Period begins on June 10, 2015.

28.     On August 10, 2015, the Company filed a Form 10-Q quarterly report for the second quarter of 2015 ended June 30, 2015 ("2Q15 10-Q") with the SEC.  The 2Q15 10-Q was signed by Defendants Hu and Wang.  Attached to the 2Q15 10-Q were signed SOX certifications signed by Defendants Hu and Wang attesting to the accuracy of the financial statements, the disclosures of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

29.     Defendants represented in the 2Q15 10-Q the Company's related party transactions, reporting no changes in cashflow attributable to related party transactions.  The 2Q15 10-Q discussed the Company's internal controls over financial reporting, stating in relevant part:

**Changes in Internal Control over Financial Reporting**

There was no change to our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) that occurred during the period covered by this report that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

30.     On November 9, 2015, the Company filed a Form 10-Q quarterly report for the third quarter of 2015 ended September 30, 2015 ("3Q15 10-Q") with the SEC. The 3Q15 10-Q was signed by Defendants Hu and Wang. Attached to the 2Q15 10-Q were signed SOX certifications signed by Defendants Hu and Wang attesting to the accuracy of the financial

statements, the disclosures of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

31.     Defendants represented in the 3Q15 10-Q the Company's related party transactions, reporting no changes in cashflow attributable to related party transactions.

32.     The 3Q15 10-Q discussed the Company's internal controls over financial reporting, stating in relevant part:

**Changes in Internal Control over Financial Reporting**

There was no change to our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) that occurred during the period covered by this report that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

33.     On March 14, 2016, the Company filed a Form 10-K for the fiscal year ended December 31, 2015 ("2015 10-K") with the SEC.  The 2015 10-K was signed by Defendants Hu and Wang.  Attached to the 2015 10-K were signed SOX certifications signed by Defendants Hu and Wang attesting to the accuracy of the financial statements, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

34.     Defendants represented in the 2015 10-K the Company's internal controls over financial reporting, stating in relevant part:

Management conducted an assessment of the effectiveness of our system of internal control over financial reporting as of December 31, 2015, the last day of our fiscal year. This assessment was based on criteria established in the framework Internal Control—Integrated Framework (2013), issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") and included an evaluation of elements such as the design and operating effectiveness of key financial reporting controls, process documentation, accounting policies, and our overall control environment. ***Based on management's evaluation under the 2013 COSO framework, management concluded that the Company's internal controls over financial reporting were effective as of December 31, 2015.***

35.     As to related-party transactions, Defendants represented in the 2015 10-K that:

***Other than as set forth below, for fiscal years ended December 31, 2015 and 2014, the Company was not involved in any related party transactions.***

* * *

During the fiscal years ended December 31, 2015, 2014 and 2013, the Company sold products to Kandi USA Inc., a company that operates under the trade name of Eliteway Motorsports ("Eliteway"), amounting to $0, $2,981,944 and $6,906,807, respectively.

36.     On May 10, 2016, the Company filed a Form 10-Q for the quarterly period ended March 31, 2016 ("1Q16 10-Q") with the SEC.  The 1Q16 10-Q was signed by Defendants Hu and Wang.  Attached to the 1Q16 10-Q were signed SOX certifications by Defendants Hu and Wang attesting to the accuracy of the financial statements, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

37.     The 1Q16 10-Q discussed the Company's internal controls over financial reporting, stating in relevant part:

**Changes in Internal Control over Financial Reporting**

There was no change to our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) that occurred during the period covered by this report that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

38.     On August 9, 2016, the Company filed a Form 10-Q for the quarterly period ended June 30, 2016 ("2Q16 10-Q") with the SEC. The 2Q16 10-Q was signed by Defendants Hu and Wang.  Attached to the 2Q16 10-Q were SOX certifications signed by Defendants Hu and Wang attesting to the accuracy of the financial statements, the disclosure of any material

changes to the Company's internal control over financial reporting and the disclosure of all fraud.

