# EXHIBIT 1

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Srinivasan Venkataraman, Individually and on Behalf of All Others Similarly Situated, | Civil Action No. 20 CIV. 8082 (LGS) |
| Plaintiff, | |
| vs. | **[PROPOSED] SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** |
| Kandi Technologies Group, Inc., Xiaoming Hu, Cheng Wang, Bing Mei, Liming Chen, Jerry Lewin, and Henry Yu, | |
| Defendants. | DEMAND FOR JURY TRIAL |

Lead Plaintiff Tom Brooks ("Plaintiff") alleges the following based upon the investigation of Plaintiff's counsel. This investigation included a review of United States Securities and Exchange Commission ("SEC") filings by Kandi Technologies Group, Inc. ("Kandi" or the "Company"), as well as securities analysts' reports and advisories about the Company, press releases, media reports, other public statements issued by, or about, the Company, and other publicly available information. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a securities class action on behalf of all persons and/or entities who purchased or otherwise acquired the Company's common stock between June 10, 2015 and March 13, 2017, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 ("Exchange Act") and SEC Rule 10b-5 promulgated thereunder.

2. Kandi designs, manufactures, and distributes electric vehicles ("EV"), EV parts, and off-road vehicles in the People's Republic of China and internationally.

3. In March 2014, Defendants announced the existence of material weaknesses in the Company's financial reporting and oversight system. These weaknesses included a lack of oversight by the Company's Audit Committee and a lack of internal controls for related-party transactions.

4. Defendants represented to investors that the Company would remediate these problems. Defendants, however, failed to do so. Indeed, in March 2017, Defendants announced that the Company needed to restate its preceding three years of financial statements. Specifically, Defendants announced that the Company lacked: (1) sufficient expertise relating to

1

technical knowledge of Generally Accepted Accounting Principles ("GAAP") and SEC disclosure regulations; (2) sufficient expertise to ensure the completeness of the disclosure of financial statements for equity investments; (3) sufficient expertise to ensure the proper disclosure of related-party transactions; (4) effective controls to ensure the proper classification and reporting of certain cash and non-cash activities related to accounts receivable, accounts payable, and notes payable; and (5) sufficient expertise to ensure the accuracy of the accounting and reporting of income taxes and related disclosures.

5.     Despite Defendants' representations to investors, Defendants were extremely reckless in remediating these problems, which caused significant losses to investors after Defendants announced their failures to the market.  Indeed, throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants failed to disclose that: (1) certain areas in the Company's previously issued financial statements for the years ended December 31, 2015 and 2014, and the first three quarters for the year ended December 31, 2016, required adjustment; (2) in turn, the Company lacked effective controls over financial reporting; and (3) as a result, Defendants' statements about the Company's business, operations, and prospects, were materially false and misleading and/or lacked a reasonable basis at all relevant times.  Defendants also failed to disclose that: (1) Kandi artificially inflated its reported revenues through undisclosed related-party transactions; (2) a substantial amount of Kandi's previous sales had been to undisclosed related parties; and (3) the Company's public statements were materially false and misleading at all relevant times.

6. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

7. The claims asserted herein arise under, and pursuant to, Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

8. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act.

9. Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b). Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred, in substantial part, in this District.

10. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of an electronic securities exchange located in this District.

## PARTIES

11. Lead Plaintiff Tom Brooks, as set forth in the previously-filed certification, incorporated by reference herein, purchased Kandi securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

3

12.     Defendant Kandi is incorporated under the laws of Delaware with its principal executive offices located in Jinhua, Zhejian Province, People's Republic of China.  Kandi's common stock trades on the NASDAQ exchange under the symbol "KNDI."

13.     Defendant Xiaoming Hu ("Hu") has served as the Company's Chief Executive Officer ("CEO"), President, and Chairman of the Board throughout the Class Period.  Prior to joining the Company, from October 2003 to April 2005, CEO Hu served as the Project Manager (Chief Scientist) in the WX Pure Electric Vehicle Development Important Project of Electro-vehicle in the State 863 Plan.  From October 1984 to March 2003, CEO Hu served as: (1) Factory Director of the Yongkang Instrument Factory; (2) Factory Director of the Yongkang Mini Car Factory; (3) Chairman and General Manager of the Yongkang Vehicle Company; (4) General Manager of the Wan Xiang Electric Vehicle Developing Center; and (5) the General Manager of the Wan Xiang Battery Company.  Additionally, CEO Hu personally owned four invention patents and seven utility model patents that he transferred to the Company in fiscal year 2012.  CEO Hu graduated from Tsinghua University.  CEO Hu knew, or was extremely reckless in not knowing, the falsity of the misrepresentations alleged herein, including, but not limited to, the test for what constitutes a related party under the applicable accounting rules and/or what disclosures are required.

14.     Defendant Cheng Wang ("Wang") was the Company's Chief Financial Officer ("CFO") from May 1, 2015 until his resignation on November 14, 2016.  As of March 20, 2015, CFO Wang had over 20 years of international financial management experience.  Before joining the Company, Mr. Wang served as CFO for Shanghai Always Marketing Service Co., LTD., one of the largest field marketing service agencies in China, leading its procurement and finance departments since May 2014.  Prior to that, CFO Wang worked for Renesola Ltd. (NYSE: SOL),

an international leading brand and technology provider of green energy products, initially as Vice President of Finance since January 2010, ascending to CFO in July 2011.  Additionally, CFO Wang holds both certifications as a Certified Public Accountant ("CPA") in China and Certified Internal Auditor ("CIA").  CFO Wang earned a Master's degree in Law from Renmin University of China and a Master's of Business Administration from the Open University of Hong Kong.  CFO Wang knew, or was extremely reckless in not knowing, the falsity of the misrepresentations alleged herein, including, but not limited to, the test for what constitutes a related party under the applicable accounting rules and/or what disclosures are required.

15.     Defendant Bing Mei ("Mei") was the Company's CFO from November 14, 2016 until his resignation on January 29, 2019.  Previously, Mr. Mei served as CFO and Board Secretary of Skystar BioPharmaceutical Company, a publicly traded biotechnology company in China since July 2011.  From June 2015 through June 2016, CFO Mei also served as an independent, non-executive Member of the Board of Directors and Chairman of the Audit Committee of PharmaMax Corporation in China.  From January 2006 through July 2011, Mr. Mei also served as CFO of Avineon, Inc., a multinational technology company in the United States, where he managed the Company's global financial operations in North America, Asia and Europe.  Previously, CFO Mei served as Controller of Arrowhead Global Solutions, Inc., a global provider of satellite communications in the United States.  In addition, CFO Mei served as Controllers of PICS, Inc. and Thompson Hospitality Corporation, a member of the Compass Group family of companies.  CFO Mei has over 15 years of accounting experience with large multinational enterprises and middle market companies in the United States and China.  CFO Mei received a B.S. in Economics from Zhejiang University in Hangzhou, China, and holds an MBA from The Fuqua School of Business at Duke University.  Additionally, CFO Mei is a CPA

5

in the State of Maryland, a Certified Management Accountant, a Chartered Global Management Accountant, and a Certified Valuation Analyst.  CFO Mei knew, or was extremely reckless in not knowing, the falsity of the misrepresentations alleged herein, including, but not limited to, the test for what constitutes a related party under the applicable accounting rules and/or what disclosures are required.

16.    Defendant Liming Chen ("Chen") has served as a director of the Company since May 1, 2012, as Chair of the Compensation Committee, and as a member of the Audit Committee and the Nominating and Corporate Governance Committee.  Defendant Chen has served as an advisor to AA Wind & Solar Energy Development Group, LLC.  Previously, from February 2009 to October 2010, Defendant Chen participated in a joint venture with Mr. Qiu Youmin, the former designer of Geely Automobile Co., Ltd., and assisted in the development of super mini three seat pure electric vehicles.  From June 2008 to July 2009, Defendant Chen participated in the development of Lithium Iron Phosphate Battery with Shanghai Yuankai Group.  Defendant Chen also served as a Professor of Electrical Engineering at Zhejiang University from 1983 to 1997.  Defendant Chen also served as a visiting scholar in the Electrical Engineering Department at Columbia University in New York City from 1981 to 1983 and as a professor in Electrical Engineering at Zhejiang University from 1960 to 1981.  Defendant Chen received his bachelor degree from Southeast University in Jiangsu, China in 1960.  Pursuant to the Company's Audit Committee Charter, Defendant Chen's responsibilities included, but were not limited to: (1) reviewing the financial reports and other financial related information released by the Company to the public, or in certain circumstances, governmental bodies; (2) reviewing the Company's system of disclosure controls and procedures, internal controls over financial reporting, and compliance with ethical standards adopted by the Company; (3) reviewing the

6

Company's accounting and financial reporting processes and the audits of the financial statements of the Company; (4) reviewing and appraising with management the performance of the Company's independent auditors; (5) providing an open avenue of communication between the independent auditors, financial and senior management, the internal audit function, and the board of directors; and (6) overseeing the registered public accounting firm's (independent auditor's) qualifications and independence.  Defendant Chen knew, or was extremely reckless in not knowing, the falsity of the misrepresentations alleged herein, including, but not limited to, the test for what constitutes a related party under the applicable accounting rules and/or what disclosures are required.

