# EXHIBIT E

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SCOTT CASHEN, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>KANDI TECHNOLOGIES GROUP, INC., XIAOMING HU, BING MEI, XIAOYING ZHU, and CHENG WANG,<br><br>Defendants. | No. 17-cv-01944-ER<br><br>CLASS ACTION<br><br>JURY TRIAL DEMANDED<br><br>This Document Relates To: All Actions |
| GERALD W. KLEIN, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>KANDI TECHNOLOGIES GROUP, INC., XIAOMING HU, BING MEI, XIAOYING ZHU, and CHENG WANG,<br><br>Defendants. | No. 17-cv-02932-ER |
| IGOR TAVROVSKY, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>KANDI TECHNOLOGIES GROUP, INC., XIAOMING HU, BING MEI, XIAOYING ZHU, and CHENG WANG,<br><br>Defendants. | No. 17-cv-03049-ER |

# CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

{00292174;1 }

**TABLE OF CONTENTS**

Preliminary Statement ........................................................................................................ 1

Jurisdiction and Venue ...................................................................................................... 6

Parties ................................................................................................................................ 6

    Plaintiffs .................................................................................................................... 6

    Defendants ................................................................................................................. 7

Factual Background ........................................................................................................... 9

    Kandi's Early History ............................................................................................... 9

    Kandi's Auditor Fails to Exercise Due Professional Care ...................................... 13

    Kandi's "New Business Model": Car-Share .......................................................... 14

    The JV Company ..................................................................................................... 16

    The JV Company Rapidly Scales its Operations .................................................... 18

    Kandi's Fundraising Draws SEC Scrutiny ............................................................ 19

The Class Period Begins .................................................................................................. 22

    Materially False and Misleading Statements in the 2013 Q3 10-Q ....................... 22

    Defendants Keep Touting the EV Business to Investors ........................................ 24

    The 2013 10-K ........................................................................................................ 26

    Partial Truths about Kandi's Internal Controls Begin to Emerge .......................... 28

    The SEC Investigation ............................................................................................ 30

    The 2014 Q1 10-Q .................................................................................................. 32

    The Amended 2013 10-K ........................................................................................ 33

    The 2014 Q2 10-Q .................................................................................................. 35

    The 2014 Q3 10-Q .................................................................................................. 37

    Materially False and Misleading Statements in the 2014 Q3 10-Q ....................... 38

    The 2014 10-K ........................................................................................................ 39

    Materially False and Misleading Statements about Cash Flows ............................ 41

    Materially False and Misleading Statements about Internal Controls .................... 42

    A New CFO .............................................................................................................. 44

    The 2015 Q1 10-Q .................................................................................................. 45

Materially False and Misleading Statements in the 2015 Q1 10-Q ................................. 45

The 2015 Q2 10-Q ........................................................................................................ 47

Materially False and Misleading Statements in the 2015 Q2 10-Q ................................. 47

The 2015 Q3 10-Q ........................................................................................................ 48

Materially False and Misleading Statements in the 2015 Q3 10-Q ................................. 50

The Chinese Government Begins Investigating Subsidy Fraud ...................................... 51

The 2015 10-K ............................................................................................................. 52

Materially False and Misleading Statements about Cash Flows in the 2015 10-K .......... 55

Materially False and Misleading Statements about Internal Controls in the 2015 10-K .. 58

The Company's Auditor is Replaced and Censured ......................................................... 59

The 2016 Q1 10-Q ........................................................................................................ 61

Materially False and Misleading Statements in the 2016 Q1 10-Q ................................. 63

The 2016 Q2 10-Q ........................................................................................................ 64

Materially False and Misleading Statements in the 2016 Q2 10-Q ................................. 66

Geely Sells its Stake in the JV Company ....................................................................... 67

New Revelations about the Car-Share Program .............................................................. 68

The Chinese Government Imposes Penalties for Subsidy Fraud ...................................... 71

The 2016 Q3 10-Q ........................................................................................................ 74

Materially False and Misleading Statements in the 2016 Q3 10-Q ................................. 76

The Truth Slowly Emerges ................................................................................................. 78

The CFO Suddenly "Resigns" ....................................................................................... 78

The Results of the Chinese Government's Subsidy Review ............................................ 78

SEC Scrutiny Resumes ................................................................................................. 79

The Draft 2015 10-K/A ................................................................................................. 83

The Company Admits the Need for a Restatement ......................................................... 88

The 2016 10-K ............................................................................................................. 90

The Restatements .......................................................................................................... 92

Relevant Accounting Standards: GAAP ......................................................................... 96

Relevant Accounting Standards: Accrual Accounting .................................................... 99

Relevant Accounting Standards: Cash Flows ................................................................. 100

Kandi's Failure to Disclose Material Non-Cash Activity ............................................... 103

Kandi's Subsequent Correspondence with the SEC Further Underscores the Undisclosed Impacts that Delayed Subsidy Payments Had on Kandi's Cash Flows .......................... 105

Kandi's Violations of GAAP Pertaining to Related-Party Transactions ........................ 108

Obligation to Present Separate Financial Statements for the JV Company .................... 110

Internal Controls over Financial Reporting .................................................................... 113

Kandi's Material Weaknesses in Internal Control ......................................................... 116

Class Action Allegations ................................................................................................ 120

Count I ............................................................................................................................ 122

Count II ........................................................................................................................... 125

Prayer for Relief ............................................................................................................. 126

Jury Demand ................................................................................................................... 126

{00292174;1 }

Lead Plaintiffs Gerald W. Klein and Gary Vatter, on behalf of themselves and all others similarly situated, allege the following based upon personal knowledge as to their own acts and upon information and belief as to all other matters based on the investigation conducted by Lead Counsel, which included a review of, *inter alia*, SEC filings by Kandi Technologies Group, Inc. ("Kandi" or the "Company"), press releases and other public statements by Defendants, conference calls and announcements made by Defendants, media and analyst reports and advisories about the Company, interviews with confidential witnesses, and other public information. Lead Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## PRELIMINARY STATEMENT

1.  This is a federal securities class action, against the Company and certain of its executive officers, on behalf of all persons who purchased or otherwise acquired the Company's securities between November 15, 2013 and March 13, 2017, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2.  Kandi designs, produces, manufactures, and distributes electric vehicle ("EV") products, EV parts, and off-road vehicles, primarily in China.

3.  In September 2013, the Chinese government announced a significant expansion of government subsidies for EVs. Under the new policy, EV manufacturers would receive subsidy payments from the central government—up to $9,800 per passenger car and $81,600 per electric bus, paid to the manufacturers on a quarterly basis—and EV purchasers would receive subsidy payments from local governments.

4.      Kandi devised a strategy to benefit from both the EV manufacturing subsidies provided by the central government and also the EV purchasing subsidies provided by local governments. Kandi manufactured EV parts (predominantly battery packs) and sold them to a newly-formed joint-venture company (defined below as the "JV Company," 50% owned by Kandi), which manufactured EV vehicles and sold them to a third company (defined below as "ZZY" or the "Service Company"), also partly owned by Kandi), which operated a car-sharing program called "EV-Share." The JV Company would receive EV manufacturing subsidies from the central government, and ZZY would receive EV purchasing subsidies from local governments.

5.      During the Class Period, Kandi's business model was premised on the expectation that it and its subsidiaries and business partners would continue to receive these generous EV subsidies. Specifically, it depended on the ZZY receiving purchasing subsidies so that it could buy EVs from the JV Company, and on the JV Company receiving manufacturing subsidies so that it could buy EV parts from Kandi.

6.      But in early 2016, the Chinese government began a fraud investigation into its EV subsidy program. While the investigation was ongoing, subsidy payments for EVs sold in 2015 and 2016 were suspended.

7.      Although Defendants tried to assure investors that this would not impact the Company's EV sales, the suspension of subsidy payments froze Kandi's whole business model—the JV Company sold *zero EVs* in the first quarter of 2016. This negatively impacted the JV Company's and ZZY's cash flow positions, preventing the JV Company from paying Kandi on time—which in turn impacted Kandi's ability to pay its own vendors and suppliers.

8.     Eventually, to obscure the impact on the Company's cash flows and to avoid recording expenses for the uncollectability of its receivables, Defendants began to effectively assign Kandi's outstanding receivables (primarily from the JV Company) to those vendors and suppliers, without ever receiving or remitting cash, while at the same time extending the credit terms offered to the JV Company, allowing it to make payments as late as *720 days after delivery*—far longer than the typical 90-to-120-day credit terms for customers in previous years.

9.     Defendants failed to properly disclose this non-cash activity, which represented hundreds of millions of dollars, to investors. Instead, they misclassified it as "cash" activity— even though Kandi had neither received nor paid out any cash in connection with that activity— and improperly reflected those sums as such in the Statements of Cash Flows in Kandi's financial statements.

10.     Defendants also committed several other material GAAP violations that conveniently had the effect of obscuring the negative impact of the suspended subsidy payments on the Company's cash flows. As a result, Kandi's financial statements materially overstated the amount of cash flowing in and out of the Company, misleading investors as to the Company's cash flow position and creating a false impression that the Company was both (a) receiving payments to settle notes receivable in a timely manner and (b) paying, in cash, its own obligations (liabilities) to its own vendors and suppliers. Ultimately, in 2017, after the SEC caught the Company's improper accounting, Kandi had to restate its financial statements *all the way back to 2014*.

11.     Kandi's internal controls were also in shambles throughout the Class Period. Kandi failed to disclose material internal control deficiencies, including a lack of effective controls over financial reporting to ensure (i) the completeness of disclosures regarding equity

{00292174;1 }                                          3

investments; (ii) proper disclosure of the financial statements of the JV Company; (iii) the proper classification and reporting of certain cash and non-cash activities related to notes receivable and notes payable on the Company's Statement of Cash Flows; (iv) the proper disclosure of related party transactions on the face of its financial statements; and (v) the accuracy of the accounting and reporting of income taxes and related disclosures. These omissions were particularly significant because the Defendants had previously disclosed similar internal control deficiencies and then falsely claimed that they were addressing the problems and had ultimately fixed them.

12. The truth was revealed through a series of partial corrective disclosures.

13. As soon as the *Wall Street Journal* reported that the Chinese government was beginning to suspect fraud in its EV subsidy program, Kandi's stock price fell 6.4%.

14. After an article titled "*Kandi Technologies: Chinese EV Clunker Begins to Break Down Amid Subsidy Scandal, 70% Downside*"[1] (the "August 18, 2016 *Seeking Alpha* Article") was published, revealing fundamental problems with the business model for Kandi's CarShare Program, Kandi's stock price fell 6%.

15. On September 8, 2016, the Chinese Ministry of Finance announced penalties against five automakers for fraudulently obtaining $150 million in illegal subsidies. The next day, news reports indicated that an additional 20 companies were also found to have committed violations, including Geely Automobile Holdings Ltd. ("Geely")—Kandi's partner for the JV Company. On this news, Kandi's stock price dropped by 5.8% and then by another 1.6%.

---

[1] Serrur & Co., *Kandi Technologies: Chinese EV Clunker Begins to Break Down amid Subsidy Scandal, 70% Downside*, Seeking Alpha, Aug. 18, 2016 11:03 AM ET, https://seekingalpha.com/article/4000616-kandi-technologies-chinese-ev-clunker-begins-break-amid-subsidy-scandal-70-percent-downside.

16.     On November 9, 2016, Kandi announced its financial results for the third quarter of 2016, disclosing that China's government subsidy investigation had delayed subsidy payments for EVs sold in 2015, decimating the JV Company's sales and (in turn) Kandi's revenues for the quarter. Upon this news, Kandi's stock price fell 12.3%.

17.     On November 14, 2016, the Company announced the abrupt resignation of its Chief Financial Officer Cheng Wang. On this news, Kandi's share price dropped by over 10%.

18.     On December 28, 2016, the SEC sent a comment letter to Kandi with questions regarding Kandi's financial statements—in particular, seeking clarification as to Kandi's accounts receivable, the expected impact of reductions in government subsidies, and why "the amount due from the JV Company has been steadily increasing" so rapidly. After the filing of the SEC comment letter, Kandi's stock price fell $0.15, or 2.9%.

19.     On March 13, 2017, the Company suddenly announced that its financial statements for 2014 through 2016 needed to be restated and should no longer be relied upon. On this news, Kandi's share price fell 6%.

20.     On March 16, 2017, Kandi filed its annual report on Form 10-K for the year ended December 31, 2016 (the "2016 10-K"), which included restatements of Kandi's financial statements for 2014 and 2015. It also disclosed numerous deficiencies in Kandi's internal controls over financial reporting. These very internal control deficiencies, which the Defendants all knew about or recklessly disregarded, had made it possible for Defendants to engage in most of the accounting manipulations that ended up forcing Kandi to restate its financial statements. Specifically, a large part of the restatement was necessary to address Kandi's improper accounting for notes receivable and payable, its treatment and disclosures relating to related party transactions, and its reporting of taxes.

21.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

22.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

23.     This Court has subject matter jurisdiction under 28 U.S.C. §1331 and Section 27 of the Exchange Act.

24.     Venue is proper in this District under Section 27 of the Exchange Act and 28 U.S.C. §1391(b), as a significant portion of Defendants' actions took place in this District. The Company's stock trades under the NASDAQ in this District, and the Company maintains offices in this District.

25.     In connection with the acts alleged herein, Defendants directly or indirectly used the means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

### Plaintiffs

26.     Lead Plaintiff Gerald W. Klein acquired Kandi securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

{00292174;1 }                                    6

27.    Lead Plaintiff Gary Vatter acquired Kandi securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

## Defendants

28.    Defendant Kandi Technologies Group, Inc. ("Kandi" or the "Company") is a Delaware corporation. Founded in March 2004, the Company went public in June 2007 through a reverse merger with Stone Mountain Resources Inc., a Nevada company that had been pursuing a gold-mining venture. In December 2012, the Company changed its name to "Kandi Technologies Group, Inc."

29.    The Company is headquartered at Jinhua City Industrial Zone, Jinhua, Zhejiang Province, People's Republic of China, Post Code 321016, and also maintains offices at 230 Park Avenue, 10th Floor, New York, NY 10169. The Company's shares trade on NASDAQ under the ticker symbol "KNDI."

30.    Defendant Xiaoming Hu ("Hu") has served as the Company's Chief Executive Officer, President, and Chairman of the Board since June 2007. The Company's annual report on Form 10-K for the year ended December 31, 2017 (the "2017 10-K") describes his background as follows:

> Prior to joining the Company, from October 2003 to April 2005, Mr. Hu served as the Project Manager (Chief Scientist) in the WX Pure Electric Vehicle Development Important Project of Electro-vehicle in the State 863 Plan. From October 1984 to March 2003, Mr. Hu served as: (i) Factory Director of the Yongkang Instrument Factory, (ii) Factory Director of the Yongkang Mini Car Factory, (iii) Chairman and General Manager of the Yongkang Vehicle Company, (iv) General Manager of the Wan Xiang Electric Vehicle Developing Center and (v) the General Manager of the Wan Xiang Battery Company. Mr. Hu personally owned 4 invention patents and 7 utility model patents, which he transferred to the Company in fiscal year 2012.

{00292174;1 }                                         7

31.     Defendant Bing Mei ("Mei") has served as the Company's CFO since November 14, 2016 and as a director of the Company since December 16, 2016. The Company's 2017 10-K describes his background as follows:

> Mr. Mei is a seasoned financial executive with over 15 years of distinguished corporate executive career with large multinational enterprises and middle market companies in the U.S. and China. Prior to joining the Company, Mr. Mei served as Chief Financial Officer and Board Secretary of Skystar Bio-Pharmaceutical Company, a publicly traded leading biotechnology company in China since July 2011. From June 2015 through June 2016, Mr. Mei also served as an Independent Non-Executive Member of the Board of Directors and Chairman of Audit Committee of PharmaMax Corporation in China. From January 2006 through July 2011, Mr. Mei served as Chief Financial Officer of Avineon, Inc., a multinational technology company in the U.S., where he managed the Company's global financial operations in North America, Asia and Europe. Previously, Mr. Mei served as Controller of Arrowhead Global Solutions, Inc. (now part of Harris Corporation), a global provider of satellite communications to remote and harsh environments in the U.S. In addition, Mr. Mei served as Controllers of PICS, Inc. and Thompson Hospitality Corporation, a member of the Compass Group family of companies. Mr. Mei received a B.S. in Economics from Zhejiang University in Hangzhou, China and holds an M.B.A. from The Fuqua School of Business at Duke University where he graduated with distinction as a Fuqua Scholar. Mr. Mei is a Certified Public Accountant (CPA) in the State of Maryland, a Certified Management Accountant (CMA), a Chartered Global Management Accountant (CGMA), and a Certified Valuation Analyst (CVA).

32.     Defendant Xiaoying Zhu ("Zhu") served as CFO and director of the Company from June 2007 until her resignation on April 30, 2015. The Company's annual report on Form 10-K for 2014 (the "2014 10-K") describes her background as follows:

> [S]ince September 2003, Ms. Zhu has served as Chief Financial Officer of Zhejiang Kandi Vehicles Co., Ltd., our wholly-owned operating subsidiary. From January 2000 to September 2003, Ms. Zhu served as the Accounting Manager for Zhejiang Yonkang Automobile Manufacture Co. Ms. Zhu graduated from Hangzhou Electronic Engineering University.

Ms. Zhu acquired CIA certificate in 2010 and EMBA certificate from Hong Kong Polytechnic University in 2011.

33.     Defendant Cheng Wang ("Wang") served as the Company's CFO and Principal Financial and Accounting Officer from May 1, 2015 until November 14, 2016, when he resigned as CFO and became the Company's new Chief Strategy Officer. Wang has also served as a Director of the Company since May 20, 2015. The Company's annual report on Form 10-K for 2016 (the "2016 10-K") describes his background as follows:

> Mr. Wang has over 20 years of international financial management experience. Before joining the Company, Mr. Wang served as the CFO for Shanghai Always Marketing Service Co., LTD., one of the largest field marketing service agencies in China, leading its procurement and finance departments since May 2014. Prior to that, Mr. Wang worked for Renesola Ltd. (NYSE: SOL), an international leading brand and technology provider of green energy products, initially as Vice President of Finance since January 2010, ascending to the CFO in July 2011. Mr. Wang holds both certifications as Certified Public Accountants ("CPA") in China and Certified Internal Auditor ("CIA"). He earned a master's degree in Law from Renmin University of China and Master of Business Administration from the Open University of Hong Kong.

34.     Defendants Hu, Mei, Zhu, and Wang are sometimes referred to herein as the "Individual Defendants."

## FACTUAL BACKGROUND

### Kandi's Early History

35.     Kandi designs, produces, manufactures, and distributes electric vehicle ("EV") products, EV parts, and off-road vehicles, primarily in China. According to its 2017 10-K, Kandi is "one of… China's leading producers and manufacturers of [EV] products, EV parts, and off-road vehicles for sale in China and global markets."

36.     Although the Company was founded in 2004, its EV business operations were minimal for many years.

{00292174;1 }                                    9

37.     Then in 2009, the Chinese government announced a new goal: turning the country into the world leader in EV vehicles by 2012. Kandi tried to capitalize on the new subsidies and introduced an electric car called the "Coco" in early 2009.

38.     But the Company was soon caught exaggerating EV sales figures in its SEC filings. In its annual report on Form 10-K for 2009, it told investors that it "expects significant growth in the sales of the CoCo and expects to expand the product line in the near term." In its quarterly report on Form 10-Q for the second quarter of 2010, Kandi reported selling 1,005 units of the CoCo in that quarter. But a May 2011 *Sharesleuth* investigation found that Kandi had "greatly overstated its sales figures" and that none of "Kandi's own electric-vehicle dealers… could account for the sales volume the company has claimed in its Securities and Exchange Commission filings and earnings reports."[2] Shortly thereafter, Kandi quietly admitted in its annual report on Form 10-K for 2011 (filed on March 30, 2012) that it had only sold a total of 658 EVs in the whole of 2010—significantly fewer than the 1,005 it had previously claimed to sell in just the second quarter of that year.

39.     Around the same time, Kandi's CEO, Defendant Hu, was involved in what the SEC later described as a "secret agreement…to manipulate the trading of Kandi stock to increase its price." On May 5, 2014, the SEC brought fraud charges against several stock promoters, accusing them of "orchestrat[ing] *manipulative trading* in… *Kandi Technologies* in 2009 and 2010"[3] and of "conducting illegal reverse merger schemes" to bring two other China-based

---

[2]     Justin McLachlan, *Kandi Technologies Corp.: Where are the Cocos?*, Sharesleuth, May 2, 2011, http://sharesleuth.com/investigations/2011/05/kandi_technologies_corp_where_are_the_cocos.

[3]     Unless otherwise noted, emphases are added and internal citations and quotations are omitted.

companies "into the U.S. markets so they could manipulate trading and reap millions of dollars in illicit profits."[4] As detailed in the SEC complaint[5]:

### F. Tazbaz, Lockhart, and Becker Orchestrated a Scheme to Defraud Through Manipulative Trading in a Third Chinese Issuer, Kandi Technologies

132. From approximately April 2009 through at least December 2010, Tazbaz, Lockhart, and Becker orchestrated a scheme to defraud investors of a third Chinese issuer, Kandi Technologies Group Inc., primarily through manipulative trading in Kandi's stock.

133. *The manipulative trading was done with scienter. In addition, the manipulative trading was done for the purposes of creating a false or misleading appearance of an active market in the stock and inducing the stock's sale or purchase by others.*

134. Kandi was listed on NASDAQ on March 18, 2008, and was trading as high as $6.82 per share in April 2008. However, by the end of 2008, Kandi's stock price had dropped to less than $1.00.

135. Tazbaz and Lockhart held large positions in Kandi's securities that they sought to liquidate.

136. In approximately September 2009, Tazbaz and Lockhart traveled to China to meet with Kandi's CEO. In that meeting, *Kandi's CEO reached an oral agreement with Tazbaz and Lockhart* as follows:

    a. Kandi agreed to provide Tazbaz and Lockhart with 350,000 additional shares of Kandi;

    b. Despite Kandi's prior oral agreement that the Kelley Group would cover certain expenses related to maintaining Kandi's public listing for the first two years after going public, Kandi agreed to cover certain additional of its own post-public expenses;

---

[4]     Press Release, SEC, *SEC Charges Toronto-Based Consultant and Four Others in Reverse Merger Schemes Involving China-Based Companies* (May 5, 2014), https://www.sec.gov/news/press-release/2014-91.

[5]     Compl,, *SEC v. Kelley et al.*, Case No. 2:14-cv-02827-SRC-CLW (D.N.J. May 5, 2014).

{00292174;1 }

c. In exchange, Tazbaz and Lockhart agreed to pay U.S. stock promoters to tout Kandi; and

**d. Tazbaz and Lockhart further agreed to orchestrate U.S. stock promoters to manipulate the trading of Kandi stock to increase its price to at least $3 per share within three months.**

* * *

144. In furtherance of the scheme, Tazbaz knowingly or recklessly engaged in numerous practices or courses of business that defrauded Kandi investors, including, but not limited to:

**a. Reaching a secret agreement with Kandi's management that in exchange for his receipt of additional stock options, Tazbaz agreed to orchestrate U.S. stock promoters' efforts to artificially inflate Kandi's stock price to more than $3 per share;**

b. Providing Kandi stock free of charge to U.S. stock promoters involved in touting Kandi;

c. Orchestrating manipulative trading by others of Kandi stock; and

d. Selling Kandi stock at prices inflated by the fraudulent scheme.

145. In furtherance of the scheme, Lockhart knowingly or recklessly engaged in numerous practices or courses of business that defrauded Kandi investors, including, but not limited to:

**a. Reaching a secret agreement with Kandi's management that in exchange for his receipt of additional stock options, Lockhart agreed to orchestrate U.S. stock promoters' efforts to artificially inflate Kandi's stock price to more than $3 per share;**

b. Engaging in manipulative trading of Kandi stock, as further alleged herein;

c. Orchestrating manipulative trading by others of Kandi stock; and

d. Selling Kandi stock at prices inflated by the fraudulent scheme.

**Kandi's Auditor Fails to Exercise Due Professional Care**

40.     During this time, Kandi and its independent registered public accounting firm demonstrated a pattern of wrongful conduct relating to the Company's financial statements, including a failure to properly disclose related-party transactions.

41.     From 2009 until April 13, 2016, Kandi's independent registered public accounting firm was Albert Wong & Co. LLP, later known as AWC (CPA) Limited ("AWC"). On May 18, 2016, the Public Company Accounting Oversight Board ("PCAOB") entered an Order censuring AWC, revoking its registration, and imposing other penalties due to AWC's "violations of PCAOB rules and standards in connection with the issuance of audit reports on the consolidated financial statements of [Kandi] for the years ended December 31, 2010, 2011, and 2012."[6]

42.     The PCAOB found that AWC had "*failed repeatedly to exercise due professional care and professional skepticism*, to obtain sufficient appropriate audit evidence with respect to financial statement assertions, to include procedures designed to provide reasonable assurance of detecting fraud or illegal acts that would have a direct and material effect on the determination of financial statement amounts, and to prepare and maintain adequate audit documentation." In particular, the PCAOB found that AWC *failed to investigate obvious signs of fraud by Kandi's management*, including, in one instance, where Defendant Hu and another Kandi financial controller had produced personal bank account statements as purported evidence of the Company's cash on hand:

---

[6]     *Order Instituting Disciplinary Proceedings, Making Findings, And Imposing Sanctions, In the Matter of AWC (CPA) Limited, WONG Chi Wai, CPA, and WONG Fei Cheung, CPA*, PCAOB Release No. 105-2016-016 (May 18, 2016), available at https://pcaobus.org/ Enforcement/Decisions/Documents/105-2016-016-AWC-CPA.pdf.

