**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SRINIVASAN VENKATARAMAN, Individually and on Behalf of All Others Similarly Situated,<br><br>　　　　　　Plaintiff,<br><br>　　vs.<br><br><br>KANDI TECHNOLOGIES GROUP, INC., XIAOMING HU, CHENG WANG, BING MEI, LIMING CHEN, JERRY LEWIN, AND HENRY YU,<br><br>　　　　　　Defendants. | Case No. 1:20-cv-08082-LGS |

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

**TABLE OF CONTENTS**

I.    INTRODUCTION ............................................................................................... 1

II.   STATEMENT OF FACTS .................................................................................. 3

III.  STANDARD OF REVIEW ................................................................................ 9

IV.   PLAINTIFF ADEQUATELY ALLEGES VIOLATIONS OF THE EXCHANGE ACT 10

      A.    Plaintiff Adequately Alleges that Defendants Made Materially False and
            Misleading Statements ............................................................................ 10

      B.    Plaintiff Adequately Alleges that Defendants Acted With Scienter ..................... 12

            1.    Defendants Had Motive and Opportunity to Commit Fraud ................... 13

            2.    Plaintiff Alleges Strong Circumstantial Evidence of Recklessness.......... 15

            a.    Defendants Participated in the Fraud Alleged and Had Access to
                  Information Demonstrating that Their Representations Were False and
                  Misleading.................................................................................... 15

            b.    Defendants Failed to Check Information They Had a Duty to Monitor ... 17

            c.    The Termination of AWC as the Company's Auditor Contributes to the
                  Strong Inference of Scienter Alleged......................................... 18

            d.    CFO Wang's Resignation Supports a Strong Inference of Scienter ......... 19

            e.    Defendants' GAAP Violations Add to the Strong Inference of Scienter
                  Alleged ...................................................................................... 19

            f.    Defendants' Accounting Experience Further Supports a Strong Inference
                  of Scienter .................................................................................. 20

      C.    Plaintiff's Claims Are Not Barred by the Statute of Limitations.......................... 21

      D.    Plaintiff Adequately Alleges Control Person Liability ......................................... 25

V.    CONCLUSION.................................................................................................. 25

## TABLE OF AUTHORITIES

<u>CASES</u>

*Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*,
No. 20-3074, 2021 WL 5499455 (2d Cir. Nov. 24, 2021) ........................................................ 9

*Armstrong v. McAlpin*,
699 F.2d 79 (2d Cir. 1983) ..................................................................................................... 24

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .................................................................................................................. 9

*ATSI Comms., Inc. v. Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007) ..................................................................................................... 25

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .................................................................................................................. 9

*Booth v. Strategic Realty Tr., Inc.*,
No. 13-CV-04921-JST, 2014 WL 3749759 (N.D. Cal. July 29, 2014) ................................... 23

*Caiafa v. Sea Containers Ltd.*,
525 F. Supp. 2d 398 (S.D.N.Y. 2007) ..................................................................................... 10

*Caiola v. Citibank, N.A., New York*,
295 F.3d 312 (2d Cir. 2002) ................................................................................................... 11

*California Pub. Employees' Ret. Sys. v. ANZ Sec., Inc.*,
137 S. Ct. 2042 (2017) ............................................................................................................ 21

*Charles Schwab Corp. v. Bank of Am. Corp.*,
883 F.3d 68 (2d Cir. 2018) ......................................................................................... 22, 23, 24

*City of Pontiac Gen. Employees' Ret. Sys. v. MBIA, Inc.*,
637 F.3d 169 (2d Cir. 2011) ............................................................................................. 21, 24

*City of Pontiac Gen. Empls.' Ret. Sys. v. Lockheed Martin Corp.*,
875 F. Supp. 2d 359 (S.D.N.Y. 2012) ..................................................................................... 13

*Cornwell v. Credit Suisse Grp.*,
689 F. Supp. 2d 629 (S.D.N.Y. 2010) ..................................................................................... 25

*Denny v. Barber*,
576 F.2d 465 (2d Cir. 1978) ................................................................................................... 24

*Dodds v. Cigna Sec., Inc.*,
    12 F.3d 346 (2d Cir. 1993)......................................................................................... 24

*Donoghue v. Am. Skiing Co.*,
    155 F. Supp. 2d 70 (S.D.N.Y. 2001).......................................................................... 24

*Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*,
    794 F.3d 297 (2d Cir. 2015)........................................................................... 15, 17, 18

*FirstBank Puerto Rico, Inc. v. La Vida Merger Sub, Inc.*,
    638 F.3d 37 (1st Cir. 2011) ........................................................................................ 24

*Fresno Cty. Employees' Ret. Ass'n v. comScore, Inc.*,
    268 F. Supp. 3d 526 (S.D.N.Y. 2017).................................................................. 11, 19

*Freudenberg v. E\*Trade Financial Corp.*,
    712 F. Supp. 2d 171 (S.D.N.Y. 2010)........................................................................ 20

*Ganino v. Citizens Utilities Co.*,
    228 F.3d 154 (2d Cir. 2000).................................................................................. 13, 15

*Gavin/Solmonese LLC v. D'Arnaud-Taylor*,
    639 F. App'x 664 (2d Cir. 2016) ................................................................................ 24

*Ho v. Duoyuan Global Water, Inc.*,
    887 F. Supp. 2d 547 (S.D.N.Y. 2012)........................................................................ 19

*Hopkinson v. Est. of Siegal*,
    No. 10 CIV. 1743 LBS, 2011 WL 2935876 (S.D.N.Y. July 12, 2011) ..................... 24

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
    324 F. Supp. 2d 474 (S.D.N.Y. 2004)................................................................... 11, 12

*In re DRDGOLD Ltd. Sec. Litig.*,
    472 F. Supp. 2d 562 (S.D.N.Y. 2007)........................................................................ 10

*In re Grupo Televisa Sec. Litig.*,
    368 F. Supp. 3d 711 (S.D.N.Y. 2019)........................................................................ 11

*In re Initial Pub. Offering Sec. Litig.*,
    241 F. Supp. 2d 281 (S.D.N.Y. 2003)........................................................................ 25

*In re Kandi Techs. Grp., Inc. Sec. Litig.*,
    No. 17 CIV. 1944 (ER), 2019 WL 4918649 (S.D.N.Y. Oct. 4, 2019) ........................ 2

*In re Lululemon Sec. Litig.*,
  14 F. Supp. 3d 553 (S.D.N.Y. 2014) ................................................................................ 12

*In re Magnum Hunter Res. Corp. Sec. Litig.*,
  26 F. Supp. 3d 278 (S.D.N.Y. 2014) ................................................................................ 12

*In re Morgan Stanley Info. Fund Sec. Litig.*,
  592 F.3d 347 (2d Cir. 2010) ............................................................................................ 11

*In re OCA, Inc. Sec. and Derivative Litigation*,
  No. 05-2165, 2006 WL 3747560 (E.D. La. Dec. 14, 2006) ........................................... 21

*In re Oxford Health Plans, Inc. Sec. Litig.*,
  187 F.R.D. 133 (S.D.N.Y.1999) ...................................................................................... 25

*In re Parmalat Sec. Litig.*,
  414 F. Supp. 2d 428 (S.D.N.Y. 2006) ............................................................................. 25

*In re Parmalat Sec. Litig.*,
  497 F. Supp. 2d 526 (S.D.N.Y. 2007) ............................................................................. 25

*In re Scottish Re Grp. Sec. Litig.*,
  524 F. Supp. 2d 370 (S.D.N.Y. 2007) ............................................................................. 19

*In re Vivendi Universal, S.A. Sec. Litig.*,
  634 F. Supp. 2d 352 (S.D.N.Y. 2009) ............................................................................. 11