39.     The 2Q16 10-Q discussed the Company's internal controls over financial reporting, stating in relevant part:

**Changes in Internal Control over Financial Reporting**

There was no change to our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) that occurred during the period covered by this report that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

40.     On November 9, 2016, the Company filed a Form 10-Q for the quarterly period ended September 30, 2016 ("3Q16 10-Q") with the SEC. The 3Q16 10-Q was signed by Defendants Hu and Wang. Attached to the 3Q16 10-Q were SOX certifications signed by Defendants Hu and Wang attesting to the accuracy of the financial statements, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

41.     The 3Q16 10-Q discussed the Company's internal controls over financial reporting, stating in relevant part:

**Changes in Internal Control over Financial Reporting**

There was no change in our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) that occurred during the period covered by this report that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

42.     The above statements in ¶¶28-41 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, as set forth in ¶¶44-55, Defendants failed to disclose that: (1) certain areas in the Company's previously issued financial statements for the years ended December 31,

2015 and 2014, and the first three quarters for the year ended December 31, 2016 required adjustment; (2) in turn, the Company lacked effective controls over financial reporting; and (3) as a result, Defendants' statements about the Company's business, operations, and prospects, were materially false and misleading and/or lacked a reasonable basis at all relevant times. Additionally, the above statements in ¶¶28-41 were also materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects because as set forth in ¶¶56-63, Defendants failed to disclose that: (1) Kandi artificially inflated its reported revenues through undisclosed related-party transactions; (2) a substantial amount of Kandi's previous sales had been to undisclosed related parties; and (3) as a result, the Company's public statements were materially false and misleading at all relevant times.

43.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

**The Truth Begins to Emerge**

44.    On November 14, 2016, the Company announced the abrupt resignation of Defendant Wang as the CFO.  On this news, shares of Kandi fell $0.40 per share, or more than 10% from their previous closing price, to close at $3.50 per share on November 14, 2016, damaging investors.

45.    On March 13, 2017, the Company filed a Form 8-K with the SEC revealing that its previously issued financial statements for the years ended December 31, 2015 and 2014, and the first three quarters for the year ended December 31, 2016 will need to be restated, stating in relevant part:

**Item 4.02 Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review.**

During the course of Kandi Technologies Group, Inc.'s (the "Company") preparation of its Annual Report on Form 10-K for the year ended December 31, 2016, and during preparation of responses to comments from the staff of the Securities and Exchange Commission ("SEC"), Division of Corporate Finance, *the Company's management identified certain areas in the Company's previously issued financial statements for the years ended December 31, 2015 and 2014, and the first three quarters for the year ended December 31, 2016 (the "Previously Issued Financial Statements"), that require adjustment as described below and in more detail in the Company's annual report on Form 10-K/A for the fiscal year ended December 31, 2015 ("Form 10-K/A"), to be filed with the SEC. As a result, on March 7, 2017, the board of directors (the "Board") of the Company, based on the recommendation of the Company's audit committee, and in consultation with management, concluded that the Company's Previously Issued Financial Statements should no longer be relied upon. The Company will, in the Form 10-K/A, restate the Previously Issued Financial Statements, which restatement will include separate audited financial statements for the JV Company (the "Restatements").* The Restatements will have no effect on the net income of the Company as reported in the Previously Issued Financial Statements. The Company will endeavor to file its Annual Report on Form 10-K for the fiscal year ended December 31, 2016, pursuant to SEC's rules (including timing guidelines), and will file the Form 10-K/A as soon as practicably possible.

The Restatements will include separate audited financial statements for the Company's equity investment in the JV Company, corrections to the classification of notes receivable and notes payable in the Company's statements of cash flow, revisions in the Company's financial statement presentation to separately identify certain related party accounts on the face of the Balance Sheets and the Consolidated Statements of Income (Loss) and Comprehensive Income (Loss), certain amendments to Note 20 – Taxes of the Notes to the Company's Consolidated Financial Statements, the adjustment of previously recorded construction-inprogress back to prepayment in Note 16 - Construction-in-Progress of the Notes to the Company's Consolidated Financial Statements, expansions of two tables of sales to and purchases from the JV Company in Note 24 - Summarized Information of Investment in the JV Company of the Notes to the Company's Consolidated Financial Statements from two years to three years, and the removal of "unaudited" labels from certain tables in Note 20 - Taxes of the Notes to the Company's Consolidated Financial Statements.

The Company will also amend its unaudited quarterly data for the first three quarters ended December 31, 2016, as set forth in its upcoming Annual Report on Form 10-K for the year ended December 31, 2016.  The Company has not filed and does not intend to file amendments to its Quarterly Reports on Form 10-Q for the quarterly periods affected.  Accordingly, investors should no longer rely upon the Company's previously released financial statements for those periods or any

earnings releases or other communications relating to those periods. The Company's Quarterly Reports on Form 10-Q for fiscal year 2017 will include restated results for the corresponding interim periods of fiscal year 2016.