17.    Defendant Jerry Lewin ("Lewin") has served as a director of the Company since November 2010 and as a member of the Company's Audit Committee.  Defendant Lewin became Senior Vice President of Field Profitability Globally of Hyatt Hotels Corporation in January of 2015.  Prior to this position, he served as Senior Vice President of Field Operations for Hyatt Hotels Corporation and is responsible for managing the hotels in North American continent.  In his past capacity as Senior Vice President of Operation, Defendant Lewin supervised a number of areas, including finance, sales and marketing, public relations, customer service, engineering, and human resources.  Defendant Lewin has served as a member of the Hyatt Hotels Corporation's Managing Committee and has sat on the board of directors of the New York City Hotel Association.  Defendant Lewin received his Bachelor of Science degree from Cornell University and completed the Executive Development Program at J.L. Kellogg Graduate School of Management at Northwestern University.  Pursuant to the Company's Audit Committee Charter, Defendant Lewin's responsibilities included, but were not limited to: (1) reviewing the financial reports and other financial related information released by the Company

7

to the public, or in certain circumstances, governmental bodies; (2) reviewing the Company's system of disclosure controls and procedures, internal controls over financial reporting, and compliance with ethical standards adopted by the Company; (3) reviewing the Company's accounting and financial reporting processes and the audits of the financial statements of the Company; (4) reviewing and appraising with management the performance of the Company's independent auditors; (5) providing an open avenue of communication between the independent auditors, financial and senior management, the internal audit function, and the board of directors; and (6) overseeing the registered public accounting firm's (independent auditor's) qualifications and independence.  Defendant Lewin knew, or was extremely reckless in not knowing, the falsity of the misrepresentations alleged herein, including, but not limited to, the test for what constitutes a related party under the applicable accounting rules and/or what disclosures are required.

18.    Defendant Henry Yu ("Yu") has severed as a director of the Company since July 1, 2011, the Chair of the Audit Committee, and as a member of both the Compensation Committee and the Nominating and Corporate Governance Committee.  Defendant Yu has served as a Senior Advisor to ChinaPlus Capital Ltd of Shanghai, a company that focuses on bridging US/China business.  Defendant Yu also has more than 34 years banking and global business experience.  Defendant Yu was Managing Director of the Global Financial Institutions of Fifth Third Bank from 2012-September of 2015.  Defendant Yu has been involved in investment banking, commercial and international multinational lending, treasury management, credit administration, compliance, foreign bank relationship management, trade finance, and global supply chain.  From 2003 through 2007, Defendant Yu held Series 7 and 62 Certification from the Financial Industry Regulatory Authority.  Through Defendant Yu's 25 plus years of

8

coverage on emerging markets, Asia, and in particular Greater China, he is a frequent speaker and lecturer on Asian/U.S./China business to universities in Georgia (Emory University, Georgia Tech, Georgia State University, Kennesaw State University, Georgia Perimeter College), and universities in China, namely Sichuan University, Suzhou Institute, Jiliang University, and Jinan University.  Defendant Yu received his BA degree in Economics in 1978 from the University of Michigan and MBA in Finance from the University of Detroit in 1980.  Pursuant to the Company's Audit Committee Charter, Defendant Yu's responsibilities included, but were not limited to: (1) reviewing the financial reports and other financial related information released by the Company to the public, or in certain circumstances, governmental bodies; (2) reviewing the Company's system of disclosure controls and procedures, internal controls over financial reporting, and compliance with ethical standards adopted by the Company; (3) reviewing the Company's accounting and financial reporting processes and the audits of the financial statements of the Company; (4) reviewing and appraising with management the performance of the Company's independent auditors; (5) providing an open avenue of communication between the independent auditors, financial and senior management, the internal audit function, and the board of directors; and (6) overseeing the registered public accounting firm's (independent auditor's) qualifications and independence.  Defendant Yu knew, or was extremely reckless in not knowing, the falsity of the misrepresentations alleged herein, including, but not limited to, the test for what constitutes a related party under the applicable accounting rules and/or what disclosures are required.

19.     Defendants Hu, Wang, Mei, Chen, Lewin, and Yu are collectively referred to herein as the "Individual Defendants."

20.    During the Class Period, the Individual Defendants, as senior executive officers and/or directors of the Company, were privy to confidential and proprietary information concerning the Company, its operations, finances, financial condition, and present and future business prospects.  Additionally, as set forth more fully below, the Individual Defendants had access to material adverse non-public information concerning the Company.  Because of their positions within the Company, the Individual Defendants had access to non-public information about the Company's business, finances, products, markets, and present and future business prospects via internal corporate documents, conversations, and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof, and via reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew, or were deliberately reckless in not knowing, that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

21.    The Individual Defendants are liable as direct participants in the wrongs alleged herein.  In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct alleged.  Because of their positions of control, the Individual Defendants were able to, and did, directly or indirectly, control the conduct of the Company's business.

22.    The Individual Defendants, because of their positions within the Company, controlled and/or possessed the authority to control the contents of the Company's reports, press releases, and presentations to securities analysts and, through them, to the investing public.  The Individual Defendants were provided with copies of the Company's reports and press releases

10

alleged to be misleading herein, prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

23.     The Individual Defendants, as senior executive officers and/or directors – and as controlling persons of a publicly-traded company whose common stock was, and is, governed by the federal securities law – had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's common stock would be based upon truthful and accurate information.  The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

24.     The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud and/or deceit on purchasers of the Company's common stock by disseminating materially false and misleading statements and/or concealing material adverse facts.  This scheme: (1) deceived the investing public regarding the Company's business, operations and management, and the intrinsic value of the Company's common stock; (2) enabled the Company to obtain additional capital at favorable prices, create a public market for its common stock, and gain access to the public equity markets; and (3) caused Plaintiff and members of the Class to purchase the Company's common stock at artificially inflated prices.

## SUBSTANTIVE ALLEGATIONS

25.     Kandi designs, produces, manufactures, and distributes EV, EV parts, and off-road vehicles in the People's Republic of China and internationally.  The Company is a Delaware

11

corporation based in Jinhua, China.  Founded in March 2004, the Company went public in June 2007 through a reverse merger with Stone Mountain Resources Inc., a Nevada company that had been pursuing a gold-mining venture.

26.    In March 2011, AWC (CPA) Limited ("AWC") audited the Company's financial statements for the year ending December 31, 2010 ("2010 Audit").  Although purportedly acting as an independent outside auditor, AWC had no clients other than the Company.

27.    During the 2010 Audit, AWC identified key audit risks and a key control weakness involving the Company's treatment of related-party transactions.  Specifically, AWC determined that when recording transactions with Kandi USA – one of the Company's five largest customers – the Company used a different name for Kandi USA.  When AWC inquired whether the counterparty was a related party, the Company evaded the question.  In fact, Kandi USA was a related party because it was owned by Wangyuan Hu, the son of CEO Hu.

28.    In March 2011, five days before the Company filed its Annual Report on Form 10-K for the year ending December 31, 2010, CEO Hu suggested that AWC resolve the issue involving Kandi USA by booking the Company's sales to Kandi USA to a different customer's account.  AWC complied and also eliminated any references to Kandi USA despite evidence demonstrating that Kandi USA actually purchased the goods.

29.    AWC also discovered during the 2010 Audit that the Company placed large amounts of cash in the personal bank accounts of its officers and employees.  For instance, AWC found that one unidentified employee held $3 million of the Company's reported year-end cash balance in a personal account.  Rather than investigate whether this transaction constituted a related-party transaction that the Company needed to disclose, AWC merely reported the transaction to the Company's Audit Committee as evidence of a key internal control weakness.

30.     AWC subsequently discovered that the same unidentified individual was holding an additional $2.5 million of the Company's reported year-end cash balance in a different bank account.  Similarly, AWC failed to investigate whether this transaction constituted a related-party transaction that the Company needed to disclose.  Additionally, AWC also discovered that CEO Hu held another $1.6 million of the Company's reported year-end cash balance in a personal account.  AWC also failed to investigate whether this transaction constituted a related-party transaction that the Company needed to disclose.

31.     In March 2012, AWC audited the Company's financial statements for the year ending December 31, 2011 ("2011 Audit").  AWC identified "the collectability of notes receivable as a key audit risk."  AWC found that a single note constituted $33.1 million of the Company's $37.9 million notes receivable balance and that the borrower had not made any interest payments on the note in 2011.  Despite these red flags, AWC did not evaluate the creditworthiness of the borrower or further investigate the collectability of the note.

32.     In December 2012, the Company changed its name to "Kandi Technologies Group, Inc." Although Kandi is headquartered in the People's Republic of China, the Company purports to maintain an office at 230 Park Avenue, 10th Floor, New York, NY 10169.