{00292174;1 }                                    13

In [Kandi's] consolidated financial statements for the year ended December 31, 2010, Kandi reported cash and restricted cash balances of $25.2 million representing approximately 34% of $74.3 million in total current assets. For $7.1 million of cash and restricted cash accounts, representing 28% of the total cash and restricted cash balances, *Respondents failed to exercise due professional care and skepticism and to obtain sufficient competent evidential matter in relying primarily on management representations that the funds held in the personal accounts of* a staff person in Kandi's finance department ("Cashier") and *Kandi's Chairman* ("Chairman") met all of the relevant financial statement assertions to be presented as Kandi's cash or restricted cash as of December 31, 2010.

43.     The PCAOB also noted that Kandi had failed to properly report certain related-party transactions in its financial statements and that AWC, while auditing those financial statements, "failed to address red flags regarding related party transactions and failed to place emphasis on testing material transactions with a related party" even though they knew that related-party transactions were a "key audit risk."[7]

### Kandi's "New Business Model": Car-Share

44.     Finally, in 2012 and 2013, Kandi's EV prospects started to improve. The Company's 2014 10-K summarized the change as follows:

Before the year 2013, the Company had been mainly engaged in the design, production and distribution of the off-road vehicle products. Due to various market factors and the environment with positive government supports, starting from the year 2013, the Company gradually shifted its

---

[7]     The undisclosed related-party transactions were with a company called "Kandi USA." As Defendant Hu was forced to admit in a Form 8-K filed in May 2011, Defendant Hu's son was the sole shareholder and officer of Kandi USA. Kandi USA was Kandi's 5th largest customer in 2012, but Kandi recorded its transactions with Kandi USA as under the pseudonym "Eliteway Motorsport." Nevertheless, the Company failed to list Eliteway Motorsport or Kandi USA at all in its 2012 10-K. The 2013 10-K then described "Kandi USA Inc. carrying trade name of Eliteway Motorsports" as a "customer" but not as a related party. Only in the 2014 10-K did the Company finally properly list Kandi USA as a related party.

{00292174;1 }                                    14

main focus towards the development on pure electric vehicles…. For the year ended December 31, 2014, the majority of the Company's revenue and profit were generated from EV parts and EV products.

45. By 2015, Kandi's annual revenues and profits had doubled, almost all of which came from sales of EV parts and EV products. The following table presents selected annual financial data, according to Kandi's 2014 10-K and annual report on Form 10-K for 2015 (the "2015 10-K"):

| | Year ended December 31, | | | |
|---|---|---|---|---|
| | **2012** | **2013** | **2014** | **2015** |
| **Revenue** | **$64,513,670** | **$94,536,045** | **$170,229,006** | **$201,069,173** |
| EV parts | $3,517,237 | $1,724,031 | $116,431,309 | $196,053,058 |
| EV products | $19,034,936 | $46,619,203 | $33,978,619 | - |
| Off-road vehicles | $41,961,497 | $46,192,811 | $19,819,078 | $5,016,115 |
| **Cost of Goods Sold** | **$51,620,280** | **$72,793,517** | **$146,825,073** | **$172,649,955** |
| **Gross Profit** | **$12,893,390** | **$21,742,528** | **$23,403,933** | **$28,419,218** |
| **Net Gain (Loss)** | **$ 6,049,479** | **($21,140,723)** | **$12,271,338** | **$14,665,495** |

46. Kandi's business strategy for the EV market relied heavily on a "new business model" that the Company ultimately dubbed the "EV-Share Program" or "Car Share Program."

47. In May 2012, at a seminar with "top Chinese government officials, and other environmental and transportation experts," Kandi presented an "innovative plan for a comprehensive Pure EV rental system for reducing traffic, parking and pollution problems in cities throughout China." Under the plan, Hangzhou, the capital of Zhejiang Province, would be "the first test site for a new transportation system which would make available 100,000 self-driven Pure EV rentals at centrally operated 'smart' vertical parking and charging facilities to be constructed at key locations throughout Hangzhou."

48.     The plan was positively received. On October 1, 2012, Kandi issued a press release announcing a definitive "sales contract… to provide the first 5,000 EVs for the currently largest pure EV commercialization launch in China -- the 20,000 pure EV leasing program in Hangzhou." The press release quoted Kandi's Chairman and CEO Xiaoming Hu as saying:

> We are very excited about the first 5,000 EV sales contract. Working closely with reliable and high-value partners such as SGCC, CALB and Hangzhou municipal government is central to our marketing strategy and Kandi is very proud to be a part of what is so far the largest pure EV commercialization program to be launched by our partners. Additionally, it is noteworthy that Kandi received a 3,000 pure EV order in Jinhua City last year. ***Kandi is on its way to become the one of leading pure EV providers in China***.

### The JV Company

49.     To build up the operational capacity necessary to meet the anticipated demand from the EV-Share Program, Kandi established a joint venture company (the "JV Company")[8] in March 2013 to "engage in the investment, research and development, production, marketing and sales of electronic vehicles in China." The JV Company was established pursuant to a joint venture agreement (the "JV Agreement") between Zhejiang Kandi Vehicles Co., Ltd. ("Kandi Vehicles"), a wholly-owned subsidiary of Kandi, and Shanghai Maple Guorun Automobile Co., Ltd. ("Shanghai Maple"), a 99%-owned subsidiary of Geely Automobile Holdings Ltd. ("Geely").

50.     In a February 4, 2013 press release, Kandi described the deal as follows:

> Geely Auto is one of the largest and most well-known automobile manufacturers in China. In August 2010, Geely Auto acquired Volvo Car Corporation from Ford Motor Company.

---

[8]     The JV Company was initially named "Zhejiang Kandi Electric Vehicles Co., Ltd." In March 2014, it changed its name to "Kandi Electric Vehicles Group Co., Ltd."

{00292174;1 }                    16

Pursuant to the terms of the framework agreement, the JV Company will be owned 50% by Shanghai Maple and 50% by Kandi Vehicles. The registered capital of the JV Company will be RMB 1,000,000,000, and with 50% to be contributed by each party. Upon the establishment of the JV Company, the JV Company will acquire certain assets from Kandi and Geely Auto in order for the JV Company to process the necessary properties, assets and technologies to conduct the EV business.

To enable the proposed enterprise to take place, both Kandi and Geely Auto will establish new wholly-owned subsidiaries and inject certain assets into these companies. The JV Company will then acquire all the equity interests in each of these companies….

The purpose for Kandi to enter into the framework agreement is to leverage on the strength, resources and expertise of both Kandi and Geely Auto in the electric vehicle segment in China. With the concerted efforts from both parties, there will be synergy for the JV Company to become an industry leader in the EV segment in the future, which will be beneficial to both Kandi and Geely Auto.

The board of directors of the JV Company will consist of four directors, of which two will be nominated by Kandi Vehicles and two will be nominated by Shanghai Maple. Mr. Shufu Li, Chairman of Geely Auto will be appointed to be the first Chairman of the JV Company and Mr. Xiaoming Hu, Chairman & CEO of Kandi will be appointed to be first General Manager. Each appointment is for a term of three years.

51.    Kandi's March 25, 2013 press release announcing the JV Company elaborated:

The JV Company will acquire EV assets from Kandi and Geely in order to possess the necessary properties, assets and technologies to conduct its EV business. The JV Company will leverage the strength, resources and expertise of both Kandi and Geely in the EV segment to develop and provide affordable electric vehicles and efficient services to its customers.

The primary product of the JV Company will be to provide EVs and EV services for the intra-city public transportation and it will use the experience of EV operations in Hangzhou City to promote the use of EVs and make it the leader in the electric vehicle market.

52.     Similarly, Geely issued a press release on March 28, 2013 describing the planned partnership as follows:

> Both parties will be equally involved in the new joint venture by playing off each other's strong points in the areas of electric car development and car production.
>
> With increased importance placed on the development of new energy vehicles in China by the government at all levels of governance, and with consumers' ever growing environmental concerns, Geely and Kandi are aiming to bring mass market, affordable cars to the markets. In initial stages, the new company will focus on developing electric vehicle solutions for the public transport system in the Hangzhou area, and will later expand to other areas, including electric automobiles. Hangzhou was selected as an electric vehicle test city along with 24 other pilot cities in China to better understand infrastructure and consumer needs during the transition from traditional gasoline engines to new energy products, and as such the city has already invested considerable amounts of funds into developing electric vehicle infrastructure around the city, making it a strong starting point for the new joint venture company.

## The JV Company Rapidly Scales its Operations

53.     The JV Company rapidly began scaling up its operations. By early 2014, it had established several wholly-owned operating subsidiaries, including (1) Zhejiang Kandi Electric Vehicles Jinhua Co., Ltd. ("Kandi Jinhua"), engaged in "EV manufacturing"; (2) Zhejiang JiHeKang Electric Vehicle Sales Co., Ltd. ("JiHeKang"), engaged in "car sales"; and (3) Zhejiang Kandi Electric Vehicles Jiangsu Co., Ltd. ("Kandi Jiangsu"), engaged in "EV research and development, manufacturing and sales." The JV Company had also acquired Kandi Electric Vehicles (Changxing) Co., Ltd. ("Kandi Changxing"), which specialized in "the production of EVs," from Kandi Vehicles.

54.     Of particular significance, in July 2013, the JV Company participated in establishing Zhejiang ZuoZhongYou Electric Vehicle Service Co., Ltd. ("ZZY" or the "Service

Company"), which was "engaged in various pure EV leasing businesses including the EV-Share Program." The 2013 10-K described the Service Company and its role as follows:

> The implementation of the Carshare Project, and other EV sharing networks, requires the development of public EV sharing stations. The Service Company is assisting the Company in the development of the public EV sharing stations. The Service Company is responsible for several aspects of the public EV sharing project, including: (i) launching the public EV sharing business; (ii) establishing a network of public EV sharing stations; (iii) investing in the construction of service facilities and parking facilities for the public EV sharing project; and (iv) providing services directly to customers who rent the EVs. The JV Company, a joint venture established by the Company and Geely (the "Joint Venture"), owns a 19% interest in the Service Company. The remaining 81% is owned by Jia Xing Jia Le Investment Partnership Enterprise, an entity which is unaffiliated with the Company.

> ***The Company recognizes revenue from its EV sharing network when it sells the SKD set***, a complete set of the main parts that can be assembled into whole vehicles, ***to Shanghai Maple***. Shanghai Maple, a 99% owned subsidiary of the Company's business partner, Geely, then assembles the SKD into a complete vehicle and sells it to the Service Company. Revenue from the subsequent sale of the full vehicle to the Service Company by Shanghai Maple is not attributable to the Company. The Company indirectly owns a 9.5% ownership interest in the Service Company through its 50% ownership in the Joint Venture. The revenue from car rentals belongs to the Service Company, not to the Company. Therefore, ***the sole source of revenue to the Company is from the sale to Shanghai Maple of the Company's SKD of an EV***.

### Kandi's Fundraising Draws SEC Scrutiny

55.     All of this required significant capital. In particular, the JV Agreement required Kandi to make a capital contribution of $80 million (RMB 500 million). But according to Kandi's annual report on Form 10-K for 2012 (the "2012 10-K"), as of December 31, 2012, Kandi only had "a working capital surplus of $35,898,297" and "credit lines from commercial banks for $53,830,687, of which $29,765,203 had been used." Kandi still needed $20 million.

{00292174;1 }                                     19

56.     On April 19, 2013, Kandi filed a shelf registration statement on Form S-3, which was declared effective on May 23, 2013. But Kandi's stock closed at $3.83 on April 19, 2013 and at $3.89 on May 23, 2013. At those prices, a share offering would not have raised much.

57.     On June 5, 2013, Kandi announced that "the first pure electric sedan jointly developed by Kandi and Geely" had been approved by the Chinese government, which meant that purchasers would "be qualified to receive all levels of national and local subsidies and incentives for EVs." After this news, Kandi's stock price increased rapidly and continued increasing, as shown in the table below:

|  | June 4 | June 5 | June 6 | June 7 | June 10 |
|---|---|---|---|---|---|
| **Closing Price** | $3.92 | $5.33 | $5.38 | $5.69 | $7.85 |
| **Volume** | 489,189 | 18,705,058 | 4,079,955 | 1,722,199 | 9,375,952 |

58.     Kandi quickly took advantage of this increase. Through a registered direct offering that closed on July 1, 2013, Kandi raised $26,387,500 by selling 4,376,036 shares at a negotiated purchase price of $6.03 per share along with various warrants to purchase up to 1,750,415 additional shares at $7.24 per share.

59.     On August 14, 2013, Kandi filed its quarterly report on Form 10-Q for the second quarter of 2013 ("2013 Q2 10-Q"). Notably, revenues had *declined:* from $26.33 million in the fourth quarter of 2012 to $14.66 million in the first quarter of 2013 to $12.16 million in the second quarter of 2013. Even worse, "*sales of EVs decreased* in the first and second quarter of 2013," which Kandi attributed to "the discontinuation of a government subsidy at the end of fiscal year ended 2012." Even though Kandi stated that it "believes that the Chinese government will either extend the previous financial subsidy to consumers or introduce a comparable subsidy in the near future," Kandi's stock price tumbled, closing as low as $4.22 on August 19, 2013.

60.     In September 2013, the Chinese government unveiled its long-anticipated subsidy

policy in a Notice titled "Regarding the Continuous Promotion and Application of New-Energy

Vehicles for the years from 2013 to 2015." Under the new policy, EV manufacturers would

receive subsidy payments from the central government, and EV purchasers would receive

subsidy payments from local governments. Kandi described the new policy in a September 19,

2013 press release as follows:

> The subsidy policy, which covers the pure electric vehicles, plug-in hybrid
> electric vehicles and fuel cell battery vehicles, aims to increase the efforts
> on promotion of new energy vehicle procurement with government
> agencies, public organizations and public transportation areas. According
> to the Notice, the central government will provide, based on certain
> technical requirement, up to RMB 60,000 (approximately USD 9,800) for
> the purchase of an all-electric passenger vehicle and up to RMB 500,000
> (approximately USD 81,700) for the purchase of an electric bus. The
> subsidy payments will be distributed to the manufacturers on a quarterly
> basis in advance and the subsidies will then be paid by the manufacturers
> directly to the consumers.

61.     Following the announcement of the new subsidy policy, Kandi's stock price

increased rapidly and continued increasing, as shown in the table below:

|  | Sep. 17 | Sep. 18 | Sep. 19 | Sep. 20 | Sep. 23 | Sep. 24 | Sep. 25 |
|---|---|---|---|---|---|---|---|
| **Closing Price** | $5.35 | $5.49 | $6.70 | $6.60 | $7.04 | $8.34 | $8.85 |
| **Volume** | 1,789,171 | 1,484,267 | 7,765,746 | 4,755,836 | 3,689,623 | 7,753,500 | 6,896,245 |

62.     Rushing to take advantage of this increase, on September 20, 2013, Kandi filed a

shelf registration statement on Form S-3, listing an additional 1,255,462 shares for issuance.

63.     This drew the SEC's scrutiny. On October 17, 2013, the SEC sent a comment

letter to Kandi regarding its September 20, 2013 Form S-3. Kandi responded to the SEC on

October 29, 2013, and then filed an amended Form S-3 on October 30, 2013.

64.     On November 12, 2013, the SEC sent a comment letter to Kandi regarding the Company's 2012 10-K and 2013 Q2 10-Q. Among other things, the SEC raised questions and sought clarification regarding Kandi's reported "$80.8 million" investment in the JV Company; its "dependence…upon a single customer, or a few customers;" its extremely large balance of "outstanding gross accounts receivable" without any "allowance for doubtful accounts"; related-party transaction issues; and the nature of China's "local government's policies that encourage the development of EVs."

### THE CLASS PERIOD BEGINS

### Materially False and Misleading Statements in the 2013 Q3 10-Q

65.     On November 14, 2013, Kandi announced its financial results for the third quarter of 2013, issuing a press release and filing its quarterly report on Form 10-Q for the third quarter of 2013 ("2013 Q3 10-Q"). The press release proclaimed that "[r]evenue for the third quarter was $17.15 million, an increase of 34.3% year-over-year from $12.77 million last year." It also quoted Defendant Hu providing the following update:

> We had a very busy and productive third quarter and were excited about Kandi's several achievements. At the end of July, the Public EV Sharing System in Hangzhou was launched. The first pure EV smart vertical parking and charging facility started its operation and we delivered the first 100 pure EVs for the trial operation of the system. Due to the attack of a typhoon in the Hangzhou area, the system is a bit behind schedule, and as of today, there are two parking/charging facilities completed and in use. There are 30 locations already chosen for building the facilities, of which 18 locations have begun construction. Additionally, Kandi established the new wholly owned subsidiary in Changxing and completed its ownership transfer to the JV Company.
>
> *Given that the long awaited government subsidy policy for EVs is finally in place, we expect that sales of EVs will surge in the next few quarters*, especially as the Public EV Sharing Project has progressed well.

66.     The 2013 Q3 10-Q stated in relevant part:

**Item 4. Controls and Procedures.**

**Evaluation of Disclosure Controls and Procedures**

The Company maintains a system of disclosure controls and procedures that is designed to ensure that information required to be disclosed by the Company in this Form 10-Q, and in other reports required to be filed under the Securities Exchange Act of 1934 (the "Exchange Act"), is recorded, processed, summarized and reported within the time periods specified in the rules and forms for such filings. Management of the Company, under the direction of the Company's Chief Executive Officer and Chief Financial Officer, reviewed and performed an evaluation of the effectiveness of the Company's disclosure controls and procedures (as defined in Rules 13a-15a(e) and 15d-15(e) under the Exchange Act) *as of September 30, 2013. Based on that review and evaluation, the Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures are effective to provide reasonable assurance that information required to be disclosed by us in reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified* in SEC rules and forms and is accumulated and communicated to management, including our principal executive officer and principal financial officer, as appropriate to allow timely decisions regarding required disclosure.

**Changes in Internal Control over Financial Reporting**

There were *no changes to our internal control over financial reporting* (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) that occurred during the period covered by this report that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

67. The 2013 Q3 10-Q also contained certifications under the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Hu and Zhu, stating that (1) the financial statements and "information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company," (2) they had "[e]valuated the effectiveness of the registrant's disclosure controls and procedures," and (3) disclosed "any change in the registrant's internal control over financial reporting that occurred during the registrant's most

{00292174;1 }                                                        23

recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting."

68.     These statements contained in the 2013 Q3 10-Q were false and misleading because, as later disclosed in the 2013 10-K, the Company had a "material weakness" in its internal controls over financial reporting as of December 31, 2013 due to "significant control deficiencies" including a "[l]ack of adequate policies and procedures in internal audit function," the absence of any "self-assessment performed by the Audit Committee to assess the effectiveness of the Audit Committee in oversight of management," the fact that the "internal control audit department reported to the CEO instead of the Audit Committee," and "Inadequate design of internal controls over the approval procedures for related party transactions." Due to the nature of these deficiencies, they necessarily must have existed as of September 30, 2013 and November 14, 2013 as well.

**Defendants Keep Touting the EV Business to Investors**

69.     Meanwhile, Kandi kept describing its EV business in increasingly optimistic terms, driving its stock price to new heights.

70.     On December 19, 2013, at the Company's 2013 Annual Meeting of Stockholders, Kandi's Chairman and CEO Hu Xiaoming told investors that "2013 has been an excellent year for Kandi from many fronts." He elaborated:

> First is the 50/50 joint venture with China's largest privately owned auto manufacturer Geely Auto and we are grateful that Mr. Li Shufu serves as the Chairman of the JV Company, which we feel very proud about. In this JV, Kandi contributed many valuable assets, including the new full-scale EV production and assembly line in Changxing. Also, Geely's subsidiary Shanghai Maple Guorun will soon complete the reform and reconstruction and become another EV production base for the JV Company, which will enable us to become the leading pure EV provider in China. Second is the micro public transportation EV sharing project in Hangzhou which was

launched this year and has progressed pretty well. ***In 2014, we expect our EV business may surpass our legacy go-cart business and become a major revenue generator for the Company***. We expect this Car Share business model will be soon replicated into more cities throughout China. Third is the national government subsidy policy renewal in September. ***With the government's support, we expect EV sales will start to take off soon. We anticipate steady increasing demand for EVs in the coming year***.

71.    The Company also stated the following at the 2013 Annual Meeting of Stockholders:

> Q: Since September, the PRC Ministries have made two long awaited announcements regarding the subsidy programs. The first outlined the amount parameters and last month the Ministries named the first 28 approved cities, which included Hangzhou, Jinhua, Shanghai, Jiangsu and Haiku, all cities that Kandi has an announced established presence. Has the actual payment of subsidies begun yet? If not, how soon is it expected?
>
> ***A: We expect subsidies will begin to pay in the first quarter of 2014.***

72.    On January 17, 2014, Kandi announced that over 2,500 "Kandi Brand SMA7000BEV and SMA7001BEV models" had been produced in December 2013—"more than one third of the total EV production in China in December, 2013." On January 23, 2014, Kandi announced that the JV Company had established a "solid platform… to begin exploring the public EV sharing project in Shanghai." On February 23, 2014, *Bloomberg* reported that Kandi was planning to expand into Beijing and Shanghai.[9]

---

[9]    *Kandi Plans Electric Car Network in Beijing, Shanghai,* Bloomberg News, Feb. 23, 2014 11:53pm EST, https://www.bloomberg.com/news/articles/2014-02-23/kandi-in-talks-to-expand-electric-car-rental-to-beijing-shanghai.

{00292174;1 }                                       25

73. Investors responded very positively. As a February 27, 2014 article in *Charged EVs*[10] summarized:

> Many see huge potential in Kandi's unique approach – its all-electric fleet offers a cheap and convenient way to get around, and is a hit with government officials, who are struggling to contain choking air pollution.
>
> "Kandi's business model can bypass obstacles in the promotion of electric cars such as inconvenience of charging," said industry analyst Harry Chen. "By expanding into more cities, it will help stimulate the overall electrical vehicle business in China."
>
> "I have been meeting local officials from other cities who have been visiting our company almost daily in the past few months," Kandi Chairman Hu Xiaoming told Bloomberg. "They are very interested in our model and keen on promoting use of electric vehicles in their cities."

74. All of this drove Kandi's stock price to new heights, as shown in the tables below:

|  | Dec. 19, 2013 | Dec. 24, 2013 | Dec. 27, 2013 | Dec. 30, 2013 |
|---|---|---|---|---|
| **Closing Price** | $7.50 | $8.00 | $10.34 | $11.95 |
| **Volume** | 1,127,258 | 2,683,295 | 5,801,178 | 10,754,928 |

|  | Jan. 2, 2014 | Jan. 15, 2014 | Feb. 24, 2014 | Mar. 5, 2014 | Mar. 17, 2014 |
|---|---|---|---|---|---|
| **Closing Price** | $13.64 | $15.00 | $15.56 | $19.90 | $21.41 |
| **Volume** | 6,959,216 | 5,821,891 | 8,724,805 | 4,382,051 | 15,054,919 |

## The 2013 10-K

75. On March 17, 2014, pre-market, Kandi announced its financial results for 2013, issuing a press release and filing its annual report on Form 10-K for 2013 (the "2013 10-K").

---

[10] Charles Morris, *Investors see huge potential in Kandi's Chinese electric car-sharing service*, Charged EV: Charged Electric Vehicles Magazine, Feb. 27, 2014, https://chargedevs.com/newswire/investors-see-huge-potential-in-kandis-chinese-electric-car-sharing-service/.

Although Kandi had a net loss of $21 million in 2013, revenues had increased from $64.5 million in 2012 to **$94.5 million** in 2013. And revenues in the fourth quarter of 2013 were **$50.6 million**—twice that of the fourth quarter of 2012. The press release quoted Defendant Hu as saying:

> **2013 was truly a breakthrough year for Kandi and our shareholders**. The newly launched Public EV Sharing System in Hangzhou has been well received and highly recognized by our customers and various local governments as another innovative EV business model by Kandi. This EV sharing project was featured in the various national and international media outlets, such as China Central Television (CCTV), Associated Press (AP) and Bloomberg. During the year, we have formed and completed a strategic EV joint venture with Geely Auto which has already produced a profound impact on improving and expanding our EV business by a better consolidation of brands, resources and expertise to gain more market shares in China's pure EV sector.
>
> **With the newly unveiled EV subsidy policy in China, many of our pending EV orders have begun to be fulfilled during the fourth quarter in which we sold 3,568 units**. For full year 2013, we achieved our expectations for revenue growth, including that almost 50% of total revenue came from EV sales. We expect this growth momentum will carry well into 2014. Together with JV partner, Geeley Auto, we now have three full-scale specialized EV production facilities, located in Shanghai, Changxing and Jinhua, which enable us to meet the strong market demand for electric vehicles in coming years.

76.    The 2013 10-K described China's subsidy policy as follows:

Pure Electric Vehicle Subsidies

The process of receiving government subsidies is as follows: manufacturers receive central government subsidies through application and sell the EVs to local dealers at a price reflecting the deduction of the central government subsidy from the normal sale price. Local dealers establish their retail price based upon their purchase price from the manufacturers, then deduct the local government subsidy from the retail price before selling the EVs to consumers. Through the above steps, consumers receive two subsidies – from the central and local governments when they purchase EVs.