*In re WorldCom, Inc. Sec. Litig.*,
  294 F. Supp. 2d 392 (S.D.N.Y. 2003) ............................................................................. 25

*In re WorldCom, Inc. Sec. Litig.*,
  No. 02 Civ. 3288, 2005 WL 2319118 (S.D.N.Y. Sept. 21, 2005) .................................. 18

*Lickteig v. Cerberus Cap. Mgmt., L.P.*,
  No. 1:19-CV-5263-GHW, 2020 WL 1989424 (S.D.N.Y. Apr. 26, 2020) ...................... 23

*Luce v. Edelstein*,
  802 F.2d 49 (2d Cir. 1986) .............................................................................................. 25

*McIntire v. China MediaExpress Holdings, Inc.*,
  No. 11 Civ. 0804 VM, 2013 WL 752954 (S.D.N.Y. Feb. 28, 2013) .......................... 18, 19

*Merck & Co. v. Reynolds*,
  559 U.S. 633 (2010) ..................................................................................................... 22, 24

iv

*Meyer v. Jinkosolar Holdings Co.*,
   761 F.3d 245 (2d Cir. 2014).................................................................................... 11

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000)................................................................................ 13, 19

*Ontario Teachers' Pension Plan Bd. v. Teva Pharm. Indus. Ltd.*,
   432 F. Supp. 3d 131 (D. Conn. 2019) ..................................................................... 23

*Peifa Xu v. Gridsum Holding Inc.*,
   No. 18 CIV. 3655 (ER), 2020 WL 1508748 (S.D.N.Y. Mar. 30, 2020)................................... 19

*Plumbers & Pipefitters Nat'l Pension Fund v. Davis*,
   No. 1:16-CV-3591-GHW, 2020 WL 1877821 (S.D.N.Y. Apr. 14, 2020) ............................... 11

*Podany v. Robertson Stephens, Inc.*,
   318 F. Supp. 2d 146 (S.D.N.Y. 2004)...................................................................... 24

*Resh v. China Agritech, Inc.*,
   No. 214CV05083RGKPJW, 2019 WL 1055240 (C.D. Cal. Jan. 8, 2019).............................. 19

*Richard v. Northwest Pipe Co.*,
   No. C9-5724RBL, 2011 WL 3813073 (W.D. Wash. Aug. 26, 2011) ...................................... 20

*Rombach v. Chang*,
   355 F.3d 164 (2d Cir. 2004)................................................................................. 12

*Schiro v. Cemex, S.A.B. de C.V.*,
   438 F. Supp. 3d 194 (S.D.N.Y. 2020)...................................................................... 24

*SEC v. Escala Grp., Inc.*,
   No. 09 Civ. 2646 (DLC), 2009 WL 2365548 (S.D.N.Y. July 31, 2009)................................. 20

*SEC v. Espuelas*,
   579 F. Supp. 2d 461 (S.D.N.Y. 2008)...................................................................... 10

*Stevelman v. Alias Research Inc.*,
   174 F. 3d 79 (2d Cir. 1999)................................................................................. 13

*Suez Equity Investors, L.P. v. Toronto-Dominion Bank*,
   250 F.3d 87 (2d Cir. 2001)................................................................................ 13, 14

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)................................................................................. 9, 12, 13, 21

v

*U.S. v. Berger,*
    473 F.3d 1080 (9th Cir. 2007) ................................................................ 12

*United States v. Ruehle,*
    583 F.3d 600 (9th Cir. 2009) ................................................................. 21

*Varghese v. China Shenghuo Pharm. Holdings, Inc.,*
    672 F. Supp. 2d 596 (S.D.N.Y. 2009) ..................................................... 11

*Washington State Inv. Bd. v. Odebrecht S.A.,*
    461 F. Supp. 3d 46 (S.D.N.Y. 2020) ....................................................... 22

STATUTES

15 U.S.C. §78j(b) ......................................................................................... 10

15 U.S.C. §78t(a) ......................................................................................... 25

15 U.S.C. §78u-4(b)(1)(B) ........................................................................... 10

15 U.S.C. §78u-4(b)(2) ................................................................................ 12

28 U.S.C. §1658 .......................................................................................... 21

RULES

Fed. R. Civ. P. 8 .......................................................................................... 25

Fed. R. Civ. P. 12(b)(6) ............................................................................... 21

vi

## I.      INTRODUCTION

This is a strong securities class action in which company insiders enriched themselves and their family members though undisclosed related-party transactions at the expense of investors.[1] This case is brought on behalf of investors who purchased or acquired Kandi's common stock between June 10, 2015 and March 13, 2017, inclusive ("Class Period").  During the Class Period, Defendants misrepresented the Company's financial results and operations in violation of the Securities Exchange Act of 1934 ("Exchange Act") and Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder.  Specifically, Defendants: (1) falsely reported the Company's financial results for 2014, 2015, and the first three quarters of 2016 – financial results that the Company ultimately restated; (2) falsely attested to the accuracy of the Company's financial statements, the disclosure of material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud pursuant to the Sarbanes Oxley Act of 2002 ("SOX"); (3) falsely reported no change in cashflow attributable to related party transactions; and (4) falsely misrepresented the efficacy of the Company's internal controls.  When Defendants disclosed the truth, the Company's stock price plummeted, causing substantial losses to investors.

Contrary to the assertions within Defendants' Memorandum of Law in Support of Defendants' Motion to Dismiss ("Motion"), Plaintiff has rectified the deficiencies that the Court found regarding the previous complaint.  Specifically, Plaintiff's Complaint contains new allegations demonstrating that Defendants had motive and opportunity to commit fraud.  For

---

[1]  Defendants are: Kandi Technologies Group, Inc. ("Kandi" or the "Company"); Xiaoming Hu ("Hu"), Cheng Wang ("Wang"), Bing Mei ("Mei"), Liming Chen ("Chen"), Jerry Lewin ("Lewin"), and Henry Yu ("Yu") (collectively "Defendants").  Unless otherwise indicated, all paragraph ("¶") references are to Plaintiff's Second Amended Complaint for Violation of the Federal Securities Laws ("Complaint"), all emphasis is added, and all internal citations and quotations are omitted.

instance, such facts include: (1) improper related-party transactions between the Company and Kandi USA, which was owned by the son of CEO Hu; (2) facts showing that Defendants permitted the Company to place large amounts of cash in the personal bank accounts of its officers and employees; (3) allegations that Defendants concealed material transactions between the Company and related parties owned by Defendants; and (4) facts showing that Defendants benefitted through their ownership of a joint venture from the subsidies provided to producers, and through their ownership of a service company, similarly benefited from the subsidies provided to purchasers. ***Defendants completely ignore these facts.*** Defendants similarly ignore the new facts alleged that constitute strong circumstantial evidence of recklessness, including facts demonstrating that they participated in the fraud and attended meetings during which they learned of information demonstrating that their public statements were false and misleading.

Rather than address these facts, Defendants beg the Court to rely upon a decision in *In re Kandi Techs. Grp., Inc. Sec. Litig.*, No. 17 CIV. 1944 (ER), 2019 WL 4918649 (S.D.N.Y. Oct. 4, 2019). In light of the new facts alleged, however, this decision is completely inapplicable. In *Kandi*, for instance, the court held that plaintiffs did not adequately allege motive. *Id*. at \*5. Plaintiff has done so here. The court in *Kandi* also determined that plaintiffs did not sufficiently allege circumstantial evidence of recklessness. Again, Plaintiff does so here. Indeed, the scienter allegations in that case bear no relation to the scienter allegations alleged here.[2] Additionally, although Defendants argue again that the statute of limitations bars Plaintiff's claims, they continue to rely upon a standard that has been rejected by the Supreme Court and have failed to meet their burden. As a result, the Court should deny Defendants' Motion.