***In addition, in conjunction with the Restatements, the Company is reassessing its internal controls over its financial reporting and compliance programs. The result of this reassessment could lead the Company to conclude that there were deficiencies in its internal controls over financial reporting that constitute material weaknesses and could therefore affect its conclusions regarding effectiveness as previously expressed in Item 9A, Controls and Procedures, of the Company's Annual Report on Form 10-K for the year ended December 31, 2015.*** Accordingly, management's report on internal controls over financial reporting as of December 31, 2015, and the associated report of AWC (CPA) Limited, the Company's former principal accountant ("AWC"), should no longer be relied upon. The Public Company Accounting Oversight Board revoked the registration of AWC on May 18, 2016. The Company dismissed AWC and engaged BDO China Shu Lun Pan Certified Public Accountants LLP ("BDO China") as its new independent registered public accounting firm on April 12, 2016, as previously reported. The Company is committed to maintaining an effective control environment and making all necessary changes to enhance control effectiveness.

The chair of the Company's audit committee, on behalf of the audit committee, and the management have discussed the matters disclosed in this Item 4.02(a) of this Current Report on Form 8-K with BDO China.

46.     On this news, shares of Kandi fell $0.30 per share, or approximately 6%, from its previous closing price to close at $4.05 per share on March 14, 2017, further damaging investors.

47.     On March 16, 2017, the Company filed its Form 10-K for fiscal year 2016 ("2016 10-K"), restated its 2014 – 3Q 2016 Financials, and admitted that there were material weaknesses in the Company's internal controls.

48.     Kandi conceded in the 2016 10-K that, among other things, it had made "errors" in the classification of notes receivable and notes payable in its statement of cash flows, it had failed to separately identify certain related party accounts on the face of the Company's balance sheets and income statements, and it had improperly accounted for the Company's equity investment in the JV Company.

49.     While the 2016 10-K also included a purported plan for remediating the material weaknesses in Kandi's internal controls, the Company warned that it could not "provide assurance that we will not fail to achieve and maintain an effective internal control environment on an ongoing basis, which may cause investors to lose confidence in our reported financial information and have a material adverse effect on the price of our common stock."

50.     Defendants' lack of meaningful internal controls resulted in numerous unreported related party transactions, such as in 2010 when the Company's auditors at the time, AWC, discovered that Defendant Hu was holding $1.6 million of the Company's reported year-end cash balance in a personal account.  AWC did not take steps determine why this was so.  Nor did AWC explore whether this was a related-party transaction that needed to be disclosed in the Company's financial statements.

51.     On November 2, 2016, the Company disclosed for the first time that it had engaged in material transactions in 2012 with Kandi USA, owned by Wangyuan Hu, the son of Defendant Hu, using its trade name, Eliteway.  The Company also disclosed that it had engaged in material transactions in 2013 and 2014 with Kandi USA, again using the trade name Eliteway. The total amount of the transactions was identified as $9,888,751.  The Company claimed that all the transactions had been at arm's length.

52.     The Company also disclosed additional related-party transactions with the Zhejiang ZuoZhongYou Electric Vehicle Services Co., Ltd. (the "Service Company"), in which the Company has a 9.5% ownership, resulting in additional receivables due from the Service Company.  As of December 31, 2014, the receivables totaled over $40 million.  As of December 31, 2016, the receivables totaled $10.4 million.  Defendants further represented, however, that

other than these transactions, "for the fiscal years ended December 31, 2017 and 2016, the Company was not involved in any related party transactions."

53.    On May 10, 2017, William Hughes, Jr. ("Hughes"), a shareholder of the Company, through his counsel, initiated a 220 demand on Kandi, pursuant to 8 Del. C. § 220, for certain books and records of the Company (the "220 Demand"). The 220 Demand sought documents concerning the restatement of the Company's 2014 – 3Q 2016 Financials, as well as related breaches of fiduciary duties and wrongdoing by the Company's management and the board of directors, mismanagement, waste, and other corporate wrongdoing at the Company. Kandi ultimately refused to produce any documents in response to Hughes's 220 Demand, and on October 2, 2017, Hughes filed in the Delaware Court of Chancery a Verified Complaint Pursuant to 8 Del. C. Section 220 to Compel Inspection of Books and Records (the "220 Complaint"). *See Hughes v. Kandi Technologies Group, Inc.*, C.A. No. 2017-0700 JTL (Del. Ch.).