33.     In March 2013, AWC audited the Company's financial statements for the year ending December 31, 2012 ("2012 Audit").  AWC similarly identified related-party transactions as a key risk.  For instance, AWC found transactions between the Company and Kandi USA.  As in 2010, the related-party transactions did not identify Kandi USA.  Instead, the Company referred to Kandi USA as Eliteway Management ("Eliteway"), which was later revealed to be a trade name for Kandi USA.

13

34.    Also in March 2013, the Company entered into a joint venture with Geely Automobile Holdings Ltd. ("Geely").  The Company sold parts to the joint venture, which used the parts to manufacture electric vehicles.  The Company and Geely each owned 50% of the joint venture.

35.    The joint venture sold the finished electric vehicles to Zhejiang ZuoZhongYou Electric Vehicle Service Co., Ltd. ("Service Company"), which sold and leased the vehicles. The Company owned 9.5% of the Service Company.  CEO Hu owned both 28.4% of Kandi and 13% of the Service Company.

36.    GAAP requires the disclosure of material related party transactions.  Specifically, Financial Accounting Standards Board ("SFAS") 57 requires that "[f]inancial statements shall include disclosures of material related party transactions."   "When related-party transactions occur, companies must disclose the nature of the relationship, provide a description of the transactions, report the dollar amounts of the transactions and any amounts due from or to related parties." J. David Spiceland *et al*., Intermediate Accounting 124 (citing Related Party Disclosures, SFAS No. 57).  Pursuant to SFAS No. 57, related party transactions include those between "an enterprise and its principal owners, management, or members of their immediate families" and those between a company and its "affiliates."   Under SFAS No. 57, "affiliates" include any company that is under common control or management with the public company, and "immediate family" is defined as "[f]amily members whom a principal owner or a member of management might control or influence or by whom they might be controlled or influenced because of the family relationship."

37.    Defendants structured the joint venture and Service Company to enable Kandi to take advantage of subsidies that the Chinese government made available to producers and

14

purchasers of electric vehicles. Through their ownership of the joint venture, Defendants benefited from the subsidies provided to producers, and through their ownership of the Service Company, Defendants similarly benefited from the subsidies provided to purchasers. As a result, Defendants violated GAAP (including, but not limited to, SFAS No. 57), and engaged in improper double-dipping with respect to subsidies provided by the Chinese government.

38.    On March 17, 2014, the Company filed its Annual Report on Form 10-K for the year ending December 31, 2013 ("2013 10-K"). Within the 2013 10-K, the Company disclosed that its "disclosure controls and procedures were not effective as of December 31, 2013, due to a material weakness." The 2013 10-K identified multiple factors that contributed to this material weakness: (1) the head of the Company's internal audit department reported to CEO Hu rather than to the Audit Committee, which "impaired the independence and objectivity of the internal control audit department;" (2) there was a lack of communication between the Company's internal audit department and the Audit Committee; and (3) the Company did not evaluate the effectiveness of the Audit Committee on a yearly basis. The Company further disclosed in the 2013 10-K that it did not have adequate internal controls for related-party transactions.

39.    Additionally, the 2013 10-K described efforts to remediate the Company's deficiencies. First, the Company changed its reporting structure so that the head of the internal audit department reported to the Company's Audit Committee. Second, the Company committed to revising its Audit Committee's charter to ensure that regular and frequent reporting on the internal audit related matters to the Audit Committee is carried out by the head of internal audit department. Third, the Company resolved to evaluate the effectiveness of the Audit Committee on a yearly basis. The Company also pledged that all of its related-party transactions would be subject to review by the Audit Committee.

40.     On May 9, 2014 – two months after the filing of the 2013 10-K – Kandi's Audit Committee held a meeting.  The members of the Audit Committee at the time were Defendant Chen, Defendant Lewin, and Defendant Yu.  Defendant Yu had been a member of the Audit Committee since July 2011 and served as Chair of the committee throughout that time. Defendant Chen had been a member of the Audit Committee since May 2012.  Defendant Lewin had been a member of the Audit Committee since November 2010.  The Company's CFO at the time, Xiaoying Zhu ("Zhu"), also attended the meeting, as did two representatives of AWC: Albert Wong and Martin Wong.  During the meeting, the participants discussed matters relating to the Company's relationship transactions and reviewed a sales contract entered into with Eliteway.

41.     On May 30, 2014, the Audit Committee met again.  Defendant Chen, Defendant Lewin, and Defendant Yu attended as members of the Company's Audit committee.  The head of the Company's internal audit department – Chenming Sun ("Sun") – also attended the meeting. The Audit Committee reviewed and approved a new Audit Committee Charter.

42.     The Audit Committee Charter specified the Audit Committee's responsibilities as follows: (1) reviewing the financial reports and other financial related information released by the Company to the public, or in certain circumstances, governmental bodies; (2) reviewing the Company's system of disclosure controls and procedures, internal controls over financial reporting, and compliance with ethical standards adopted by the Company; (3) reviewing the Company's accounting and financial reporting processes and the audits of the financial statements of the Company; (4) reviewing and appraising with management the performance of the Company's independent auditors; (5) providing an open avenue of communication between the independent auditors, financial and senior management, the internal audit function, and the

16

board of directors; and (6) overseeing the registered public accounting firm's (independent auditor's) qualifications and independence.

43.    In July 2014, Defendant Yu met with management, the Company's internal audit team, and AWC to review the progress of implementation of the remediation measures and to spearhead a comprehensive remediation plan to fully address the deficiencies in the Company's internal controls.

44.    After the Audit Committee's meetings in May 2014, the committee did not meet again until March 13, 2015 – three days before the Company filed its Form 10-K for the fiscal year ended December 31, 2014 ("2014 10-K").   The Audit Committee members were still Defendant Chen, Defendant Lewin, and Defendant Yu.   CFO Zhu also attended the meeting, along with Sun, the head of the internal controls department.   Martin Wong attended the meeting on behalf of AWC.   During the meeting, the Audit Committee approved a policy of a related-party transaction relating to a joint venture.

45.    On March 16, 2015, the Company filed its 2014 10-K with the SEC.   The 2014 10-K was signed by Defendant Hu.   Attached to the 2014 10-K was a certification pursuant to the Sarbanes Oxley Act of 2002 ("SOX") signed by Defendant Hu attesting to the accuracy of the financial statements, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.   Specifically, Defendant Hu represented:

I, [Hu Xiaoming], certify that:

1.    I have reviewed this annual report on Form 10-K of Kandi Technologies Group, Inc.;

2.    ***Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report***;

17

3. *Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report*;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and;

   d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. *The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):*

   a. *All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which*

18

>*are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and*

>   b.   *Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.*

46.   Defendants also represented in the 2014 10-K the Company's internal controls over financial reporting, stating in relevant part:

> Management conducted an assessment of the effectiveness of our system of internal control over financial reporting as of December 31, 2014, the last day of our fiscal year. This assessment was based on criteria established in the framework Internal Control—Integrated Framework (2013), issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") and included an evaluation of elements such as the design and operating effectiveness of key financial reporting controls, process documentation, accounting policies, and our overall control environment. ***Based on management's evaluation under the 2013 COSO framework, management concluded that the Company's internal controls over financial reporting were effective as of December 31, 2014.***[1]

47.   As to related-party transactions, Defendants represented in the 2014 10-K that:

> ***Other than as set forth below, for fiscal years ended December 31, 2014 and 2013, the Company was not involved in any related party transactions.***

* * *

> During fiscal year ended December 31, 2014, 2013 and 2012, the Company sold products to Kandi USA Inc. carrying trade name of Eliteway Motorsports ("Eliteway") amounting to $2,981,944, $6,906,807 and $5,297,548, respectively. As of December 31, 2014 and 2013, outstanding receivable due from Eliteway was $620,410 and $2,800,958, respectively.

> Mr. Hu Wangyuan was the sole shareholder and officer of Eliteway which served as a US importer of the Company's products. Mr. Hu Wangyuan is the adult son of the Company's chairman and Chief Executive Officer, Mr. Hu Xiaoming. For the year ended December 31, 2014, 2013and 2012, Eliteway and Mr. Hu Wangyuan were financially independent from the Company. The transactions between the Company and Eliteway were carried at arm's-length without

---

[1]   Unless otherwise indicated, all emphasis is added.

19

preferential terms comparing with other customers at the comparative order size or volume.

48.    The 2014 10-K also represented the following regarding Kandi's procedures for related-party transactions:

In May 2014, we adopted a written Management Policy of Related-Party Transaction (the "Policy"). According to the Policy, a "Related Transaction" is "any transaction, includes, but not limited to, any financial transaction, arrangement, relationship (including any indebtedness or guarantee of indebtedness) or any series of similar transactions, arrangements or relationships, since the beginning of the Company's last fiscal year, or any currently proposed transaction, and the amount involved exceeds $120,000, and in which any related party had or will have a direct or indirect material interest". The Policy's definition of a "Related Party" is in line with the definition set forth in the instructions to Item 404(a) of Regulation S-K promulgated by the SEC.