Because the central and local government subsidy amounts and policies are open and disclosed to the public and all the subsidies are reviewed and verified by the respective governments, consumers know what subsidized prices they will receive and pay for EVs. Therefore, even though dealers can sell vehicles at prices established at their discretion, programs are designed to assure that consumers should receive the entire benefit from both subsidies.

Currently, there are two subsidies from central and local governments for the pure electric vehicles (the "EVs") in China – one from each of the central and local governments. The ultimate beneficiary for these subsidies is the consumer and the actual prices that consumers pay reflect the deduction of both subsidies.

(a) The central government provides a subsidy to manufacturers paid in advance quarterly upon application and approval and settled annually. After selling product to dealers, manufacturers can submit subsidy payment applications with invoices and other supporting documents at the end of each quarter to the requisite central government agencies through their regional offices. After the review and approval by the agencies, the central government makes advance subsidy payments to the manufacturers. At the end of the year, the final subsidy amounts are verified, reconciled according to the number of vehicles actually sold to consumers and settled on an annual basis.

(b) Pursuant to the requirement of the central government, the local governments provide a subsidy to consumers who purchase EVs by a price reduction from the dealer. After the consumer purchases an EV at a reduced selling price from the dealer, the dealer submits a subsidy application to the local government, including a consumer authorization letter for subsidy application, consumer personal I.D., EV Vehicle License, EV purchase invoice and other required documents and requests reimbursement (to the dealer) for the local government subsidy.

### Partial Truths about Kandi's Internal Controls Begin to Emerge

77. The 2013 10-K also disclosed that "*the Company's internal controls over financial reporting were not effective as of December 31, 2013*." In relevant part:

Management conducted an assessment of the effectiveness of our system of internal control over financial reporting as of December 31, 2013, the

{00292174;1 }                                28

last day of our fiscal year. This assessment was based on criteria established in the framework Internal Control—Integrated Framework, issued by the Committee of Sponsoring Organizations ("COSO") of the Treadway Commission and included an evaluation of elements such as the design and operating effectiveness of key financial reporting controls, process documentation, accounting policies, and our overall control environment. Our management has excluded from its assessment for internal control over financial reporting at Zhejiang Kandi Electric Vehicles Co.,Ltd., which is a 50% owned joint venture established in March 2013 and is accounted as an equity method investment. The main operations of Zhejiang Kandi Electric Vehicles Co.,Ltd started on December 2013, and therefore, management's assertion of the effectiveness of Kandi Technologies Group, Inc.'s internal control over financial reporting excluded internal control over financial reporting of Zhejiang Kandi Electric Vehicles Co. Ltd.

Based on management's evaluation under the COSO framework, management concluded that *the Company's internal controls over financial reporting were not effective as of December 31, 2013*.

*Management identified significant deficiencies in internal controls, which, in the aggregate, lead to a conclusion that a material weakness exists in the control environment*. The significant deficiencies noted in the control environment are summarized as follows:

*1. Lack of adequate policies and procedures in internal audit function*, which may potentially result in: (1) lack of communication between internal audit department and the Audit Committee and the Board of Directors; (2) insufficient internal audit work to ensure that the Company's policies and procedures have been carried out as planned.

2. There was *no self-assessment performed by the Audit Committee* to assess the effectiveness of the Audit Committee in oversight of management.

3. The *internal control audit department reported to the CEO instead of the Audit Committee*. Such reporting structure impaired the independence and objectivity of the internal control audit department.

*4. Inadequate design of internal controls over the approval procedures for related party transactions.*

{00292174;1 }                                        29

78.     The 2013 10-K also purported to describe the Company's efforts to address these

problems:

> Promptly upon discovery of these significant deficiencies, management
> took affirmative remediation action to ensure that established, in-place
> policies and procedures would be consistently implemented moving
> forward. Additionally, *management is investing in on-going efforts to*
> *continuously improve the control environment* and has committed
> considerable resources to the continuous improvement of the design,
> implementation, documentation, testing and monitoring of our internal
> controls.

* * *

> **Remediation of Material Weakness**
>
> To remediate the foregoing material weakness, management reviewed and
> modified processes, procedures and controls over internal audits and
> related party transactions to ensure greater oversight and transparency. In
> particular, (1) the Audit Committee is in a process of evaluating the
> existing internal audit charter to ensure the annual internal control plan is
> evaluated and approved by the Audit Committee, and regular and frequent
> reporting on the internal audit related matters to the Audit Committee is
> carried out by the head of internal audit department. We have also
> restructured the internal audit department, such that the head of internal
> audit department reports directly to Audit Committee to enhance the
> independence and objectivity of the internal audit Department; (2) A
> procedure for self-evaluation on the effectiveness of the Audit Committee
> will be carried out on the January of each year; (3) *Starting from January*
> *2014, all related party transactions are subject to the evaluation and*
> *approval of our Audit Committee.*

### The SEC Investigation

79.     The 2013 10-K disclosed for the first time that Kandi had been "furnishing

documents" to the SEC in response to a "document subpoena issued on November 21, 2013

regarding a matter known as *In the Matter of Kandi Technologies Group, Inc.*"

80.    As a March 28, 2014 *Sharesleuth* article[11] noted:

Kandi did not mention the investigation in the press release it issued last week to announce its fourth-quarter and full-year earnings. Instead, it disclosed the probe in its annual SEC filing, in the middle of a long list of potential risk factors.

\* \* \*

The fact that the SEC has issued a subpoena indicates that the probe has moved beyond the informal stage and now is classified as a formal investigation; According to a guide on the SEC's website, its enforcement attorneys cannot issue subpoenas unless the commission authorizes a formal investigation.

A formal order of investigation allows the SEC's enforcement staff to compel testimony from officers, directors and employees, as well as third parties, such as suppliers, customers and other business partners.

81.    Ultimately, as further detailed above at ¶39, the SEC brought fraud charges on May 5, 2014 against several stock promoters, accusing them of "conducting illegal reverse merger schemes" and "orchestrat[ing] *manipulative trading* in [Kandi] in 2009 and 2010."[12] In particular, the SEC alleged that *Kandi's CEO—Defendant Hu—had reached a "secret agreement… to manipulate the trading of Kandi stock to increase its price* to at least $3 per share within three months."

---

[11]    Chris Carey, *SEC probe of Kandi Technologies has risen to a formal investigation* (Mar. 28, 2014), http://sharesleuth.com/short-takes/reverse-mergers/2014/03/sec-probe-of-kandi-technologies-has-risen-to-a-formal-investigation.

[12]    Press Release, SEC, *SEC Charges Toronto-Based Consultant and Four Others in Reverse Merger Schemes Involving China-Based Companies* (May 5, 2014), https://www.sec.gov/news/press-release/2014-91.

{00292174;1 }                                    31

## The 2014 Q1 10-Q

82.     On May 12, 2014, Kandi announced its financial results for the first quarter of 2014, issuing a press release and filing its quarterly report on Form 10-Q for the first quarter of 2014 (the "2014 Q1 10-Q"). The press release proclaimed that "Revenue for EV Sales More Than Tripled," from $1.7 million in the first quarter of 2012 to $8.4 million in the first quarter of 2013, and that revenues overall almost doubled, from $14.7 million in the first quarter of 2012 to $40.2 million in the first quarter of 2013.

83.     The 2014 Q1 10-Q made clear that the Company's internal controls remained deficient. Specifically, "***the Company's disclosure controls and procedures were not effective*** as of March 31, 2014, due to ***significant deficiencies in internal controls***, which, in the aggregate, lead to a conclusion that a material weakness exists in the control environment as follows:"

> 1.     ***Lack of adequate policies and procedures in internal audit function***, which may potentially result in: (1) lack of communication between internal audit department and the Audit Committee and the Board of Directors; (2) insufficient internal audit work to ensure that the Company's policies and procedures have been carried out as planned.
>
> 2.     There was ***no self-assessment performed by the Audit Committee*** to assess the effectiveness of the Audit Committee in oversight of management.
>
> 3.     ***Inadequate design of internal controls over the approval procedures for related party transactions***.

84.     The 2014 Q1 10-Q purported to describe the Company's efforts to address these problems. In particular, it stated that Kandi had "made arrangements to insure the efficient and timely communication between the internal control audit department and the Audit Committee":

The internal audit department was restructured that its head has reported directly to Audit Committee on major accounting items to enhance the independence and objectivity of the department. Currently, the internal audit department has also revaluated the policies and procedures in internal audit function, and made necessary remediation. The new internal audit policies and procedures are in the process of approval and are expected to be approved by the end of May 2014.

During the first quarter of 2014, *our Board of Directors also revaluated the approval procedures for related party transactions, and has prepared a new detail approval procedure for related party transactions*. This is in the process of finalization, which is expected to be approved by our Board of Directors by the end of May 2014.

## The Amended 2013 10-K

85.     On May 16, 2014, Kandi filed an amended annual report on Form 10-K/A for 2013 (the "2013 10-K/A"). The 2013 10-K/A explained that it was filed

to amend and supplement the following provisions of [the 2013 10-K], to agree with the Company's responses to the SEC Staff's comments dated April 25, 2014:

- Item 7 of Part II

- Note 19 of the Notes to Consolidated Financial Statements under Item 8 of Part II

- Item 13 of Part III

In this Amendment, we expanded the analysis under "Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operation" to: (i) include comparable GAAP measures where non-GAAP figures were presented regarding net income in the "Overview" section; (ii) *expand the disclosure under "EV Products" to provide greater detail regarding the Company's business partners and EV sharing project*; and (iii) quantify all factors contributing to the change in interest income (expense) in the section entitled "Interest Income (Expense), Net." The Company also amended Note 19 of the "Notes to Consolidated Financial Statements" under Item 8 of Part II to more clearly detail how the Company's effective income tax rate was calculated. Finally, *we also amended the disclosure under "Item 13.*

*Certain Relationships and Related Transactions*, and Director Independence" to be consistent with other disclosures made elsewhere in the Form 10-K.

86.     In particular, the 2013 10-K/A listed the following amounts due to the Company from a related party called "Kandi USA Inc. carrying trade name of Eliteway Motorsports":

> During fiscal year ended December 31, 2013, the Company sold products to Kandi USA Inc. carrying trade name of Eliteway Motorsports ("Eliteway") amounting to $6,906,807 (2012: $5,297,548). At the fiscal year ended 2013, outstanding receivable due from Eliteway was $2,800,958 (2012: $2,678,349).

> Mr. Hu Wangyuan was the sole shareholder and officer of Eliteway which served as a US importer of the Company's products. Mr. Hu Wangyuan is the adult son of the Company's Chairman and Chief Executive Officer, Mr. Hu Xiaoming. As of and for the year ended December 31, 2013, Eliteway and Mr. Hu Wangyuan were financially independent from the Company. The transactions between the Company and Eliteway were carried at arm's-length without preferential terms comparing with other customers at the comparative order size or volume.

87.     This disclosure followed a long correspondence between Kandi and the SEC over its financial statements, which continued until at least May 27, 2014. In its responses on January 17, 2014 as well as February 24, 2014, Kandi (among other things) had repeatedly insisted that Eliteway Motorsports, a customer that provided 11% of Kandi's sales in the first half of 2012, was somehow not a "related party" even though "Mr. Hu Wangyuan is the sole shareholder and an officer of Eliteway Motorsports (previously known as Kandi USA, Inc.), which is one of the US importers for our products, and is the adult son of our Chairman and CEO Mr. Hu Xiaoming." The SEC was not convinced, and Kandi ultimately had to file its 2013 10-K/A, which correctly listed Eliteway Motorsports as a related party.

**The 2014 Q2 10-Q**

88.     Kandi continued announcing operational milestones. On July 7, 2014, Kandi announced that the JV Company had

> received a national subsidy of RMB197 million (approximately US *$31.8 million*) for sales of over 3,000 Electric Vehicles ("EVs") between June and December in 2013 and sales of over 1,000 EVs during the first quarter of 2014. The subsidy payment includes the 2013 year-end subsidy and advance subsidy payment for the first quarter of 2014…. Additionally, the city of Hangzhou, where the Company has launched its innovative short-term EV rental and long-term EV leasing program, is expected to announce its local subsidy policy for new energy vehicles in the near future.

89.     On July 14, 2014, pre-market, Kandi announced that the JV Company had "sold 4,114 Kandi brand Electric Vehicles ('EVs') during second quarter of 2014, a 238% increase from 1,215 EVs in the first quarter of 2014." Upon this news, Kandi's stock price jumped $3.92, or 26.63%, to close at $18.64 on July 14, 2014 (compared to $14.72, its July 11, 2014 closing price).

90.     On August 11, 2014, Kandi announced its financial results for the second quarter of 2014, issuing a press release and filing its quarterly report on Form 10-Q for the second quarter of 2014 (the "2014 Q2 10-Q"). The press release proclaimed that "[EV] revenue increased by 552.1% to $13.25 million as compared to $2.03 million in the second quarter of 2013" and that overall revenue "for the second quarter grew 171.1% to $32.96 million from $12.16 million in the second quarter last year."

91.     The 2014 Q2 10-Q made clear that Kandi's internal controls remained deficient. Specifically, it stated that Kandi's "*disclosure controls and procedures were not effective as of June 30, 2014* due to significant deficiencies in internal controls, which, in the aggregate, lead to a conclusion that a material weakness exists in the control environment as follows:"

{00292174;1 }                                    35

1. We have a lack of adequate policies and procedures in internal audit function, which may potentially result in: (1) lack of communication between our internal audit department and the Audit Committee and our Board of Directors; (2) insufficient internal audit work to ensure that our policies and procedures have been carried out as planned.

2. There was no self-assessment performed by the Audit Committee to assess the effectiveness of its in oversight of management.

3. We have an inadequate design of internal controls over the approval procedures for related-party transactions.

92. The 2014 Q2 10-Q provided the following update on the Company's remedial efforts:

**Changes in Internal Control over Financial Reporting**

During the first six months of 2014, we took the initiative to enhance the effective and timely communication between our internal audit department and our Audit Committee. We reorganized our internal audit department so that the head of such department reports directly to the Audit Committee on any reportable issue to enhance the independence and objectivity of the internal audit function. In addition, the internal audit department revisited the policies and procedures of internal audit and made modification to keep internal audit workflow in compliance with SEC requirements. On May 30, 2014, the Audit Committee of the Board of Directors held a special meeting and approved the new Internal Audit Activity Charter.

During the first six months of 2014, the Board of Directors also evaluated the design of internal controls over the approval procedures for related-party transactions, and developed a set of revised approval procedures for related-party transactions. ***On May 30, 2014, the Audit Committee of the Board of Directors held a special meeting and approved the new Management Policy on Related Party Transactions***.

In July 2014, the Chairman of the Audit Committee of the Board of Directors met with our management, our internal audit team and our independent auditor to review the progress of implementation of the

remediation measures and *spearheaded a comprehensive remediation plan to fully address the deficiencies in our internal controls*. We intend to complete the project in a timely fashion and will conduct quarterly assessments of the state of our financial reporting measures and systems, as a whole.

Aside from the remediation measures that we initiated during this reporting period described above, there was no change to our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) that occurred during the period covered by this report that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

### The 2014 Q3 10-Q

93.     On November 10, 2014, Kandi announced its financial results for the third quarter of 2014, issuing a press release, holding an earnings call, and filing its quarterly report on Form 10-Q for the third quarter of 2014 (the "2014 Q3 10-Q"). The press release proclaimed that "[EV] Parts sales increased by 107.9% to $35.81 million as compared to $17.22 million in the second quarter of 2014" and that overall revenue "for the third quarter grew 157.78% to $44.21 million from $17.15 million in the third quarter last year." The press release also quoted Defendant Hu as saying:

> Our third quarter was another exciting quarter with strong top-line growth, improved financial condition and new strategic developments. In particular, our EV manufacturing joint venture with Geely Auto, or the 'JV Company' achieved great quarterly net profit and net margin, despite the fact that the quarter was back-end loaded because the new EV purchase tax exemption did not become effective until September 1.

> During the quarter, we also made numerous business initiatives, including the initial delivery of Kandi brand EVs to Shanghai public pure EV sharing program, the unveiling of our new 4-seat pure EV model KD17 'Cyclone', and the successful completion of our $71 million registered direct offering. Given the increasing opportunities and demand for electric cars in China, as well as Kandi's solid foundation and financial strength,

we believe we are in a great position to continue executing our current business strategy.

Looking forward to the fourth quarter, we are confident that our business model is beginning to gain traction in both topline and bottom-line growth. The Car-Share Program has been highly recognized and well received by the customers, we believe our EV business model will be expanded to more EV pilot cities in China. We are also thrilled with our recent partnership with Ant Financial Services Group to launch Alipay, including Alipay Wallet services and technology platform, to Kandi's EV end users. We hope to raise the market awareness of the Kandi brand through the 300 million registered Alipay users.

**Materially False and Misleading Statements in the 2014 Q3 10-Q**

94.      The 2014 Q3 10-Q stated that "our CEO and CFO concluded that as of the end of the period covered by this report, *our disclosure controls and procedures were effective*." It provided the following update regarding remedial measures:

**Changes in Internal Control over Financial Reporting**

During the quarter ended September 30, 2014, we continued to implement the remediation measures according to our new Internal Audit Activity Charter that were approved on May 30, 2014. In addition, the Audit Committee conducted a self-assessment to assess our effectiveness in oversight of management and updated the Audit Committee Charter.

Other than those set forth above, there was no change to our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) that occurred during the period covered by this report that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

95.      The 2014 Q3 10-Q also contained SOX certifications signed by Defendants Hu and Zhu, stating that (1) the financial statements and "information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company," (2) they had "[e]valuated the effectiveness of the registrant's disclosure controls and procedures," and (3) disclosed "any change in the registrant's internal control over financial

{00292174;1 }                                         38

reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting."

96.     The statements contained in the 2014 Q3 10-Q were false and misleading because (i) certain areas in the Company's previously issued financial statements as of and for the years ended December 31, 2014, including the quarters therein, did not materially conform with GAAP and, therefore, required correction; and (ii) the Company, in fact, continued to lack effective internal controls over financial reporting as of September 30, 2014.

**The 2014 10-K**

97.     On February 17, 2015, the Company issued a press release announcing that it had received a letter from the SEC dated February 9, 2015 "advising that the Division has concluded its investigation of Kandi and, based on information received to date, does not intend to recommend to the Commission that any enforcement action be brought against Kandi. This formally concludes the SEC's investigation that commenced in 2013."

98.     On March 16, 2015, Kandi announced its financial results for 2014, issuing a press release, holding an earnings call, and filing its annual report on Form 10-K for 2014 (the "2014 10-K"). The press release touted Kandi's "Record Full Year 2014 Financial Results," including that "[EV] Parts sales increased significantly by 6,653.4% to $116.4 million compared to $1.7 million in the previous year" and that "revenues grew 80.1% to $170.2 million from $94.5 million in 2013." The press release quoted Defendant Hu as saying:

> Looking ahead, we are extremely excited about Kandi's business prospects for continued growth. Given the government's strong commitment towards policies that encourage the adoption of electric vehicles nationwide, including the national and local government subsidies, the electric vehicle tax breaks, along with the prevailing favorable market conditions in China, we are confident in our ability to

execute our strategy to further grow market shares in China. Recently, the management team of our joint venture company has decided to expand its EV sales effort directly to the end customers, which, together with JV's existing fleet sales model, will be a key catalyst that boost consumer demand for our electric vehicles. We look forward to enhancing our overall product and service, while leveraging the JV Company's flexible business model and its leading position in both EV sharing and EV sales businesses, and finally making Kandi a leader in the EV market in China.

99.     The 2014 10-K described its business environment, and China's subsidies, as follows:

To improve the environment of the urban areas, the China Central Government, along with many municipalities, has been introducing numerous supporting policies that encouraged the usage and adoption of EVs, including subsidies, tax exemptions, special treatment of tag and license. *Among these policies, the most significant development involved the availability of subsidies from central and local government for the sale of EVs*. The process of receiving government subsidies is as follows: manufacturers receive central government subsidies through application and sell the EVs to local dealers at a discounted price, reflecting the deduction of the central government subsidy from the normal sale price. Local dealers then establish their retail price based upon the prevailing purchase price from the manufacturers, and then deduct the local government subsidy from the retail price before selling the EVs to consumers. Through these steps, consumers receive both subsidies from the central and local governments when they purchase EVs.

100.    The 2014 10-K stated, with respect to accounts receivable, that "As of December 31, 2014 and 2013, the credit terms with the Company's customers were typically 90 to 120 days after delivery." Moreover:

An allowance for doubtful accounts is recorded in the period when a loss is probable based on an assessment of specific factors, such as troubled collection, historical experience, accounts aging, ongoing business relations and other factors. Accounts are written off after exhaustive efforts at collection. If accounts receivable are to be provided for, or written off, they would be recognized in the consolidated statement of operations within operating expenses. We had an *allowance for doubtful*

{00292174;1 }                                    40

*accounts of $0 for the years ended December 31, 2014 and 2013*, in accordance with our management's judgment based on their best knowledge.

## Materially False and Misleading Statements about Cash Flows

101.    The 2014 10-K stated the following about the Company's cash flows:

## Cash Flow

For the year ended December 31, 2014, cash used in operating activities was $7,453,756, as compared to cash provided by operating activities of $14,687,446 for the year ended December 31, 2013 and cash used in operating activities of $10,721,895 for the year ended December 31, 2012. The major operating activities that provided cash for the year ended December 31, 2014 were net income of $12,271,338, an increase in accounts payable of $23,095,825 and a decrease in accounts receivable of $15,445,962. The major operating activity that used cash for the year ended December 31, 2014 was an increase in receivables from the JV Company of $48,593,522.

*Cash used in investing activities for the year ended December 31, 2014 was $50,108,255*, as compared to cash used in investing activities of $59,844,162 and $4,751,858 for the years ended December 31, 2013 and 2012, respectively. Cash provided by investing activities for the year ended December 31, 2014 was primarily the result of the ***repayment of notes receivable of $29,354,592***. Cash used in investing activities for the year ended December 31, 2014 was primarily the result of the purchases of construction in progress of $50,891,170 and the ***issuance of notes receivable of $24,705,489***.

102.    These statements were false and misleading because, as later revealed in the 2016 10-K, Kandi had neither received "repayment of notes receivable of $29,354,592" nor issued "notes receivable of $24,705,489." More than half of the purported "repayment of notes receivable of $29,354,592" actually "represent[ed] the collections of the notes receivables or the assignment of the notes receivable to our suppliers to settle the accounts payables." Likewise, more than half of the purported "issuance of notes receivable of $24,705,489" actually "represent[ed] the settlement of the trade receivables with notes receivables."

103. As further detailed below at ¶¶239–253, reporting its cash flows in this manner allowed Kandi to mask certain cash flow problems that were arising because the JV Company and/or ZZY had stopped receiving subsidy payments. It enabled Kandi to avoid disclosing to investors that the Company was settling its accounts payable to suppliers not in cash but by assigning notes receivable, primarily from the JV Company. Such disclosures, if properly made, would have suggested to investors that the JV Company was giving Kandi notes receivable instead of paying on time in cash, which in turn deprived Kandi of cash it needed to pay its own suppliers on time.

### Materially False and Misleading Statements about Internal Controls

104. The 2014 10-K provided the following update regarding Kandi's internal controls:

**Remediation of Previously Reported Material Weakness**

As of December 31, 2014, the management evaluated the material weakness in our internal control that was disclosed in Item 9A of our Annual Report on Form 10-K for the year ended December 31, 2013 (the "2013 Form 10-K") and related implementation of corrective measures in 2014. In May 2014, the Audit Committee reviewed and approved the Company's policies and procedures related to remediating inadequate internal control environment that was disclosed in Item 9A of the 2013 Form 10-K, of which Audit Committee Charter and Amended Business Ethics and Codes of Conduct have been posted on our website. The internal auditor reports directly to the Company's audit committee. The Chairman of the Audit Committee and management representatives met with the internal auditor and the independent auditor who conducts the audit of internal control over financial reporting. The Audit Committee also reviewed and approved the amended approval procedures and guidelines for related-party transactions (internal audit process). This new rule has been implemented by the management. In addition, the Audit Committee conducted a self-assessment to assess our effectiveness in oversight of management and updated the Audit Committee Charter. ***The management believes that the progresses made met the remediation requirements and were sufficient to remediate the material weakness in***

*our internal control that was disclosed in Item 9A of our 2013 Form 10-K*.

105.    The 2014 10-K also stated:

**Item 9A. Controls and Procedures.**

**(a) Evaluation of Disclosure Controls and Procedures**

*The Company has evaluated, under the supervision of the Company's Chief Executive Officer and the Chief Financial Officer, the effectiveness of disclosure controls and procedures as of December 31, 2014…. Based on this evaluation, the Chief Executive Officer and Chief Financial Officer concluded that the Company's disclosure controls and procedures were effective as of December 31, 2014.*

* * *

*Management conducted an assessment of the effectiveness of our system of internal control over financial reporting as of December 31, 2014*, the last day of our fiscal year. This assessment was based on criteria established in the framework Internal Control—Integrated Framework (2013), issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") and included an evaluation of elements such as the design and operating effectiveness of key financial reporting controls, process documentation, accounting policies, and our overall control environment. *Based on management's evaluation under the 2013 COSO framework, management concluded that the Company's internal controls over financial reporting were effective as of December 31, 2014.*

106.    The 2014 10-K also contained SOX certifications signed by Defendants Hu and Zhu, stating that (1) the financial statements and "information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company," (2) they had "[e]valuated the effectiveness of the registrant's disclosure controls and procedures," and (3) disclosed "any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially

{00292174;1 }                                      43

affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting."