---

[2] *See* Declaration of Ex Kano S. Sams II in Support of Plaintiff's Opposition to Defendants' Memorandum of Law in Support of Defendants' Motion to Dismiss ("Sams Decl."), Exhibit ("Ex.") 1.

2

## II.    STATEMENT OF FACTS

Kandi manufactures and distributes EV, EV parts, and off-road vehicles.  ¶25. In March 2011, AWC (CPA) Limited ("AWC") audited the Company's financial statements for the year ending December 31, 2010 ("2010 Audit").  ¶26.  Although purportedly acting as an independent outside auditor, AWC had no clients other than the Company.  *Id.*  During the 2010 Audit, AWC identified key audit risks and a key control weakness involving the Company's treatment of related-party transactions.  ¶27.  Specifically, AWC determined that when recording transactions with Kandi USA – one of the Company's five largest customers – the Company used a different name for Kandi USA.  *Id.*  When AWC inquired whether the counterparty was a related party, the Company evaded the question.  *Id.*  In fact, Kandi USA was a related party because it was owned by Wangyuan Hu, the son of CEO Hu.  *Id.*  In March 2011, CEO Hu suggested that AWC resolve the issue by booking the Company's sales to Kandi USA to a different customer's account.  ¶28. AWC complied and also eliminated any references to Kandi USA despite evidence demonstrating that Kandi USA actually purchased the goods.  *Id.*

AWC also discovered during the 2010 Audit that the Company placed large amounts of cash in the personal bank accounts of its officers and employees.  ¶29.  For instance, AWC found that one unidentified employee held $3 million of the Company's reported year-end cash balance in a personal account.  *Id.*  AWC reported the transaction to the Company's Audit Committee as evidence of a key internal control weakness.  *Id.*  AWC subsequently discovered that the same unidentified individual was holding an additional $2.5 million of the Company's reported year-end cash balance in a different bank account and that CEO Hu held another $1.6 million of the Company's reported year-end cash balance in a personal account.  ¶30.

In March 2012, AWC audited the Company's financial statements for the year ending December 31, 2011 ("2011 Audit").  ¶31.  AWC identified "the collectability of notes receivable

3

as a key audit risk." *Id.* AWC found that a single note constituted $33.1 million of the Company's $37.9 million notes receivable balance and that the borrower had not made any interest payments on the note in 2011. *Id.*

In March 2013, AWC audited the Company's financial statements for the year ending December 31, 2012 ("2012 Audit"). ¶33. AWC similarly identified related-party transactions as a key risk. *Id.* For instance, AWC found transactions between the Company and Kandi USA. As in 2010, the related-party transactions did not identify Kandi USA. *Id.* Instead, the Company referred to Kandi USA as Eliteway Management ("Eliteway"), which was later revealed to be a trade name for Kandi USA. *Id.* Also in March 2013, the Company entered into a joint venture with Geely Automobile Holdings Ltd. ("Geely"). ¶34. The Company sold parts to the joint venture, which used the parts to manufacture electric vehicles. *Id.* The Company and Geely each owned 50% of the joint venture. *Id.* The joint venture sold the finished electric vehicles to Zhejiang ZuoZhongYou Electric Vehicle Service Co., Ltd. ("Service Company"), which sold and leased the vehicles. ¶35. The Company owned 9.5% of the Service Company. *Id.* CEO Hu owned both 28.4% of Kandi and 13% of the Service Company. *Id.*

On March 17, 2014, the Company filed its Form 10-K for the year ending December 31, 2013 ("2013 10-K"). ¶38. Within the 2013 10-K, the Company disclosed that its "disclosure controls and procedures were not effective as of December 31, 2013, due to a material weakness." *Id.* The 2013 10-K identified multiple factors that contributed to this material weakness: (1) the head of the Company's internal audit department reported to CEO Hu rather than to the Audit Committee, which "impaired the independence and objectivity of the internal control audit department;" (2) there was a lack of communication between the Company's internal audit department and the Audit Committee; and (3) the Company did not evaluate the effectiveness of

4

the Audit Committee on a yearly basis.  *Id*.  The Company further disclosed in the 2013 10-K that it did not have adequate internal controls for related-party transactions.  *Id*.  Additionally, the 2013 10-K described efforts to remediate the Company's deficiencies.  ¶39.  First, the Company changed its reporting structure so that the head of the internal audit department reported to the Company's Audit Committee.  *Id*.  Second, the Company committed to revising its Audit Committee's charter to ensure that regular and frequent reporting on the internal audit related matters to the Audit Committee is carried out by the head of internal audit department.  *Id*.  Third, the Company resolved to evaluate the effectiveness of the Audit Committee annually and to have its Audit Committee review all of its related-party transactions.  *Id*.

On May 9, 2014, Kandi's Audit Committee held a meeting.  ¶40.  The members of the Audit Committee at the time were Defendant Chen, Defendant Lewin, and Defendant Yu.  *Id*.  The Company's CFO at the time, Xiaoying Zhu ("Zhu"), also attended the meeting.  *Id*.  During the meeting, the participants discussed matters relating to Kandi's relationship transactions and reviewed a sales contract entered into with Eliteway.  *Id*.

On May 30, 2014, the Audit Committee met again.  ¶41.  Defendant Chen, Defendant Lewin, and Defendant Yu attended as members of the Company's Audit committee.  *Id*.  The head of the Company's internal audit department – Chenming Sun ("Sun") – also attended the meeting.  *Id*.  The Audit Committee reviewed and approved a new Audit Committee Charter.  *Id*.  In July 2014, Defendant Yu met with management, the Company's internal audit team, and AWC to review the progress of implementation of the remediation measures and to spearhead a comprehensive remediation plan to fully address the deficiencies in the Company's internal controls.  ¶43.

After the Audit Committee's meetings in May 2014, the committee did not meet again until March 13, 2015 – three days before the Company filed its Form 10-K for the fiscal year ended December 31, 2014 ("2014 10-K").  ¶44.  The Audit Committee members were still Defendant Chen, Defendant Lewin, and Defendant Yu.  *Id*.  CFO Zhu also attended the meeting, along with Sun, the head of the internal controls department.  *Id*.  During the meeting, the Audit Committee approved a policy of a related-party transaction relating to a joint venture.  *Id*.

On March 7, 2016 – one week before the filing of the Company's Annual Report on Form 10-K for the year ending December 31, 2015 ("2015 10-K") – the Company's Audit Committee met for the first time since its meeting on March 13, 2015.  ¶55.  The members of the Audit Committee were still Defendant Chen, Defendant Lewin, and Defendant Yu.  *Id*.  CFO Wang also attended the meeting as well as Sun, the head of the internal audit department.  *Id*.  During the meeting, CFO Wang identified related-party transactions that took place in 2015.  ¶56. Specifically, the Company's management identified two related parties: Kandi USA and the Service Company.  *Id*.  During the meeting, Company management represented that the Company had not engaged in any related-party transactions with Kandi USA during 2015.  *Id*.  Management reported that the Company had engaged in related-party transactions with the Service Company, describing the transactions as mainly involving battery sales.  *Id*.