54.    Based on his findings, Hughes filed a complaint against Kandi in the Court of Chancery of Delaware on February 14, 2019. *See Hughes v. Hu, et al.*, C. A. No. 2019-0112-JTL. Defendants moved to dismiss the complaint pursuant to Rule 23.1, contending that the Hughes failed to make a demand on the board or plead that demand would have been futile. The court ruled against the defendants, stating in relevant part:

> The plaintiff obtained books and records before filing suit. The fruits of that investigation—and, just as important, what the Company conspicuously failed to produce—have enabled the plaintiff to plead a complaint that supports a reasonable pleading-stage inference of a bad faith failure of oversight by the named director defendants. Four of the defendants comprise a majority of the board that would have considered a demand, and the substantial threat of liability renders them incapable of disinterestedly considering a demand. Demand would have been futile, so the Rule 23.1 motion is denied.

The defendants also have moved to dismiss the complaint pursuant to Rule 12(b)(6), contending that the plaintiff failed to state a claim on which relief can be granted. Both sides treated the analysis of the Rule 23.1 motion as dispositive of the Rule 12(b)(6) motion. That motion is also denied.

55.    On March 16, 2018, the Company filed a Form 10-K for the fiscal year ended December 31, 2017 ("2017 10-K") with the SEC confirming that its internal controls over financial reporting ("ICFR") were not effective as of December 31, 2017, stating in relevant part:

> Management conducted an assessment of the effectiveness of our system of ICFR as of December 31, 2017, the last day of our fiscal year of 2017.  This assessment was based on criteria established in Internal Control—Integrated Framework, issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") in 2013 (the "2013 COSO Framework") and included an evaluation of elements such as the design and operating effectiveness of key financial reporting controls, process documentation, accounting policies, and our overall control environment. ***Based on management's evaluation under the 2013 COSO framework, management concluded that the Company's internal controls over financial reporting were not effective as of December 31, 2017. Certain control deficiencies existed in the internal control over financial reporting as of December 31, 2017, including lack of adequate knowledge of US GAAP and SEC rules and inaccurate accounting for income taxes. These material weaknesses existed as of December 31, 2015 and had not yet been fully remediated as of December 31, 2017.***

### The Full Truth Emerges

56.    On November 30, 2020, Hindenburg Research published a report on Kandi entitled "Kandi: How This China-Based NASDAQ Listed Company Used Fake Sales, EV Hype to Nab $160 Million From U.S. Investors."  A copy of the report is attached hereto as Exhibit A and incorporated herein by reference.

57.    Among other things, the comprehensive Hindenburg Report detailed the following:

· Today we reveal what we believe to be a brazen scheme by China-based, NASDAQ-listed Kandi Technologies Group to falsify revenue using fake sales to undisclosed affiliates.

18

- Our investigation included extensive on-the-ground inspection at Kandi's factories and customer locations in China, interviews with over a dozen former employees and business partners, and review of numerous litigation documents and international public records.

- We unmasked Kandi's "unnamed" top customers and found that almost 64% of Kandi's last twelve months (LTM) sales have been to undisclosed related parties.

- The company's largest customer, representing ~55% of last twelve months (LTM) sales, shares a phone number with a Kandi subsidiary, and shared an executive with Kandi.

- We visited the "customer". It is based in a tiny building right next to Kandi's factory with a sign indicating that it's a Kandi company. The same building housed another entity used by Kandi as part of a separate fake sales scheme to collect illegitimate subsidies from the Chinese government, for which it was fined and sanctioned.

- Kandi's second largest customer, representing ~9% of LTM sales, was once wholly owned by the company. Its website still integrates the Kandi logo with the customer name.  Export records show that 91% of the U.S. exports by the "customer" went to undisclosed related party entities based out of Kandi's U.S. headquarters and warehouses.

- To support this, we have photographic evidence of one such Kandi "customer's" inventory sitting in Kandi's own warehouse.

- Kandi's financials corroborate our concerns. The company has consistently booked revenue it cannot collect, a classic hallmark of fake revenue. Its Days Sales Outstanding (DSO) a common measure of revenue collection, was 278 days in the previous quarter, about 5.6x worse than its closest auto peer.

- Kandi's top financial ranks have been a revolving door; another key sign of accounting irregularities. The company has had 3 auditors in the past 5 years, and 4 Chief Financial Officers in the past 4 years.

- Kandi's current auditor, Marcum, was just handed a 3-year ban from auditing Chinese companies by the Public Company Accounting Oversight Board (PCAOB). Rather than firing the auditor, Kandi just reported its intention to renew the engagement.

- Kandi's latest issues are part of a long-running pattern, rather than an isolated incident. The architects of Kandi's original go-public transaction were charged with fraud by the SEC in 2014 for, among other things,

engaging in a scheme with Kandi's (still) Chairman/CEO to artificially inflate its stock price.