Under the Policy, The Company's proposed material related transaction with related person shall be submitted to the Board for consideration and discussion after independent director presents his/her approval opinion beforehand. The Audit Committee shall conduct audit on the related transaction and develop a written opinion, and can engage independent finance advisor to issue a report as a basis of its judgment, then submit it to the Board. The Policy states that the Board meeting can be held as long as non-affiliated directors over half of the Board attend, and any resolution made by the Board must be approved by over half of non-affiliated directors.

49.    The Class Period begins on June 10, 2015.

50.    On August 10, 2015, the Company filed a Form 10-Q quarterly report for the second quarter of 2015 ended June 30, 2015 ("2Q15 10-Q") with the SEC.  The 2Q15 10-Q was signed by Defendants Hu and Wang.  Attached to the 2Q15 10-Q were signed SOX certifications signed by Defendants Hu and Wang attesting to the accuracy of the financial statements, the disclosures of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

51.    Defendants represented in the 2Q15 10-Q the Company's related party transactions, reporting no changes in cashflow attributable to related party transactions.  The

20

2Q15 10-Q discussed the Company's internal controls over financial reporting, stating in relevant part:

**Changes in Internal Control over Financial Reporting**

There was no change to our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) that occurred during the period covered by this report that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

52. On November 9, 2015, the Company filed a Form 10-Q quarterly report for the third quarter of 2015 ended September 30, 2015 ("3Q15 10-Q") with the SEC. The 3Q15 10-Q was signed by Defendants Hu and Wang. Attached to the 2Q15 10-Q were signed SOX certifications signed by Defendants Hu and Wang attesting to the accuracy of the financial statements, the disclosures of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

53. Defendants represented in the 3Q15 10-Q the Company's related party transactions, reporting no changes in cashflow attributable to related party transactions.

54. The 3Q15 10-Q discussed the Company's internal controls over financial reporting, stating in relevant part:

**Changes in Internal Control over Financial Reporting**

There was no change to our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) that occurred during the period covered by this report that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

55. On March 7, 2016 – one week before the filing of the Company's Annual Report on Form 10-K for the year ending December 31, 2015 ("2015 10-K") – the Company's Audit Committee met for the first time since its meeting on March 13, 2015. The members of the Audit Committee were still Defendant Chen, Defendant Lewin, and Defendant Yu. CFO Wang

also attended the meeting as well as Sun, the head of the internal audit department.  Lai Wingwai attended the meeting on behalf of AWC.

56.    During the meeting, CFO Wang summarized the Company's year-end financial results.  CFO Wang also identified related-party transactions that took place in 2015.  The Company's management identified two related parties: Kandi USA and the Service Company.  During the meeting, Company management represented that the Company had not engaged in any related-party transactions with Kandi USA during 2015.  Management reported that the Company had engaged in related-party transactions with the Service Company, describing the transactions as mainly involving battery sales.

57.    On March 14, 2016, the Company filed it 2015 10-K with the SEC.  The 2015 10-K was signed by Defendants Hu and Wang.  Attached to the 2015 10-K were signed SOX certifications signed by Defendants Hu and Wang attesting to the accuracy of the financial statements, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

58.    Defendants represented in the 2015 10-K the Company's internal controls over financial reporting, stating in relevant part:

> Management conducted an assessment of the effectiveness of our system of internal control over financial reporting as of December 31, 2015, the last day of our fiscal year. This assessment was based on criteria established in the framework Internal Control—Integrated Framework (2013), issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") and included an evaluation of elements such as the design and operating effectiveness of key financial reporting controls, process documentation, accounting policies, and our overall control environment. ***Based on management's evaluation under the 2013 COSO framework, management concluded that the Company's internal controls over financial reporting were effective as of December 31, 2015.***

59.    As to related-party transactions, Defendants represented in the 2015 10-K that:

***Other than as set forth below, for fiscal years ended December 31, 2015 and
2014, the Company was not involved in any related party transactions.***

\* \* \*

During the fiscal years ended December 31, 2015, 2014 and 2013, the Company
sold products to Kandi USA Inc., a company that operates under the trade name
of Eliteway Motorsports ("Eliteway"), amounting to $0, $2,981,944 and
$6,906,807, respectively.

60.    On March 22, 2016, the Company's Audit Committee acted by unanimous written

consent to ratify a radically different description of the related-party transactions between the

Company and the Service Company than discussed during its March 7, 2016 meeting.  In the

consent, the Audit Committee approved related-party transactions with the Service Company

totaling $42,032,060.  The Company's management represented that the consideration for the

transactions was based on fair market price.  In the same written consent, the Audit Committee

also authorized Company management to engage in related-party transactions with the Service

Company during the remainder of 2016.

61.    On April 12, 2016, the Company's Board of Directors ("Board") held a meeting

to terminate AWC as the Company's auditor effective immediately.  The seven members of the

board at the time were the three members of the Audit Committee – Defendant Chen, Defendant

Lewin, and Defendant Yu – as well as CEO Hu, CFO Wang, Ni Guangzheng, and Qian

Jiansong.  The Board retained BDO China Shu Lun Pan CPAs as the Company's new auditor

effective immediately.  The Audit Committee acted by unanimous written consent the same day

to replace AWC with BDO China.

62.    On May 10, 2016, the Company filed a Form 10-Q for the quarterly period ended

March 31, 2016 ("1Q16 10-Q") with the SEC.  The 1Q16 10-Q was signed by Defendants Hu

and Wang.  Attached to the 1Q16 10-Q were signed SOX certifications by Defendants Hu and

23

Wang attesting to the accuracy of the financial statements, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

63.    The 1Q16 10-Q discussed the Company's internal controls over financial reporting, stating in relevant part:

**Changes in Internal Control over Financial Reporting**

There was no change to our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) that occurred during the period covered by this report that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

64.    On May 18, 2016, the Public Company Accounting Oversight Board issued an order instituting disciplinary proceedings against AWC, making findings about AWC's conduct and imposing sanctions on the firm.  The sanctions related to AWC's handling of the 2010, 2011, and 2012 Audits and imposed monetary penalties on AWC and its principals.  After the issuance of the PCAOB Order, NASDAQ asked the Company to verify its cash balances.

65.    On August 1, 2016, the Audit Committee met to review the Company's Quarterly Report on Form 10-Q for the quarter ending June 30, 2016. The members of the Audit Committee continued to be Defendant Chen, Defendant Lewin, and Defendant Yu.  CFO Wang also attended, as well as Sun, the head of the internal audit department.  Liu Yi and Mou Xun attended on behalf of BDO China.

66.    CFO Wang summarized the Company's quarterly financial results and the Company's Audit Committee discussed the results of BDO China's audit of the Company's cash balances. CFO Wang then reported on the Company's related-party transactions for the six months ending June 30, 2016.  According to CFO Wang, sales to the Service Company totaled nearly $4 million, while receivables from the Service Company totaled nearly $11 million.  The Company's management did not identify any other related-party transactions.

24

67.    During the meeting, the Audit Committee also discussed a decision by the Chinese government to delay its subsidy payments to the joint venture, which affected the Company's outlook for the remainder of the year.  Defendant Lewin suggested that the Company should consider alternatives to mitigate its reliance on the subsidies that the Chinese government was providing to producers and purchasers of electric vehicles.

68.    On August 9, 2016, the Company filed a Form 10-Q for the quarterly period ended June 30, 2016 ("2Q16 10-Q") with the SEC. The 2Q16 10-Q was signed by Defendants Hu and Wang.  Attached to the 2Q16 10-Q were SOX certifications signed by Defendants Hu and Wang attesting to the accuracy of the financial statements, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

69.    The 2Q16 10-Q discussed the Company's internal controls over financial reporting, stating in relevant part:

**Changes in Internal Control over Financial Reporting**

There was no change to our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) that occurred during the period covered by this report that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

70.    In September 2016, the Chinese government decided to phase out the subsidies. This decision followed a months-long investigation into the Company and other Chinese manufacturers who appeared to have structured their operations to take advantage of subsidies as both producers and purchasers of vehicles.