107.    These statements contained in the 2014 10-K were false and misleading because Defendants failed to disclose that: (i) certain areas in the Company's previously issued financial statements as of and for the year ended December 31, 2014, including the quarters therein, did not materially conform with GAAP and, therefore, required correction; and (ii) the Company continued to lack effective internal controls over financial reporting as of December 31, 2014.

## A New CFO

108.    On March 24, 2015, Kandi announced in a Form 8-K that Mr. Wang Cheng (Henry Wang) would become the Company's new CFO, effective May 1, 2015. Kandi's concurrent press release elaborated:

> Mr. Wang has over 20 years of international financial management experience. Before joining Kandi, Henry served as Chief Financial Officer for Shanghai Always Marketing Service Co., LTD., one of the largest field marketing service agencies in China, leading its procurement and finance departments since May 2014. Prior to that, Mr. Wang worked for Renesola Ltd. (NYSE:SOL), an international leading brand and technology provider of green energy products, initially as the Vice President of Finance, ascending to Chief Financial Officer in July 2011. Mr. Wang holds both certifications as Certified Public Accountants ("CPA") in China and Certified Internal Auditor ("CIA"), and earned a Master's degree in Law from Renmin University of China and a Master's of Business Administration from the Open University of Hong Kong.
>
> Mr. Hu Xiaoming, Chairman and Chief Executive Officer of Kandi, said, "We are pleased to welcome Henry Wang to our management team as the new Chief Financial Officer. His depth of experience in financial management, international business development, and operations will be a significant asset to Kandi. Henry possesses the knowledge and experience to provide broad-based business acumen, financial leadership and risk management to positively impact the business beyond the finance function."

{00292174;1 }                                    44

109.    On April 13, 2015, Kandi announced that the JV Company "will explore public listing options in China in an effort to unlock shareholder value." The press release elaborated:

> The JV Company…held a Board of Directors meeting on April 8, 2015, at which the Board authorized management to explore options for going public in China. Accessing the public capital market would allow the JV Company to leverage the growing electric vehicle ("EV") market demand in China and the government's strengthened commitment to EVs in terms of subsidies for EV end-users.

> Mr. Hu Xiaoming, Chairman and Chief Executive Officer of Kandi and Chairman of the JV Company, commented, "Through the combined efforts of Kandi and Geely Auto, our JV Company has become the leader in pure electric vehicle manufacturing in China, and a growing leader in the production of new energy vehicles. Together, we believe that the prevailing industry fundamentals are such that a public listing will deliver substantial value to our shareholders over the long-term. *The JV Company has confidence in achieving the goal of a public listing in China within the next two years, as long as market conditions permit*."

## The 2015 Q1 10-Q

110.    On May 11, 2015, Kandi announced its financial results for the first quarter of 2015, issuing a press release and filing its quarterly report on Form 10-Q for the first quarter of 2015 (the "2015 Q1 10-Q"). The press release proclaimed that "[EV] Parts sales increased by 71.3% to $43.0 million for the first quarter of 2015 compared to $25.1 million in the same period of 2014" and that total "revenues grew 9.0% to $43.8 million for the first quarter of 2015 from $40.2 million for the first quarter of 2014."

### Materially False and Misleading Statements in the 2015 Q1 10-Q

111.    The 2015 Q1 10-Q stated as follows:

**Evaluation of Disclosure Controls and Procedures**

We have evaluated, under the supervision of our Chief Executive Officer ("CEO") and our Chief Financial Officer ("CFO"), the effectiveness of disclosure controls and procedures (as such term is defined in Rules 13a-

{00292174;1 }                                    45

15(e) and 15d-15(e) under the Securities Exchange Act of 1934 (the "Exchange Act")) as of March 31, 2015. ***Based on this evaluation, our CEO and CFO concluded that as of the end of the period covered by this report, our disclosure controls and procedures were effective.***

\* \* \*

**Changes in Internal Control over Financial Reporting**

There was no change to our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) that occurred during the period covered by this report that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

112.    The 2015 Q1 10-Q also contained SOX certifications signed by Defendants Hu and Wang, stating that (1) the financial statements and "information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company," (2) they had "[e]valuated the effectiveness of the registrant's disclosure controls and procedures," and (3) disclosed "any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting."

113.    These statements contained in the 2015 Q1 10-Q were false and misleading because Defendants failed to disclose that: (i) certain areas in the Company's previously issued financial statements as of and for the year ended December 31, 2014, including the quarters therein, as well as for the first quarter of 2015, did not materially conform with GAAP (for the issues discussed above pertaining to proper disclosure of cash flows, among other things) and, therefore, required correction; and (ii) the Company continued to lack effective internal controls over financial reporting as of March 31, 2015.

**The 2015 Q2 10-Q**

114.    On August 10, 2015, Kandi announced its financial results for the second quarter of 2015, issuing a press release and filing its quarterly report on Form 10-Q for the second quarter of 2015 (the "2015 Q2 10-Q").

115.    The press release proclaimed that "[EV] parts sales increased 168.3% to $46.6 million for the second quarter of 2015 compared to $17.4 million in the same period of 2014" and that total "revenues grew 45.5% to $48.0 million for the second quarter of 2015 from $33.0 million for the second quarter of 2014." However, as the 2015 Q2 10-Q admitted, "Net income was $5,425,502 for the second three months of 2015, a decrease of $5,731,583 or 51.4% compared to $11,157,085 for the same period of last year," which Kandi claimed was "primarily attributable to the change of the fair value of financial derivatives."

116.    The press release also quoted Kandi's new CFO, Mr. Wang Cheng, as saying:

> Our strong financial results in the second quarter were in line with our expectations. By early July of this year, the JV Company had received the remaining subsidies from the central government for 2014 and expects to obtain the 2015 subsidies in the coming months, which will contribute to the Company's third quarter cash flow.

**Materially False and Misleading Statements in the 2015 Q2 10-Q**

117.    The 2015 Q2 10-Q also stated in relevant part:

**Evaluation of Disclosure Controls and Procedures**

We have evaluated, under the supervision of our Chief Executive Officer ("CEO") and our Chief Financial Officer ("CFO"), the effectiveness of disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934 (the "Exchange Act")) as of June 30, 2015. *Based on this evaluation, our CEO and CFO concluded that as of the end of the period covered by this report, our disclosure controls and procedures were effective.*

\* \* \*

{00292174;1 }                                       47

**Changes in Internal Control over Financial Reporting**

There was no change to our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) that occurred during the period covered by this report that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

118. The 2015 Q2 10-Q also contained SOX certifications signed by Defendants Hu and Wang, stating that (1) the financial statements and "information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company," (2) they had "[e]valuated the effectiveness of the registrant's disclosure controls and procedures," and (3) disclosed "any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting."

119. The statements contained in the 2015 Q2 10-Q were false and misleading because Defendants failed to disclose that: (i) certain areas in the Company's previously issued financial statements as of and for the year ended December 31, 2014, including the quarters therein, as well as for the first two quarters of 2015, did not materially conform with GAAP (for the issues discussed above pertaining to proper disclosure of cash flows, among other things) and, therefore, required correction; and (ii) the Company continued to lack effective internal controls over financial reporting as of June 30, 2015.

**The 2015 Q3 10-Q**

120. On November 9, 2015, Kandi announced its financial results for the third quarter of 2015, issuing a press release and filing its quarterly report on Form 10-Q for the third quarter of 2015 (the "2015 Q3 10-Q"). The press release proclaimed that "[EV] parts sales increased

35.7% to $49.0 million for the third quarter of 2015, compared with $36.1 million in the same period of 2014," that total "revenues grew 14.3% to $50.5 million for the third quarter of 2015 from $44.2 million for the same period of 2014," and that the JV Company "sold 6,004 EV products, a 208% increase compared with the same period last year."

121.    The press release quoted Defendant Hu as saying:

> The third quarter performance underscores our tremendous growth in EV parts and EV sales as we became China's top seller for EV products in September. During the third quarter, we obtained the approval for a vehicle purchase tax exemption for Kandi Cyclone ("K17"), while launching a successful promotion in Beijing and Shanghai. The initial market response has been extremely positive, and we believe K17 will become the Company's key driver for growth over the next year. Meanwhile, China's central government has extended its continuous support and confidence in developing the new energy vehicle (NEV) industry by releasing additional policies, including reducing traffic controls and purchase quotas on NEVs, encouraging government purchases, and promoting EV carshare programs. With the government's dedication, we see unprecedented opportunities ahead of us, and we are well positioned to benefit from the EV adoption in China by leveraging our unique growth engines: the rapid expansion of our Micro Public Transportation program and the burgeoning direct sales program through the distribution channel.

122.    The 2015 Q3 10-Q also noted that:

> In August 2015, because **the Service Company started to prepare for Initial Pricing Offering**, the JV Company transferred its shares of the Service Company to Shanghai Guorun and Kandi Vehicles for 9.5% respectively. As the result, the Company has the direct economic interest of 9.5% of the Service Company through Kandi Vehicles.

123.    During the earnings call, one analyst asked about certain local government subsidies that had been delayed a few times. In response, Defendant Hu tried to convince investors not to worry about any such delays, including by stating:

Mr. Frank, Mr. Hu likes to clarify what he just mention regarding to the Hangzhou's subsidy and *this subsidy is paid to the service company ZZY, so for the money that is owned to the ZZY from the government is not going to Kandi directly*. So for all the money will be considered as the AR in our financial book, *it's not going to affect our net income*, just want to clarify that.

### Materially False and Misleading Statements in the 2015 Q3 10-Q

124.   The 2015 Q3 10-Q also stated:

**Evaluation of Disclosure Controls and Procedures**

We have evaluated, under the supervision of our Chief Executive Officer ("CEO") and our Chief Financial Officer ("CFO"), the effectiveness of disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934 (the "Exchange Act")) as of September 30, 2015. *Based on this evaluation, our CEO and CFO concluded that as of the end of the period covered by this report, our disclosure controls and procedures were effective.*

\* \* \*

**Changes in Internal Control over Financial Reporting**

There was *no change to our internal control over financial reporting* (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) that occurred during the period covered by this report that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

125.   The 2015 Q3 10-Q also contained SOX certifications signed by Defendants Hu and Wang, stating that (1) the financial statements and "information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company," (2) they had "[e]valuated the effectiveness of the registrant's disclosure controls and procedures," and (3) disclosed "any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially

affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting."

126.    The statements contained in the 2015 Q3 10-Q were false and misleading because Defendants failed to disclose that: (i) certain areas in the Company's previously issued financial statements as of and for the year ended December 31, 2014, including the quarters therein, as well as for the first three quarters of 2015, did not materially conform with GAAP (for the issues discussed above pertaining to proper disclosure of cash flows, among other things) and, therefore, required correction; and (ii) the Company continued to lack effective internal controls over financial reporting as of September 30, 2015.

**The Chinese Government Begins Investigating Subsidy Fraud**

127.    On January 12, 2016, Kandi issued a press release announcing that the JV Company "achieved strong sales of pure electric vehicles ("EVs") in 2015 and expects to exceed its previously announced sales target for the full year 2015. The Company anticipates the total number of EV sales to exceed the previous guidance range of 20,000 to 22,000 EV products by 5% or more."

128.    However, by this time, the Chinese government had begun suspecting fraud in its EV subsidy program. As the *Wall Street Journal* reported on January 24, 2016[13]:

> Nearly every major Chinese car maker is churning out electric cars these days in hopes of capitalizing on regulatory largesse. One problem: Regulators are wary it is being misused.
>
> One suspected strategy involves manufacturers selling faulty or incomplete cars to related parties who pocket the subsidies and then return the cars. That could explain why wholesale shipments of electric cars

---

[13]    Abheek Bhattacharya, *China Risks Electric-Car Shakedown*, Wall St. J., Jan. 24, 2016 3:43 p.m., https://www.wsj.com/articles/china-risks-electric-car-shakedown-1453668015.

between January and November were 56% above retail sales, according to LMC Automotive data. By contrast, in the broader car market, wholesale was 6% higher than retail.

The Ministry of Finance says misused funds could be clawed back as officials step up scrutiny. This would affect one of China's fastest-growing auto segments. Subsidies make up to 35% of what consumers pay. In 2015, wholesale shipments of electric and hybrid vehicles -- including buses -- were more than quadruple their 2014 level. The broader car market limped ahead by 4.7%.

129.    On this news, Kandi's stock price fell $0.54, or 6.4%, to close at $7.88 on January 25, 2016 (compared to $8.42 on January 22, 2016.)

**The 2015 10-K**

130.    On March 14, 2016, Kandi announced its financial results for 2015, issuing a press release, holding an earnings call, and filing the 2015 10-K. The press release emphasized that "EV parts sales increased 68.4% to $196.1 million in 2015, compared with $116.4 million in 2014" and that total "revenues grew 18.1% to $201.1 million in 2015, from $170.2 million in 2014." The press release also quoted Defendant Hu as saying:

> Our outstanding results in 2015 include exceeding revenue and EV sales targets with the JV Company by selling 24,220 EV products, a 121.5% increase year-over-year. As the JV Company became China's top seller for pure EV products in 2015, its EV products received extremely positive market recognition, highlighted by model K17 named as China 2015 Pure Electric Passenger Vehicle of the Year at the 6th Global New Energy Vehicle Conference. The direct sales program was launched in the second quarter and achieved 9,273 in EV products sales in 2015 through the distribution channel under this program, accounting for 38.3% of total EV products sold during the year. We are confident in being able to increase the contribution of direct sales as a percentage of total sales in 2016.

{00292174;1 }                                              52

131.    The 2015 10-K provided additional details about the JV Company:

**Share of Profit (Loss) after Tax of the JV Company**

For the year ended December 31, 2015, *the JV Company's net sales were $362,715,996*, gross income was $59,635,845, and net income was $23,323,128. We accounted for our investments in the JV Company under the equity method of accounting as we have 50% ownership interest in the JV Company. As a result, we recorded 50% of the JV Company's profit, or $11,661,564 for the year ended December 31, 2015. After eliminating intra-entity profits and losses, our share of the after tax profit of the JV Company was $11,841,855 for the year ended December 31, 2015, compared to $4,490,266 for 2014, representing an increase in income of $7,351,589. During the year of 2015, the JV Company's revenues were primarily derived from the sales growth of EV products in the PRC with a total of 24,220 units sold during the year.

132.    The 2015 10-K also stated the following about accounts and notes receivable:

(e) Accounts Receivable

An allowance for doubtful accounts is recorded in the period when a loss is probable based on an assessment of specific factors, such as troubled collection, historical experience, accounts aging, ongoing business relations and other factors. Accounts are written off after exhaustive efforts at collection. If accounts receivable are to be provided for, or written off, they would be recognized in the consolidated statement of operations within operating expenses. *We had an allowance for doubtful accounts of $0 for the years ended December 31, 2015 and 2014*, in accordance with our management's judgment based on their best knowledge.

(f) Notes receivable

*Notes receivable represent short-term loans to third parties with the maximum term of one year*. Interest income will be recognized according to each agreement between a borrower and the Company on an accrual basis. If notes receivable are paid back or written off, that transaction will be recognized in the relevant year. If the loan default is probable, reasonably assured and the loss can be reasonably estimated, the Company will recognize income if the written-off loan is recovered at a future date. In case of any foreclosure proceedings or legal actions being taken, the

Company provides an accrual for the related foreclosure expenses and related litigation expenses. ***The Company also receives Notes receivable from the JV Company to settle the accounts receivables***.

133. In the earnings call, Defendant Hu provided the following update regarding the Chinese government's EV subsidy policy:

> Currently ***China's government is conducting a industry wide investigation concerning the new energy vehicle subsidy***. We welcome the investigation and attention from the government which we believe will help the healthy development of the EV industry, while benefiting scaled EV manufacturers like Kandi in the long run. Meanwhile China's central government has extended its continued support and confidence in developing the New Energy Vehicle or NEV industry by enacting additional policies including reducing traffic controls and purchase quotas on NEVs, encouraging government purchases and promoting EV car-share programs. We are confident that through the rapid expansion of our Micro Public Transportation program and the strong performance of the direct sales program through the distribution channel, both of which are our unique growth engines, Kandi will continue to lead the growth of China's EV industry in 2016 and beyond.
>
> Starting from January 1, 2016 one criteria for NEV subsidy is that a higher speed must meet 100 kilometers per hour, and the Ministry of Industry and Information Technology of China or the MIIT announced new work of qualified EV models to receive the national subsidy. However the national tax payroll doesn't release the list of purchase tax exemption accordingly. As such tax for EV manufacturers including our JV company have been significantly delayed in the first quarter of 2016. That being said we believe this issue is temporary and will be resolved soon and it will not impact the JV company sales for the whole year. ***We expect the JV company to achieve 35,000 or more in EV product sales in 2016, which represents at least a 44.5% year-over-year growth from 2015***.

134. Later on the call, in response to an analyst question about the size and timing of subsidy payments for the second half of 2015, Defendant Hu stated:

> The subsidy payment we received in August last year was the payment in advance, and the rest of the subsidy for 2015 will be paid after the government finishes the process of subsidy verification and allocation.

{00292174;1 }

54

The payment schedule is depending on the processing time. Typically this should arrive around March or April, but due to the investigation the government is conducting regarding improper behavior from some EV manufacturers. So, we think it's going to cause some delays. But, *we still anticipate the payment to be delivered by the end of the first half this year*.

## Materially False and Misleading Statements about Cash Flows in the 2015 10-K

135.    The 2015 10-K stated the following about the Company's cash flows:

**Cash Flow**

For the year ended December 31, 2015, cash used in operating activities was $3,130,976, as compared to cash used in operating activities of $7,453,756 for the year ended December 31, 2014 and cash provided by operating activities of $14,687,446 for the year ended December 31, 2013. The major operating activities that provided cash for the year ended December 31, 2015 were net income of $14,665,495, an increase in accounts payable of $31,814,545 and a decrease in accounts receivable of $7,052,626. The major operating activity that used cash for the year ended December 31, 2015 was *an increase in receivables from the JV Company of $28,519,360*.

Cash used in investing activities for the year ended December 31, 2015 was $5,937,117, as compared to cash used in investing activities of $50,108,255 and $59,844,162 for the years ended December 31, 2014 and 2013, respectively. Cash provided by investing activities for the year ended December 31, 2015 was primarily the result of the *repayment of notes receivable of $127,226,115*. Cash used in investing activities for the year ended December 31, 2015 was primarily the result of the purchases of construction in progress of $1,128,443 and the *issuance of notes receivable of $131,852,319*.

136.    These statements were false and misleading because the Company had misclassified certain non-cash events as "cash used in investing activities"—referring to them as the "repayment" or "issuance" of notes receivable. As later revealed in the 2016 10-K, Kandi had neither received "repayment of notes receivable of $127,226,115" nor issued "notes receivable of $131,852,319." More than half of the purported "repayment of notes receivable of

$127,226,115" actually "represent[ed] the collections of the notes receivables or the assignment of the notes receivable to our suppliers to settle the accounts payables." Likewise, more than half of the purported "notes receivable of $131,852,319" actually "represent[ed] the settlement of the trade receivables with notes receivables."

137.   As further detailed below at ¶¶239–253, reporting its cash flows in this manner allowed Kandi to mask certain cash flow problems that were arising because the JV Company and/or ZZY had stopped receiving subsidy payments. It enabled Kandi to avoid disclosing to investors that the Company was settling its accounts payable to suppliers not in cash but by assigning Kandi's own notes receivable, primarily from the JV Company, to them. Such disclosures, if properly made, would have suggested to investors that the JV Company was giving Kandi notes receivable instead of paying Kandi on time in cash, which in turn deprived Kandi of cash it needed to pay its own suppliers on time.

138.   Kandi's disclosures about cash flows in the 2015 10-K were also misleading because they disclosed nothing about the Company's credit terms with its customers.

139.   As later disclosed in the 2016 10-K, "As of December 31, 2016 and *December 31, 2015*, the credit terms with the Company's customers were typically 210 to 720 days and *150 to 180 days* respectively after delivery." This was a sharp increase from previous years: according to the 2014 10-K, "As of December 31, 2014 and 2013, the credit terms with the Company's customers were typically 90 to 120 days after delivery." Kandi did not disclose this sharp increase until a whole year later, when it filed its 2016 10-K.

140.   The undisclosed trend towards longer and longer credit terms—over the same time period that Kandi was deriving an increasingly large proportion of its revenues from its sales to the JV Company, up to 97.5% in 2015—was material to any investor's assessment of the

{00292174;1 }                                    56

Company's cash flows and of how they might be impacted by any potential delays in receiving government subsidy payments. Defendants' failure to disclose in the 2015 10-K that credit terms with the Company's customers had increased so much since 2014 was thus materially misleading because it obscured the fact that they already knew that delays in subsidy payments were having an impact on the JV Company's sales and cash flow position—and thereby on Kandi's cash flows and receivables.

141.    As Kandi ultimately explained in the 2016 10-K, the Company had to extend credit terms in 2016 "due to the delayed subsidy payments from the government on EV sales." As the 2017 10-K further explained:

> In 2016, the Company extended credit terms with certain customers, mainly the JV Company whose outstanding balance has already exceeded the originally granted credit terms to a much longer period because of delayed subsidy payments for EVs sold by the JV Company from the Chinese government. ***Because of the industry-wide subsidy review, the Chinese government temporarily delayed issuance of subsidy payments for the EVs sold in 2015 and 2016, which negatively impacted the JV Company's cash flow position and caused its delay in repaying the Company***.

142.    On information and belief, the Company's undisclosed increase in credit terms in 2015 demonstrates that the delay in subsidy payments, and the resulting impact on the JV Company's cash flow position and thereby on Kandi's receivables, had actually begun in 2015. But Kandi did not disclose any changes to its payment terms until much later, nor did it adequately disclose its practice of assigning its own notes receivable to satisfy amounts Kandi owed to suppliers and vendors.

**Materially False and Misleading Statements about Internal Controls in the 2015 10-K**

143.    The 2015 10-K also stated in relevant part:

Our management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rules 13a-15(f) and 15d-15(f) under Exchange Act. The Company's internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with U.S. generally accepted accounting principles.

The Company's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the Company; (ii) ***provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the Company are being made only in accordance with authorizations of management and directors of the Company***; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the Company's assets that could have a material effect on the consolidated financial statements….

***Management conducted an assessment of the effectiveness of our system of internal control over financial reporting as of December 31, 2015***, the last day of our fiscal year. ***This assessment was based on criteria stablished in the framework Internal Control—Integrated Framework (2013), issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO")*** and included an evaluation of elements such as the design and operating effectiveness of key financial reporting controls, process documentation, accounting policies, and our overall control environment. ***Based on management's evaluation under the 2013 COSO framework, management concluded that the Company's internal controls over financial reporting were effective as of December 31, 2015.***

144.    The 2015 10-K also contained SOX certifications signed by Defendants Hu and Wang, stating that (1) the financial statements and "information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the

Company," (2) they had "[e]valuated the effectiveness of the registrant's disclosure controls and procedures," and (3) disclosed "any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting."

145.    These statements contained in the 2015 10-K were false and misleading because, as later admitted in the 2016 10-K and as further detailed below, Defendants failed to disclose that: (i) certain areas in the Company's previously issued financial statements as of and for the years ended December 31, 2014 and 2015, including the quarters therein, did not materially conform with GAAP and, therefore, required correction; and (ii) the Company continued to lack effective internal controls over financial reporting as of those dates.

**The Company's Auditor is Replaced and Censured**

146.    On April 13, 2016, Kandi announced that, with the Audit Committee's approval, it had "dismissed AWC (CPA) Limited ('AWC') as the Company's independent registered public accounting firm" and had appointed "BDO China Shu Lun Pan Certified Public Accountants LLP ('BDO China') as the Company's new independent registered public accounting firm, effective April 12, 2016." Kandi's Form 8-K stated as follows:

> The principal accountant's reports of AWC on the financial statements of the Company as of and for the fiscal years ended December 31, 2015 and 2014 did not contain any adverse opinion or disclaimer of opinion and was not qualified or modified as to uncertainty, audit scope or accounting principles.
>
> During the Company's two most recent fiscal years and the subsequent interim period through April 12, 2016, there were no disagreements with AWC on any matter of accounting principles or practices, financial statement disclosure, or auditing scope or procedure, which disagreement(s), if not resolved to the satisfaction of AWC, would have

caused it to make reference to the subject matter of the disagreement(s) in connection with its report. During the Company's two most recent fiscal years and the subsequent interim period through April 12, 2016, there were no reportable events of the type described in Item 304(a)(1)(v) of Regulation S-K.

The Company provided AWC with a copy of the foregoing disclosure and requested AWC to furnish the Company with a letter addressed to the Securities and Exchange Commission stating whether it agrees with the statements made therein. A copy of such letter, dated April 13, 2016, furnished by AWC is filed as Exhibit 16.1 to this Form 8-K.

On April 12, 2016, the Company's audit committee approved the engagement of BDO China Shu Lun Pan Certified Public Accountants LLP ("BDO China") as the Company's new independent registered public accounting firm. During the Company's two most recent fiscal years and the subsequent interim period through April 12, 2016, neither the Company nor anyone on its behalf consulted with BDO China regarding (i) the application of accounting principles to a specified transaction, either completed or proposed; the type of audit opinion that might be rendered on the Company's financial statements, and neither a written report nor oral advice was provided that BDO China concluded was an important factor considered by the Company in reaching a decision as to the accounting, auditing or financial reporting issue; or (ii) any matter that was either the subject of a disagreement (as defined in Item 304(a)(1)(iv) of Regulation S-K and its related instructions) or a reportable event (as described in Item 304(a)(1)(v) of Regulation S-K).