On March 22, 2016, the Company's Audit Committee acted by unanimous written consent to ratify a radically different description of the related-party transactions between the Company and the Service Company than discussed during its March 7, 2016 meeting.  ¶60.  In the consent, the Audit Committee approved related-party transactions with the Service Company totaling $42,032,060.  *Id*.  In the same written consent, the Audit Committee also authorized Company

management to engage in related-party transactions with the Service Company during the remainder of 2016. *Id.*

On August 1, 2016, the Audit Committee met to review the Company's Quarterly Report on Form 10-Q for the quarter ending June 30, 2016. ¶65. The members of the Audit Committee continued to be Defendant Chen, Defendant Lewin, and Defendant Yu. *Id.* CFO Wang also attended, as well as Sun, the head of the internal audit department. *Id.* CFO Wang reported on the Company's related-party transactions for the six months ending June 30, 2016. *Id.* According to CFO Wang, sales to the Service Company totaled nearly $4 million, while receivables from the Service Company totaled nearly $11 million. *Id.* The Company's management did not identify any other related-party transactions. *Id.* During the meeting, the Audit Committee also discussed a decision by the Chinese government to delay its subsidy payments to the joint venture, which affected the Company's outlook for the remainder of the year. ¶67. Defendant Lewin suggested that the Company should consider alternatives to mitigate its reliance on the subsidies that the Chinese government was providing to producers and purchasers of electric vehicles. *Id.*

In September 2016, the Chinese government decided to phase out the subsidies. ¶70. This decision followed a months-long investigation into the Company and other Chinese manufacturers who appeared to have structured their operations to take advantage of subsidies as both producers and purchasers of vehicles. *Id.*

On November 2, 2016, Defendants disclosed for the first time that the Company had engaged in material transactions with Kandi USA (owned by the son of CEO Hu) using its trade name, Eliteway. ¶75. Defendants further disclosed that the Company had engaged in material transactions with Kandi USA, again using the trade name Eliteway. *Id.* The total amount of the transactions was identified as $9,888,751. *Id.* Additionally, Defendants disclosed additional

7

related-party transactions with the Service Company resulting in additional receivables due from the Service Company.  ¶76.  As of December 31, 2014, the receivables totaled over $40 million.  *Id*.  As of December 31, 2016, the receivables totaled $10.4 million.  *Id*.  On November 14, 2016, the Company announced the abrupt resignation of Defendant Wang as the CFO.  ¶77.  On this news, shares of Kandi fell more than 10%.  *Id*.

On March 13, 2017, the Company revealed that its previously issued financial statements for the years ended December 31, 2015 and 2014, and the first three quarters for the year ended December 31, 2016 will need to be restated.  ¶78.  On March 16, 2017, the Company admitted that there were material weaknesses in the Company's internal controls.  ¶80.  Kandi conceded that, among other things, it had made "errors" in the classification of notes receivable and notes payable in its statement of cash flows, it had failed to separately identify certain related party accounts on the face of the Company's balance sheets and income statements, and it had improperly accounted for the Company's equity investment in the JV Company.  ¶81.  On March 16, 2018, the Company filed a Form 10-K for the fiscal year ended December 31, 2017 ("2017 10-K") with the SEC confirming that its internal controls over financial reporting ("ICFR") were not effective as of December 31, 2017.  ¶84.

On November 30, 2020, Hindenburg Research published a report on Kandi entitled "Kandi: How This China-Based NASDAQ Listed Company Used Fake Sales, EV Hype to Nab $160 Million From U.S. Investors."  ¶¶85-88; Sams Decl. Ex. 2.  The Hindenburg Report "found that almost 64% of Kandi's last twelve months (LTM) sales have been to undisclosed related parties."  *Id*.  The Hindenburg Report identified the Company's largest customer as Jinhua Chaoneng Automobile Sales Co. Ltd. ("Chaoneng") and discovered that Chaoneng was located in the same industrial park as Kandi and in "[t]he same building [that] housed another entity used by Kandi as

8

part of a [prior] separate fake sales scheme to collect illegitimate subsidies from the Chinese government, for which it was fined and sanctioned." *Id.*

The Hindenburg Report also identified Kandi's second largest customer as former Kandi subsidiary Zhejiang Kuke Sports Technology Co., Ltd. ("Kuke"), which accounted for "11% of last quarter's sales and 9% of Kandi's LTM sales." *Id.* According to the Hindenburg Report, "corporate records on QCC.com still refer to [Kuke] as being a part of Kandi." *Id.* Additionally, the Hindenburg Report found that Kuke's "website still shows close ties to Kandi," that "[t]he homepage features a large image of Kandi's factory and that [Kuke's] logo integrates Kandi with its corporate name." *Id.* The Hindenburg Report found further that 30% of Kuke's historical exports were to Massimo Motor Sports LLC ("Massimo"), an entity based out of Kandi America's Headquarters and owned by the Founder and Manager of Kandi America. *Id.* According to the Hindenburg Report, Massimo was therefore a top customer and top supplier to the Company. *Id.*

## III.   STANDARD OF REVIEW

A plaintiff's allegations need only be "plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Courts must "accept all factual allegations in the complaint as true" and "must consider the complaint in its entirety. . . ." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). The Second Circuit has recently cautioned that "[a]lthough pleading standards are heightened for securities fraud claims, we must be careful not to mistake heightened pleading standards for impossible ones." *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*, No. 20-3074, 2021 WL 5499455, at *4 (2d Cir. Nov. 24, 2021).

## IV.    PLAINTIFF ADEQUATELY ALLEGES VIOLATIONS OF THE EXCHANGE ACT

Section 10(b) of the Exchange Act makes it unlawful "to use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."  15 U.S.C. §78j(b).

### A.    Plaintiff Adequately Alleges that Defendants Made Materially False and Misleading Statements

Under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), a plaintiff adequately pleads falsity by "specify[ing] each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. §78u-4(b)(1)(B).

First, the Company's restatement constitutes an admission that its financial results were materially false at the time they were issued.  Indeed, "misreported financial data are clearly false statements of fact."  *In re DRDGOLD Ltd. Sec. Litig.*, 472 F. Supp. 2d 562, 569 (S.D.N.Y. 2007); *see also Caiafa v. Sea Containers Ltd.*, 525 F. Supp. 2d 398, 410 (S.D.N.Y. 2007) ("the mere fact that statements were restated at all is sufficient to establish falsity at the pleading stage").  On March 13, 2017, Kandi announced that its financial statements for 2014, 2015, and the first three quarters of 2016 would need to be restated.  ¶78.  Kandi conceded that it had made "errors" in the classification of notes receivable and notes payable in its statement of cash flows, it had failed to separately identify certain related party accounts on the face of the Company's balance sheets and income statements, and it had improperly accounted for the Company's equity investment in the JV Company.  ¶81.  "A complaint pleads false or misleading statements with sufficient particularity if it alleges that there was a restatement correcting earlier corporate filings and identifies the restated financials."  *SEC v. Espuelas*, 579 F. Supp. 2d 461, 472 (S.D.N.Y. 2008). Moreover, contrary to Defendants' assertion (Motion at 6, 11, 23-24), "the mere fact that financial

10

results were restated is sufficient basis for pleading that those statements *were false when made*." *Fresno Cty. Employees' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 544 (S.D.N.Y. 2017); *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 486 (S.D.N.Y. 2004) This "[m]isreported financial information clearly amounts to a false statement of fact." *Varghese v. China Shenghuo Pharm. Holdings, Inc.*, 672 F. Supp. 2d 596, 606 (S.D.N.Y. 2009).[3]

Second, in stark contrast to Defendants' representations during the Class Period (¶¶45-46, 50-52, 54, 57-58, 63, 68-69, 71-72), Kandi admitted that: (1) "the Company's internal controls over financial reporting were not effective as of December 31, 2017;" (2) "[c]ertain control deficiencies existed in the internal control over financial reporting as of December 31, 2017, including lack of adequate knowledge of US GAAP and SEC rules and inaccurate accounting for income taxes;" and (3) "[t]hese material weaknesses existed as of December 31, 2015 and had not yet been fully remediated as of December 31, 2017." ¶¶80, 84. Misrepresentations "concerning the design and efficacy of internal controls are actionable." *In re Grupo Televisa Sec. Litig.*, 368 F. Supp. 3d 711, 720 (S.D.N.Y. 2019); *Plumbers & Pipefitters Nat'l Pension Fund v. Davis*, No. 1:16-CV-3591-GHW, 2020 WL 1877821, at *12 (S.D.N.Y. Apr. 14, 2020).