· In 2016, Kandi's long-serving prior auditor was ejected from the industry by the PCAOB specifically for failure to catch obvious signs of fraud at Kandi, including misappropriation by company management and undisclosed related party transactions.

· Kandi's latest pitch to investors is focused on an imminent U.S. launch. We show that Kandi has been "launching" in the U.S. for 12 years. Its first U.S. vehicles were imported illegally and seized by customs. A former distribution partner said every single car that eventually made it into the country broke.

· Kandi has a reputation in China for poor quality vehicles and failing to honor service warranties. The company has reported no domestic EV sales for years outside of its minority stake in a joint venture. We expect its U.S. efforts will continue to sputter.

· We also review Kandi's partnership with a Chinese rideshare company, which it has repeatedly claimed could lead to up to 300,000 EV sales. We show that the rideshare partner's app is mostly vaporware; it has almost no users and isn't even ranked among China's top 50 rideshare apps.

· Lastly, we address the company's much-touted battery swap program, which is preliminary and hopelessly behind peers, including Kandi's own partner Geely. Without a meaningful number of cars on the road Kandi's battery swap efforts simply don't make sense.

· Kandi raised $160 million from U.S. investors this month alone. All told, we think Kandi has engaged in a major fake revenue scheme, hyping its story to U.S. investors, in order to take advantage of regulatory gaps enabling China-based companies to siphon cash from U.S. capital markets with impunity.

58.     The Hindenburg Report "unmasked Kandi's unnamed top customers and found that almost 64% of Kandi's last twelve months (LTM) sales have been to undisclosed related parties."  In connection with the preparation of the Hindenburg Report, representatives visited "[t]he company's largest customer, representing ~55% of last twelve months (LTM) sales." Analyzing various sources of information, the Hindenburg Report identified the Company's largest customer as Jinhua Chaoneng Automobile Sales Co. Ltd. ("Chaoneng").  The Hindenburg

Report found that Chaoneng was located in the same industrial park as Kandi and in "[t]he same building [that] housed another entity used by Kandi as part of a [prior] separate fake sales scheme to collect illegitimate subsidies from the Chinese government, for which it was fined and sanctioned."   The Hindenburg Report also discovered that Chaoneng previously shared an executive with Kandi, the same phone number as a Kandi subsidiary, and that Chaoneng had signage outside of its building with the name "KANDI" appearing on one sign and the words "Jinhua Kandi Electric Vehicle Chaoneng" on another.

59.   The Hindenburg Report also identified Kandi's second largest customer as former Kandi subsidiary Zhejiang Kuke Sports Technology Co., Ltd. ("Kuke"), which accounted for "11% of last quarter's sales and 9% of Kandi's LTM sales."   According to the Hindenburg Report, "corporate records on QCC.com still refer to [Kuke] as being a part of Kandi." Additionally, the Hindenburg Report found that Kuke's "website still shows close ties to Kandi," that "[t]he homepage features a large image of Kandi's factory and that [Kuke's] logo integrates Kandi with its corporate name."   The Hindenburg Report found further that Kuke's website "features the brand name 'Jasscol', which is a registered trademark *owned by Kandi*."   The Hindenburg Report found further that 30% of Kuke's historical exports were to Massimo Motor Sports LLC ("Massimo"), an entity based out of Kandi America's Headquarters and owned by the Founder and Manager of Kandi America.   According to the Hindenburg Report, Massimo was therefore a top customer and top supplier to the Company.   The Hindenburg Report stated further that 52% of Kuke's historical exports went to Jass Motorsports, Inc., an entity that shared an executive with Kandi and was based out of the same address as a branch of Kandi USA.   The Hindenburg Report further noted that 9% of Kuke's historical exports went to Lil Pick Up, Inc., an entity that also leased warehouse space at Kandi America's Headquarters.