71.    On November 9, 2016, the Company filed a Form 10-Q for the quarterly period ended September 30, 2016 ("3Q16 10-Q") with the SEC. The 3Q16 10-Q was signed by Defendants Hu and Wang. Attached to the 3Q16 10-Q were SOX certifications signed by

25

Defendants Hu and Wang attesting to the accuracy of the financial statements, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

72.    The 3Q16 10-Q discussed the Company's internal controls over financial reporting, stating in relevant part:

**Changes in Internal Control over Financial Reporting**

There was no change in our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) that occurred during the period covered by this report that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

73.    The above statements in ¶¶50-54, 57-59, 62-63, 68-69, and 71-72 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects.  As set forth in ¶¶26-31, 33-37, 40-44, 55-57, 60, 64, Defendants failed to disclose that: (1) certain areas in the Company's previously issued financial statements for the years ended December 31, 2015 and 2014, and the first three quarters for the year ended December 31, 2016 required adjustment; (2) the Company lacked effective controls over financial reporting; (3) Defendants' statements about the Company's business, operations, and prospects, were materially false and misleading and/or lacked a reasonable basis at all relevant times; (4) Kandi artificially inflated its reported revenues through undisclosed related-party transactions; (5) a substantial amount of Kandi's previous sales had been to undisclosed related parties; and (6) as a result, the Company's public statements were materially false and misleading at all relevant times.  Additionally, Defendants' misrepresentations were made with scienter because, among other things: (1) Defendants benefitted in a concrete and personal way from the purported fraud; (2) Defendants knew facts or had access to information suggesting that

26

their public statements were not accurate; and (3) Defendants failed to check information they

had a duty to monitor.  Specifically:

- During the 2010 Audit, AWC identified key audit risks and a key control weakness involving the Company's treatment of related-party transactions.  AWC determined that when recording transactions with Kandi USA – one of the Company's five largest customers – the Company used a different name for Kandi USA.  When AWC inquired whether the counterparty was a related party, the Company evaded the question.  In fact, Kandi USA was a related party because it was owned by Wangyuan Hu, the son of CEO Hu;

- In March 2011, five days before the Company filed its Annual Report on Form 10-K for the year ending December 31, 2010, CEO Hu suggested that AWC resolve the issue involving Kandi USA by booking the Company's sales to Kandi USA to a different customer's account.  AWC complied and also eliminated any references to Kandi USA despite evidence demonstrating that Kandi USA actually purchased the goods;

- During the 2010 Audit, AWC also discovered that CEO Hu held another $1.6 million of the Company's reported year-end cash balance in a personal account;

- In March 2013, AWC similarly identified related-party transactions as a key risk in connection with the 2012 Audit.  For instance, AWC found transactions between the Company and Kandi USA.  As in 2010, the related-party transactions did not identify Kandi USA.  Instead, the Company referred to Kandi USA as Eliteway, which was later revealed to be a trade name for Kandi USA;

- Also in March 2013, the Company entered into a joint venture with Geely wherein the Company sold parts to the joint venture, which used the parts to manufacture electric vehicles. The Company and Geely each owned 50% of the joint venture. The joint venture sold the finished electric vehicles to the Service Company, which sold and leased the vehicles. The Company owned 9.5% of the Service Company.  CEO Hu owned both 28.4% of Kandi and 13% of the Service Company.  Defendants structured the joint venture and Service Company to enable Kandi to take advantage of subsidies that the Chinese government made available to producers and purchasers of electric vehicles. Through their ownership of the joint venture, Defendants benefited from the subsidies provided to producers, and through their ownership of the Service Company, Defendants similarly benefited from the subsidies provided to purchasers.  As a result, Defendants violated GAAP (including, but not limited to, SFAS No. 57), and engaged in improper double-dipping with respect to subsidies provided by the Chinese government;

- On May 9, 2014, Kandi's Audit Committee held a meeting.  The members of the Audit Committee at the time were Defendant Chen, Defendant Lewin, and

27

Defendant Yu.  CFO Zhu also attended the meeting, as did two representatives of AWC: Albert Wong and Martin Wong.  During the meeting, the participants discussed matters relating to the Company's relationship transactions and reviewed a sales contract entered into with Eliteway;

- On May 30, 2014, the Audit Committee met again.  Defendant Chen, Defendant Lewin, and Defendant Yu attended as members of the Company's Audit committee.  Sun, the head of the Company's internal audit department, also attended the meeting.  The Audit Committee reviewed and approved a new Audit Committee Charter.   The Audit Committee Charter specified the Audit Committee's responsibilities as follows: (1) reviewing the financial reports and other financial related information released by the Company to the public, or in certain circumstances, governmental bodies; (2) reviewing the Company's system of disclosure controls and procedures, internal controls over financial reporting, and compliance with ethical standards adopted by the Company; (3) reviewing the Company's accounting and financial reporting processes and the audits of the financial statements of the Company; (4) reviewing and appraising with management the performance of the Company's independent auditors; (5) providing an open avenue of communication between the independent auditors, financial and senior management, the internal audit function, and the board of directors; and (6) overseeing the registered public accounting firm's (independent auditor's) qualifications and independence;

- In July 2014, Defendant Yu met with management, the Company's internal audit team, and AWC to review the progress of implementation of the remediation measures and to spearhead a comprehensive remediation plan to fully address the deficiencies in the Company's internal controls;

- On March 13, 2015, the Company's Audit Committee held a meeting.  The Audit Committee members were still Defendant Chen, Defendant Lewin, and Defendant Yu.  CFO Zhu also attended the meeting, along with Sun, the head of the internal controls department.  Martin Wong attended the meeting on behalf of AWC. During the meeting, the Audit Committee approved a policy of a related-party transaction relating to a joint venture;

- On March 7, 2016, the Company's Audit Committee held a meeting.  The members of the Audit Committee were still Defendant Chen, Defendant Lewin, and Defendant Yu.  CFO Wang also attended the meeting as well as Sun, the head of the internal audit department.  Lai Wingwai attended the meeting on behalf of AWC.  During the meeting, CFO Wang summarized the Company's year-end financial results.  CFO Wang also identified related-party transactions that took place in 2015.  The Company's management identified two related parties: Kandi USA and the Service Company.  During the meeting, Company management represented that the Company had not engaged in any related-party transactions with Kandi USA during 2015.  Management reported that the Company had

28

engaged in related-party transactions with the Service Company, describing the transactions as mainly involving battery sales;

- On March 22, 2016, the Company's Audit Committee acted by unanimous written consent to ratify a radically different description of the related-party transactions between the Company and the Service Company than discussed during its March 7, 2016 meeting.  In the consent, the Audit Committee approved related-party transactions with the Service Company totaling $42,032,060.  The Company's management represented that the consideration for the transactions was based on fair market price.  In the same written consent, the Audit Committee also authorized Company management to engage in related-party transactions with the Service Company during the remainder of 2016;

- On May 18, 2016, the Public Company Accounting Oversight Board issued an order instituting disciplinary proceedings against AWC, making findings about AWC's conduct and imposing sanctions on the firm.  The sanctions related to AWC's handling of the 2010, 2011, and 2012 Audits and imposed monetary penalties on AWC and its principals.  After the issuance of the PCAOB Order, NASDAQ asked the Company to verify its cash balances; and

- On August 1, 2016, the Audit Committee met to review the Company's Quarterly Report on Form 10-Q for the quarter ending June 30, 2016. The members of the Audit Committee continued to be Defendant Chen, Defendant Lewin, and Defendant Yu.  CFO Wang also attended, as well as Sun, the head of the internal audit department.  Liu Yi and Mou Xun attended on behalf of BDO China.  CFO Wang summarized the Company's quarterly financial results and the Company's Audit Committee discussed the results of BDO China's audit of the Company's cash balances. CFO Wang then reported on the Company's related-party transactions for the six months ending June 30, 2016.  According to CFO Wang, sales to the Service Company totaled nearly $4 million, while receivables from the Service Company totaled nearly $11 million.  The Company's management did not identify any other related-party transactions.  During the meeting, the Audit Committee also discussed a decision by the Chinese government to delay its subsidy payments to the joint venture, which affected the Company's outlook for the remainder of the year.  Defendant Lewin suggested that the Company should consider alternatives to mitigate its reliance on the subsidies that the Chinese government was providing to producers and purchasers of electric vehicles.

74.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## The Truth Begins to Emerge

75.    On November 2, 2016, Defendants disclosed for the first time that the Company had engaged in material transactions in 2012 with Kandi USA (owned by Wangyuan Hu, the son of CEO Hu) using its trade name, Eliteway.  Defendants further disclosed that the Company had engaged in material transactions in 2013 and 2014 with Kandi USA, again using the trade name Eliteway.  The total amount of the transactions was identified as $9,888,751.  The Company claimed that all the transactions had been at arm's length.

76.    Additionally, Defendants disclosed additional related-party transactions with the Service Company resulting in additional receivables due from the Service Company.  As of December 31, 2014, the receivables totaled over $40 million. As of December 31, 2016, the receivables totaled $10.4 million.  Defendants further represented, however, that other than these transactions, "for the fiscal years ended December 31, 2017 and 2016, the Company was not involved in any related party transactions."

77.    On November 14, 2016, the Company announced the abrupt resignation of Defendant Wang as the CFO.  On this news, shares of Kandi fell $0.40 per share, or more than 10% from their previous closing price, to close at $3.50 per share on November 14, 2016, damaging investors.