147. On May 18, 2016, the Public Company Accounting Oversight Board ("PCAOB") entered an Order censuring AWC, revoking its registration, and imposing other penalties due to AWC's "violations of PCAOB rules and standards in connection with the issuance of audit reports on the consolidated financial statements of [Kandi] for the years ended December 31, 2010, 2011, and 2012." *See supra* ¶40. In particular, the PCAOB found that Kandi's auditor "***failed repeatedly to exercise due professional care and professional skepticism***, to obtain sufficient appropriate audit evidence with respect to financial statement assertions, to include procedures designed to provide reasonable assurance of detecting fraud or illegal acts that would

have a direct and material effect on the determination of financial statement amounts, and to prepare and maintain adequate audit documentation."

148. Following the PCAOB Order, Kandi's stock price fell $0.17, or 2.5%, to close at $6.56 on May 19, 2016 (compared to $6.73 on May 18, 2016).

### The 2016 Q1 10-Q

149. On May 10, 2016, Kandi announced its financial results for the first quarter of 2016, issuing a press release and filing its quarterly report on Form 10-Q for the first quarter of 2016 (the "2016 Q1 10-Q").

150. The press release noted that "[EV] parts sales increased 7.5% to $46.2 million for the first quarter of 2016, compared with $43.0 million in the same period of 2015" and that "revenues grew 15.7% to $50.7 million for the first quarter of 2016, from $43.8 million for the same period of 2015." However, the 2016 Q1 10-Q had to admit that *the JV Company had sold zero EVs in the quarter*:

> Starting from January 1, 2016, one criterion for the EV models to receive NEV subsidy is that the highest speed must meet 100 kilometers per hour, and the Ministry of Industry and Information Technology of China, or the MIIT, announced a new list of qualified EV models to receive the national subsidy. However, the National Tax Bureau has not released the list of EV models to receive purchase tax exemption accordingly. As such, *the JV Company had no EV products sold in the first quarter of 2016* because potential purchasers could not obtain any tax exemption before the updated list from the National Tax Bureau was promulgated. The JV Company received the tax exemption approval on four EV models in early April 2016 and has started to sell EV products.

151. The press release quoted Defendant Hu addressing this as follows:

> In this quarter, various elements, including the newly approved product list from Ministry of Industrial and Information Technology of China ("MIIT") for national subsidies and the subsequent pending of the list of vehicles entitled to purchase tax exemption from the National Tax Bureau

{00292174;1 }                                          61

heavily impacted the JV Company's sales and also Kandi's financial performance. After confirming that four EV products of the JV Company were on the newly approved list which qualified for purchase tax exemption, the JV Company has started to sell EV products since April 2016. ***Although the JV Company has no sales in the first quarter, I believe it will catch up in the rest of the year and achieve the full year target. We expect to deliver 5,500-6,000 EV products in the second quarter and no less than 35,000 EVs for the full year***. Out of our full year targets of 35,000 EVs, we anticipate 10,000 of them be used for our Micro Public Transportation Program while 25,000 EVs be allocated to the direct sales channel.

152.    In the earnings call, Defendant Hu provided additional information about the status of government subsidies:

> Currently, China's government is wrapping up its industry-wide investigation with regards to the potential violation of new energy vehicle subsidy policy. In the first quarter, the JV Company received numerous audits from the Ministry of Finance National Audit Office and inspection team of State Council. The related auditing team gave very positive comments for Kandi's business model and MPT program. We very much welcome for these audits from the government agencies. As I stated before, the current investigation from the government targets to enhance the healthy development of the Chinese EV industry and it shall eventually benefit large-scale and qualified manufacturers like Kandi in the long run.

> Furthermore, China's central government has recently extended its continuous support and confidence in developing the new energy vehicle industry by enacting additional favorable policies such as no traffic controls and purchase quotas on new energy vehicles, encouraging government purchases, promoting EV car share programs, and release the credit control on new energy vehicle purchase, etc. We believe that Kandi will benefit from both policies for continuous growth.

153.    The press release also provided the following Outlook:

**Outlook**

For the second quarter of 2016, Kandi expects net revenues to be in the range of $55 million to $57 million, with gross margin in the range of

12.5% to 13.5%. For the full year 2016, Kandi expects net revenues to be in the range of $270 million to $300 million.

The Company also expects the JV Company to deliver 5,500-6,000 EV products in the second quarter and a total of 35,000 or more EV products in the full year of 2016.

### Materially False and Misleading Statements in the 2016 Q1 10-Q

154.	The 2016 Q1 10-Q also stated:

### Evaluation of Disclosure Controls and Procedures

We have evaluated, under the supervision of our Chief Executive Officer ("CEO") and our Chief Financial Officer ("CFO"), the effectiveness of disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934 (the "Exchange Act")) as of March 31, 2015. ***Based on this evaluation, our CEO and CFO concluded that as of the end of the period covered by this report, our disclosure controls and procedures were effective.***

\* \* \*

### Changes in Internal Control over Financial Reporting

There was no change to our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) that occurred during the period covered by this report that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

155.	The 2016 Q1 10-Q also contained SOX certifications signed by Defendants Hu and Wang, stating that (1) the financial statements and "information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company," (2) they had "[e]valuated the effectiveness of the registrant's disclosure controls and procedures," and (3) disclosed "any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially

affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting."

156. The statements contained in the 2016 Q1 10-Q were false and misleading because Defendants failed to disclose that: (i) certain areas in the Company's previously issued financial statements as of and for the years ended December 31, 2014 and 2015, including the quarters therein, and for the first quarter of 2016, did not materially conform with GAAP (for the issues discussed above pertaining to proper disclosure of cash flows, among other things) and, therefore, required correction; and (ii) the Company continued to lack effective internal controls over financial reporting as of March 31, 2016.

### The 2016 Q2 10-Q

157. On July 14, 2016, Kandi announced in a press release that the JV Company had "achieved strong sales results in pure [EVs] in the second quarter ended June 30, 2016 and expects to exceed its previously announced sales forecast of 5,500 to 6,000 EV products by approximately 10%."

158. On August 9, 2016, Kandi announced its financial results for the second quarter of 2016, issuing a press release and filing its quarterly report on Form 10-Q for the second quarter of 2016 (the "2016 Q2 10-Q"). The press release emphasized that "[EV] parts sales increased 15.4% to $53.8 million for the second quarter of 2016, compared with $46.6 million in the same period of 2015," that " revenues grew 15.1% to $55.2 million for the second quarter of 2016, compared with $48.0 million for the same period of 2015," and that the JV Company "sold 7,200 units of EV products, including 5,072 EV products to the Micro Public Transportation (MPT) program and 2,128 EV products to the direct sales program, a 61.9% increase compared to the same period last year."

{00292174;1 }                                         64

159. The press release quoted Defendant Hu as saying:

> After more than 3 months of waiting, the JV Company finally obtained the approval for a purchase tax exemption for its "Global Hawk" EV products and had a positive sales performance in May and June. The total number of EV products sold in the second quarter was 7,200, a 61.9% increase compared to the same period of 2015 and exceeded our guidance by 20%. Notably, Zhejiang Geely Holding Group, the parent company of Geely Automobile Holdings Ltd., is planning to purchase 50% of the equity of Shanghai Maple Guorun Automobile Co., Ltd. at a premium price (a purchase price exceeding the cash amount of the aggregate of the original investment and the shared profits over the years), which will support the future growth of the JV Company and also create better conditions for the JV Company to apply for its EV production license and pursue public listing in China. Recently [the Service Company] expanded its micro public transportation program into two new cities, Tianjin and Jiangyin. Pang Da Automobile Trade Co., Ltd. ("Pang Da") has also signed a framework sales agreement pursuant to which Pang Da is to buy at least 60,000 EVs in the next four years from the JV Company for its Green Campus Drive Electric Campaign. We are excited to see progress and continued business growth in the future.

160. However, the 2016 Q2 10-Q had to admit that the JV Company still had not received any subsidies for its 2015 EV sales:

> In the first half year of 2016, *our JV Company did not receive subsidies from central government on the EV products sold in year 2015*. This period of subsidy suspension was a result of *an industry-wide government investigation on EV manufacturers in China with regards to any potential violation of new energy vehicle subsidy policy*, starting from the beginning of 2016. The subsidy suspension period impacted the JV Company's financial conditions including the sales and cash flow.

161. During the earnings call, Defendant Hu further stated:

> We had thought that JV Company would receive the central government subsidy at the end of the second quarter, but this subsidy payment has been delayed. The *delay in receiving central government subsidy caused a big challenge for JV Company* to achieve the whole year product and sales plan, which may also impact Kandi EV parts sales in the year 2016.

**Materially False and Misleading Statements in the 2016 Q2 10-Q**

162.     The 2016 Q2 10-Q also stated in relevant part:

**Evaluation of Disclosure Controls and Procedures**

We have evaluated, under the supervision of our Chief Executive Officer ("CEO") and our Chief Financial Officer ("CFO"), the effectiveness of disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934 (the "Exchange Act")) as of June 30, 2016. ***Based on this evaluation, our CEO and CFO concluded that as of the end of the period covered by this report, our disclosure controls and procedures were effective.***

\* \* \*

**Changes in Internal Control over Financial Reporting**

There was no change to our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) that occurred during the period covered by this report that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

163.     The 2016 Q2 10-Q also contained SOX certifications signed by Defendants Hu and Wang, stating that (1) the financial statements and "information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company," (2) they had "[e]valuated the effectiveness of the registrant's disclosure controls and procedures," and (3) disclosed "any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting."

164.     The statements contained in the 2016 Q2 10-Q were false and misleading because Defendants failed to disclose that: (i) certain areas in the Company's previously issued financial statements as of and for the years ended December 31, 2014 and 2015, including the quarters

{00292174;1 }                                       66

therein, and for the first two quarters of 2016, did not materially conform with GAAP (for the issues discussed above pertaining to proper disclosure of cash flows, among other things) and, therefore, required correction; and (ii) the Company continued to lack effective internal controls over financial reporting as of June 30, 2016.

## Geely Sells its Stake in the JV Company

165. On July 25, 2016, Geely announced that it was selling its stake in the JV Company for $110 million—a valuation barely above the $88 million carrying value that Kandi had reported for its "Investment in JV Company" in the 2016 Q2 10-Q.

166. Geely explained its reasons for selling as follows:

> As part of the Group's on-going strategy to enhance value for Shareholders, the Group plans to consolidate and enhance its product portfolio and thus brand image by focusing on relatively higher-end automobiles going forward. In addition, recent policies issued in the PRC in relation to the eligibility for subsidies and tax exemptions have also been unfavourable to the product portfolios of the Kandi JV and the Zhidou JV and have a negative effect on their financial performance in 2016. As a result, both the Kandi JV and the Zhidou JV have incurred net losses during the first quarter of year 2016. The Kandi JV and the Zhidou JV, being a 50% and 45% held joint ventures of the Group, are also considered as relatively passive investments of the Group as the Group does not have majority control and influence in the day-to-day management of the two companies pursuant to the respective shareholders agreements. Therefore, given such operational and management structure and constraints, it is difficult for the Group to exercise significant influence on the companies in case of, among others, unfavourable policies in the PRC and deteriorating business environment, which are the factors which the Kandi JV and the Zhidou JV have recently been experiencing. Taking into account the above, the Directors consider that the *future prospects of the Kandi JV and the Zhidou JV are uncertain*, and the Disposals will allow the Group to allocate more time and resources to the development of mid to higher-end automobiles.

{00292174;1 }                                        67

**New Revelations about the Car-Share Program**

167.    On August 18, 2016, an article titled "*Kandi Technologies: Chinese EV Clunker Begins to Break Down Amid Subsidy Scandal, 70% Downside*"[14] (the "August 18, 2016 *Seeking Alpha* Article") was published, revealing fundamental problems with the business model for Kandi's CarShare Program.

168.    The 2015 10-K had revealed for the first time that Defendant Hu had acquired a 13% ownership interest in ZZY. The August 18, 2016 *Seeking Alpha* Article detailed the dangers that this created:

> ***The potential for fraudulent sales is clear***. By selling to its own JV, Kandi creates reportable revenue and, in theory, operating income. The JV is accounted for using the equity method, which means that its results are not consolidated on Kandi's financial statements, but its after-tax income is shown as a single line below the company's operating income. The JV in turn shows a profit by selling EVs to ZZY. Because Kandi holds only 9.5% of ZZY, it is not required to consolidate ZZY's balance sheet and statements on its books. ***Any losses at ZZY - and thus of the entire operation, overall of which Kandi effectively exercises control - are hidden from view***.
>
> ***Artificial or easily manipulated sales often allow management and promoters to inflate a stock's price at will***, and in such a situation, insiders are incentivized to award themselves valuable stock options and warrants. Sure enough, that is what Kandi has done. In fiscal year 2015, 97% of Kandi's listed revenues came from sales to the JV and its subsidiaries, and in May 2015, Kandi awarded management a stock option package worth $39 million on the grant date. In light of the fact that Kandi generated a loss from operations of $4 million in 2015, and its share of JV after-tax income was a little more than $10 million that was a rather handsome reward.

---

[14]    Serrur & Co., *Kandi Technologies: Chinese EV Clunker Begins to Break Down amid Subsidy Scandal, 70% Downside*, Seeking Alpha, Aug. 18, 2016 11:03 AM ET, https:// seekingalpha.com/article/4000616-kandi-technologies-chinese-ev-clunker-begins-break-amid-subsidy-scandal-70-percent-downside.

{00292174;1 }                                              68

169.    The August 18, 2016 *Seeking Alpha* Article also revealed that

In calendar year 2015, Kandi reported $201 million in revenue, a respectable 17% increase over the prior year. Yet, ***it struggled to generate an operating profit***, reporting an operating loss for the year of $3.9 million, ***due in no small part to $22 million in stock-based compensation for the management, which accounted for an astonishing 78% of gross profits*** and comprised more than 68% of the company's operating expense. To put this outrageous pay package in context, that was more than the $19 million compensation paid to the management of Southwest Airlines (NYSE: LUV), a $27 billion market cap company, which in 2015 generated $19.8 billion revenues, $4.1 billion in operating income and $3.1 billion in cash flow!

Kandi's CY 2015 cash flow from operations was negative $3 million despite the enormous non-cash charge in the form of stock-based compensation and an increase in accounts payable and other accrued expenses from $50.8 million at YE 2014 to $83.5 million at YE 2015, a 64% year-over-year increase. ***That explosion in payables indicates that Kandi is having trouble paying its suppliers.***

Though Kandi wasn't able to generate any operating profits or cash flow in 2015, it did show a pre-tax profit of $20.8 million, thanks to its share of the JV's 2015 net income ($11 million), a change in valuation of warrants issued to insiders ($8 million), and net interest, government grants, and other income ($4.4 million).

While the profit contribution from the JV of $11 million might look promising, a closer inspection of the balance sheet and cash flow statement reveals that receivables from the JV and its subsidiaries have been piling up even faster than Kandi's bills to suppliers. In other words, ***the JV is no longer paying Kandi for its purchases***. Kandi was owed $76 million from its customer subsidiaries as of December 31, 2014 (the sum of accounts receivable, notes receivable, amount due from JV, and amount due from related party), and such receivables skyrocketed to $137.8 million by the end of 2015. That is an 81% year-over-year increase against an 18% increase in revenue.

So despite showing positive GAAP earnings of $14.6 million, Kandi did not generate positive operating earnings or positive cash flow for all of 2015. And while it did show positive net income from its JV stake, ***the huge increase in money owed to Kandi by the JV indicates that the JV is***

*not generating cash to back up its net income (just like parent Kandi) and is experiencing a significant cash crunch*.

And all of that was before the EV subsidy scandal even broke! In the first half of 2016, Kandi again failed to generate any operating profits, showing a negative $3.9 million operating loss, equal to its operating loss for all of 2015. All other income, including income from the JV but excluding any change in the value of warrants, was $2.8 million. Thus, when excluding the change in value of warrants, Kandi failed to earn a pretax income in the first six months of 2016.

These might not sound like ideal conditions under which to escalate a stock compensation plan, but Kandi is living in the moment. Stock compensation has risen to $15 million for the first half of 2016, an indefensible 200% increase from the same period last year. At the current rate, Kandi is on track to increase full-year stock-based compensation over last year despite not generating operating profits or operating cash flow for six quarters.

Kandi's receivables are also not improved in the first half of 2016. Total receivables and amounts due from related parties increased to $180.4 million as of June 30, 2016, a 30% increase from YE 2015. Meanwhile, *Kandi has continued to delay payments to suppliers*: accounts payable and other accrued expenses have risen from $82.5 million at YE 2015 to $125.1 million, a 50% increase.

Not surprisingly, *this rapid deterioration in Kandi's balance sheet* has not helped cash flow for the first half of 2016. Cash flow from operations was negative $6.8 million for H1 2016, more than twice Kandi's cash burn for all of 2015. Indicating *the subsidy scandal has thrown Kandi into serious financial jeopardy*.

And the outlook isn't any better. An examination of the latest 10-Q's footnote on inventories underscores the bad news to come, as Kandi's inventory listed under "work-in-progress", which should correlate strongly with future sales, has plummeted to $800,000, a level lower than that of any quarter in the past six years. This a heart-stopping 53% drop from $1.7 million in the previous quarter, and 75% drop from the average of $3.2 million over the past three years, and a clear sign of a company strapped for cash and expecting a material drop off in future sales.

170.    Following the publication of the August 18, 2016 *Seeking Alpha* Article, Kandi's stock price fell $0.41, or 6% to close at $6.35 on August 18, 2016 (compared to $6.76 on August 17, 2016).

### The Chinese Government Imposes Penalties for Subsidy Fraud

171.    On September 8, 2016, the Chinese Ministry of Finance announced penalties against five domestic automakers that it said had defrauded the Chinese government's EV subsidy program of 1 billion yuan ($150 million) in subsidies. It revoked the manufacturing license of Suzhou Gemsea Coach Manufacturing, which "had fabricated virtually its entire new energy vehicle manufacturing and sales operations, including forging sales and manufacturing certificates and licenses for the vehicle."[15] And four other companies (Chery Wanda Guizhou Bus, King Long United Auto Industry, Shenzhen Wuzhoulong Motors, and Henan Shaolin Bus), which had claimed subsidies for vehicles they had not finished building, were fined heavily and disqualified from receiving any future subsidies.

172.    These penalties grew out of "special inspections on 90 major new energy vehicle manufacturers" that had been ongoing since early 2016. As the Ministry's press release stated:

> Violation of relevant laws and regulations to defraud and illegally seek financial subsidies has seriously disrupted the market order and infringed on the lawful rights and interests of law-abiding companies in research and development of new energy vehicles. It has caused a bad influence on the promotion and application of new energy vehicles in China and a widespread concern in society. In order to rectify the order of the industry, serious financial and legal disciplines, and respond to social concerns, the State Council's General Office organized an inspection. In early 2016, the Ministry organized forces to conduct special inspections on 90 major new

---

[15]     *China Fines Five Auto Makers for Electric-Vehicle Subsidy Fraud*, Wall St. J., Sept. 8, 2016 9:19 p.m. ET, https://www.wsj.com/articles/china-fines-five-auto-makers-for-electric-vehicle-subsidy-fraud-1473337367.

energy vehicle manufacturers. Between 2013 and 2015, a total of 401,000 new energy vehicles have been declared to receive central financial subsidy funds and 133,000 new energy vehicles have been sold. The inspection found that some companies were suspected of defrauding financial subsidies in violation of relevant laws and regulations. Some vehicles were not sold to consumers that reported subsidies in advance, and many vehicles were idle after receiving subsidies.[16]

173.    Later that day, China's official Securities Daily newspaper reported that "a more detailed report on the results of the verification and disposal of subsidies for new energy vehicles was circulated in the WeChat group of new energy companies."[17] That report named 20 additional companies who had committed violations, including Geely.

174.    Specifically, Geely was found to have committed two kinds of violations.

175.    First, Geely had obtained subsidy payments for electric vehicles with "no electricity." The article elaborated:

> According to the source, "there is no electricity in the car" means that there is *only one empty car shell, and there is no battery loaded*, or a *battery is installed and passed through the inspection, and then removed and loaded into another car*. This kind of deception is the method that the Economic Observer has highlighted in the earliest new energy fraud report. As for the logo does not match (battery), it may be a more subtle trick. Among them, *Geely is involved because the company's Conti micro electric car is suspected of being cheated*.

---

[16]    Press Release, China Ministry of Finance, *Bulletin Regarding Inspections Focused on Local Public Budgets for Popularization Applications of Financial Subsidy Funds for New Energy Vehicles*, Sept. 8, 2016, http://www.mof.gov.cn/zhengwuxinxi/bulinggonggao/tongzhitonggao/201609/t20160908_2413434.htm.

[17]    Liu Xiaolin, *Over 20 car companies or suspected new energy car fraud subsidies amounted to nearly 10 billion*, Sohu.com, Sept. 8, 2016 9:50 p.m., http://business.sohu.com/20160908/n468003545.shtml; *see also* Jake Spring, *China's green car subsidy scandal spreads, 20 more car makers named*, Reuters, Sep. 9, 2016 5:21 AM, https://in.reuters.com/article/china-autos-green-idINKCN11F13C?il=0.

{00292174;1 }                                            72

176. The Ministry's press release described the penalties for "no electricity" violations as follows:

> For other problems found in the inspection, our department will handle the matters according to the law. First, for enterprises that have problems with "vehicles lacking electricity" and "non-conforming standards," the *central financial subsidy funds that have been obtained for vehicles in 2013 and 2014 have been recovered*, and according to the relevant provisions of the "Regulations on Punishments of Financial Violations," *a fine of 30% of the amount of the problem is imposed*; problematic vehicles from 2015 are not liquidated. For the enterprises involved in these kinds of problems, the *pre-draw qualifications for financial subsidies in 2016 will be canceled*, but the vehicles that are legally produced and sold according to the law can still apply for financial subsidies according to regulations.

177. Second, Geely had obtained subsidy payments for "idle" vehicles, i.e. vehicles that were sold but never operated and instead just remained idle. The Ministry's press release described the penalties for such "idle vehicle" violations as follows:

> Second, the Ministry is to temporarily deduct the central subsidy or 50% of the central subsidy for idle vehicles in the 2015 liquidation. Among them: *if the vehicle meets the ex-factory standard but the object of sale is an affiliated enterprise rather than an end user, and the subsidy is sought in advance, the central financial subsidy funds involved will be suspended for liquidation. After the vehicle is sold to the end user and applied in practice, the actual delivery and application will be carried out*. The annual subsidy standard shall be declared and liquidated after strict examination by relevant departments. Although the vehicle sold to the end user is idle after obtaining the financial subsidy (excluding the rental company), it is only settled at 50% of the normal subsidy standard during the liquidation. After one year, the utilization standard rate will be reached and the balance will be repaid. If it is still idle after one year, the subsidy will be disqualified and the central financial subsidy fund that has already been disbursed will be recovered.

178. The new "idle vehicle" penalties created particularly severe risks for Kandi's business model and cash flows. Of Kandi's $201 million in revenue in 2015, $196 million were "revenues from the sale of EV parts to the JV Company." The JV Company used these EV parts

to manufacture EV cars. According to a April 24, 2017 press release, Kandi expected EVs manufactured by the JV Company in 2015 to receive a total of RMB 1 billion (US$145.7 million) in subsidies from the Chinese government.[18] But a significant portion of the JV Company's EV sales were to ZZY—and under the new penalties, because ZZY was an "affiliated enterprise," any "central financial subsidy funds involved will be suspended for liquidation." And if subsidies were delayed, Kandi would have to wait to receive cash for its purported sales to the JV Company, which would impact Kandi's ability to pay its own suppliers.

179.    As the *Associated Press* noted, the revelations and associated penalties also "prompted questions about whether it might disrupt the ruling Communist Party's financial support to an industry it is spending heavily to promote."[19]

180.    On this news, Kandi's stock price fell from $6.23 on September 7, 2016 to $5.84 on September 8 (a $0.39 drop, or 5.8%) and then to $5.69 on September 9, 2016 (a $0.15 drop, or 1.6%).

**The 2016 Q3 10-Q**

181.    On November 9, 2016, Kandi announced its financial results for the third quarter of 2016, issuing a press release (pre-market) and filing its quarterly report on Form 10-Q for the third quarter of 2016 (the "2016 Q3 10-Q") (post-market). Compared to the third quarter of 2015, revenues had decreased 87.4%, EV parts sales had decreased 90.4%, and the JV Company

---

[18]    According to Kandi's April 24, 2017 press release, "RMB 364.5 million (approximately US$52.9 million) was received on August 10, 2015, and RMB 239 million (approximately US$34.7 million) was received on April 21, 2017," totaling "RMB 603.5 million (approximately US$87.6 million)," with a further central government subsidy payment of RMB 400 million (approximately US$58.1 million)" expected to follow.

[19]    Joe McDonald, *China's electric vehicle industry shaken by scandal*, Associated Press, Sep. 13, 2016, https://www.apnews.com/457eba91a7694725bc89036677f3f6f6.

sales had decreased 96.9%. The 2016 Q3 10-Q also made clear that "[i]n the first nine months of 2016, our JV Company did not receive subsidies from central government on the EV products sold in year 2015."