Third, Defendants also represented that Kandi reported no change in cashflow attributable to related-party transactions. ¶¶47-48, 51, 53, 59. Defendants, however, failed to disclose that: (1) Kandi artificially inflated its reported revenues through undisclosed related-party transactions;

---

[3] Defendants suggest that they had no "duty to disclose or correct these things before the 2016 10-K was issued." Motion at 24. "Even when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth." *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014); *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 366 (2d Cir. 2010); *Caiola v. Citibank, N.A., New York*, 295 F.3d 312, 331 (2d Cir. 2002). Defendants also assert that the Hindenburg Report provided no new information. Motion at 24. The Company's stock, however, plunged nearly 25% after the Hindenburg report was issued, demonstrating that the market was reacting to new information, not information that it had already digested. *See In re Vivendi Universal, S.A. Sec. Litig.*, 634 F. Supp. 2d 352, 372 (S.D.N.Y. 2009) ("While defendants argue that . . . the market had already absorbed the news, they can point to no reason why the stock declined").

11

and (2) a substantial amount of Kandi's previous sales had been to undisclosed related parties. ¶¶3-5, 27, 29-30, 33, 36, 38-39, 44, 56, 60, 66, 73, 76, 78, 81, 83, 86-87.

Defendants' argument to the contrary fails. Motion at 23-24. Defendants claim that because Kandi's restatement purportedly had no impact on the Company's net income, it cannot constitute an admission of falsity. Motion at 23. This assertion is meritless. Among other things, Defendants made errors in the classification of Kandi's notes receivable and notes payable in the Company's statement of cash flows. ¶81. As courts have recognized, "we find it beyond dispute that, before making reasonable investment decisions, a reasonable investor would consider [a company's] cash flow . . . to be material information." *U.S. v. Berger*, 473 F.3d 1080, 1103 (9th Cir. 2007). Thus, Plaintiff has adequately alleged falsity.[4]

### B.    Plaintiff Adequately Alleges that Defendants Acted With Scienter

The PSLRA requires plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. §78u-4(b)(2); *Tellabs*, 551 U.S. at 314. Importantly, "courts must consider the complaint in its entirety . . . . The inquiry is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322-23 (italics in original). A strong inference of scienter arises if, "[w]hen the allegations are accepted as true and taken collectively," a "reasonable person would deem the inference of scienter

---

[4] Defendants' reliance on the cases they cite is severely misplaced. In *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553 (S.D.N.Y. 2014), *aff'd,* 604 F. App'x 62 (2d Cir. 2015), the statements at issue involved statements the court found to be "statements of opinion or belief," such as whether the company's product quality was not "superior." *Id.* at 577. No such statements of opinion exist here, where Kandi admitted through its restatement that the Company's financial results were false. ¶78. The same is true for *Rombach v. Chang*, 355 F.3d 164 (2d Cir. 2004), in which there were no false statements alleged based upon a restatement. Similarly, in *In re Magnum Hunter Res. Corp. Sec. Litig.*, 26 F. Supp. 3d 278 (S.D.N.Y. 2014), *aff'd,* 616 F. App'x 442 (2d Cir. 2015), the court noted "the mere fact that financial results were restated is sufficient basis for pleading that those statements were false when made." *Id.* at 295 (citing *Atlas*, 324 F. Supp. 2d at 486). The court then analyzed scienter and noted that the "modest size" of the restatement undermines an inference of fraud. *Id.* Thus, court made no attempt to distinguish *Atlas* and the well-established principle for which it stands: a restatement is in and of itself evidence of contemporaneous falsity.

12

cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324-26. "The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the smoking-gun genre, or even the most plausible of competing inferences" – the inference need only be equally plausible to any non-culpable inference. *Id.* at 324. Moreover, "at the motion to dismiss stage, a tie on scienter goes to the plaintiff." *City of Pontiac Gen. Empls.' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 372 (S.D.N.Y. 2012).

In the Second Circuit, plaintiffs may establish scienter in one of two ways: "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious behavior or recklessness." *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000). "Either set of allegations will suffice to satisfy the necessary scienter element of a securities fraud claim." *Stevelman v. Alias Research Inc.*, 174 F. 3d 79, 84 (2d Cir. 1999). Plaintiff adequately alleges scienter under both prongs of the test.

### 1.    Defendants Had Motive and Opportunity to Commit Fraud

"To show motive and opportunity, plaintiffs must allege a likelihood that defendants could realize 'concrete benefits' through the deception." *Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 100 (2d Cir. 2001); *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 170 (2d Cir. 2000). Such is the case here.

First, Defendants engaged in improper related-party transactions between the Company and Kandi USA, which was owned by the son of CEO Hu. ¶¶27-28. Specifically, AWC determined that when recording transactions with Kandi USA – one of the Company's five largest customers – the Company used a different name for Kandi USA. *Id.* CEO Hu suggested that AWC resolve the issue involving Kandi USA by booking the Company's sales to Kandi USA to a different customer's account. *Id.* AWC complied and also eliminated any references to Kandi USA despite evidence demonstrating that Kandi USA actually purchased the goods. *Id.*

13

Second, Defendants permitted the Company to place large amounts of cash in the personal bank accounts of its officers and employees. ¶¶29-30. For instance, AWC found that one unidentified employee held $3 million of the Company's reported year-end cash balance in a personal account. *Id*. AWC subsequently discovered that the same unidentified individual was holding an additional $2.5 million of the Company's reported year-end cash balance in a different bank account and that CEO Hu held another $1.6 million of the Company's reported year-end cash balance in a personal account. *Id*.

Third, Defendants concealed material transactions between the Company on the one hand and related parties Kandi USA and the Service Company on the other hand. For instance, AWC found transactions between the Company and Kandi USA that did not identify Kandi USA. ¶33. Instead, the Company referred to Kandi USA as Eliteway, which was later revealed to be a trade name for Kandi USA. *Id*. Additionally, pursuant to the joint venture, the Company owned 9.5% of the Service Company and CEO Hu owned both 28.4% of Kandi and 13% of the Service Company. *Id*. ¶¶34-35. On November 2, 2016, Defendants disclosed for the first time that the Company had engaged in material transactions in with Kandi USA using its trade name, Eliteway. ¶75. The total amount of the transactions was identified as $9,888,751. *Id*. Additionally, Defendants disclosed additional related-party transactions with the Service Company resulting in additional receivables due from the Service Company. ¶76. As of December 31, 2016, the receivables totaled $10.4 million. *Id*.

Finally, through their ownership of the joint venture, Defendants benefited from the subsidies provided to producers, and through their ownership of the service company, Defendants similarly benefited from the subsidies provided to purchasers. ¶¶34-37, 56, 60, 66, 70, 76. As a result, engaged in improper double-dipping with respect to subsidies provided by the Chinese

14

government.  *Id*.  These allegations entail "concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged."  *Ganino*, 228 F.3d at 170.

### 2.  Plaintiff Alleges Strong Circumstantial Evidence of Recklessness

Plaintiff has also alleged strong circumstantial evidence of recklessness. "Circumstantial evidence can support an inference of scienter in a variety of ways, including where defendants (1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor."  *Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 306 (2d Cir. 2015).[5]

### a.  Defendants Participated in the Fraud Alleged and Had Access to Information Demonstrating that Their Representations Were False and Misleading

Additionally, Plaintiff adequately alleges that Defendants participated in the fraud alleged and attended meetings during which they had access to information demonstrating that their public statements were false and misleading.  ¶¶27-28, 30, 40-44, 55-56, 60-61, 65-67, 73.  For instance, Defendants engaged in improper related-party transactions between the Company and Kandi USA, which was owned by the son of CEO Hu.  ¶¶27-28.  CEO Hu suggested that AWC resolve the issue involving Kandi USA by booking the Company's sales to Kandi USA to a different customer's account.  *Id*.  Defendants, moreover, permitted the Company to place large amounts of cash in the personal bank accounts of its officers and employees.  ¶¶29-30.