60.     On December 7, 2020, Kandi issued a letter from the Company's Chairman ("Chairman's Letter") that attempted to dispute the findings contained in the Hindenburg Report. The Chairman's Letter stated as follows:

Jinhua, China, Dec. 07, 2020 (GLOBE NEWSWIRE) – Kandi Technologies Group, Inc. (NASDAQ GS: KNDI) (the "Company" or "Kandi") today issued a letter to its shareholders from the Chairman as below:

Dear Kandi Shareholder,

On November 30, 2020, a firm with an acknowledged short position in Kandi stock issued a "research report" that leveled a series of inaccurate allegations regarding Kandi and its management team.  The firm that issued the report is shorting our stock and will profit if the stock price declines.  In contrast, the Company's motive is to create value for all shareholders by building a durable and profitable leader in a dynamic growth industry.   It is clear from this review that the report contains a variety of misleading accusations that are either thinly veiled assertions of opinion, or based on previously reported historical events. As one example, they question the odds of success of our ride-sharing initiative. Anyone, you included, is free to assess the likelihood of success of our business strategy.  Merely asserting an opinion on our strategy proves nothing about our trustworthiness.  Assertions like this, we will ignore.  While the entire report lacks merit, the Company and its management believe that it would be helpful to our shareholders to address the inaccuracies that have received significant press attention.

1.      By mischaracterizing certain documents from 2014, the report insinuates that I participated in a scheme to inflate the price of our stock during the reverse merger process.  This is inaccurate because, as the report acknowledges, neither I nor the Company were ever charged with any such violations.  This is not new information and was previously disclosed in our regulatory filings.

2.      The Company's participation in Chinese government subsidy programs through a joint venture (the "JV Company") is well documented in public filings.  Contrary to the report's allegations, the JV Company properly received subsidy payments for all electric vehicles sold prior to 2016 and the JV Company's dual production licenses were approved in August 2019. According to government policy, any company that improperly participated in the subsidy program would not receive any subsidy payments nor dual production licenses.

3.      As with other aspects of the report, the Company's decision to change auditors was previously disclosed and resulted from Kandi's growth rather

than any sort of alleged "fraud". For example, in 2019 we changed to an auditor that is subject to inspection by the Public Company Accounting Oversight Board ("PCOAB"). Our current auditor is a leader in providing accounting services to Chinese companies listed in the United States.

4.      The report's assertions of "related party" transactions and "fabricated sales" suffer from a number of defects:

a.      Chaoneng's legal representative (Hu Yiheng) is not currently an executive of Kandi as the report contends. In fact, Mr. Hu Yiheng resigned from Kandi in April 2011 to start Chaoneng. The report uses misleading quotes from an October 2010 article as support for its contention that Mr. Hu Yiheng is still with Kandi.

b.      When it was first established in 2011, Chaoneng rented office space from Kandi and listed its landlord's phone number (0579-82239276) for business registration purposes. This is not Chaoneng's current telephone number.

c.      Chaoneng is located in the same industrial park complex as Kandi, but not at the same address (as the report contends). Chaoneng is the fourth building on the lot while Zhejiang Kandi Smart Battery Swap Technology Co., Ltd (formerly Jinhua An Kao Power Technology Co., Ltd) is located at the north side of the first factory building. Chaoneng provides maintenance services to vehicles manufactured by Kandi at that location. The reference to "Kandi" in the signage refers to their services for Kandi vehicles, not Kandi as a company. Kandi and Chaoneng are not related parties.

d.      The report mistakenly contends that Massimo Motor Sports and its owner David Shan are undisclosed related parties of Kandi. Mr. Shan left SC Autosports (formally named Sportsman Country) when Kandi acquired it in 2018 and no longer has any affiliation with Kandi.

e.      Kuke was a subsidiary of Kandi until January 2008. In February 2008, Kuke was spun-off from Kandi and has been an independent entity since that time. While Kuke has been the exclusive agent of Kandi's products in the United States since August 2015, Kandi plans to end this exclusivity in 2021 based on the expected growth in the United States of Kandi's subsidiary SC Autosports.

f.      The report mistakenly contends that KANDI USA and JASS MOTORSPORTS have the same address. KANDI USA closed in November 2015. There is no affiliation between Kandi USA and JASS MOTORSPORTS.

g.      Finally, Kandi's financial reports are audited, and care is taken to properly record sales.

Accordingly, and contrary to the report's allegations, we are enthusiastic about the progress we made in 2020. Our ATV sales achieved substantial growth, while unit sales of the Scrou-produced balancing scooters should exceed 500,000 in 2020 and we expect sales to exceed 3 million units in 2021.  Prospects for EV parts sales are strong. Our K23 and K27 EV models received the required clearance from the United States Environmental Protection Agency (EPA) via Certificates of Conformity.  Our K27 model recently met the safety regulations of the U.S. Department of Transportation FMVSS 500 and is scheduled to be launched on the market soon.  Safety certification for the K23 is being finalized and we anticipate customer deliveries in the first quarter of 2021. The "300,000 government-accredited pure EV within 5 years rideshare" program has officially started in the city of Shaoxing in Zhejiang province, and in the city of Haikou in Hainan province.  We strongly believe that the program will drive sales growth of our EV and battery swap equipment in 2021. In addition, our new 1 million plus square feet (100,000 square meters) facility will be completed in January 2021 and is expected to start production in the first quarter of 2021.