78.    On March 13, 2017, the Company filed a Form 8-K with the SEC revealing that its previously issued financial statements for the years ended December 31, 2015 and 2014, and the first three quarters for the year ended December 31, 2016 will need to be restated, stating in relevant part:

> **Item 4.02 Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review.**

30

During the course of Kandi Technologies Group, Inc.'s (the "Company") preparation of its Annual Report on Form 10-K for the year ended December 31, 2016, and during preparation of responses to comments from the staff of the Securities and Exchange Commission ("SEC"), Division of Corporate Finance, *the Company's management identified certain areas in the Company's previously issued financial statements for the years ended December 31, 2015 and 2014, and the first three quarters for the year ended December 31, 2016 (the "Previously Issued Financial Statements"), that require adjustment as described below and in more detail in the Company's annual report on Form 10-K/A for the fiscal year ended December 31, 2015 ("Form 10- K/A"), to be filed with the SEC. As a result, on March 7, 2017, the board of directors (the "Board") of the Company, based on the recommendation of the Company's audit committee, and in consultation with management, concluded that the Company's Previously Issued Financial Statements should no longer be relied upon. The Company will, in the Form 10-K/A, restate the Previously Issued Financial Statements, which restatement will include separate audited financial statements for the JV Company (the "Restatements").* The Restatements will have no effect on the net income of the Company as reported in the Previously Issued Financial Statements. The Company will endeavor to file its Annual Report on Form 10-K for the fiscal year ended December 31, 2016, pursuant to SEC's rules (including timing guidelines), and will file the Form 10-K/A as soon as practicably possible.

The Restatements will include separate audited financial statements for the Company's equity investment in the JV Company, corrections to the classification of notes receivable and notes payable in the Company's statements of cash flow, revisions in the Company's financial statement presentation to separately identify certain related party accounts on the face of the Balance Sheets and the Consolidated Statements of Income (Loss) and Comprehensive Income (Loss), certain amendments to Note 20 – Taxes of the Notes to the Company's Consolidated Financial Statements, the adjustment of previously recorded construction-inprogress back to prepayment in Note 16 - Construction-in-Progress of the Notes to the Company's Consolidated Financial Statements, expansions of two tables of sales to and purchases from the JV Company in Note 24 - Summarized Information of Investment in the JV Company of the Notes to the Company's Consolidated Financial Statements from two years to three years, and the removal of "unaudited" labels from certain tables in Note 20 - Taxes of the Notes to the Company's Consolidated Financial Statements.

The Company will also amend its unaudited quarterly data for the first three quarters ended December 31, 2016, as set forth in its upcoming Annual Report on Form 10-K for the year ended December 31, 2016.  The Company has not filed and does not intend to file amendments to its Quarterly Reports on Form 10-Q for the quarterly periods affected.  Accordingly, investors should no longer rely upon the Company's previously released financial statements for those periods or any earnings releases or other communications relating to those periods. The

Company's Quarterly Reports on Form 10-Q for fiscal year 2017 will include restated results for the corresponding interim periods of fiscal year 2016.

***In addition, in conjunction with the Restatements, the Company is reassessing its internal controls over its financial reporting and compliance programs. The result of this reassessment could lead the Company to conclude that there were deficiencies in its internal controls over financial reporting that constitute material weaknesses and could therefore affect its conclusions regarding effectiveness as previously expressed in Item 9A, Controls and Procedures, of the Company's Annual Report on Form 10-K for the year ended December 31, 2015.*** Accordingly, management's report on internal controls over financial reporting as of December 31, 2015, and the associated report of AWC (CPA) Limited, the Company's former principal accountant ("AWC"), should no longer be relied upon. The Public Company Accounting Oversight Board revoked the registration of AWC on May 18, 2016. The Company dismissed AWC and engaged BDO China Shu Lun Pan Certified Public Accountants LLP ("BDO China") as its new independent registered public accounting firm on April 12, 2016, as previously reported. The Company is committed to maintaining an effective control environment and making all necessary changes to enhance control effectiveness.

The chair of the Company's audit committee, on behalf of the audit committee, and the management have discussed the matters disclosed in this Item 4.02(a) of this Current Report on Form 8-K with BDO China.

79.     On this news, shares of Kandi fell $0.30 per share, or approximately 6%, from its previous closing price to close at $4.05 per share on March 14, 2017, further damaging investors.

80.     On March 16, 2017, the Company filed its Form 10-K for fiscal year 2016 ("2016 10-K"), restated its 2014 – 3Q 2016 Financials, and admitted that there were material weaknesses in the Company's internal controls.

81.     Kandi conceded in the 2016 10-K that, among other things, it had made "errors" in the classification of notes receivable and notes payable in its statement of cash flows, it had failed to separately identify certain related party accounts on the face of the Company's balance sheets and income statements, and it had improperly accounted for the Company's equity investment in the JV Company.

82.    While the 2016 10-K also included a purported plan for remediating the material weaknesses in Kandi's internal controls, the Company warned that it could not "provide assurance that we will not fail to achieve and maintain an effective internal control environment on an ongoing basis, which may cause investors to lose confidence in our reported financial information and have a material adverse effect on the price of our common stock."

83.    Defendants' lack of meaningful internal controls resulted in numerous unreported related party transactions, such as in 2010 when the Company's auditors at the time, AWC, discovered that Defendant Hu was holding $1.6 million of the Company's reported year-end cash balance in a personal account.  AWC did not take steps to determine why this was so.  Nor did AWC explore whether this was a related-party transaction that needed to be disclosed in the Company's financial statements.

84.    On March 16, 2018, the Company filed a Form 10-K for the fiscal year ended December 31, 2017 ("2017 10-K") with the SEC confirming that its internal controls over financial reporting ("ICFR") were not effective as of December 31, 2017, stating in relevant part:

> Management conducted an assessment of the effectiveness of our system of ICFR as of December 31, 2017, the last day of our fiscal year of 2017.  This assessment was based on criteria established in Internal Control—Integrated Framework, issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") in 2013 (the "2013 COSO Framework") and included an evaluation of elements such as the design and operating effectiveness of key financial reporting controls, process documentation, accounting policies, and our overall control environment. ***Based on management's evaluation under the 2013 COSO framework, management concluded that the Company's internal controls over financial reporting were not effective as of December 31, 2017. Certain control deficiencies existed in the internal control over financial reporting as of December 31, 2017, including lack of adequate knowledge of US GAAP and SEC rules and inaccurate accounting for income taxes. These material weaknesses existed as of December 31, 2015 and had not yet been fully remediated as of December 31, 2017.***

**The Full Truth Emerges**

85.    On November 30, 2020, Hindenburg Research published a report on Kandi entitled "Kandi: How This China-Based NASDAQ Listed Company Used Fake Sales, EV Hype to Nab $160 Million From U.S. Investors."  A copy of the report is attached hereto as Exhibit A and incorporated herein by reference.

86.    Among other things, the comprehensive Hindenburg Report detailed the following:

- Today we reveal what we believe to be a brazen scheme by China-based, NASDAQ-listed Kandi Technologies Group to falsify revenue using fake sales to undisclosed affiliates.

- Our investigation included extensive on-the-ground inspection at Kandi's factories and customer locations in China, interviews with over a dozen former employees and business partners, and review of numerous litigation documents and international public records.

- We unmasked Kandi's "unnamed" top customers and found that almost 64% of Kandi's last twelve months (LTM) sales have been to undisclosed related parties.

- The company's largest customer, representing ~55% of last twelve months (LTM) sales, shares a phone number with a Kandi subsidiary, and shared an executive with Kandi.

- We visited the "customer". It is based in a tiny building right next to Kandi's factory with a sign indicating that it's a Kandi company. The same building housed another entity used by Kandi as part of a separate fake sales scheme to collect illegitimate subsidies from the Chinese government, for which it was fined and sanctioned.

- Kandi's second largest customer, representing ~9% of LTM sales, was once wholly owned by the company. Its website still integrates the Kandi logo with the customer name.  Export records show that 91% of the U.S. exports by the "customer" went to undisclosed related party entities based out of Kandi's U.S. headquarters and warehouses.

- To support this, we have photographic evidence of one such Kandi "customer's" inventory sitting in Kandi's own warehouse.

34

· Kandi's financials corroborate our concerns. The company has consistently booked revenue it cannot collect, a classic hallmark of fake revenue. Its Days Sales Outstanding (DSO) a common measure of revenue collection, was 278 days in the previous quarter, about 5.6x worse than its closest auto peer.

· Kandi's top financial ranks have been a revolving door; another key sign of accounting irregularities. The company has had 3 auditors in the past 5 years, and 4 Chief Financial Officers in the past 4 years.

· Kandi's current auditor, Marcum, was just handed a 3-year ban from auditing Chinese companies by the Public Company Accounting Oversight Board (PCAOB). Rather than firing the auditor, Kandi just reported its intention to renew the engagement.

· Kandi's latest issues are part of a long-running pattern, rather than an isolated incident. The architects of Kandi's original go-public transaction were charged with fraud by the SEC in 2014 for, among other things, engaging in a scheme with Kandi's (still) Chairman/CEO to artificially inflate its stock price.