182.   The press release quoted Defendant Hu explaining this as follows:

China's central government preceded a review on the subsidies paid to all the EV manufacturers, which caused the 2015 subsidy payments remain unpaid industry-wide. ***The delay in subsidy payment heavily impacted the JV Company's production and sales, which resulted in a significant decrease in our EV parts sales***.

183.   The press release also quoted Defendant Wang as saying:

***Due to the delayed government subsidy payments, we have experienced decreased cash flow in the third quarter of 2016***, which inevitably impacted the Company's financial performance in this quarter.

184.   Defendants tried to assure investors that the problems were all temporary. The press release quoted Defendant Hu saying:

Although our financial performance this year has not matched up to our past success, we have accomplished lots of fundamental work for the business growth in year 2017. First, with the subsidy review in year 2016, after our positive communication with the government, we believe there will be a good outcome soon. There is some misunderstanding with the EV battery exchange model adopted by our end customers to repeatedly and efficiently utilize batteries for the EVs that we manufactured during 2013 and 2014, which was also a challenge to the Company's further development. Taking the opportunity for clarification with government during the subsidy review, we can clear up this barrier and create a good base for future smooth development. Second, the process of preparing the JV Company to enter into capital markets at the appropriate time and with a strong valuation is on the track as planned; At the same time, we have done lots of work for the JV Company to obtain the vehicles manufacturing license approval in 2017. Finally, we will introduce two new EV models in 2017. Our new models, carefully designed to best serve market needs, will provide a solid foundation for the fast growth in 2017.

\* \* \*

{00292174;1 }                                   75

Although the central government will begin reducing the amount of renewable energy subsidies to all EV manufacturers in 2017, the subsidy program itself will continue through 2020. Under the government's current subsidy policy, we believe the EVs produced and sold by the JV Company meet national renewable energy subsidy requirements and are eligible to receive subsidy payments. Kandi is currently developing the EV products after year 2020, which do not rely solely on subsidy payments and is identifying key areas of focus in which to ensure Kandi's sustained growth and improve Kandi's earnings capabilities.

185. Likewise, the press release quoted Defendant Wang as saying that "[w]e expect our cash flow and financial position will be improved in the coming quarters once the central government concludes its review and resumes its subsidy payments." The press release also provided the following Outlook:

**Outlook**

For the fourth quarter of 2016, Kandi expects net revenues to be in the range of $28 million to $30 million.

The Company also expects the JV Company to deliver 2,000 to 2,200 EV products in the fourth quarter.

186. In response to this news, Kandi's stock price fell from $4.45 on November 8, 2016 to close at $3.90 on November 9, 2016—a drop of $0.55, or 12.3%.

### Materially False and Misleading Statements in the 2016 Q3 10-Q

187. The 2016 Q3 10-Q also stated:

**Evaluation of Disclosure Controls and Procedures**

We have evaluated, under the supervision of our Chief Executive Officer ("CEO") and our Chief Financial Officer ("CFO"), the effectiveness of disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934 (the "Exchange Act")) as of September 30, 2016. ***Based on this evaluation, our CEO and CFO concluded that as of the end of the period covered by this report, our disclosure controls and procedures were effective.***

{00292174;1 }                                          76

\* \* \*

**Changes in Internal Control over Financial Reporting**

There was no change in our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) that occurred during the period covered by this report that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting. (Emphasis added.)

188.    The 2016 Q3 10-Q also contained SOX certifications signed by Defendants Hu and Wang, stating that (1) the financial statements and "information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company," (2) they had "[e]valuated the effectiveness of the registrant's disclosure controls and procedures," and (3) disclosed "any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting."

189.    The statements contained in the 2016 Q3 10-Q were false and misleading because Defendants failed to disclose that: (i) certain areas in the Company's previously issued financial statements as of and for the years ended December 31, 2014 and 2015, including the quarters therein, and for the first three quarters of 2016, did not materially conform with GAAP (for the issues discussed above pertaining to proper disclosure of cash flows, among other things) and, therefore, required correction; and (ii) the Company continued to lack effective internal controls over financial reporting as of September 30, 2016.

## THE TRUTH SLOWLY EMERGES

### The CFO Suddenly "Resigns"

190.    On November 14, 2016, pre-market, the Company announced that Defendant Wang was "resigning… effective immediately" as CFO and that Mr. Mei Bing had been appointed to take his place as CFO. Specifically, the press release stated that Wang was "resigning as our Chief Financial Officer in order to assume the position of Chief Strategy Officer" and that he would now "be responsible for driving Kandi's corporate strategy and implementing investment decisions."

191.    Wang's supposed appointment as "Chief Strategy Officer" was clearly a smokescreen to mask the abruptness of the executive reshuffling. Kandi had never previously mentioned a "Chief Strategy Officer" in any previous Form 10-K. Nor did the Company describe Wang or anyone else as a "Chief Strategy Officer" when it subsequently filed its 2016 10-K on March 16, 2017. Instead, it simply described Wang as a "director" and noted that he had "resigned from his CFO position." Moreover, the Company's November 15, 2017 Definitive Proxy Statement described Wang as a "former Director," and Wang is not listed in the Company's 2017 10-K at all, as a director or otherwise.

192.    On this news, Kandi's stock price fell $0.40, or 10%, to close at $3.50 on November 14, 2016 (compared to $3.90, its November 11, 2016 closing price).

### The Results of the Chinese Government's Subsidy Review

193.    On December 20, 2016, pre-market, Kandi announced "the final results of the review of subsidy payments for [EVs] manufactured by [the JV Company] from 2013 to 2014." Based on those results, the "JV Company estimates it will need to write off approximately USD 6.6 million of previously recorded account receivables."

194.    The press release quoted Defendant Hu stating that:

> after discussion with governmental authorities, the confusion surrounding the EVs manufactured and sold by the JV Company during 2013 and 2014 that used the reusable battery exchange model were finally properly resolved. Although *our partner received a slight penalty from the Government*, the JV Company itself incurred roughly USD 6.6 million in lost subsidies which converts into USD 3.3 million losses to Kandi on the equity method of accounting basis. The Government subsidy review did not cause the major losses, but it has had a significantly negative effect on our business this year; however, now that it is over, it may have a strong positive impact on healthy growth of the renewable energy vehicle industry in the future.

### SEC Scrutiny Resumes

195.    On December 28, 2016, post-market, the SEC sent a comment letter to Kandi relating to its financial statements for 2014 and 2015. Among other things, the SEC raised questions and sought clarification regarding the expected impact of delays or reductions in government subsidies and the sharp increases over the Class Period in Kandi's receivables[20] and in the "amount due from the JV Company, net." Regarding the JV Company, the SEC asked:

> We note from the disclosure here and similar disclosure in your Form 10-Q for the quarterly period ended September 30, 2016, that *the amount due from the JV Company has been steadily increasing* from $51.4 million at December 31, 2014, to $76.1 million at December 31, 2015, and further to $114.8 million at September 30, 2016. *Please disclose how and when you expect to recover these amounts.*

---

[20]    As far back as November 2013, the SEC had raised concerns regarding Kandi's large balance of "outstanding gross accounts receivable" without any "allowance for doubtful accounts."

196.     The fact that the SEC even needed to ask this question strongly suggests that it was not apparent or easily discernible from Kandi's financial statements during the Class Period why this balance had increased.[21]

197.     After the filing of the SEC's comment letter, Kandi's stock price fell $0.15, or 2.9%, from $5.15 (its December 28, 2016 closing price) to close at $5.00 on December 29, 2016.

198.     Kandi's response to the SEC on January 25, 2017 made clear that *the increase in receivables was the result of delays in the JV Company's receipt of subsidy payments*:

> The amount due from the JV Company is the receivables for products that the Company and its subsidiaries sold to the JV Company. In connection with an industry-wide subsidy investigation launched by the government of the PRC into all EV manufacturers during 2016, the government of the PRC temporarily suspended the issuance of subsidy payments. ***The delay in receipt of such subsidy payments reduced the JV Company's ability to collect its receivable from its business partner so that it was unable to settle its receivable amounts with us in a timely fashion***. The subsidy review is now complete and we expect that the subsidy payment process will resume and the JV Company's cash position will improve and enable it to pay down the balance owed to us.

199.     In other words, unless and until it received those subsidy payments, the JV Company could not timely make payments to Kandi.

200.     Moreover, the steady increase in "the amount due from the JV Company" did not account for the full impact of the delayed subsidy payments. Kandi's 2015 10-K had disclosed that Kandi "receives Notes receivable from the JV Company to settle the accounts receivables," but did not quantify this item. The SEC's December 28, 2016 comment letter had asked for

---

[21]     In fact, the SEC later requested, in its July 18, 2017 comment letter, "a detailed roll forward of the 'amount due from JV Company, net'" for each quarter of 2017, with "the specific dates and amounts of payments received and facts and circumstances surrounding any changes to this balance," and separately showing "amounts attributed to subsidies" and "amounts related to sale transactions apart from the portion associated with subsidies."

clarification regarding whether Kandi reported "the effects of these notes receivable in the cash

flow statement." Kandi responded on January 25, 2017 as follows :

> Accepting bank acceptance notes as settlement of trade receivable [sic] is
> common practice in China.  The recipient of bank acceptance notes
> usually has the ability to cash the notes at discount right away after
> receiving it rather than waiting for certain period of time when it matures.
> The notes receivable from the JV Company and another party which
> indicated [sic] as payments for sales were disclosed in "Issuance of notes
> receivable" and "repayment of notes receivable" item as ($131,852,319)
> and $127,226,115 in the cash flow statement for the year ended December
> 31, 2015 …

201.    The SEC's response to this, in a February 8, 2017 comment letter, made clear that

Kandi had been mischaracterizing this activity in its Statements of Cash Flows:

> It appears from your response to prior comment 1 and disclosure in note
> 12:
>
>> a. you have received notes receivable from the purchasers of your
>> inventory by virtue of the settlement of trade receivables initially
>> recognized in the sale of the inventory,
>>
>> b. notes receivable represent financing provided by you in the sale
>> of your inventory, and
>>
>> a.c. the cash flow effects of these notes receivable are classified as
>> issuance and repayments of notes receivable in the investing
>> section of the statement of cash flows which represent the receipts
>> and the collections of the receivables, respectively.
>
> Consequently, in subsequent periods your treatment appears to reflect cash
> receipts from the sale of inventory as investing activities. ***Classification of
> the cash flow effects of receivables from the sale of inventory in
> investing activities does not comply*** with the requirements of [ASC 230,
> Statement of Cash Flows -- Classification of Certain Cash Receipts and
> Cash Payments ("ASC 230")]-10. ASC 230-10-45-16a states cash inflows
> from operating activities includes cash receipts from sales of goods or
> services, including receipts from collection or sale of accounts and both
> short and long term notes receivable from customers arising from those
> sales. Please explain to us how your cash flow presentation compiles with

GAAP in your situation. Also, please advise us the impact to your statements of cash flows for each of the most recent three annual periods completed and, as appropriate, the most recent interim period completed in conforming your treatment to ASC 230-10-45-16a.

202.    In response, Kandi wrote in its March 7, 2017 letter to the SEC:

Upon the settlement of the trade receivables with notes receivables, we debited notes receivables and credited corresponding trade receivables (accounts receivable, due from JV Company or due from related parties). These transactions were reflected in the statement of cash flows as decrease in trade receivables (accounts receivables, due from JV Company or due from related party) in cash flows from operating activities and issuance of notes receivables in cash flow from investing activities. *We will report the receipts of notes receivable for the settlement of trade receivables as a noncash activity in the schedule of noncash transactions rather than an issuance of notes receivable in cash flow from investing activities in the statement of cash flows in the revised disclosures in our amended Form 10-K*.

* * *

*For the years ended 2015, 2014 and 2013, $120,815,961, $14,311,483 and $0, respectively, were reported as repayments of notes receivable in the investing section of the statement of cash flows which represent the collections of the notes receivables or the assignment of the notes receivable to our suppliers to settle the accounts payables*. For the nine months ended September 30, 2016, $62,415,498 was reported as repayments of notes receivable in the investing section of the statement of cash flows which represent the collections of the notes receivables or the assignment of the notes receivable to our suppliers to settle the accounts payables. *We agree that the current classification as repayments of notes receivable in cash flow from investing activities does not comply with US GAAP. We will report the cash receipts from the collection of notes receivables as an activity in the cash flow from operating activities in the statement of cash flows and the assignment of the notes receivable to our suppliers to settle the accounts payables or the settlement of other payables as an noncash activity in the schedule of noncash transactions in the revised disclosures in our amended Form 10-K*.

203.   The SEC's February 8, 2017 comment letter also insisted that Kandi file an amended Form 10-K for 2015 in order "to file separate audited financial statements for the JV company pursuant to Rule 3-09(a) of Regulation S-X for the same periods that would be required under Rules 3-01 and 3-02 of Regulation S-X as if the investee were a registrant." In addition, the SEC stated that "management should undertake to have the registrant's financial statements reaudited by a PCAOB-registered firm in connection with filing the amended 2015 Form 10-K."

### The Draft 2015 10-K/A

204.   On March 6, 2017, Kandi filed, as correspondence for the SEC's review, an amended annual report on Form 10-K/A for 2015 (the "Draft 2015 10-K/A"). The Draft 2015 10-K/A contained an Explanatory Note stating that it:

> (a) restates its Consolidated Balance Sheets as of December 31, 2015 and 2014 and the related Consolidated Statements of Income (Loss) and Comprehensive Income (Loss) and Consolidated Statements of Cash Flows for the years ended December 31, 2015, 2014 and 2013, which have been re-audited by the Company's independent registered public accountants, BDO China Shu Lun Pan Certified Public Accountants LLP;
>
> (b) amends its Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A") as it relates to the years ended December 31, 2015, 2014 and 2013;
>
> (c) restates its "Selected Financial Data" in Item 6 for the years 2015, 2014, 2013, 2012 and 2011;
>
> (d) amends its Note 12 –Notes Receivables of the Notes to our Consolidated Financial Statements;
>
> (e) amends its Note 20 –Taxes of the Notes to our Consolidated Financial Statements;
>
> (f) restates its Item 9A. Controls and Procedures to disclose management's reassessed conclusions regarding our disclosure procedures and internal control over financial reporting ; and

(g) includes separate audited financial statements for the JV Company.

The board of directors of the Company, based on the recommendation of the audit committee and in consultation with management, concluded that, because of errors identified in the Company's previously issued financial statements for the years ended December 31, 2015 and 2014, and the first three quarters for the year ended December 31, 2016, the Company should restate its previously issued financial statements, including quarterly data for the year ended December 31, 2016 and selected financial data for the relevant periods (the "Restatements").

The errors were discovered by management during the course of its preparation of the annual report, including the financial results, for the year ended December 31, 2016, and during the course of preparation of responses to comments from the staff of the Securities and Exchange Commission ("SEC") Division of Corporate Finance. None of the financial statement errors implicate misconduct with respect to the Company or its management or employees.

As described in more detail in Note 28 of the Notes to our Consolidated Financial Statements, the Restatements for the years ended December 31, 2015, 2014 and 2013 reflect adjustments to include separate audited financial statements for our equity investment in the JV Company and to correct errors in the classification of notes receivable and notes payable in the statements of cash flow, the revision in our financial statement presentation to separately identify certain related party accounts on the face of the Balance Sheets and the Consolidated Statements of Income (Loss) and Comprehensive Income (Loss), certain amendments in Note 20 – Taxes of the Notes to our Consolidated Financial Statements, the adjustment of previously recorded construction-in-progress back to prepayment in Note 16 - Construction-in-Progress of the Notes to our Consolidated Financial Statements, corrections expanding two tables of sales to and purchases from the JV Company in Note 24 - Summarized Information of Investment in the JV Company of the Notes to our Consolidated Financial Statements from two years to three years, and corrections removing "unaudited" labels from certain tables in Note 20 - Taxes of the Notes to our Consolidated Financial Statements. The Restatements had no effect on net income.

{00292174;1 }                                            84

We are also amending our unaudited quarterly data for the first three quarters ended December 31, 2016 within the Form 10-K for the year ended December 31, 2016. We have not filed and do not intend to file amendments to our Quarterly Reports on Form 10-Q for the quarterly periods affected. Investors should no longer rely upon the Company's previously released financial statements for these periods and any earnings releases or other communications relating to these periods. Quarterly reports for fiscal 2017 will include restated results for the corresponding interim periods of fiscal 2016.

We discovered that material weaknesses in internal control over financial reporting existed within our organization, resulting from Company finance personnel's lack of requisite U.S. GAAP and SEC compliance experience necessary to perform financial reporting in line with the Company's standard processes and controls. Additionally, our monitoring controls for completeness and accuracy of financial reporting related to certain accounting areas was not properly designed. The effects of the material weaknesses are discussed in more detail in Item 9A, Controls and Procedures. BDO China Shu Lun Pan Certified Public Accountants LLP, our independent registered public accounting firm, has audited the effectiveness of our internal controls over financial reporting as of December 31, 2015 and issued audit reports that are included in Item 8 of this Form 10-K/A.

205. The Draft 2015 10-K/A also contained a "Report Of Independent Registered Public Accounting Firm" in which BDO China stated its opinion that "the consolidated financial statements referred to above present fairly, in all material respects, the financial position of the Company and its subsidiaries as of December 31, 2015 and 2014, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2015."

206. However, BDO China also specifically stated that it had "audited… the Company's internal control over financial reporting as of December 31, 2015… and our report dated March 14, 2017 *doesn't express an opinion on the Company's internal control over*

*financial reporting because we were unable to apply procedures to satisfy ourselves as to the effectiveness of the Company's internal control over financial reporting*." Elaborating:

> Since we were unable to apply procedures to satisfy ourselves as to the effectiveness of the Company's internal control over financial reporting, the scope of our work was not sufficient to enable us to express, and we do not express, an opinion, on the effectiveness of the Company's internal control over financial reporting.
>
> ***Nevertheless, we draw attention to management conclusion that the Company has at least the following material weaknesses in internal control over financial reporting as of December 31, 2015***:
>
> Control Activities Associated with Financial Statement Closing Processes. The Company identified material weaknesses in its financial statement closing processes arising from the potential for a material error in the financial statements from consideration of the following deficiencies:
>
> - Disclosure requirements for equity investments. The Company did not have effective controls to ensure the completeness of the disclosure of financial statements for equity investments. The method used to identify the requirements to file separate audited financial statements for equity investments was not adequately performed during each reporting period.
>
> - Presentation of the statement of cash flows. The Company did not have effective controls to ensure the proper classification and reporting of certain cash and non-cash activities related to notes receivable and notes payable on the statement of cash flows. The procedures used to prepare the statement of cash flows were not adequately performed during each reporting period.
>
> - Disclosure of related party transactions. The Company did not have effective controls to ensure the proper disclosure of related party transactions on the face of financial statements. The procedures used to prepare the financial statements were not adequately performed during each reporting period.
>
> - Accounting for income taxes. The Company did not have effective controls to ensure the accuracy of the accounting and reporting of income taxes and related disclosures. The method used to identify

{00292174;1 }                                      86

tax rates and calculate income taxes was not adequately performed during each reporting period.

207.    The Draft 2015 10-K/A also stated the following:

**(d) Plan for Remediation of the Material Weakness in Internal Control Over Financial Reporting**

Management has been actively engaged in the planning for, and implementation of, remediation efforts to address the material weaknesses, as well as other identified areas of risks. These remediation efforts, outlined below, are intended both to address the identified material weaknesses and to enhance the Company's overall financial control environment. Management believes that the material weaknesses arose due to the Company's rapid growth outpacing the development of the Company's accounting infrastructure.

Management's planned actions to further address these issues including:

- the addition of more experienced accounting and finance personnel to manage the Company's U.S. GAAP practice and SEC reporting compliance;

- necessary training for related accounting and finance personnel, so that they are well versed in the rules in the Company's accounting manual such as the selection of accounting principles, the application of accounting policies and the procedures of accounting treatment; and remain current with accounting rules, regulations and trends;

- a thorough review of the finance and accounting departments to ensure that the areas of responsibilities are properly matched to the staff competencies and the planning is properly matched to the procedures; and that the lines of communication and processes are as effective as possible;

- a thorough review of the processes and procedures used in the Company's period closing and financial reporting, including but not limited to presentation of the statement of cash flows, disclosure of related party transactions, disclosure requirements for equity investment and accounting for income taxes, to ensure the

related processes and procedures in our current accounting manual
is complete and updated.

The audit committee has directed management to develop a detailed plan
and timetable for the implementation of the foregoing remedial measures
(to the extent not already completed) and will monitor their
implementation. In addition, under the direction of the audit committee,
management will continue to review and make necessary changes to the
overall design of the Company's internal control environment, as well as
policies and procedures to improve the overall effectiveness of internal
control over financial reporting.

Management believes the measures described above and others that will
be implemented will remediate the material weaknesses the Company has
identified and strengthen its internal control over financial reporting.

208.     After Kandi filed the Draft 2015 10-K/A, Kandi's share price fell, closing at $4.15

on March 6, 2017 and then at $4.00 on March 7, 2017—after having closed at $4.20 on March 3,

2017.

209.     On March 10, 2017, the SEC responded, noting among other things that the Draft

2015 10-K/A's stated "plan for remediation of the material weakness in internal control appears

to focus on" a material weakness "arising from a lack of requisite knowledge of US GAAP and

SEC reporting requirements" but "does not appear to address the other four material weaknesses

identified."

### The Company Admits the Need for a Restatement

210.     On March 13, 2017, post-market, Kandi filed a Form 8-K announcing that its

*financial statements for 2014 and 2015 should no longer be relied upon*, elaborating as

follows:

> **Item 4.02 Non-Reliance on Previously Issued Financial Statements or
> a Related Audit Report or Completed Interim Review.**
>
> (a) During the course of Kandi Technologies Group, Inc.'s (the
> "Company") preparation of its Annual Report on Form 10-K for the year

ended December 31, 2016, *and during preparation of responses to comments from the staff of the Securities and Exchange Commission ("SEC")*, Division of Corporate Finance, *the Company's management identified certain areas in the Company's previously issued financial statements* for the years ended December 31, 2015 and 2014, and the first three quarters for the year ended December 31, 2016 (the "Previously Issued Financial Statements"), *that require adjustment* as described below and in more detail in the Company's annual report on Form 10-K/A for the fiscal year ended December 31, 2015 ("Form 10-K/A"), to be filed with the SEC. *As a result, on March 7, 2017, the board of directors (the "Board") of the Company*, based on the recommendation of the Company's audit committee, and in consultation with management, *concluded that the Company's Previously Issued Financial Statements should no longer be relied upon*. *The Company will, in the Form 10-K/A, restate the Previously Issued Financial Statements, which restatement will include separate audited financial statements for the JV Company* (the "Restatements"). The Restatements will have no effect on the net income of the Company as reported in the Previously Issued Financial Statements. The Company will endeavor to file its Annual Report on Form 10-K for the fiscal year ended December 31, 2016, pursuant to SEC's rules (including timing guidelines), and *will file the Form 10-K/A as soon as practicably possible.*

The Restatements will include *separate audited financial statements for the Company's equity investment in the JV Company*, *corrections to the classification of notes receivable and notes payable* in the Company's statements of cash flow, *revisions in the Company's financial statement presentation to separately identify certain related party accounts on the face of the Balance Sheets* and the Consolidated Statements of Income (Loss) and Comprehensive Income (Loss), certain amendments to Note 20 – Taxes of the Notes to the Company's Consolidated Financial Statements, the adjustment of previously recorded construction-in-progress back to prepayment in Note 16 - Construction-in- Progress of the Notes to the Company's Consolidated Financial Statements, expansions of two tables of sales to and purchases from the JV Company in Note 24 - Summarized Information of Investment in the JV Company of the Notes to the Company's Consolidated Financial Statements from two years to three years, and the removal of "unaudited" labels from certain tables in Note 20 - Taxes of the Notes to the Company's Consolidated Financial Statements.

*The Company will also amend its unaudited quarterly data for the first three quarters ended December 31, 2016, as set forth in its upcoming Annual Report on Form 10-K for the year ended December 31, 2016.* The Company has not filed and does not intend to file amendments to its Quarterly Reports on Form 10-Q for the quarterly periods affected. Accordingly, investors should no longer rely upon the Company's previously released financial statements for those periods or any earnings releases or other communications relating to those periods. *The Company's Quarterly Reports on Form 10-Q for fiscal year 2017 will include restated results for the corresponding interim periods of fiscal year 2016.*

In addition, in conjunction with the Restatements, the Company is reassessing its internal controls over its financial reporting and compliance programs. *The result of this reassessment could lead the Company to conclude that there were deficiencies in its internal controls over financial reporting that constitute material weaknesses* and could therefore affect its conclusions regarding effectiveness as previously expressed in Item 9A, Controls and Procedures, of the Company's Annual Report on Form 10-K for the year ended December 31, 2015. Accordingly, *management's report on internal controls over financial reporting as of December 31, 2015, and the associated report of AWC (CPA) Limited, the Company's former principal accountant ("AWC"), should no longer be relied upon*.