Defendants also attended meetings during which they had access to information demonstrating that their public statements were false and misleading.  For instance, on May 9, 2014, Kandi's Audit Committee held a meeting.  ¶40.  The members of the Audit Committee at

---

[5] As demonstrated above, Plaintiff has adequately alleged that Defendants benefitted in a concrete and personal way from the purported fraud.

15

the time were Defendant Chen, Defendant Lewin, and Defendant Yu. *Id*. The Company's CFO at the time, Xiaoying Zhu ("Zhu"), also attended the meeting. *Id*. During the meeting, the participants discussed matters relating to Kandi's relationship transactions and reviewed a sales contract entered into with Eliteway. *Id*.

After the Audit Committee's meetings in May 2014, the committee did not meet again until March 13, 2015 – three days before the Company filed its Form 10-K for the fiscal year ended December 31, 2014 ("2014 10-K"). ¶44. The Audit Committee members were still Defendant Chen, Defendant Lewin, and Defendant Yu. *Id*. CFO Zhu also attended the meeting, along with Sun, the head of the internal controls department. *Id*. During the meeting, the Audit Committee approved a policy of a related-party transaction relating to the joint venture. *Id*.

On March 7, 2016 – one week before the filing of the Company's Annual Report on Form 10-K for the year ending December 31, 2015 ("2015 10-K") – the Company's Audit Committee met for the first time since its meeting on March 13, 2015. ¶55. The members of the Audit Committee were still Defendant Chen, Defendant Lewin, and Defendant Yu. *Id*. CFO Wang also attended the meeting as well as Sun, the head of the internal audit department. *Id*. During the meeting, CFO Wang identified related-party transactions that took place in 2015. ¶56. Specifically, the Company's management identified two related parties: Kandi USA and the Service Company. *Id*. During the meeting, Company management represented that the Company had not engaged in any related-party transactions with Kandi USA during 2015. *Id*. Management reported that the Company had engaged in related-party transactions with the Service Company, describing the transactions as mainly involving battery sales. *Id*.

On March 22, 2016, the Company's Audit Committee acted by unanimous written consent to ratify a radically different description of the related-party transactions between the Company

16

and the Service Company than discussed during its March 7, 2016 meeting.  ¶60.  In the consent, the Audit Committee approved related-party transactions with the Service Company totaling $42,032,060.  *Id*.  In the same written consent, the Audit Committee also authorized Company management to engage in related-party transactions with the Service Company during the remainder of 2016.  *Id*.

On August 1, 2016, the Audit Committee met.  ¶65.  The members of the Audit Committee continued to be Defendant Chen, Defendant Lewin, and Defendant Yu.  *Id*.  CFO Wang also attended, as well as Sun, the head of the internal audit department.  *Id*.  CFO Wang reported on the Company's related-party transactions for the six months ending June 30, 2016.  *Id*.  According to CFO Wang, sales to the Service Company totaled nearly $4 million, while receivables from the Service Company totaled nearly $11 million.  *Id*.  The Company's management did not identify any other related-party transactions.  *Id*.  During the meeting, the Audit Committee also discussed a decision by the Chinese government to delay its subsidy payments to the joint venture, which affected the Company's outlook for the remainder of the year.  ¶67.  Defendant Lewin suggested that the Company should consider alternatives to mitigate its reliance on the subsidies that the Chinese government was providing to producers and purchasers of electric vehicles.  *Id*.  These allegations illustrate that Defendants "had access to information suggesting that their public statements were not accurate." *Blanford*, 794 F.3d at 306.

### b.    Defendants Failed to Check Information They Had a Duty to Monitor

Plaintiff further alleges that Defendants failed to check information they had a duty to monitor.  ¶¶13-18, 41-43.  For instance, on May 30, 2014, the Company's Audit Committee met. ¶41.   Defendant Chen, Defendant Lewin, and Defendant Yu attended as members of the Company's Audit committee.  *Id*.  The Audit Committee reviewed and approved a new Audit

17

Committee Charter.  *Id.*   The Audit Committee Charter specified the Audit Committee's responsibilities as follows: (1) reviewing the financial reports and other financial related information released by the Company to the public, or in certain circumstances, governmental bodies; (2) reviewing the Company's system of disclosure controls and procedures, internal controls over financial reporting, and compliance with ethical standards adopted by the Company; (3) reviewing the Company's accounting and financial reporting processes and the audits of the financial statements of the Company; (4) reviewing and appraising with management the performance of the Company's independent auditors; (5) providing an open avenue of communication between the independent auditors, financial and senior management, the internal audit function, and the board of directors; and (6) overseeing the registered public accounting firm's (independent auditor's) qualifications and independence.  ¶42.  Additionally, in July 2014, Defendant Yu met with management, the Company's internal audit team, and AWC to review the progress of implementation of the remediation measures and to spearhead a comprehensive remediation plan to fully address the deficiencies in the Company's internal controls.  ¶43.  These allegations constitute circumstantial evidence that Defendants "failed to check information they had a duty to monitor."  *Blanford*, 794 F.3d at 306.

### c. The Termination of AWC as the Company's Auditor Contributes to the Strong Inference of Scienter Alleged

The termination of AWC as Kandi's auditor adds to the strong inference of scienter.  Courts have held that "besides a formal corrective disclosure by a defendant . . . the market may learn of possible fraud from a number of sources [such as] . . . resignations of CFOs or auditors . . . ."  *In re WorldCom, Inc. Sec. Litig.*, No. 02 Civ. 3288, 2005 WL 2319118, at *23 (S.D.N.Y. Sept. 21, 2005); *McIntire v. China MediaExpress Holdings, Inc.*, No. 11 Civ. 0804 VM, 2013 WL 752954, at *16 (S.D.N.Y. Feb. 28, 2013).  Here, on April 12, 2016, the Company's Board of Directors

18

("Board") held a meeting to terminate AWC as the Company's auditor effective immediately. ¶61. The Audit Committee acted by unanimous written consent the same day to replace AWC with BDO China. *Id.* Additionally, on May 18, 2016, the Public Company Accounting Oversight Board ("PCAOB") issued an order instituting disciplinary proceedings against AWC, making findings about AWC's conduct and imposing sanctions on the firm. ¶64. These allegations further support a strong inference of scienter. *See Resh v. China Agritech, Inc.*, No. 214CV05083RGKPJW, 2019 WL 1055240, at *5 (C.D. Cal. Jan. 8, 2019) (a company's termination of an auditor supported a strong inference of scienter).

### d. CFO Wang's Resignation Supports a Strong Inference of Scienter

Coupled with the other allegations of scienter, CFO Wang's resignation also bolsters the strong inference of scienter alleged. *See, e.g.*, *comScore*, 268 F. Supp. 3d at 553 ("The timing and circumstances surrounding the resignations . . . also contribute to the inference of scienter"); *Ho v. Duoyuan Global Water, Inc*., 887 F. Supp. 2d 547, 575 (S.D.N.Y. 2012). Here, **less than two weeks** after Defendants disclosed that the Company had engaged in material transactions with Kandi USA (owned by the son of CEO Hu), the Company announced the abrupt resignation of CFO Wang. ¶¶75-77. Such resignations "although not sufficient in and of themselves, add to the overall pleading of circumstantial evidence of fraud." *In re Scottish Re Grp. Sec. Litig*., 524 F. Supp. 2d 370, 394 n.176 (S.D.N.Y. 2007).