To conclude, we strongly believe that this report is laced with innuendo and supposition, which are countered by our proven prospects for future growth.  Rest assured that we will continue to operate with the highest standards in order to maximize shareholder value.

Most sincerely,

Hu Xiaoming
Chairman and Chief Executive Officer
Kandi Technologies Group

61.      Contrary to its intention to dispute the contentions regarding Kandi's related parties contained in the Hindenburg Report, the Chairman's Letter actually admitted facts that confirm the related nature of such entities.  For instance, with respect to Chaoneng, the Chairman's Letter admitted, among other things, that: (1) Chaoneng rented office space from Kandi; (2) Chaoneng and Kandi previously shared the same telephone number; (3) Chaoneng is located in the same industrial park complex as Kandi, adjacent to a Kandi factory; (4) Chaoneng provides maintenance services to vehicles manufactured by Kandi in the same industrial park

24

complex; (5) Chaoneng has Kandi's name in its signage at the industrial park complex; and (6) Chaoneng's legal representative, Hu Yiheng, was previously an executive of Kandi who resigned from Kandi in April 2011 to start Chaoneng.

62.     Similarly, with respect to Kuke, the Chairman's Letter admitted, among other things, that: (1) Kuke was a subsidiary of Kandi until January 2008; (2) in February 2008, Kuke was spun-off from Kandi; and (3) Kuke has been the exclusive agent of Kandi's products in the United States since August 2015.

63.     Additionally, the Chairman's Letter failed to dispute – and therefore impliedly conceded – that: (1) the Chinese government previously sanctioned Kandi and its JV partner over a scheme to collect illegitimate government subsidy payments through fake EV sales and the entity used to generate the fake sales in the scheme – Left Middle Right, Co. Ltd. – is based out of the same building as Chaoneng; (2) corporate records on QCC.com still refer to Kuke as being part of Kandi; (3) Kuke's website shows close ties to Kandi and feature the brand name Jasscol, which is a registered trademark owned by Kandi; (4) Kuke is buying from Kandi and then selling right back to undisclosed related parties of Kandi; (5) Massimo Motor Sports, an undisclosed related-party entity of Kandi America, is both a top customer and a top supplier of Kandi; (6) 52% of Kuke's historical exports were to Jass Motorsports, Inc., an entity that shared an executive with Kandi and was previously based in the same address as a branch of Kandi USA; and (7) 9% of Kuke's historical exports went to Lil Pickk Up, Inc., and entity that also leases warehouse space at Kandi America's headquarters.

**CLASS ACTION ALLEGATIONS**

64.     Plaintiff brings this action as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of all those who purchased

the Company's common stock during the Class Period, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have, or had, a controlling interest.

65.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, the Company's common stock was actively traded on NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

66.     Plaintiff's claims are typical of the claims of the members of the Class, since all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law alleged herein.

67.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

68.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether Defendants' acts constituted violations of the federal securities laws;

(b)      whether Defendants' statements made to the investing public during the Class Period misrepresented material facts concerning the Company's business, operations, and financial condition;

(c)      whether the price of the Company's common stock was artificially inflated during the Class Period; and

(d)      to what extent the members of the Class have sustained damages and the proper measure of damages.

69.      A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  Additionally, there will be no difficulty in the management of this action as a class action.

## LOSS CAUSATION

70.      During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of the Company's common stock.  Defendants' conduct, moreover, operated as a fraud or deceit on Class Period purchasers of the Company's common stock by failing to disclose, and misrepresenting, the adverse facts detailed herein.  As Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of the Company's common stock declined significantly as the prior artificial inflation dissipated from the Company's stock price.

71.      For example, on November 14, 2016, the Company announced the abrupt resignation of Defendant Wang as the CFO.  On this news, shares of Kandi fell $0.40 per share,

or more than 10% from their previous closing price, to close at $3.50 per share on November 14, 2016, damaging investors.

72.     Additionally, on March 13, 2017, the Company filed a Form 8-K with the SEC revealing that its previously issued financial statements for the years ended December 31, 2015 and 2014, and the first three quarters for the year ended December 31, 2016 will need to be restated.  On this news, shares of Kandi fell $0.30 per share, or approximately 6%, from its previous closing price to close at $4.05 per share on March 14, 2017, further damaging investors.