· In 2016, Kandi's long-serving prior auditor was ejected from the industry by the PCAOB specifically for failure to catch obvious signs of fraud at Kandi, including misappropriation by company management and undisclosed related party transactions.

· Kandi's latest pitch to investors is focused on an imminent U.S. launch. We show that Kandi has been "launching" in the U.S. for 12 years. Its first U.S. vehicles were imported illegally and seized by customs. A former distribution partner said every single car that eventually made it into the country broke.

· Kandi has a reputation in China for poor quality vehicles and failing to honor service warranties. The company has reported no domestic EV sales for years outside of its minority stake in a joint venture. We expect its U.S. efforts will continue to sputter.

· We also review Kandi's partnership with a Chinese rideshare company, which it has repeatedly claimed could lead to up to 300,000 EV sales. We show that the rideshare partner's app is mostly vaporware; it has almost no users and isn't even ranked among China's top 50 rideshare apps.

· Lastly, we address the company's much-touted battery swap program, which is preliminary and hopelessly behind peers, including Kandi's own partner Geely. Without a meaningful number of cars on the road Kandi's battery swap efforts simply don't make sense.

35

·    Kandi raised $160 million from U.S. investors this month alone. All told, we think Kandi has engaged in a major fake revenue scheme, hyping its story to U.S. investors, in order to take advantage of regulatory gaps enabling China-based companies to siphon cash from U.S. capital markets with impunity.

87.    The Hindenburg Report "unmasked Kandi's unnamed top customers and found that almost 64% of Kandi's last twelve months (LTM) sales have been to undisclosed related parties."  In connection with the preparation of the Hindenburg Report, representatives visited "[t]he company's largest customer, representing ~55% of last twelve months (LTM) sales." Analyzing various sources of information, the Hindenburg Report identified the Company's largest customer as Jinhua Chaoneng Automobile Sales Co. Ltd. ("Chaoneng").  The Hindenburg Report found that Chaoneng was located in the same industrial park as Kandi and in "[t]he same building [that] housed another entity used by Kandi as part of a [prior] separate fake sales scheme to collect illegitimate subsidies from the Chinese government, for which it was fined and sanctioned."  The Hindenburg Report also discovered that Chaoneng previously shared an executive with Kandi, the same phone number as a Kandi subsidiary, and that Chaoneng had signage outside of its building with the name "KANDI" appearing on one sign and the words "Jinhua Kandi Electric Vehicle Chaoneng" on another.

88.    The Hindenburg Report also identified Kandi's second largest customer as former Kandi subsidiary Zhejiang Kuke Sports Technology Co., Ltd. ("Kuke"), which accounted for "11% of last quarter's sales and 9% of Kandi's LTM sales."  According to the Hindenburg Report, "corporate records on QCC.com still refer to [Kuke] as being a part of Kandi." Additionally, the Hindenburg Report found that Kuke's "website still shows close ties to Kandi," that "[t]he homepage features a large image of Kandi's factory and that [Kuke's] logo integrates Kandi with its corporate name."  The Hindenburg Report found further that Kuke's website

36

"features the brand name 'Jasscol', which is a registered trademark *owned by Kandi*." The Hindenburg Report found further that 30% of Kuke's historical exports were to Massimo Motor Sports LLC ("Massimo"), an entity based out of Kandi America's Headquarters and owned by the Founder and Manager of Kandi America. According to the Hindenburg Report, Massimo was therefore a top customer and top supplier to the Company. The Hindenburg Report stated further that 52% of Kuke's historical exports went to Jass Motorsports, Inc., an entity that shared an executive with Kandi and was based out of the same address as a branch of Kandi USA. The Hindenburg Report further noted that 9% of Kuke's historical exports went to Lil Pick Up, Inc., an entity that also leased warehouse space at Kandi America's Headquarters.

89.     On December 7, 2020, Kandi issued a letter from the Company's Chairman ("Chairman's Letter") that attempted to dispute the findings contained in the Hindenburg Report. The Chairman's Letter stated as follows:

> Jinhua, China, Dec. 07, 2020 (GLOBE NEWSWIRE) – Kandi Technologies Group, Inc. (NASDAQ GS: KNDI) (the "Company" or "Kandi") today issued a letter to its shareholders from the Chairman as below:
>
> Dear Kandi Shareholder,
>
> On November 30, 2020, a firm with an acknowledged short position in Kandi stock issued a "research report" that leveled a series of inaccurate allegations regarding Kandi and its management team. The firm that issued the report is shorting our stock and will profit if the stock price declines. In contrast, the Company's motive is to create value for all shareholders by building a durable and profitable leader in a dynamic growth industry. It is clear from this review that the report contains a variety of misleading accusations that are either thinly veiled assertions of opinion, or based on previously reported historical events. As one example, they question the odds of success of our ride-sharing initiative. Anyone, you included, is free to assess the likelihood of success of our business strategy. Merely asserting an opinion on our strategy proves nothing about our trustworthiness. Assertions like this, we will ignore. While the entire report lacks merit, the Company and its management believe that it would be helpful to our shareholders to address the inaccuracies that have received significant press attention.

1.  By mischaracterizing certain documents from 2014, the report insinuates that I participated in a scheme to inflate the price of our stock during the reverse merger process.   This is inaccurate because, as the report acknowledges, neither I nor the Company were ever charged with any such violations.  This is not new information and was previously disclosed in our regulatory filings.

2.  The Company's participation in Chinese government subsidy programs through a joint venture (the "JV Company") is well documented in public filings.   Contrary to the report's allegations, the JV Company properly received subsidy payments for all electric vehicles sold prior to 2016 and the JV Company's dual production licenses were approved in August 2019. According to government policy, any company that improperly participated in the subsidy program would not receive any subsidy payments nor dual production licenses.

3.  As with other aspects of the report, the Company's decision to change auditors was previously disclosed and resulted from Kandi's growth rather than any sort of alleged "fraud".  For example, in 2019 we changed to an auditor that is subject to inspection by the Public Company Accounting Oversight Board ("PCOAB").  Our current auditor is a leader in providing accounting services to Chinese companies listed in the United States.

4.  The report's assertions of "related party" transactions and "fabricated sales" suffer from a number of defects:

    a.  Chaoneng's legal representative (Hu Yiheng) is not currently an executive of Kandi as the report contends.  In fact, Mr. Hu Yiheng resigned from Kandi in April 2011 to start Chaoneng.  The report uses misleading quotes from an October 2010 article as support for its contention that Mr. Hu Yiheng is still with Kandi.

    b.  When it was first established in 2011, Chaoneng rented office space from Kandi and listed its landlord's phone number (0579-82239276) for business registration purposes.   This is not Chaoneng's current telephone number.

    c.  Chaoneng is located in the same industrial park complex as Kandi, but not at the same address (as the report contends). Chaoneng is the fourth building on the lot while Zhejiang Kandi Smart Battery Swap Technology Co., Ltd (formerly Jinhua An Kao Power Technology Co., Ltd) is located at the north side of the first factory building. Chaoneng provides maintenance services to vehicles manufactured by Kandi at that location. The reference to "Kandi" in the signage refers to their services for Kandi vehicles, not Kandi as a company.  Kandi and Chaoneng are not related parties.

38

d.    The report mistakenly contends that Massimo Motor Sports and its owner David Shan are undisclosed related parties of Kandi.  Mr. Shan left SC Autosports (formally named Sportsman Country) when Kandi acquired it in 2018 and no longer has any affiliation with Kandi.

e.    Kuke was a subsidiary of Kandi until January 2008. In February 2008, Kuke was spun-off from Kandi and has been an independent entity since that time. While Kuke has been the exclusive agent of Kandi's products in the United States since August 2015, Kandi plans to end this exclusivity in 2021 based on the expected growth in the United States of Kandi's subsidiary SC Autosports.

f.    The report mistakenly contends that KANDI USA and JASS MOTORSPORTS have the same address. KANDI USA closed in November 2015. There is no affiliation between Kandi USA and JASS MOTORSPORTS.

g.    Finally, Kandi's financial reports are audited, and care is taken to properly record sales.

Accordingly, and contrary to the report's allegations, we are enthusiastic about the progress we made in 2020. Our ATV sales achieved substantial growth, while unit sales of the Scrou-produced balancing scooters should exceed 500,000 in 2020 and we expect sales to exceed 3 million units in 2021.  Prospects for EV parts sales are strong. Our K23 and K27 EV models received the required clearance from the United States Environmental Protection Agency (EPA) via Certificates of Conformity.  Our K27 model recently met the safety regulations of the U.S. Department of Transportation FMVSS 500 and is scheduled to be launched on the market soon.  Safety certification for the K23 is being finalized and we anticipate customer deliveries in the first quarter of 2021. The "300,000 government-accredited pure EV within 5 years rideshare" program has officially started in the city of Shaoxing in Zhejiang province, and in the city of Haikou in Hainan province.  We strongly believe that the program will drive sales growth of our EV and battery swap equipment in 2021. In addition, our new 1 million plus square feet (100,000 square meters) facility will be completed in January 2021 and is expected to start production in the first quarter of 2021.