211.    On this news, Kandi's share price fell $0.30, or approximately 6%, to close at $4.05 on March 14, 2017.

## The 2016 10-K

212.    On March 16, 2017, Kandi announced its financial results for 2016, issuing a press release (pre-market), holding an earnings call, and filing (post-market) its annual report on Form 10-K for 2016 (the "2016 10-K"). The JV Company's EV-product sales had decreased from 24,220 in 2015 to 10,148 in 2016. This greatly hurt Kandi's financials:

{00292174;1 }                                              90

|  | Year ended December 31, | |
|---|---|---|
|  | **2015** | **2016** |
| **Revenue** | **$201,069,173** | **$129,492,013** |
| EV parts | $196,053,058 | $120,079,312 |
| EV products | - | $3,718,291 |
| Off-road vehicles | $5,016,115 | $5,694,410 |
|  |  |  |
| **Cost of Goods Sold** | **$172,649,955** | **$111,770,197** |
|  |  |  |
| **Gross Profit** | **$28,419,218** | **$17,721,816** |
|  |  |  |
| **Net Gain (Loss)** | **$14,665,495** | **($6,510,757)** |

213. During the earnings call, Defendant Hu assured investors that Kandi would "receive the rest of the [subsidy] payment for the sales in 2015 very soon" and also "shouldn't be waiting for too long" to receive subsidy payments for 2016 sales. Also, in response to an analyst who asked if there was "any chance the government's never going to make, or further reduce, cash payments owed," Defendant Hu stated:

> Our EV sales in 2015 and '16 are up to the government subsidy standard, so I don't think the amount is going to be reduced. However, it's going to take a longer time to receive them.

> I believe that the payment is going to be, again, paid gradually in 2017. So, it's really just a matter of time, not a matter of whether they are going to reduce the amount of the payment they are going to pay to the Company.

214. As further detailed below, the 2016 10-K also restated the consolidated financial statements for 2014 and 2015.

215. On this news, Kandi's share price fell $0.35, or 8.6%, to close at $3.70 on March 16, 2017 (compared to $4.05 on March 15, 2017).

{00292174;1 }

91

**The Restatements**

216.    The 2016 10-K summarized the errors that had forced Kandi to restate its

financial statements for 2014 and 2015 as follows:

> NOTE 26 - Restatements of Certain Accounts in Previously Issued
> Financial Statements
>
> The Restatements reflect ***separate audited financial statements for the
> fiscal years ended December 31, 2016, 2015 and 2014 of the JV
> Company***, the adjustments to correct errors identified by management
> during the Company's normal closing process, in the course of the
> Company's regularly scheduled audit, and during preparation of the
> responses to the comments from the staff of the SEC Division of
> Corporate Finance. ***The Restatements primarily reflect adjustments to
> correct errors in the classification of notes receivables and notes
> payables in the statements of cash flows*** in previous relevant years, the
> revision in our financial statement presentation to ***separately identify
> certain accounts on the face of Balance Sheets*** and the Consolidated
> Statements of Income (Loss) and Comprehensive Income (Loss) in
> previous relevant years, the amendments to certain previously disclosed
> amounts and disclosures in Note 18 – Taxes of the Notes to our
> Consolidated Financial Statements, and the corrected amount of
> previously disclosed construction -in-progress in Note 16 - Construction -
> in-Progress of the Notes to our Consolidated Financial Statements.

217.    Many of the adjustments were necessary to correct errors in Kandi's Statements

of Cash Flows. In particular, the 2016 10-K revealed that Kandi had ***completely failed to make***

the following "Supplemental Non-Cash Disclosures" in its 2013 10-K, 2014 10-K, and 2015 10-

K:

| | 2015 | 2014 | 2013 |
|---|---|---|---|
| Settlement of due from JV Company and related parties with notes receivable | $99,147,703 | $13,548,659 | 0 |
| Settlement of accounts receivables with notes receivable from unrelated parties | $23,292,896 | $1,706,188 | 0 |
| Assignment of notes receivable to supplier to settle accounts payable | $119,107,737 | $14,311,483 | 0 |
| Settlement of accounts payable with notes payables | $13,781,830 | $5,707,027 | $3,549,435 |

218.    These "Supplemental Non-Cash Disclosures" in the 2016 10-K informed investors—for the first time—that for the past two years, Kandi had been (a) allowing the JV Company to settle an increasingly large proportion of the amount due to Kandi[22] by issuing notes receivable instead of paying in cash and then (b) settling its accounts payable with suppliers largely not in cash but by assigning notes receivable, primarily from the JV Company. In 2015 alone, Kandi assigned more than $119 million of such notes to settle accounts payable with its suppliers.

219.    Investors had no way of knowing this until Kandi corrected its previously-issued Statements of Cash Flows in the 2016 10-K. Kandi had not previously disclosed its practice of assigning receivables to outstanding accounts payable in this manner, and certainly did not reflect such in its Statements of Cash Flows as originally filed, in violation as GAAP.

220.    Instead of properly disclosing these ***non-cash*** events, Kandi had misclassified these sums as "cash flows from investing activities"—primarily as the "issuance" or

---

[22]    In 2015, Kandi generated $196 million in "revenues from the sale of EV parts to the JV Company"—97.5% of its total revenue that year. The $99,147,703 in "Settlement of due from JV Company and related parties with notes receivable" is more than half of this sum.

"repayment" of notes receivable.[23] By misclassifying non-cash activity as cash activity in this way, Kandi had inflated its cash flow figures by hundreds of millions of dollars.

221.    The 2016 10-K described the "nature and impact" of the adjustments necessary to correct these errors as follows:

> Revision in Consolidated Statements of Cash Flows:
>
> (1).    For the years ended December 31, 2015 and 2014, ***$122,440,599 and $15,254,847, respectively, were previously reported as an issuance of notes receivables*** in cash flow from investing activities in the statement of cash flows*, which represent the settlement of the trade receivables with notes receivables*. This ***classification as issuance of notes receivables in cash flow from investing activities was not correct***. In this Form 10-K, the receipts of notes receivable for the settlement of trade receivables are reported as a noncash activity in the schedule of noncash transactions in the statement of cash flows.
>
> (2).    For the years ended December 31, 2015 and 2014, ***$120,815,961 and $14,311,483, respectively, were previously reported as repayments of notes receivable*** in the investing section of the statement of cash flows, ***which represent the collections of the notes receivables or the assignment of the notes receivable to our suppliers to settle the accounts payables***. This ***classification as repayments of notes receivables in cash flow from investing activities was not correct***. In this Form 10-K, for the years ended December 31, 2015 and 2014, $1,708,224 and $0, respectively, of the cash receipts from the collection of notes receivables are reported as an activity in the cash flow from operating activities in the statement of cash flows and $119,107,737 and $14,311,483 of the assignment of the notes receivable to our suppliers to settle the accounts payables as noncash activity in the schedule of noncash transactions.
>
> (3).    For the years ended December 31, 2015 and 2014, ***$13,781,830 and $5,707,027, respectively, were previously reported as the proceeds from***

---

[23]    Kandi acknowledged in its March 7, 2017 letter to the SEC that it had included these "assignments" within the line item "Repayment of notes receivable" (which they were not), within the category referred to as "Investing activities" (which this was not), without any specific identification or disclosure of such activity.

*notes payables* in the financing section of the statement of cash flows, which *represent the settlement of accounts payable with notes payables*. This *classification as proceeds from notes payables in cash flow from financing activities was not correct*. In this Form 10-K, the settlement of accounts payables with notes payable are reported as a noncash activity in the schedule of noncash transactions in the statement of cash flows.

222.    The impact of this misclassification on Kandi's reported cash flows is evident in the following tables, which list the most significant of the adjustments Kandi had to make to its Statements of Cash Flows for 2014 and 2015:

| | | As Stated in 2015 10-K | As Restated | Variance |
|---|---|---|---|---|
| Net cash (used in) provided by operating activities | | ($3,130,976) | ($6,372,255) | ($3,241,279) |
| | Changes in operating assets and liabilities, net of effects of acquisition, (Increase) Decrease In | | | |
| | Accounts receivable | $7,052,626 | ($16,240,270) | $23,292,896 |
| | Amount due from the JV Company | ($28,519,360) | ($127,667,063) | ($99,147,703) |
| | Accounts payable | $31,814,545 | $164,704,112 | $132,889,567 |
| | Notes payable | - | ($15,398,471) | ($15,398,471) |
| | | | | |
| Net cash provided by (used in) investing activities | | ($5,937,117) | ($4,312,479) | $1,624,638 |
| | Issuance of notes receivable | ($131,852,319) | ($9,411,720) | $122,440,599 |
| | Repayment of notes receivable | $127,226,115 | $6,410,154 | ($120,815,961) |

| | | As Stated in 2014 10-K | As Restated | Variance |
|---|---|---|---|---|
| Net cash (used in) provided by operating activities | | ($7,453,756) | $3,327,918 | $10,781,674 |
| | Changes in operating assets and liabilities, net of effects of acquisition, (Increase) Decrease In | | | |
| | Accounts receivable | $15,445,962 | $13,739,774 | ($1,706,188) |

|  | As Stated in 2014 10-K | As Restated | Variance |
|---|---|---|---|
| Amount due from the JV Company | ($48,593,522) | ($62,142,181) | ($13,548,659) |
| Accounts payable | $23,095,825 | $43,114,334 | $20,018,509 |
| Notes payable | - | ($1,951,788) | ($1,951,788) |
|  |  |  |  |
| Net cash provided by (used in) investing activities | ($50,108,255) | ($57,134,690) | ($7,026,435) |
| Issuance of notes receivable | ($24,705,489) | ($9,450,642) | $15,254,847 |
| Repayment of notes receivable | $29,354,592 | $15,043,109 | ($14,311,483) |

223.    The 2016 10-K tried to downplay the significance of these restatements, stating

the following:

> The Restatements had no effect on net income as reported in the
> previously issued financial statements. The effect of the Restatements on
> the Company's Balance Sheets and the Statement of Cash Flows is not
> material.

224.    But as detailed below, these misstated financial items were more significant than

Kandi was willing to admit.

### Relevant Accounting Standards: GAAP

225.    The Financial Accounting Standards Board ("FASB") promulgates and maintains

accounting standards for public companies in the US. These standards are known as Generally

Accepted Accounting Principles ("GAAP").

226.    The SEC requires that public companies present financial statements in

accordance with GAAP. 17 C.F.R. § 210.4-01(a)(1). "Financial statements filed with the

Commission which are not prepared in accordance with generally accepted accounting principles

will be presumed to be misleading or inaccurate, despite footnote or other disclosures." *Id*.

227. The conceptual framework underlying GAAP, especially the rules that comprise the accrual-based accounting required by GAAP, are set forth, among other places, in Statements of Financial Accounting Concepts ("FASCON"s) promulgated by the FASB.

228. As the FASB has explained, the "objective of general purpose financial reporting is to **provide financial information about the reporting entity that is** useful to existing and potential investors, lenders, and other creditors in making decisions about providing resources to the entity."[24]

229. With respect to future cash flow, FASCON 8 further provides that "[i]nvestors', lenders' and other creditors' expectations about returns depend on their assessment of the amount, timing and uncertainty of (the prospects for) future net cash inflows to the entity," and "[c]onsequently, existing and potential investors, lenders and other creditors need information to help them assess the prospects for future net cash inflows to an entity." Among other things, investors and creditors are interested in knowing "how efficiently and effectively the entity's management and governing board have discharged their responsibilities to use the entity's resources." Those responsibilities include "ensuring that the entity complies with applicable laws, regulations and contractual provisions." *Id*. at OB3–OB5.

230. For financial information to be useful, "it must be **relevant** and **faithfully represent what it purports to represent**. The usefulness of financial information is enhanced if it is comparable, verifiable, timely, and understandable." *Id*. at QC4.

---

[24] FASB, Statement of Financial Accounting Concepts No. 8, *Conceptual Framework for Financial Reporting - Chapter 1, The Objective of General Purpose Financial Reporting, and Chapter 3, Qualitative Characteristics of Useful Financial Information* ("FASCON 8") OB2 (Sep. 2010), available at https://www.fasb.org/jsp/FASB/Document_C/ DocumentPage?cid=1176157498129 .

231. The FASB has explained the two ways that financial information can be relevant:

> QC6. Relevant financial information is capable of making a difference in the decisions made by users. Information may be capable of making a difference in a decision even if some users choose not to take advantage of it or already are aware of it from other sources.
>
> QC7. Financial information is capable of making a difference in decisions if it has **predictive value, confirmatory value, or both**.
>
> QC8. Financial information has predictive value if it can be used as an input to processes employed by users to predict future outcomes. Financial information need not be a prediction or forecast to have predictive value. Financial information with predictive value is employed by users in making their own predictions.
>
> QC9. Financial information has confirmatory value if it provides feedback (confirms or changes) about previous evaluations.
>
> QC10. The predictive value and confirmatory value of financial information are interrelated. Information that has predictive value often also has confirmatory value. For example, revenue information for the current year, which can be used as the basis for predicting revenues in future years, also can be compared with revenue predictions for the current year that were made in past years. The results of those comparisons can help a user to correct and improve the processes that were used to make those previous predictions….

232. In addition:

> QC12. Financial reports represent economic phenomena in words and numbers. To be useful, financial information not only must represent relevant phenomena, but it also **must faithfully represent the phenomena that it purports to represent**. To be a perfectly faithful representation, a depiction would have three characteristics. It would be *complete, neutral,* and *free from error*.

*Id*. at QC12.

233. Moreover, "[t]he individual items, subtotals, or other parts of a financial statement may often be more useful than the aggregate to those who make investment, credit, and similar

decisions." FASB, Statement of Financial Accounting Concepts No. 5, *Recognition and Measurement of Financial Statements of Business Enterprises* 15-16, P 22 (Dec. 1984)).

### Relevant Accounting Standards: Accrual Accounting

234.    Financial statements purporting to conform to GAAP must be prepared on an accrual basis. FASCON 8 explains the purpose of accrual accounting as follows:

> *Accrual accounting depicts the effects of transactions, and other events and circumstances on a reporting entity's economic resources and claims in the periods in which those effects occur, even if the resulting cash receipts and payments occur in a different period*. This is important because information about a reporting entity's economic resources and claims and changes in its economic resources and claims during a period provides a better basis for assessing the entity's past and future performance than information solely about cash receipts and payments during that period.

FASCON 8, OB17.

235.    Accrual accounting is explained in more detail in FASB Statement of Financial Accounting Concepts No. 6, *Elements of Financial Statements* (Dec. 1985) ("FASCON 6"):

> Accrual accounting uses accrual, deferral, and allocation procedures whose goal is *to relate revenues, expenses, gains, and losses to periods to reflect an entity's performance during a period instead of merely listing its cash receipts and outlays*. Thus, recognition of revenues, expenses, gains, and losses and the related increments or decrements in assets and liabilities—including matching of costs and revenues, allocation, and amortization—is the essence of using accrual accounting to measure performance of entities. The goal of accrual accounting is to account in the periods in which they occur for the effects on an entity of transactions and other events and circumstances, to the extent that those financial effects are recognizable and measurable.

FASCON 6, ¶ 145.

236. Thus, at the core of accrual accounting is matching revenues and expenses to each other and to the periods to which they relate, which is often referred to as the "matching principle." As further explained in FASCON 6:

> Matching of costs and revenues is simultaneous or combined recognition of the revenues and expenses that result directly and jointly from the same transactions or other events. In most entities, some transactions or events result simultaneously in both a revenue and one or more expenses. The revenue and expense(s) are directly related to each other and require recognition at the same time.

FASCON 6, ¶146.

237. In addition:

> Items that qualify under the definitions of elements of financial statements and that meet criteria for recognition and measurement (paragraph 23) are accounted for and included in financial statements by the use of accrual accounting procedures. Accrual accounting and related concepts are therefore significant not only for defining elements of financial statements but also for understanding and considering other aspects of the conceptual framework for financial accounting and reporting.

FASCON 6, ¶134.

238. Accrual-based activity is reflected, generally, in an entity's income statement, and for purposes of the determination of net income in accordance with GAAP.

### Relevant Accounting Standards: Cash Flows

239. Financial statements prepared in accordance with GAAP must also include a Statement of Cash Flows, which reconciles the beginning and ending cash balances reported by an entity (i.e., on its balance sheet) with the accrual-based activities discussed above. Users of financial statements may utilize the statement of cash flows to understand how and to what extent an entity has received actual cash inflows during a particular period and effectuated cash outflows. To that end, a statement of cash flows is generally segregated into three sections: cash

flows from operating activities, cash flows from investing activities, and cash flows from financing activities.

240. The purpose and intent of statements of cash flows is defined within GAAP:

10-1 The primary objective of a statement of cash flows is to provide relevant information about the cash receipts and cash payments of an entity during a period.

10-2 The information provided in a statement of cash flows, if used with related disclosures and information in the other financial statements, should help investors, creditors, and others (including donors) to do all of the following:

a. Assess the entity's ability to generate positive future net cash flows

b. Assess the entity's ability to meet its obligations, its ability to pay dividends, and its needs for external financing

c. Assess the reasons for differences between net income and associated cash receipts and payments

d. Assess the effects on an entity's financial position of both its cash and noncash investing and financing transactions during the period.

ASC 230-10-10.

241. FASCON 8 also explains the importance of cash flow information:

OB20. Information about a reporting entity's cash flows during a period also helps users to assess the entity's ability to generate future net cash inflows. It indicates how the reporting entity obtains and spends cash, including information about its borrowing and repayment of debt, cash dividends or other cash distributions to investors, and other factors that may affect the entity's liquidity or solvency. Information about cash flows helps users understand a reporting entity's operations, evaluate its financing and investing activities, assess its liquidity or solvency, and interpret other information about financial performance.

242. Generally, issuers are directed, regarding the form and content of statements of cash flows, that:

{00292174;1 }

101

> 45-1 A statement of cash flows shall report the cash effects during a period of an entity's operations, its investing transactions, and its financing transactions.
>
> 45-2 A reconciliation of net income and net cash flow from operating activities, which generally provides information about the net effects of operating transactions and other events that affect net income and operating cash flows in different periods, also shall be provided.

ASC 230-10-45.

243. Cash inflows may emanate from the receipt of payment for services provided or goods sold (including the payment of accounts receivable by third parties), which constitute operating activities, or from the repayment of loans or notes receivable, which constitute investing activities. Cash inflows from financing activities might relate to the sale or issuance of stock and/or bonds, while cash outflows from financing activities might include the repayment of debt, the issuance of dividends, or the repurchase of company stock. As to other types of cash outflows, those referred to as "operating activities" might emanate from, or relate to, payments to suppliers or vendors, wages paid, or payment for other selling, general, and administrative expenses. Cash outflows from investing activities might include the purchase of fixed assets, for instance, the purchase of investment instruments (such as stocks or bonds), or the lending of money, among other things.

244. All of the foregoing must be properly reflected in an entity's financial statements by way of the statement of cash flows.

245. GAAP also provides for an additional category of disclosure within the Statement of Cash Flows that is often referred to as "Supplemental Disclosure of Cash Flow Information." Within this section, entities may be required to disclose certain "noncash" activity that reflected on or impacted the amounts in the entity's financial statements. "Noncash" is defined as "information about all investing and financing activities of an enterprise during a period that

{00292174;1 }                                       102

affect recognized assets or liabilities but that do not result in cash receipts or cash payments in the period." (ASC 230-10-50-3)

246.    Specifically, regarding the disclosure of noncash activity, GAAP requires:

**Noncash Investing and Financing Activities:**

50-3 Information about all investing and financing activities of an entity during a period that affect recognized assets or liabilities but that do not result in cash receipts or cash payments in the period shall be disclosed. Those disclosures may be either narrative or summarized in a schedule, and they shall clearly relate the cash and noncash aspects of transactions involving similar items.

50-4 Examples of noncash investing and financing transactions are converting debt to equity; acquiring assets by assuming directly related liabilities, such as purchasing a building by incurring a mortgage to the seller; obtaining an asset by entering into a capital lease; obtaining a building or investment asset by receiving a gift; and exchanging noncash assets or liabilities for other noncash assets or liabilities.

ASC 230-10-50.

## Kandi's Failure to Disclose Material Non-Cash Activity

247.    During the Class Period, Defendants misled investors about the Company's cash flow position by issuing financial statements that violated the GAAP requirements described above.

248.    Specifically, Defendants completely failed to properly disclose its use of several non-cash activities that were highly material, representing hundreds of millions of dollars. Instead, they mischaracterized those hundreds of millions of dollars as representing "cash" activity and improperly reflected those sums as such in Kandi's Statements of Cash Flows—even though Kandi had neither received nor paid out any cash in connection with that activity. *See supra* ¶¶217–222.

249.    As a result, Kandi's financial statements materially overstated the amount of cash flowing in and out of the Company, misleading investors as to the Company's cash flow position and creating a false impression that the Company was both (a) receiving payments to settle notes receivable in a timely manner and (b) paying, in cash, its own obligations (liabilities) to its own vendors and suppliers. These errors in Kandi's Statements of Cash Flows comprised the largest portion of the accounts and amounts that were corrected in Kandi's restated financial statements for 2014 and 2015.

250.    These GAAP violations were all the more material because of how heavily Kandi's cash flow position depended on the JV Company's cash flow position, which in turn depended heavily on the timely receipt of subsidy payments from the Chinese government.

251.    As noted above, the sharp increases in Kandi's receivables and in the "amount due from the JV Company, net" over the Class Period were the result of delays in the JV Company's receipt of subsidy payments, which "reduced the JV Company's ability to collect its receivable from its business partner so that it was unable to settle its receivable amounts with us in a timely fashion." *See supra* ¶¶198–199.

252.    In other words, unless and until it received those subsidy payments, the JV Company could not timely make payments to Kandi. This dependency had a significant effect on the Company's cash flows and the manner in which it needed to facilitate payments to its suppliers—which ultimately occurred through the assignment of Kandi's own notes receivable (primarily from the JV Company) to Kandi's vendors and suppliers. It also had significant implications for the way Kandi should have presented such activity in the Company's Statements of Cash Flows, which instead, as originally filed, obfuscated such activity. This misleading presentation was not corrected until Kandi restated its financial statements.

253.     Indeed, instead of properly presenting such non-cash activity as required under GAAP, Kandi had told investors in the 2015 10-K that the Company's cash flows from investing activities in 2015 were "primarily the result of the ***repayment of notes receivable of $127,226,115***" and "the ***issuance of notes receivable of $131,852,319***." Similarly, the 2014 10-K had told investors that Kandi's cash flows from investing activities in 2014 were "primarily the result of the ***repayment of notes receivable of $29,354,592***" and "the ***issuance of notes receivable of $24,705,489***." *See supra* ¶¶ 101, 135. This effectively told investors that, in 2015 and 2014 respectively, Kandi (1) had ***received*** $127,226,115 and $29,354,592 ***in cash*** from the "repayment of notes receivable" and (2) had ***issued $131,852,319 and $24,705,489 in new*** notes receivable. Given that the JV Company accounted for 97.5% of Kandi's revenues as well as the vast majority of its accounts receivable, this suggested at the very least that the JV Company had enough cash to pay most of that $127,226,115. But in fact, the vast majority of what Kandi had characterized as the "issuance" and "repayment of notes receivable" actually represented ***non-cash*** activity that Kandi had completely failed to disclose.

### Kandi's Subsequent Correspondence with the SEC Further Underscores the Undisclosed Impacts that Delayed Subsidy Payments Had on Kandi's Cash Flows

254.     As the Company's correspondence with the SEC continued, the SEC asked why Kandi's receivable balances, as well as the credit terms it was offering its customers, had increased so significantly, especially during 2016. Kandi's responses further demonstrate that not only had the Company's inflow of cash diminished during this timeframe, but that most of such reduction could be attributed to the lack of government subsidies received by the JV Company.

255.     Specifically, the SEC asked in its April 19, 2017 letter:

> Please provide a comparative analysis of material changes in cash flows of operating activities between consecutive fiscal periods presented, for example, between 2016 and 2015 and 2015 and 2014…

For example, for 2016 it is not clear *how increases in accounts payable and accounts receivable affect cash relative to payments of accounts payable and collections of accounts receivable*.

256.     Kandi responded on May 19, 2017 as follows:

The significant increased cash [sic] used in operating activities in 2016 as compared to that in 2015 was largely due to the net loss in 2016, *slow collection of accounts receivables resulting in significantly increased account receivables, and increased other receivables related to advanced payments to our suppliers*. The negative change of cash provided by operating activities in 2014 to cash used in operating activities in 2015 was *largely due to increased due from the JV Company and related parties*, and increased accounts receivables in 2015 although increased accounts payables partially offset this effect.

257.     The 2016 10-K also revealed, for the first time, that:

As of December 31, 2016 and December 31, 2015, the credit terms with the Company's customers were typically *210 to 720 days* and 150 to 180 days respectively after delivery. *The Company extended the credit term with its customers this year to a much longer period* as referenced above *due to the delayed subsidy payments from the government on EV sales*.

258.     The SEC's April 19, 2017 letter asked about these extended terms:

8. We note *the credit terms you grant to customers has increased from 150-180 days at December 31, 2015 to 210-720 days at December 31, 2016*. Please tell us what consideration you gave to classifying accounts with terms greater than 1 year as long term. So that we may better understand your receivable balances, include in your response an aging schedule of all receivable (i.e., accounts and notes receivable) balances related to your sale of products to both related and unrelated parties, including amounts due from the JV Company and its affiliates.