### e. Defendants' GAAP Violations Add to the Strong Inference of Scienter Alleged

Defendants' GAAP violations add to the strong inference of scienter alleged. Violations of GAAP, along with allegations of "corresponding fraudulent intent," can show scienter. *Novak*, 216 F.3d at 309; *Peifa Xu v. Gridsum Holding Inc.*, No. 18 CIV. 3655 (ER),

19

2020 WL 1508748, at \*12 (S.D.N.Y. Mar. 30, 2020). Here, Defendants violated GAAP which required the disclosure of material related party transactions. ¶36. Specifically, Financial Accounting Standards Board ("SFAS") 57 requires that "[f]inancial statements shall include disclosures of material related party transactions." *Id*. Defendants structured the joint venture and Service Company to enable Kandi to take advantage of subsidies that the Chinese government made available to producers and purchasers of electric vehicles. ¶37. As a result, Defendants violated GAAP (including, but not limited to, SFAS No. 57), and engaged in improper double-dipping with respect to subsidies provided by the Chinese government. *Id*. Indeed, Kandi conceded in its 2016 10-K that it had failed to separately identify certain related party accounts on the face of the Company's balance sheets and income statements. ¶81. Thus, Defendants' GAAP violations bolster the strong inference of scienter alleged. *Freudenberg v. E\*Trade Financial Corp*., 712 F. Supp. 2d 171, 199-200 (S.D.N.Y. 2010).

### f.    Defendants' Accounting Experience Further Supports a Strong Inference of Scienter

The fact that CFO Wang and CFO Mei are Certified Public Accountants ("CPAs") further supports the strong inference of scienter alleged. *See, e.g., Richard v. Northwest Pipe Co*., No. C9-5724RBL, 2011 WL 3813073, at \*4 (W.D. Wash. Aug. 26, 2011) ("plaintiffs convincingly argue[] that defendants, who were both CPAs and had extensive accounting experience, should have known of the falsity of their statements"); *SEC v. Escala Grp., Inc*., No. 09 Civ. 2646 (DLC), 2009 WL 2365548, at \*13 (S.D.N.Y. July 31, 2009) (holding that defendants' status as a licensed CPA was relevant in the scienter analysis). Here, CFO Wang has over 20 years of international financial management experience (including serving as CFO of another publicly traded company) and holds certifications as both a CPA and a Certified Internal Auditor. ¶14. Similarly, CFO Mei previously served as CFO of several publicly traded companies, has over 15 years of accounting

20

experience and is a CPA in the State of Maryland.  ¶15.  Thus, "[a]s the head of finance, [the CFO] cannot now credibly claim ignorance of the general disclosure requirements imposed on a publicly traded company with respect to its outside auditors or the need to truthfully report corporate information to the SEC."  *United States v. Ruehle*, 583 F.3d 600, 610 (9th Cir. 2009); *see also In re OCA, Inc. Sec. and Derivative Litigation*, No. 05-2165, 2006 WL 3747560, at *19 (E.D. La. Dec. 14, 2006) (allegations that a defendant "was trained as a certified public accountant and that he had significant accounting, auditing and SEC reporting experience" suggest "an extreme departure from ordinary care by a chief financial officer with this experience and background.").

When considering these facts collectively – as the Court is required to do under *Tellabs* (551 U.S. at 323) – Plaintiff has adequately alleged scienter.

### C.    Plaintiff's Claims Are Not Barred by the Statute of Limitations

In an argument recycled from their previous motion to dismiss (*see* Doc. 43 at 13-16), Defendants claim that Plaintiff's claims are barred by the statute of limitations.  Defendants' contention fails now just as it did then.

The Exchange Act provides that "a private right of action that involves a claim of fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws . . . may be brought not later than the earlier of: (1) 2 years after the discovery of the facts constituting the violation; or (2) 5 years after such violation."  28 U.S.C. §1658.  The filing period commences "when the plaintiff discovers (or should have discovered) the securities-law violation."  *California Pub. Employees' Ret. Sys. v. ANZ Sec., Inc.*, 137 S. Ct. 2042, 2049 (2017).  A securities-law violation is discovered when the plaintiff learns "sufficient information about [the violation] to . . . plead it in a complaint" with enough "detail and particularity to survive a [Federal Rule of Civil Procedure] 12(b)(6) motion to dismiss."  *City of Pontiac Gen. Employees'*

21

*Ret. Sys. v. MBIA, Inc.*, 637 F.3d 169, 175 (2d Cir. 2011); *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 95 (2d Cir. 2018).

Although Defendants claim that "this is not a matter of inquiry notice" (Motion at 13), Defendants clearly attempt to rely upon a standard which is no longer valid due to the Supreme Court's decision in *Merck & Co. v. Reynolds*, 559 U.S. 633, 651-53 (2010). For instance, Defendants repeatedly suggest that: (1) "the Second Amended Complaint was filed more than two years after a reasonable investor would have been put *on notice* of any alleged false statements or omissions;" (2) "Plaintiff and all other reasonable investors were put *on notice* of the claims asserted in the Second Amended Complaint by the issuance of the Restatement on March 16, 2017;" (3) "the announcement of the Restatement in March 2017 put Plaintiff *on notice* of the alleged internal control issues and supposed misstatements in the Financial Statements;" and (4) the Dismissed Action "is sufficient to put Plaintiff *on notice*." Motion at 2, 12-13.

The Supreme Court made it clear, however, that "discovery" is the event that triggers the limitations period for the claims asserted, not "notice." *Merck*, 559 U.S. at 651-53. In fact, the Supreme Court drew a sharp distinction between these two concepts, holding that if "inquiry notice refers to the point where the facts would lead a reasonably diligent plaintiff to investigate further, that point is not necessarily the point at which the plaintiff would already have discovered facts" constituting a violation of the securities laws. *Id.* at 651. Accordingly, the Supreme Court rejected the "inquiry notice" standard to which Defendants repeatedly rely in their Motion. *Id.* Importantly, ***"[i]t is Defendants' burden to show how these events did alert or should have alerted Plaintiff to discover facts with sufficient detail and particularity to demonstrate each element of the alleged violations, including the scienter of each Defendant***." *Washington State Inv. Bd. v. Odebrecht S.A.*, 461 F. Supp. 3d 46, 62 (S.D.N.Y. 2020).

22

Here, Defendants identify no event through which Plaintiff should have gained sufficient information to plead with enough detail and particularity to survive a motion to dismiss, including scienter. On the contrary, although Defendants attempt to rely heavily upon the Company's Restatement and the decision in *Kandi* to suggest that Plaintiff's claims are barred, Defendants simultaneously contend that they made no false or misleading statements at all and that they acted without scienter. "Under the discovery rule standard, though, the statute of limitations would not start running until the plaintiffs could have plausibly pled their claims." *Ontario Teachers' Pension Plan Bd. v. Teva Pharm. Indus. Ltd.*, 432 F. Supp. 3d 131, 180 (D. Conn. 2019). Indeed, "the fact that different plaintiffs had made allegations against similar defendants in another case does not render [a plaintiff's] claims untimely." *Lickteig v. Cerberus Cap. Mgmt., L.P.*, No. 1:19-CV-5263-GHW, 2020 WL 1989424, at \*8 (S.D.N.Y. Apr. 26, 2020). Moreover, the fact that *Kandi* was dismissed supports Plaintiff's position – that for purposes of the statute of limitations, in the court's opinion, *Kandi **did not*** plausibly plead claims under the Exchange Act.