73.     As a result of the purchases of the Company's common stock during the Class Period, Plaintiff and the other members of the Class suffered economic loss (damages) under the federal securities laws.  Defendants' false and misleading statements had the intended effect, and caused, the Company's common stock to trade at artificially inflated levels throughout the Class Period.

74.     By concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of the Company's business and prospects.  As the truth regarding the Company was revealed to the market, the price of the Company's common stock fell significantly.  These declines removed the inflation from the price of the Company's common stock, causing real economic loss to investors who purchased the Company's common stock during the Class Period.

75.     The declines in the price of the Company's common stock after the corrective disclosures came to light were a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market.  The timing and magnitude of the price declines in the Company's common stock negate any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions,

macroeconomic, or industry factors, or by Company-specific facts unrelated to defendants' fraudulent conduct.

76.     The economic loss (damages) suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of the Company's common stock and the subsequent significant decline in the value of the Company's common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

77.     At all relevant times, the market for the Company's common stock was an efficient market for the following reasons, among others:

(a)     The Company's common stock met the requirements for listing, and was listed and actively traded on NASDAQ, a highly efficient, electronic stock market;

(b)     As a regulated issuer, the Company filed periodic public reports with the SEC;

(c)     The Company regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     The Company was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

78.     As a result of the foregoing, the market for the Company's common stock promptly digested current information concerning the Company from all publicly available

sources and reflected such information in the prices of the Company's stock.  Under these circumstances, all purchasers of the Company's common stock during the Class Period suffered similar injury through their purchase of the Company's common stock at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

79.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements alleged herein.  Many of the specific statements alleged herein were not identified as "forward-looking statements" when made, and thus are not entitled to protection under the safe harbor provision.  Additionally, to the extent that there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.   Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements alleged herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of the Company who knew that those statements were false when made.

## COUNT I
### Violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Promulgated Thereunder Against All Defendants

80.    Plaintiff repeats and realleges each and every allegation contained above as though set forth in full herein.

81.    During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew, or were deliberately reckless

in not knowing, were misleading.  These statements were false and misleading because they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

82.     Defendants: (1) employed devices, schemes, and artifices to defraud; (2) made untrue statements of material fact/and or omitted to state material facts necessary to make the statements made not misleading; and (3) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

83.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for the Company's common stock.  Plaintiff and the Class would not have purchased the Company's common stock at the prices they paid – or at all – if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

84.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

**COUNT II**
**Violation of Section 20(a) of the Exchange Act Against the Individual Defendants**

85.     Plaintiff repeats and realleges each and every allegation contained above as though set forth in full herein.

86.     The Individual Defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and/or intimate knowledge of the Company's statements filed with the

SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements alleged to be false and misleading herein.

87.    The Individual Defendants, moreover, were provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings, and other statements alleged to be false and misleading herein.  The Individual Defendants were provided with, or had unlimited access to, such documents and statements prior to, and/or shortly after these statements were issued, and therefore had the ability to prevent the issuance of the statements and/or cause the statements to be corrected.  Additionally, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and had the power to control or influence the particular transactions giving rise to the securities violations.

88.    The Individual Defendants all had ultimate authority over the Company's statements, including controlling the content of such statements and whether and how to communicate such statements to the public.

89.    By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff, and certifying Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.     Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Such other and further relief as the Court may deem just and proper.

### JURY DEMAND

Plaintiff hereby demands a trial by jury.

Respectfully submitted,

DATED:  December 18, 2020         **GLANCY PRONGAY & MURRAY LLP**

By:     s/ Charles H. Linehan
Robert V. Prongay (admitted *pro hac vice*)
Ex Kano S. Sams II (*pro hac vice* pending)
Charles H. Linehan (admitted *pro hac vice*)
Pavithra Rajesh (admitted *pro hac vice*)
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: clinehan@glancylaw.com

*Counsel for Lead Plaintiff Tom Brooks and the Class*

**LAW OFFICES OF HOWARD G. SMITH**
Howard G. Smith
3070 Bristol Pike, Suite 112
Bensalem, PA 19020
Telephone: (215) 638-4847
Facsimile: (215) 638-4867

*Additional Counsel*

**PROOF OF SERVICE**

I, the undersigned say:

I am not a party to the above case and am over eighteen years old.

On January 7, 2021, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Southern District of New York, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on January 7, 2021.

*s/ Charles H. Linehan*
 Charles H. Linehan