To conclude, we strongly believe that this report is laced with innuendo and supposition, which are countered by our proven prospects for future growth.  Rest assured that we will continue to operate with the highest standards in order to maximize shareholder value.

Most sincerely,

39

Hu Xiaoming
Chairman and Chief Executive Officer
Kandi Technologies Group

90.     Contrary to its intention to dispute the contentions regarding Kandi's related parties contained in the Hindenburg Report, the Chairman's Letter actually admitted facts that confirm the related nature of such entities.   For instance, with respect to Chaoneng, the Chairman's Letter admitted, among other things, that: (1) Chaoneng rented office space from Kandi; (2) Chaoneng and Kandi previously shared the same telephone number; (3) Chaoneng is located in the same industrial park complex as Kandi, adjacent to a Kandi factory; (4) Chaoneng provides maintenance services to vehicles manufactured by Kandi in the same industrial park complex; (5) Chaoneng has Kandi's name in its signage at the industrial park complex; and (6) Chaoneng's legal representative, Hu Yiheng, was previously an executive of Kandi who resigned from Kandi in April 2011 to start Chaoneng.

91.     Similarly, with respect to Kuke, the Chairman's Letter admitted, among other things, that: (1) Kuke was a subsidiary of Kandi until January 2008; (2) in February 2008, Kuke was spun-off from Kandi; and (3) Kuke has been the exclusive agent of Kandi's products in the United States since August 2015.

92.     Additionally, the Chairman's Letter failed to dispute – and therefore impliedly conceded – that: (1) the Chinese government previously sanctioned Kandi and its JV partner over a scheme to collect illegitimate government subsidy payments through fake EV sales and the entity used to generate the fake sales in the scheme – Left Middle Right, Co. Ltd. – is based out of the same building as Chaoneng; (2) corporate records on QCC.com still refer to Kuke as being part of Kandi; (3) Kuke's website shows close ties to Kandi and feature the brand name Jasscol, which is a registered trademark owned by Kandi; (4) Kuke is buying from Kandi and then selling

40

right back to undisclosed related parties of Kandi; (5) Massimo Motor Sports, an undisclosed related-party entity of Kandi America, is both a top customer and a top supplier of Kandi; (6) 52% of Kuke's historical exports were to Jass Motorsports, Inc., an entity that shared an executive with Kandi and was previously based in the same address as a branch of Kandi USA; and (7) 9% of Kuke's historical exports went to Lil Pickk Up, Inc., and entity that also leases warehouse space at Kandi America's headquarters.  As alleged in more detail above, these allegations relate to Defendants' false and misleading representations during the Class Period.

## CLASS ACTION ALLEGATIONS

93.    Plaintiff brings this action as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of all those who purchased the Company's common stock during the Class Period, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have, or had, a controlling interest.

94.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, the Company's common stock was actively traded on NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

95.    Plaintiff's claims are typical of the claims of the members of the Class, since all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law alleged herein.

96.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

97.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether Defendants' acts constituted violations of the federal securities laws;

(b)    whether Defendants' statements made to the investing public during the Class Period misrepresented material facts concerning the Company's business, operations, and financial condition;

(c)    whether the price of the Company's common stock was artificially inflated during the Class Period; and

(d)    to what extent the members of the Class have sustained damages and the proper measure of damages.

98.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  Additionally, there will be no difficulty in the management of this action as a class action.

**LOSS CAUSATION**

99.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of the Company's common stock.  Defendants' conduct, moreover, operated as a fraud or deceit on Class Period purchasers of the Company's common stock by failing to disclose, and misrepresenting, the adverse facts detailed herein.  As Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of the Company's common stock declined significantly as the prior artificial inflation dissipated from the Company's stock price.

100.     For example, on November 14, 2016, the Company announced the abrupt resignation of Defendant Wang as the CFO – less than two weeks after Defendants disclosed for the first time that the Company had engaged in material transactions with Kandi USA (owned by Wangyuan Hu, the son of CEO Hu) using its trade name, Eliteway.  On this news, shares of Kandi fell $0.40 per share, or more than 10% from their previous closing price, to close at $3.50 per share on November 14, 2016, damaging investors.

101.     Additionally, on March 13, 2017, the Company filed a Form 8-K with the SEC revealing that its previously issued financial statements for the years ended December 31, 2015 and 2014, and the first three quarters for the year ended December 31, 2016 will need to be restated.  On this news, shares of Kandi fell $0.30 per share, or approximately 6%, from its previous closing price to close at $4.05 per share on March 14, 2017, further damaging investors.

102.     As a result of the purchases of the Company's common stock during the Class Period, Plaintiff and the other members of the Class suffered economic loss (damages) under the federal securities laws.  Defendants' false and misleading statements had the intended effect, and

43

caused, the Company's common stock to trade at artificially inflated levels throughout the Class Period.

103.    By concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of the Company's business and prospects.  As the truth regarding the Company was revealed to the market, the price of the Company's common stock fell significantly.  These declines removed the inflation from the price of the Company's common stock, causing real economic loss to investors who purchased the Company's common stock during the Class Period.

104.    The declines in the price of the Company's common stock after the corrective disclosures came to light were a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market.  The timing and magnitude of the price declines in the Company's common stock negate any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic, or industry factors, or by Company-specific facts unrelated to defendants' fraudulent conduct.

105.    The economic loss (damages) suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of the Company's common stock and the subsequent significant decline in the value of the Company's common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

**APPLICABILITY OF PRESUMPTION OF RELIANCE:**
**FRAUD ON THE MARKET DOCTRINE**

106.    At all relevant times, the market for the Company's common stock was an efficient market for the following reasons, among others:

44

(a)     The Company's common stock met the requirements for listing, and was listed and actively traded on NASDAQ, a highly efficient, electronic stock market;

(b)     As a regulated issuer, the Company filed periodic public reports with the SEC;

(c)     The Company regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     The Company was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

107.    As a result of the foregoing, the market for the Company's common stock promptly digested current information concerning the Company from all publicly available sources and reflected such information in the prices of the Company's stock.  Under these circumstances, all purchasers of the Company's common stock during the Class Period suffered similar injury through their purchase of the Company's common stock at artificially inflated prices and a presumption of reliance applies.

**NO SAFE HARBOR**

108.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements alleged herein.  Many of the specific statements alleged herein were not identified as "forward-looking statements" when made, and thus are not entitled to protection under the safe harbor provision.  Additionally, to the extent that there were any forward-looking statements, there were no meaningful cautionary

45

statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.   Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements alleged herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of the Company who knew that those statements were false when made.

**COUNT I**
**Violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Promulgated Thereunder Against All Defendants**

109.    Plaintiff repeats and realleges each and every allegation contained above as though set forth in full herein.

110.    During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew, or were deliberately reckless in not knowing, were misleading.   These statements were false and misleading because they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

111.    Defendants: (1) employed devices, schemes, and artifices to defraud; (2) made untrue statements of material fact/and or omitted to state material facts necessary to make the statements made not misleading; and (3) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

112.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for the Company's common stock.   Plaintiff

and the Class would not have purchased the Company's common stock at the prices they paid – or at all – if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

113. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## COUNT II
### Violation of Section 20(a) of the Exchange Act Against the Individual Defendants

114. Plaintiff repeats and realleges each and every allegation contained above as though set forth in full herein.

115. The Individual Defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and/or intimate knowledge of the Company's statements filed with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements alleged to be false and misleading herein.

116. The Individual Defendants, moreover, were provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings, and other statements alleged to be false and misleading herein. The Individual Defendants were provided with, or had unlimited access to, such documents and statements prior to, and/or shortly after these statements were issued, and therefore had the ability to prevent the issuance of the statements and/or cause the statements to be corrected. Additionally, the Individual Defendants had direct and

47

supervisory involvement in the day-to-day operations of the Company and had the power to control or influence the particular transactions giving rise to the securities violations.

117.    The Individual Defendants all had ultimate authority over the Company's statements, including controlling the content of such statements and whether and how to communicate such statements to the public.

118.    By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff, and certifying Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.    Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Respectfully submitted,

DATED:  November 8, 2021         **GLANCY PRONGAY & MURRAY LLP**

By:   *s/ Ex Kano S. Sams II*
Robert V. Prongay (admitted *pro hac vice*)
Ex Kano S. Sams II (admitted *pro hac vice*)
Charles H. Linehan (admitted *pro hac vice*)
Pavithra Rajesh (admitted *pro hac vice*)
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: esams@glancylaw.com

*Counsel for Lead Plaintiff Tom Brooks and the Class*

**LAW OFFICES OF HOWARD G. SMITH**
Howard G. Smith
3070 Bristol Pike, Suite 112
Bensalem, PA 19020
Telephone: (215) 638-4847
Facsimile: (215) 638-4867

*Additional Counsel*

49