9.   You disclose *you extended the credit term with customers to a much longer period due to the delayed subsidy payments from the government on EV sales*. Please explain to us and disclose why you believe it was necessary to extend the upper range of the credit term by four times the number of days in the prior upper range from 180 days to 720 days. Additionally, *tell us the impact that extending the credit term had on your judgment for an allowance for doubtful accounts on your*

{00292174;1 }                                          106

*receivables from customers and the JV company and recognition as revenue of the associated sales in regard to collectability.*

259. The Company responded on May 19, 2017:

> We extended the credit term from 180 days to 720 days to our certain customers; mainly the JV Company [sic] because some of the receivables from the JV Company were associated with the sale of the EV parts to the JV Company for them to manufacture and sell the EVs in 2015. ***Because of the industry-wide subsidy review, the Chinese government temporarily delayed the issuing of the subsidy payments for the EVs sold in 2015 and 2016, which had negative impact on the JV Company's cash flow and caused their delay in repaying us. By extending our credit term to 720 days, it will allow them to repay us in 2017 when the government resumes the subsidy payments.***

260. The SEC's April 19, 2017 letter had also asked why the "amount due from the JV Company, net" was still continuing to increase. Kandi had previously stated, in its January 25, 2017 letter, that the "subsidy review is now complete and we expect that the subsidy payment process will resume and the JV Company's cash position will improve and enable it to pay down the balance owed to us." Kandi responded on May 19, 2017:

> As the Chinese government has resumed the subsidy payments to the JV Company's manufactured EVs and the due from the JV Company balance is largely associated with the subsidy payments, the Company believes the remainder of the balance can be reasonably expected to be gradually repaid by the JV Company this year. However, a detailed payment schedule for the remainder can't be reasonably estimated as the subsidy payment schedule is at the Chinese government's discretion although we can reasonably expect it will be paid within a year according to our past experience of subsidy payment with Chinese government and no information for the arrangement of the approximately $130 million remaining subsidies has been given by the government so far.

261. This correspondence thus confirms that there had been increasing uncertainty throughout the Class Period as to the recoverability of the Company's accounts (and later, "notes") receivable, especially with respect to the JV Company. However, during the Class

{00292174;1 }
107

Period, the Company made no similar disclosures regarding the reasons behind the increase in the amount due from the JV Company, and instead obfuscated its own cash flow deficiencies by improperly characterizing and reporting non-cash events in its Statements of Cash Flows.

262.    Moreover, all of the foregoing failures occurred despite the fact that Kandi was acutely aware of, and in its 2015 10-K had made reference to, the risk to its business associated with a disruption in subsidy payments. Nevertheless, the Company failed, in its originally-filed financial statements for the Class Period, to properly account for (i.e., in its Statements of Cash Flows) or sufficiently disclose the impact of the disruption in the subsidy program and how such was impacting the Company's cash flows during that timeframe. This reporting failure occurred despite the fact that a significantly increasing proportion of its revenues emanating from the very entity – the JV Company – that was directly dependent upon receiving such subsidies in order to pay for the parts it was purportedly purchasing from Kandi.

263.    The foregoing errors and insufficient disclosures during the Class Period were further magnified, therefore, by the Company's failure to properly report transactions with related parties, including in its reporting of measures of revenue in its income statements, in its financial statements for the same timeframe.

**Kandi's Violations of GAAP Pertaining to Related-Party Transactions**

264.    Kandi was required, under GAAP and SEC Regulation S-X, to make specific disclosures pertaining to related party transactions.

265.    SEC Regulation S-X requires:

(1) *Related party transactions should be identified and the amounts stated on the face of the balance sheet, income statement, or statement of cash flows*.

(2) In cases where separate financial statements are presented for the registrant, certain investees, or subsidiaries, separate disclosure shall be

made in such statements of the amounts in the related consolidated financial statements which are (i) eliminated and (ii) not eliminated. Also, any intercompany profits or losses resulting from transactions with related parties and not eliminated and the effects thereof shall be disclosed.

17 C.F.R. § 210.4-08(k). GAAP further reiterates that "[a]mounts earned from transactions with related parties shall be disclosed under § 210.4–08(k)." ASC 225-10-S99-2.

266.    Throughout the Class Period, Kandi's financial statements were not in accordance with the foregoing requirements because Kandi they to properly reflect, *on the face of the income statements*, the amount of revenues that emanated from purported sales to related parties (and, as discussed above, the true nature and magnitude of its 'cash flow' machinations as a result of slowing payments from the JV Company).

267.    Indeed, the mix comprising the Company's total revenues was changing dramatically throughout the Class Period—but Kandi did not make this clear *on the face of its income statements* as required under GAAP. The following presentation from Kandi's Draft 2015 10-K/A—which did not previously exist, as Kandi acknowledged in its 2016 10-K—reflects that trend:

| | Year ended December 31, | | | | | |
| | 2015 | | 2014 | | 2013 | |
| | As Restated | % of Revenue | As Restated | % of Revenue | As Restated | % of Revenue |
|---|---|---|---|---|---|---|
| Revenues from Unrelated parties | $6,790,032 | 3.40% | $49,539,910 | 29.10% | $83,312,222 | 88.10% |
| Revenues from the JV Company and related Parties | $194,279,141 | 96.60% | $120,689,096 | 70.90% | $11,223,823 | 11.90% |
| **REVENUES, NET** | **$201,069,173** | | **$170,229,006** | | **$94,536,045** | |

## Obligation to Present Separate Financial Statements for the JV Company

268.     Throughout the Class Period, Kandi failed to disclose separate financial statements for the JV Company, a significant non-consolidated subsidiary, as required by Regulation S-X.

269.     Under Regulation S-X, "separate financial statements… shall be filed" for any "majority-owned subsidiary not consolidated" where "any of the conditions set forth in §210.1-02(w)…are met." 17 C.F.R. § 210.3-09. One of these conditions is:

> (3) The ***registrant's and its other subsidiaries' equity in the income from continuing operations before income taxes, extraordinary items and cumulative effect of a change in accounting principle of the subsidiary exclusive of amounts attributable to any noncontrolling interests exceeds 10 percent of such income of the registrant*** and its subsidiaries consolidated for the most recently completed fiscal year.

17 C.F.R. § 210.1-02(w).

270.     Kandi acknowledged in its January 25, 2017 letter to the SEC that Regulation S-X required Kandi to file separate financial statements for the JV Company, and that Kandi had failed to meet this requirement:

> Note 24 – Summarized Information of Investment in the JV Company, page F-37
>
> *6. Please tell us your consideration of the requirement to file separate financial statements in regard to your investment in the JV Company pursuant to Rule 3-09 of Regulation S-X. Please include your calculations and analysis determined in accordance with the cited guidance.*
>
> **Response:**
>
> The Company's ***equity in the income from continuing operations*** before income taxes, extraordinary items and cumulative effect of a change in accounting principle of the subsidiary exclusive of amounts attributable to any noncontrolling interests ***from the JV Company was $11,661,564 and $3,763,082*** for the years ended December 31, 2015 and 2014, compared to

such income of the Company and its subsidiaries consolidated of $18,977,841 and $14,651,101 for the years ended December 31, 2015 and 2014, it **accounted for 61% and 26%**, respectively. Investment in the JV Company was classified as a significant investment and disclosed by the equity method.

Pursuant to Rule 3-09(c) of Regulation S-X, we disclosed a statement of income and condensed balance sheet items under Note 24 – Summarized Information of Investment in the JV Company in 2015 Form 10-K [sic], and **separate audited financial statements including balance sheet, income statement and statement of cash flows for the JV Company will be included in the Upcoming Form 10-K**.

271.    Then, in connection with its restatement, Kandi corrected its reporting for prior periods, ultimately including financial statements of the JV Company.

272.    As a January 2015 *Seeking Alpha* article[25] explained, due to Kandi's failure to file separate financial statements for the JV Company during the Class Period, "**Kandi's JV is a black box, which makes it perfect for playing accounting games**." The article elaborated as follows:

> Why is it relevant that Kandi controls ZZY? **Because if Kandi CEO Xiaoming Hu is both the buyer (as controller of the JV) and seller (as controller of ZZY) in these transactions, then he can easily manipulate and time sales to meet or exceed revenue expectations**. With the concomitant inflated revenues in hand, Kandi's management can then sell inflated shares to the public. KNDI's CEO Hu can, with a snap of his fingers, create as many sales as is plausible to KNDI's unsophisticated retail investor base by "selling" and "delivering" EVs to ZZY, with **ZZY returning unpaid receivables or notes in lieu of cash to the Kandi JV**.
>
> But if ZZY is 81% owned by another investor group, then the risk of monetizing the EVs should be transferred to ZZY and the "Shanghai

---

[25]    Serrur & Co., *The Potemkin Parking Lot: Related Party Transactions and Questionable Revenue Recognition at Kandi Technologies*, Seeking Alpha, Jan. 26, 2015 9:15 a.m. ET, https://seekingalpha.com/article/2849366-the-potemkin-parking-lot-related-party-transactions-and-questionable-revenue-recognition-at-kandi-technologies.

venture capitalists" when the EVs are sold, right? Well, that's assuming two things. First, it assumes that ZZY actually has been sufficiently capitalized. Kandi has provided absolutely no information on the terms of the ZZY partnership or who the other investors are, aside from their corporate names. Second, it assumes that ZZY has paid the JV in cash or mostly in cash. *If the JV received payment from ZZY in the form of receivables or other notes, and ZZY hasn't been sufficiently capitalized by the "Shanghai venture capitalists," then the risk of the EVs not being monetized by ZZY will remain with the JV if ZZY is ultimately unable to pay the receivables*. Even worse, if the EVs are monetized (through the leasing program or subsidies), the lion's share of the upside (81%) would remain, in this scenario, with the ZZY "partners" - a real "heads I win, tails you lose" deal for the "Shanghai venture capitalists."

Well, if the JV were only receiving IOUs from ZZY, it would be clear from the financial statements, right? Wrong. *Kandi has chosen to account for its JV partnership using the equity method of accounting*, which means that it doesn't have to provide a detailed cash flow statement, income statements, or a balance sheet of the JV in its filings, nor does it need to consolidate it with its statements. All it is required to show is the JV's net income and add Kandi's share of this net income in Kandi's calculation of its own net income. In other words, *Kandi's JV is a black box, which makes it perfect for playing accounting games*. In Kandi's latest 10-Q, it provided only a highly simplified balance sheet for the JV….

*Kandi's cash flow problems (Kandi is owed more than $50m by the JV) and attendant need to raise cash via dilutive share offerings is consistent with the theory that ZZY is paying the JV mostly with receivables*.

273. The August 18, 2016 *Seeking Alpha* Article further detailed these dangers:

*The potential for fraudulent sales is clear*. By selling to its own JV, Kandi creates reportable revenue and, in theory, operating income. The JV is accounted for using the equity method, which means that its results are not consolidated on Kandi's financial statements, but its after-tax income is shown as a single line below the company's operating income. The JV in turn shows a profit by selling EVs to ZZY. Because Kandi holds only 9.5% of ZZY, it is not required to consolidate ZZY's balance sheet and statements on its books. *Any losses at ZZY - and thus of the entire*

*operation, overall of which Kandi effectively exercises control - are hidden from view*.

*Artificial or easily manipulated sales often allow management and promoters to inflate a stock's price at will*, and in such a situation, insiders are incentivized to award themselves valuable stock options and warrants. Sure enough, that is what Kandi has done. In fiscal year 2015, 97% of Kandi's listed revenues came from sales to the JV and its subsidiaries, and in May 2015, Kandi awarded management a stock option package worth $39 million on the grant date. In light of the fact that Kandi generated a loss from operations of $4 million in 2015, and its share of JV after-tax income was a little more than $10 million that was a rather handsome reward.

274.    As discussed in more detail below, Kandi acknowledged a number of material weaknesses in its system of internal control over financial reporting, including with respect to the presentation and disclosure of audited financial statements for the JV Company. In particular, the following control deficiency existed as of December 31, 2015 and also as of December 31, 2016:

> Disclosure requirements for equity investments. The Company did not have effective controls to ensure the completeness of the disclosure of financial statements for equity investments. The method used to identify the requirements to file separate audited financial statements for equity investments was not adequately performed during each reporting period.

### Internal Controls over Financial Reporting

275.    After a series of high profile financial scandals relating to large public companies (and their auditors) that occurred in the early 2000s, the Sarbanes-Oxley Act of 2002 ("SOX") was enacted to protect the investments of shareholders and the general public from improper actions or misrepresentations by public companies. One of the key provisions reiterated the need for management at public companies to establish and maintain a system of internal controls relating to, among other things, financial reporting, and to document, test, and maintain those controls and procedures to ensure their effectiveness, as well as to assess and report on the

{00292174;1 }                                                113

design and operating effectiveness of internal control over financial reporting on at least an

annual basis. SEC General Rules and Regulations (17 C.F.R. § 240.13a-15(f)) defines the term

"internal control over financial reporting" (or "ICFR") as:

> … a process designed by, or under the supervision of, the issuer's
> principal executive and principal financial officers, or persons performing
> similar functions, and effected by the issuer's board of directors,
> management and other personnel, to provide reasonable assurance
> regarding the reliability of financial reporting and the preparation of
> financial statements for external purposes in accordance with generally
> accepted accounting principles and includes those policies and procedures
> that:
>
>> (1) Pertain to the maintenance of records that in reasonable
>> detail accurately and fairly reflect the transactions and
>> dispositions of the assets of the issuer;
>>
>> (2) Provide reasonable assurance that transactions are recorded
>> as necessary to permit preparation of financial statements in
>> accordance with generally accepted accounting principles, and
>> that receipts and expenditures of the issuer are being made only
>> in accordance with authorizations of management and directors
>> of the issuer; and
>>
>> (3) Provide reasonable assurance regarding prevention or
>> timely detection of unauthorized acquisition, use or disposition
>> of the issuer's assets that could have a material effect on the
>> financial statements.

276.    SEC Regulation S-K (17 C.F.R. § 229.308 [Item 308] (a)) describes what

information should be included in management's report on ICFR, including the following:

> (1) A statement of management's responsibility for establishing and
> maintaining adequate internal control over financial reporting for the
> registrant;
>
> (2) A statement identifying the framework used by management to
> evaluate the effectiveness of the registrant's internal control over financial
> reporting as required by paragraph (c) of §240.13a-15 or §240.15d-15 of
> this chapter;

{00292174;1 }                                    114

(3) Management's assessment of the effectiveness of the registrant's internal control over financial reporting as of the end of the registrant's most recent fiscal year, including a statement as to whether or not internal control over financial reporting is effective. This discussion must include disclosure of any material weakness in the registrant's internal control over financial reporting identified by management. Management is not permitted to conclude that the registrant's internal control over financial reporting is effective if there are one or more material weaknesses in the registrant's internal control over financial reporting.

277. Many U.S. public companies, including Kandi (as expressly stated in its financial statements throughout the Class Period), have adopted the integrated framework for establishing and maintaining a system of internal controls established by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") in 1992 (the "COSO Integrated Framework"). The COSO Integrated Framework assists management, boards of directors, external stakeholders, and others interacting with the entity in their respective duties as they relate to the establishment and maintenance of internal controls, without being overly prescriptive (recognizing that the size and operations of subject entities may differ). It does so by providing both an understanding of what constitutes a system of internal controls and insight into when internal controls are being applied effectively.

278. COSO's integrated framework stipulates that:

[A]n effective system of internal control reduces, to an acceptable level, the risk of not achieving an objective relating to one, two, or all three categories of objectives – that is, operations, reporting, and compliance. It requires that (i) each of the five components of internal control and relevant principles is present and functioning, and that (ii) the five components are operating together in an integrated manner.

(COSO Internal Control-Integrated Framework Frequently Asked Questions, May 2013)

279. The five integrated components of internal control outlined in the Integrated Framework are:

a. Control Environment

b. Risk Assessment

c. Control Activities

d. Information and Communication

e. Monitoring

280. In view of the requirements for public companies to establish, maintain, and report on their systems of internal controls (including as such controls relate to financial reporting), a material weakness in a system of internal controls is defined as a deficiency, or a combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis. (17 C.F.R. § 210.13a-15(f)). If a Company identifies a material weakness, it must disclose such in the company's ICFR report. In addition, management is not permitted to conclude that the company's internal control over financial reporting is effective if there are one or more material weaknesses in the company's internal control over financial reporting. COSO's framework for internal controls concurs with this assertion.

## Kandi's Material Weaknesses in Internal Control

281. Throughout the Class Period, Kandi reported that its internal control over financial reporting was effective, based on consideration of COSO's Integrated Framework.

282. However, the SEC's February 8, 2017 comment letter noted that Kandi's previous auditor had been censured by the PCAOB and insisted that the Company "undertake to have the registrant's financial statements reaudited by a PCAOB-registered firm." Subsequently, while preparing its 2016 10-K, the Company once again performed the required evaluation of its

internal controls over financial reporting. Based on that evaluation, management identified

material weaknesses in such purported controls as a result of deficiencies in the Control

Activities component of internal control set forth in the COSO Integrated Framework. The same

was found with respect to December 31, 2015. Kandi itself described those deficiencies in its

Draft 2015 10-K/A, in the following manner:

> Based on management's evaluation under the 2013 COSO framework,
> management identified the following control deficiencies as of December
> 31, 2015 in the Company's internal control over financial reporting,
> principally related to the Company's period-end financial reporting.
>
> 1. Disclosure requirements for equity investments. The Company did not
> have effective controls to ensure the completeness of the disclosure of
> financial statements for equity investments. The method used to identify
> the requirements to file separate audited financial statements for equity
> investments was not adequately performed during each reporting period.
>
> 2. Presentation of the statement of cash flows. The Company did not have
> effective controls to ensure the proper classification and reporting of
> certain cash and non-cash activities related to notes receivable and notes
> payable on the statement of cash flows. The procedures used to prepare
> the statement of cash flows were not adequately performed during each
> reporting period.
>
> 3. Disclosure of related party transactions. The Company did not have
> effective controls to ensure the proper disclosure of related party
> transactions on the face of financial statements. The procedures used to
> prepare the financial statements were not adequately performed during
> each reporting period.
>
> 4. Accounting for income taxes. The Company did not have effective
> controls to ensure the accuracy of the accounting and reporting of income
> taxes and related disclosures. The method used to identify tax rates and
> calculate income taxes was not adequately performed during each
> reporting period.
>
> These control deficiencies resulted in the addition of separate audited
> financial statements of the JV Company to this Form 10K/A, the
> correction in accounting for income taxes and the reclassification of

{00292174;1 }                                    117

financial statement line items and related financial disclosures, as disclosed in Note 28, Restatements of Previously Issued Financial Statements, to our consolidated financial statements.

Based on the combination of the control deficiencies as laid out above, management concluded that material weaknesses exist in internal control over financial reporting and the Company's internal control over financial reporting was not effective as of December 31, 2015 based on the criteria established in Internal Control—Integrated Framework issued by the COSO.

283. In the 2016 10-K, Kandi stated that these material weaknesses were present as of December 31, 2016 as well, stating:

As disclosed in management's report on internal control over financial reporting management observed material weaknesses relating to our 2015 and 2014 financial statements that resulted in the addition of separate audited financial statements of the JV Company, the correction in accounting for income taxes and the reclassification of financial statement line items and related financial disclosures, as disclosed in Note 26, Restatement of Previously Issued Financial Statements, to our consolidated financial statements contained in this Annual Report. In addition, ***these material weaknesses continued to exist throughout 2016 and as a result, we have concluded that we did not maintain effective internal control over financial reporting as of December 31, 2016.***

284. Further, as a result of the foregoing identified material weaknesses, management undertook a remediation plan relative to its system of internal control (similar to as when a material weakness was identified for 2013) which included:

- the addition of more experienced accounting and finance personnel to manage the Company's U.S. GAAP practice and SEC reporting compliance;

- necessary training for related accounting and finance personnel, so that they are well versed in the rules in the Company's accounting manual such as the selection of accounting principles, the application of accounting policies and the procedures of accounting treatment; and remain current with accounting rules, regulations and trends;

{00292174;1 }

- a thorough review of the finance and accounting departments to ensure that the areas of responsibilities are properly matched to the staff competencies and the planning is properly matched to the procedures; and that the lines of communication and processes are as effective as possible;

- a thorough review of the processes and procedures used in the Company's period closing and financial reporting, including but not limited to presentation of the statement of cash flows, disclosure of related party transactions, disclosure requirements for equity investment and accounting for income taxes, to ensure the related processes and procedures in our current accounting manual is complete and updated.

285. Ultimately, management's conclusions with respect to its system of internal controls over financial reporting during the Class Period, as reflected in the ICFR reports, were improper and misleading in view of: (i) the accounting literature discussed herein; (ii) comment letters from the SEC; (iii) the conclusion reached and communicated by the board of directors of Kandi "that the Company's Previously Issued Financial Statements should no longer be relied upon" (Kandi 8-K filed on March 13, 2017); and (iv) the Company's own conclusion that its disclosure controls and procedures were not effective as of December 31, 2014, December 31, 2015 and December 31, 2016. (Kandi 2015 Form 10-K/A and Kandi 2016 Form 10-K).

286. The aforementioned control deficiencies, including identified material weaknesses, which were known or should have been known by Kandi's management, should have led Kandi to conclude and, more specifically, contemporaneously disclose that its system of internal control over financial reporting was not effective as of, and for the years ended, December 31, 2014, December 31, 2015, and December 31, 2016. As discussed herein, the financial statements for the interim quarterly periods within and annual periods ended December 31, 2014 and December 31, 2015 (as well as the first three quarters of 2016) were materially misstated with respect to GAAP, in concert with the described material weaknesses.

## CLASS ACTION ALLEGATIONS

287.     Lead Plaintiffs bring this action as a class action under Federal Rule of Civil Procedure 23(a) and (b)(3), individually and on behalf of all those who purchased or otherwise acquired the Company's securities during the Class Period. Excluded from the Class are Defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

288.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on NASDAQ. While the exact number of Class members is unknown at this time and can be ascertained only through appropriate discovery, Lead Plaintiffs believe there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company's or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

289.     Lead Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

290.     Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

{00292174;1 }                                        120

291. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

   a.   Whether Defendants violated the Exchange Act;

   b.   Whether Defendants participated in and pursued the wrongful activities complained of herein;

   c.   Whether Defendants' statements were materially false and misleading or omitted to state material facts about the Company;

   d.   Whether Defendants acted with due care in misrepresenting or omitting to state material information concerning the Company; and

   e.   The extent of damages sustained by members of the Class and the appropriate measure of damages.

292. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

293. Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

294. The questions of law or fact common to the Class predominate over any questions affecting individual members of the Class, such that a class action is superior to other available

{00292174;1 }

methods for fairly and efficiently adjudicating the controversy. There will be no difficulty in managing this action as a class action.

**COUNT I**

**Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5**
**Against All Defendants**

295.    Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

296.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Kandi securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Kandi securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

297.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to

influence the market for Kandi securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Kandi's finances and business prospects.

298.    By virtue of their positions at Kandi, defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to defendants. Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

299.    Information showing that defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control. As the senior managers and/ or directors of Kandi, the Individual Defendants had knowledge of the details of Kandi's internal affairs.

300.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Kandi. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Kandi's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of

Kandi securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Kandi's business and financial condition which were concealed by defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Kandi securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by defendants, and were damaged thereby.

301.    During the Class Period, Kandi securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Kandi securities at prices artificially inflated by defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Kandi securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Kandi securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

302.    By reason of the conduct alleged herein, defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

303.    As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure

that the Company had been disseminating misrepresented financial statements to the investing

public.

## COUNT II

## Violations of Section 20(a) of the Exchange Act against the Individual Defendants

304.    Plaintiff repeats and re-alleges each and every allegation contained in the

foregoing paragraphs as if fully set forth herein.

305.    During the Class Period, the Individual Defendants participated in the operation

and management of Kandi, and conducted and participated, directly and indirectly, in the

conduct of Kandi's business affairs. Because of their senior positions, they knew the adverse

non-public information about Kandi's misstatement of income and expenses and false financial

statements.

306.    As officers and/or directors of a publicly owned company, the Individual

Defendants had a duty to disseminate accurate and truthful information with respect to Kandi's

financial condition and results of operations, and to correct promptly any public statements

issued by Kandi which had become materially false or misleading.

307.    Because of their positions of control and authority as senior officers, the

Individual Defendants were able to and did control the contents of the various reports, press

releases and public filings which Kandi disseminated in the marketplace during the Class Period

concerning Kandi's results of operations. Throughout the Class Period, the Individual

Defendants exercised their power and authority to cause Kandi to engage in the wrongful acts

complained of herein. The Individual Defendants therefore, were "controlling persons" of Kandi

within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in

the unlawful conduct alleged which artificially inflated the market price of Kandi securities.

{00292174;1 }                                    125

308. Each of the Individual Defendants, therefore, acted as a controlling person of Kandi. By reason of their senior management positions and/or being directors of Kandi, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Kandi to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Kandi and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

309. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Kandi.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

a. Determining that the instant action may be maintained as a class action under Federal Rule of Civil Procedure 23, and certifying Lead Plaintiffs as Class Representatives;

b. Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

c. Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

d. Awarding such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

{00292174;1 }

126

Dated: August 29, 2018

**POMERANTZ LLP**

By: */s/ Murielle J. Steven Walsh*
Jeremy A. Lieberman
Murielle J. Steven Walsh
Aatif Iqbal
600 Third Ave., 20th Floor
New York, NY 10016
Tel: (212) 661-1100
Fax: (917) 463-1044
Email: jalieberman@pomlaw.com
mjsteven@pomlaw.com
aiqbal@pomlaw.com

**GAINEY McKENNA & EGLESTON**
Gregory M. Egleston
Thomas J. McKenna
Robert Schupler
440 Park Avenue South
New York, NY 10016
Telephone: (212) 983-1300
Facsimile: (212) 983-0380
Email: gegleston@gme-law.com
tjmckenna@gme-law.com
rschupler@gme-law.com

*Lead Counsel for Plaintiffs*

{00292174;1 }                    127