Defendants cannot simultaneously assert that they made no false and misleading statements and acted without scienter, and yet claim that sufficient information was nevertheless discoverable at some unspecified point in time to enable Plaintiff to successfully plead violations of the Exchange Act. *See, e.g.*, *Charles Schwab*, 883 F.3d at 95 ("Even if UBS's SEC filing would have led a reasonable investor to investigate the possibility of fraud, such inquiry notice does not automatically begin the running of the limitations period for Securities Exchange Act claims"); *Booth v. Strategic Realty Tr., Inc.*, No. 13-CV-04921-JST, 2014 WL 3749759, at \*6 (N.D. Cal. July 29, 2014) ("Just because [defendants] acknowledged a lack of control in one specific area in summer 2012 . . . how much additional time was needed to properly trigger discovery under the

23

one-year statute of limitations is a question that is best addressed after the development of a sufficient factual record.").

Finally, citing *Denny v. Barber*, 576 F.2d 465 (2d Cir. 1978) and *Podany v. Robertson Stephens, Inc.*, 318 F. Supp. 2d 146 (S.D.N.Y. 2004), Defendants claim that "it would be temporally impossible for Defendants to have relied on events in 2020 (the Short Report) in making statements that occurred as early as March 2015." Motion at 15. Defendants' assertion, however, completely misses the mark. The analysis for purposes of the statute of limitations is not whether Defendants had access to the Hindenburg Report, but whether Plaintiff learned of sufficient information about the violation to plead it with enough detail and particularity to survive a motion to dismiss. *MBIA*, 637 F.3d at 175; *Charles Schwab*, 883 F.3d at 95. Indeed, Defendants claim that the Hindenburg Report adduces no facts "as it relates to evidence of conscious misbehavior or recklessness." Motion at 21. Because Defendants have not satisfied their burden of demonstrating "how these events did alert or should have alerted ***Plaintiff*** to discover facts with sufficient detail and particularity to demonstrate each element of the alleged violations, ***including the scienter of each Defendant***" (*Odebrecht*, 461 F. Supp. 3d at 62), Defendants' argument fails.[6]

---

[6] Defendants' cases are distinguishable. In *Schiro v. Cemex, S.A.B. de C.V.*, 438 F. Supp. 3d 194 (S.D.N.Y. 2020), the Company disclosed that senior executives had paid bribes in connection with certain transactions, which the court held sufficient to trigger the running of the statute of limitations. *Id*. at 201. Similarly, in *Gavin/Solmonese LLC v. D'Arnaud-Taylor*, 639 F. App'x 664, 668 (2d Cir. 2016), the court found that information that "Defendants had misrepresented facts when soliciting investors" was previously available, thereby triggering the statute of limitations. *Id*. at 668. In *FirstBank Puerto Rico, Inc. v. La Vida Merger Sub, Inc*., 638 F.3d 37 (1st Cir. 2011), the court held that plaintiffs had actual notice of their claims, including defendants' scienter. *Id*. at 40. Here, however, Defendants argue the ***opposite*** – they contend that Defendants' disclosures ***do not*** evidence scienter. Motion at 20-21. Additionally, *Dodds v. Cigna Sec., Inc*., 12 F.3d 346, 351 (2d Cir. 1993), *Armstrong v. McAlpin*, 699 F.2d 79, 88 (2d Cir. 1983), and *Donoghue v. Am. Skiing Co*., 155 F. Supp. 2d 70, 75 (S.D.N.Y. 2001), discuss inquiry notice as the event triggering the applicable statute of limitations – a principle which the Supreme Court rejected in *Merck*. 559 U.S. at 651-53. Additionally, *Hopkinson v. Est. of Siegal*, No. 10 CIV. 1743 LBS, 2011 WL 2935876 (S.D.N.Y. July 12, 2011) is completely inapplicable because it is not a securities fraud class action. Defendants, moreover, mischaracterize the holding in *Hopkinson*. Contrary to Defendants' representation (Motion at 14), the court stated that it "did not hold that [a prior] complaint alone was sufficient [to place plaintiff on notice of fraud] but that, considered in concert with the other information at Plaintiff's disposal" should have alerted Plaintiff. *Id*. at *2-3. The "other information" in *Hopkinson* – including a letter sent from the Internal Revenue Service to the plaintiff – bears no relation to the facts here. Defendants also claim that "a number of the claims contained in the Second Amended Complaint are also barred by the statute of repose applicable to securities fraud claims because more than five years have passed from the making

24

### D.      Plaintiff Adequately Alleges Control Person Liability

In the Second Circuit, a control person liability claim under §20(a) has two elements: "(1) a primary violation by a controlled person; and (2) direct or indirect control of the primary violator by the defendant." *In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 414 (S.D.N.Y. 2003). "Allegations of control are not averments of fraud and therefore need not be pleaded with particularity." *In re Parmalat Sec. Litig.*, 414 F. Supp. 2d 428, 440 (S.D.N.Y. 2006). Thus, "[t]hey need satisfy only the less stringent requirements of Fed.R.Civ.P. 8." *Id.*; *In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 396 (S.D.N.Y. 2003). Whether a person is a "controlling person" is a fact-intensive inquiry the courts generally do not resolve on a motion to dismiss. *In re Oxford Health Plans, Inc. Sec. Litig.,* 187 F.R.D. 133, 143 (S.D.N.Y.1999). Contrary to Defendants' assertion (Motion at 24-25) – and as demonstrated above – Plaintiff has adequately pled a primary violation and has also sufficiently alleged the Individual Defendants' control over the Company. ¶¶13-24, 114-118; 15 U.S.C. §78t(a).[7]

### V.      CONCLUSION

For the foregoing reasons, the Court should deny Defendants' Motion. Alternatively, if the Court grants any portion of the Motion, Plaintiff respectfully requests leave to amend. *See Luce v. Edelstein*, 802 F.2d 49, 56 (2d Cir. 1986) ("Complaints dismissed under Rule 9(b) are almost always dismissed with leave to amend.").

---

of the challenged statements and the filing of the Complaint." Motion at 12 n.6. However, the Class Period begins on June 10, 2015 (¶49), and therefore the challenged statements fall within five years of the filing of the Complaint. Thus, the statute of repose does not bar Plaintiff's claims.

[7] Despite reference to culpable participation in *ATSI Comms., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007) (Motion at 25), district courts in this Circuit have held that such allegations are not required to state a control person claim. *See, e.g.*, *In re Parmalat Sec. Litig.*, 497 F. Supp. 2d 526, 532 n.42 (S.D.N.Y. 2007). *Parmalat* noted that *ATSI*'s reference to culpable participation was *dictum*. *Id.*; *see also Initial Pub. Offering*, 241 F. Supp. 2d at 396 ("scienter is not an essential element of a Section 20(a) claim"). Even if culpable participation were required, however, Plaintiff has adequately alleged it through allegations demonstrating Defendants' scienter. *Cornwell v. Credit Suisse Grp.*, 689 F. Supp. 2d 629, 639 (S.D.N.Y. 2010).

DATED:  January 28, 2022                **GLANCY PRONGAY & MURRAY LLP**

By:   *s/ Ex Kano S. Sams II*
                                   
Robert V. Prongay (admitted *pro hac vice*)
Ex Kano S. Sams II (admitted *pro hac vice*)
Charles H. Linehan (admitted *pro hac vice*)
Pavithra Rajesh
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: esams@glancylaw.com

*Counsel for Lead Plaintiff Tom Brooks and the Class*

**LAW OFFICES OF HOWARD G. SMITH**
Howard G. Smith
3070 Bristol Pike, Suite 112
Bensalem, PA 19020
Telephone: (215) 638-4847
Facsimile: (215) 638-4867

*Additional Counsel*

**PROOF OF SERVICE**

I, the undersigned say:

I am not a party to the above case and am over eighteen years old.

On January 28, 2022, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Southern District of New York, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on January 28, 2022.

*s/ Ex Kano S. Sams II*
Ex Kano S. Sams II