# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Srinivasan Venkataraman, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>Kandi Technologies Group, Inc., Xiaoming Hu, Cheng Wang, Bing Mei, Liming Chen, Jerry Lewin, and Henry Yu,<br><br>Defendants. | Civil Action No. 20 CIV. 8082 (DEH)<br><br><br>**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR CLASS CERTIFICATION** |

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................ 1

II.     STATEMENT OF FACTS AND RELEVANT PROCEDURAL HISTORY ........................ 3

III.    ARGUMENT ...................................................................................................... 8

      A.      Securities Fraud Actions Are Ideally Suited For Class Certification ............................. 8

      B.      The Proposed Class Satisfies the Prerequisites of Rule 23(a) ..................................... 10

              1.      The Class is so Numerous that Joinder of All Class Members is Impracticable ................................................................................... 11

              2.      Questions of Law and Fact Are Common to Members of the Class ................ 12

              3.      Plaintiff's Claims Are Typical of Those of the Class ................................... 13

              4.      Plaintiff Will Fairly and Adequately Protect the Interests of the Class ........... 14

      C.      The Proposed Class Satisfies Rule 23(b)(3) ..................................................... 15

              1.      Common Questions of Law and Fact Predominate Over Individual Questions ................................................................................... 16

                     (a)     The Company Had a High Trading Volume During the Class Period. 17

                     (b)     A Sufficient Number of Analysts Covered the Company to Support a Finding of Market Efficiency ................................................. 18

                     (c)     The Company Had a Substantial Number of Market Makers ................................................................................... 19

                     (d)     The Company Was Eligible to File Form S-3 Registration Statements ................................................................................... 20

                     (e)     There Was a Cause and Effect Between The Company's News and Its Stock Price Movement ................................................. 21

    (f)  Other  Considerations  Further  Demonstrate  Market
      Efficiency ................................................................................................ 22

  2.  Damages Can Be Established on a Class-Wide Basis .................................... 24

  3.  A Class Action is Superior to Other Methods of Adjudication ....................... 24

IV. CONCLUSION .......................................................................................................... 25

**TABLE OF AUTHORITIES**

<u>CASES</u>

*Amchem Prods., Inc. v. Windsor*,
   521 U.S. 591 (1997)................................................................................... 14, 19, 20

*Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*,
   568 U.S. 455 (2013)......................................................................................... 14, 20

*Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*,
   222 F.3d 52 (2d Cir. 2000)...................................................................................... 18

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988)................................................................................................ 20

*Cammer v. Bloom*,
   711 F. Supp. 1264 (D.N.J. 1989) ........................................................... 20, 21, 22, 24

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
   310 F.R.D. 69 (S.D.N.Y. 2015) ............................................................................. 24

*Chauhan v. Intercept Pharms.*,
   2021 WL 235890 (S.D.N.Y. Jan. 25, 2021) ........................................................... 19

*Cheney v. Cyberguard Corp.*,
   213 F.R.D. 484 (S.D. Fla. 2003)...................................................................... 22, 27

*Consol. Rail Corp. v. Town of Hyde Park*,
   47 F.3d 473 (2d Cir. 1995)..................................................................................... 15

*Dura Pharms., Inc. v. Broudo*,
   544 U.S. 336 (2005)............................................................................................... 12

*Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*,
   268 F. Supp. 3d 526 (S.D.N.Y. 2017).............................................................. 10, 11

*Green v. Wolf Corp.*,
   406 F.2d 291 (2d Cir. 1968).............................................................................. 12, 14

*Halliburton Co. v. Erica P. John Fund, Inc.*,
   573 U.S. 258 (2014)............................................................................................... 25

*In re Aphria, Inc. Sec. Litig.*,
   342 F.R.D. 199 (S.D.N.Y. 2022) ........................................................................... 15

*In re Avon Sec. Litig.*,
1998 WL 834366 (S.D.N.Y. Nov. 30, 1998) .............................................................................. 13

*In re Blech Sec. Litig.*,
187 F.R.D. 97 (S.D.N.Y. 1999) .............................................................................. 12, 14

*In re Deutsche Telekom Ag Sec. Litig.*,
229 F. Supp. 2d 277 (S.D.N.Y. 2002) .............................................................................. 12, 15

*In re Facebook, Inc., IPO Sec. & Derivative Litig.*,
312 F.R.D. 332 (S.D.N.Y. 2015) .............................................................................. 17

*In re Grupo Televisa Sec. Litig.*,
368 F. Supp. 3d 711 (S.D.N.Y. 2019) .............................................................................. 10

*In re NIO, Inc. Sec. Litig.*,
2023 WL 5048615 (E.D.N.Y. Aug. 8, 2023) ......................................................................... *passim*

*In re Petrobras,*
*Sec.*, 862 F.3d 250 (2d Cir. 2017) .............................................................................. 19, 25

*In re Synchrony Fin. Sec. Litig.*,
2023 WL 1503032 (D. Conn. Feb. 3, 2023) ......................................................................... *passim*

*In re Xcelera.com Sec. Litig.*,
430 F.3d 503 (1st Cir. 2005) .............................................................................. 21, 22

*Kinney v. Capstone Turbine Corp.*,
2016 WL 5341948 (C.D. Cal. Feb. 29, 2016) .......................................................................... 19

*Korn v. Franchard Corp.*,
456 F.2d 1206 (2d Cir. 1972) .............................................................................. 13

*Krogman v. Sterritt*,
202 F.R.D. 467 (N.D. Tex. 2001) .............................................................................. 20, 26

*Martinek v. AmTrust Fin. Servs., Inc.*,
2022 WL 326320 (S.D.N.Y. Feb. 3, 2022) .......................................................................... 17, 18

*McIntire v. China MediaExpress Holdings, Inc.*,
38 F. Supp. 3d 415 (S.D.N.Y. 2014) .............................................................................. 13, 15, 16, 26

*Richards v. FleetBoston Fin. Corp.*,
235 F.R.D. 165 (D. Conn. 2006) .............................................................................. 13

*Robidoux v. Celani*,
   987 F.2d 931 (2d Cir. 1993)........................................................................ 15, 17

*Schaub v. Mullen Auto., Inc.*,
   2022 WL 18277984 (C.D. Cal. Aug. 4, 2022)....................................................... 19

*Set Capital LLC v. Credit Suisse Grp. AG*,
   996 F.3d 64 (2d Cir. 2021).............................................................................. 11

*Shah v. Zimmer Biomet Holdings, Inc.*,
   2020 WL 2570050 (N.D. Ind. May 21, 2020) ......................................................... 19

*Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier Inc.*,
   546 F.3d 196 (2d Cir. 2008)............................................................................. 13

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
   551 U.S. 308 (2007)..................................................................................... 12

*Venkataraman v. Kandi Techs. Grp., Inc.*,
   2022 WL 4225562 (S.D.N.Y. Sept. 13, 2022)............................................... 9, 10, 11

*Villella v. Chem. & Mining Co. of Chile Inc.*,
   333 F.R.D. 39 (S.D.N.Y. 2019) ........................................................................ 22

*Waggoner v. Barclays PLC*,
   875 F.3d 79 (2d Cir. 2017)............................................................................. 25

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011)..................................................................................... 16

*Wilson v. LSB Indus., Inc.*,
   2018 WL 3913115 (S.D.N.Y. Aug. 13, 2018)................................................... *passim*

## RULES

Fed. R. Civ. P. 23(a) ........................................................................................ 14, 19
Rule 23 of the Federal Rules of Civil Procedure ............................................................. 5, 6, 29
Rule 23(a)(1)................................................................................................. 15
Rule 23(a)(2)................................................................................................. 16
Rule 23(a)(3)................................................................................................. 17
Rule 23(a)(4)................................................................................................. 18
Rule 23(b)(3)................................................................................................. 19, 28

## REGULATIONS

17 C.F.R. § 229.404 ......................................................................................... 11

Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Lead Plaintiff Tom Brooks ("Plaintiff") hereby moves to certify this case as a class action, appoint Plaintiff as a class representative, and appoint Lead Counsel as Class Counsel.[1]

## I.       INTRODUCTION

This action asserts claims pursuant to the Securities Exchange Act of 1934 ("Exchange Act") and Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder against Kandi and certain of its current and former officers for making false and misleading statements and omissions between June 10, 2015 and March 13, 2017, inclusive ("Class Period").[2] Plaintiff alleges that during the Class Period, Defendants misrepresented the Company's financial results and operations in violation of the Exchange Act.   Specifically, Defendants: (1) falsely reported the Company's financial results for 2014, 2015, and the first three quarters of 2016 – financial results that the Company ultimately restated; (2) falsely attested to the accuracy of the Company's financial statements, the disclosure of material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud pursuant to the Sarbanes Oxley Act of 2002 ("SOX"); (3) falsely reported no change in cashflow attributable to related party

---

[1]       Unless otherwise stated, all Rules references are to the Federal Rules of Civil Procedure. Defendants are: (1) Kandi Technologies Group, Inc. ("Kandi" or the "Company"); (2) Xiaoming Hu ("Hu"); (3) Cheng Wang ("Wang"); (4) Liming Chen ("Chen"); (5) Jerry Lewin ("Lewin"); and (6) Henry Yu ("Yu") (collectively "Defendants").  Defendants Hu, Wang, Chen, Lewin, and Yu are collectively the "Individual Defendants."

[2]       Plaintiff moves to certify the following class: all persons and entities who purchased or otherwise acquired Kandi securities from June 10, 2015, and March 13, 2017, inclusive, and were damaged thereby ("Class").  Excluded from the Class are: (1) Defendants; (2) any person who served as a partner, control person, officer and/or director of the Company during the Class Period, and members of their immediate families; (3) present and former parents, subsidiaries, assigns, successors, affiliates, and predecessors of the Company; (4) any entity in which Defendants have or had a controlling interest; (5) any trust of which an Individual Defendant is the settler or which is for the benefit of an Individual Defendant and/or member(s) of their immediate families; (6) Defendants' liability insurance carriers; and (7) the legal representatives, heirs, successors, predecessors, and assigns of any person or entity excluded under provisions (1) through (6) herein.

1

transactions; and (4) falsely misrepresented the efficacy of the Company's internal controls. When Defendants disclosed the truth, the Company's stock price plummeted, causing substantial losses to investors.

This case is apt for class certification. Recognizing the significant role of class actions in protecting investors, courts liberally construe the requirements of Rule 23 in favor of class certification and have repeatedly recognized that class certification is appropriate in similar situations. Class certification is proper here because: (1) the Class is so numerous that joinder of all members is impracticable; (2) there are questions of law and fact common to the Class; (3) the claims or defenses of the representative party are typical of the claims or defenses of the Class; and (4) the representative party will fairly and adequately protect the interests of the Class. Class certification is also proper because the questions of law or fact common to class members predominate over any questions affecting only individual members and because a class action is superior to other available methods for fairly and effectively adjudicating the controversy. Moreover, Plaintiff is entitled to rely upon the fraud-on-the-market presumption of reliance because the market for the Company's securities was efficient and because issues common to the Class predominate over any individual issues. To demonstrate market efficiency, Plaintiff has submitted the Declaration of Dr. Adam Werner, a renowned expert who has conducted a comprehensive analysis of the Company's market efficiency.[3]

Class certification will enable Plaintiff and thousands of other similarly situated investors to efficiently prosecute this action to seek remedies for their losses. Accordingly, the Court should

---

[3]    *See* Declaration of Ex Kano S. Sams II in Support of Plaintiff's Motion for Class Certification ("Sams Decl."), Exhibit ("Ex.") A.

certify this case as a class action, appoint Plaintiff as a class representative, and appoint Glancy Prongay & Murray LLP ("GPM") as Class Counsel.

## II.   STATEMENT OF FACTS AND RELEVANT PROCEDURAL HISTORY

Kandi manufactures and distributes EV, EV parts, and off-road vehicles.   ¶25.[4] Throughout the Class Period, Defendants made false and misleading statements regarding the Company's financial statements and operations that Defendants knew, or were reckless in not knowing, were false and misleading.  For instance, on March 7, 2016 – one week before the filing of the Company's Form 10-K for the year ending December 31, 2015 ("2015 10-K") – the Company's Audit Committee met for the first time since its meeting on March 13, 2015. ¶55.  The members of the Audit Committee were Defendant Chen, Defendant Lewin, and Defendant Yu. *Id*. Chief Financial Officer ("CFO") Wang also attended the meeting as well as Chenming Sun ("Sun"), the head of the internal audit department. *Id*.  During the meeting, CFO Wang identified related-party transactions that took place in 2015.  ¶56.  Specifically, the Company's management identified two related parties: Kandi USA and the Service Company. *Id*.  During the meeting, Company management represented that the Company had not engaged in any related-party transactions with Kandi USA during 2015. *Id*.  Management reported that the Company had engaged in related-party transactions with the Service Company, describing the transactions as mainly involving battery sales. *Id*.

On March 22, 2016, the Company's Audit Committee acted by unanimous written consent to ratify a radically different description of the related-party transactions between the Company and the Service Company than discussed during its March 7, 2016 meeting.  ¶60.  In the consent,

---

[4]   Unless otherwise indicated, all paragraph ("¶") references are to Plaintiff's Second Amended Complaint for Violation of the Federal Securities Laws ("Complaint").

the Audit Committee approved related-party transactions with the Service Company totaling $42,032,060. *Id*. In the same written consent, the Audit Committee also authorized Company management to engage in related-party transactions with the Service Company during the remainder of 2016. *Id*.

On August 1, 2016, the Audit Committee met to review the Company's Form 10-Q for the quarter ending June 30, 2016. ¶65. The members of the Audit Committee continued to be Defendant Chen, Defendant Lewin, and Defendant Yu. *Id*. CFO Wang also attended, as well as Sun, the head of the internal audit department. *Id*. CFO Wang reported on the Company's related-party transactions for the six months ending June 30, 2016. *Id*. According to CFO Wang, sales to the Service Company totaled nearly $4 million, while receivables from the Service Company totaled nearly $11 million. *Id*. The Company's management did not identify any other related-party transactions. *Id*. During the meeting, the Audit Committee also discussed a decision by the Chinese government to delay its subsidy payments to the joint venture, which affected the Company's outlook for the remainder of the year. ¶67. Defendant Lewin suggested that the Company should consider alternatives to mitigate its reliance on the subsidies that the Chinese government was providing to producers and purchasers of electric vehicles. *Id*.

In September 2016, the Chinese government decided to phase out the subsidies. ¶70. This decision followed a months-long investigation into the Company and other Chinese manufacturers who appeared to have structured their operations to take advantage of subsidies as both producers and purchasers of vehicles. *Id*.

On November 2, 2016, Defendants disclosed for the first time that the Company had engaged in material transactions with Kandi USA (owned by the son of CEO Hu) using its trade name, Eliteway. ¶75. Defendants further disclosed that the Company had engaged in material

4

transactions with Kandi USA, again using the trade name Eliteway. *Id*. The total amount of the transactions was identified as $9,888,751. *Id*. Additionally, Defendants disclosed additional related-party transactions with the Service Company resulting in additional receivables due from the Service Company. ¶76. As of December 31, 2014, the receivables totaled over $40 million. *Id*. As of December 31, 2016, the receivables totaled $10.4 million. *Id*. On November 14, 2016, the Company announced the abrupt resignation of Defendant Wang as the CFO. ¶77. On this news, shares of Kandi fell more than 10%. *Id*.

On March 13, 2017, the Company revealed that its previously issued financial statements for the years ended December 31, 2015 and 2014, and the first three quarters for the year ended December 31, 2016 will need to be restated. ¶78. On March 16, 2017, the Company admitted that there were material weaknesses in the Company's internal controls. ¶80. Kandi conceded that, among other things, it had made "errors" in the classification of notes receivable and notes payable in its statement of cash flows, it had failed to separately identify certain related party accounts on the face of the Company's balance sheets and income statements, and it had improperly accounted for the Company's equity investment in the JV Company. ¶81. On this news, shares of Kandi fell $0.30 per share, or approximately 6%, from the previous closing price to close at $4.05 per share on March 14, 2017, further damaging investors. ¶79.

On March 16, 2018, the Company filed a Form 10-K for the fiscal year ended December 31, 2017 ("2017 10-K") with the SEC confirming that its internal controls over financial reporting ("ICFR") were not effective as of December 31, 2017. ¶84. On November 30, 2020, Hindenburg Research published a report on Kandi entitled "Kandi: How This China-Based NASDAQ Listed Company Used Fake Sales, EV Hype to Nab $160 Million From U.S. Investors." ¶¶85-88.

After Defendants filed a motion to dismiss the operative Complaint, Judge Schofield issued an order on September 13, 2022, largely denying Defendants' motion. *Venkataraman v. Kandi Techs. Grp., Inc.*, No. 20 CIV. 8082 (LGS), 2022 WL 4225562 (S.D.N.Y. Sept. 13, 2022) ("Order").  In the Order, Judge Schofield held that:

> The SAC sufficiently and specifically alleges that the statements about related-party transactions during the class period were false to the extent they concealed transactions with the Service Company. The SAC alleges that beginning in the 2015 10-K -- which was incorporated by reference in statements in the later 10-Qs that there had been "no change" in cash flow from related parties -- the only related-party transactions Kandi disclosed were with its subsidiary Kandi USA, sometimes under the trade name Eliteway. The SAC also alleges that Kandi had been engaging in related-party transactions with the Service Company throughout 2015 and 2016. The more general statements in the SOX certifications about the accuracy of the financial statements and the disclosure of fraud are sufficiently alleged to be false to the same extent as the more specific misstatements (and only to that extent).
>
> * * *
>
> The SAC also specifically alleges that, beginning with the 2015 10-K, Kandi's statements about material weaknesses in internal controls were false. *In re Grupo Televisa Sec. Litig.*, 368 F. Supp. 3d 711, 720 (S.D.N.Y. 2019) ("Misstatements made in its certifications concerning the design and efficacy of internal controls are actionable."). In its 2017 10-K, Kandi disclosed that newly discovered "material weaknesses existed as of December 31, 2015 and had not yet been fully remediated as of December 31, 2017." Contrary to Defendants' argument, this is not an allegation of "fraud by hindsight," but rather an admission by Kandi that earlier statements were false when made. *Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 544 (S.D.N.Y. 2017) ("Although a restatement is not an admission of wrongdoing, the mere fact that financial results were restated is sufficient basis for pleading that those statements were false when made." (internal quotation marks omitted)).

*Id*. at *5–6. Judge Schofield also ruled that "[t]he SAC alleges facts supporting a 'strong inference of scienter' with respect to the first category, related-party transactions, and the second, internal controls, to the extent material weaknesses pertained to reporting of related-party transactions." *Id*. at *6.  Specifically, the Court determined that "[t]he SAC alleges the requisite strong inference of scienter as to each of the Defendants except for Defendant Mei." *Id*. at *7.

6

Judge Schofield held that "the SAC sufficiently pleads that Defendants Hu and Kandi had a motive and opportunity to commit fraud." *Id*.  Regarding the scienter of the other Defendants, Judge Schofield ruled that:

> The SAC pleads sufficient circumstantial evidence of recklessness or conscious misbehavior as to Defendants Chen, Lewin, Yu and Wang because the SAC plausibly alleges that they "knew facts or had access to information suggesting that their public statements were not accurate." *Set Cap.*, 996 F.3d at 79. The SAC alleges that, on March 7, 2016, Defendants Chen, Lewin, Yu and Wang attended a meeting of Kandi's Audit Committee at which "management identified two related parties" including "the Service Company," and "reported that the Company had engaged in related-party transactions with the Service Company" in 2015. The SAC also alleges that, on August 1, 2016, those same Defendants attended another Audit Committee meeting, and Wang reported to the others that "for the six months ending June 30, 2016" "sales to the Service Company totaled nearly $4 million, while receivables from the Service Company totaled nearly $11 million."
>
> The Audit Committee's awareness of related-party transactions was consistent with the stated procedures for such transactions as represented in Kandi's 2014 10-K, issued shortly before the beginning of the Class Period. Those procedures specified that Kandi's "definition of a 'Related Party' is in line with the definition set forth in the instructions to Item 404(a) of regulation S-K promulgated by the SEC." The relevant regulatory definition, in turn, defines "[t]ransactions with related persons" as those "in which any related person had or will have a direct or indirect material interest," and a "related person" includes "[a]ny director or executive officer of the registrant." 17 C.F.R. § 229.404. Defendants do not dispute that the transactions with the Service Company, in which Defendant Hu, Kandi's CEO, held a significant stake, qualifies as a related-party transaction. The written policy makes clear that Defendants were aware of the reporting requirements for related-party transactions during the Class Period. Defendants' alleged knowledge of the existence of the transactions and of the requirements for reporting them, at the time Defendants signed off on reports omitting those transactions, is sufficient circumstantial evidence of recklessness or conscious misbehavior.

*Id*. at \*7-\*8.

After the Court's Order, the parties engaged in discovery (in accordance with the stay of discovery imposed by the Private Securities Litigation Reform Act of 1995 during the pendency of a motion to dismiss).  The documents produced by Defendants and the testimony of the

7

Individual Defendants have confirmed that Defendants made false and misleading statements during the Class Period and that Defendants acted with scienter.

## III.     ARGUMENT

### A.     Securities Fraud Actions Are Ideally Suited For Class Certification

The Supreme Court "has long recognized that meritorious private actions to enforce federal antifraud securities laws are an essential supplement to criminal prosecutions and civil enforcement actions brought, respectively, by the Department of Justice and the Securities and Exchange Commission (SEC)." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 313 (2007).[5]  Indeed, "[t]he securities statutes seek to maintain public confidence in the marketplace" and they do so "by deterring fraud, in part, through the availability of private securities fraud actions." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005).

The Second Circuit has declared that "[e]quity has long recognized that there is need for a course which would redress wrongs otherwise unremediable because the individual claims involved were too small, or the claimants too widely dispersed." *Green v. Wolf Corp.*, 406 F.2d 291, 297 (2d Cir. 1968).  "Moreover, early in the development of our civil procedures it became apparent that judicial efficiency demanded the elimination of multiple suits arising from the same facts and questions of law." *Id*.  "Hence, the wise and necessary procedure was created by which a few representatives of a class could sue on behalf of others similarly situated, and be granted a judgment that would bind all." *Id*.

Accordingly, "[c]lass actions are generally well-suited to securities fraud cases such as this one because they avoid the time and expense of requiring all class members to litigate

---

[5]     Unless otherwise indicated, all emphasis is added and all internal quotations and citations are omitted.

individually." *In re Deutsche Telekom Ag Sec. Litig.*, 229 F. Supp. 2d 277, 282 (S.D.N.Y. 2002); *see also In re Blech Sec. Litig.*, 187 F.R.D. 97, 102 (S.D.N.Y. 1999) ("Class action treatment of related claims is particularly appropriate when plaintiffs seek redress for violations of the securities laws."); *In re Avon Sec. Litig.*, No. 91 CIV. 2287 (LMM), 1998 WL 834366, at *4 (S.D.N.Y. Nov. 30, 1998) ("the Second Circuit favors the use of class actions for the resolution of securities law claims, in particular those brought under Rule 10b–5.").

Additionally, the Second Circuit has declared that in determining the propriety of class certification, courts must be "mindful of the admonition of liberality toward demands for class suit status in securities litigation (particularly 10b-5 suits)." *Korn v. Franchard Corp.*, 456 F.2d 1206, 1209 (2d Cir. 1972); *see also McIntire v. China MediaExpress Holdings, Inc*., 38 F. Supp. 3d 415, 423 (S.D.N.Y. 2014) ("The Second Circuit has directed courts to adopt a liberal interpretation of Rule 23 in order to maximize the benefits to private parties and, in cases such as this one involving alleged manipulation of public markets, to maximize the benefits to the public provided by class actions."). "[T]he preponderance of the evidence standard applies to evidence proffered to establish Rule 23's requirements." *Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 202 (2d Cir. 2008); *see also In re NIO, Inc. Sec. Litig.*, No. 19CV1424NGGJRC, 2023 WL 5048615, at *3 (E.D.N.Y. Aug. 8, 2023) ("In evaluating these requirements, the preponderance of the evidence standard applies to evidence proffered to establish Rule 23's requirements.").

Furthermore, "[a]t the class certification stage, courts generally accept the factual allegations of the complaint as true." *In re Synchrony Fin. Sec. Litig.*, No. 3:18-CV-1818 (VAB), 2023 WL 1503032, at *2 (D. Conn. Feb. 3, 2023); *see also Richards v. FleetBoston Fin. Corp*., 235 F.R.D. 165, 168 (D. Conn. 2006) ("In ruling on a motion for class certification at the present

9

stage of the litigation, the court accepts the factual allegations of the Complaint as true.").

Although courts conduct a "rigorous analysis" of facts relevant to class certification, the Supreme

Court has declared that "Rule 23 grants courts no license to engage in free-ranging merits inquiries

at the certification stage." *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 466

(2013). "Merits questions may be considered to the extent – but only to the extent – that they are

relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id*.;

*see also Synchrony*, 2023 WL 1503032, at *2 ("Although the Supreme Court has required district

courts to engage in a rigorous analysis of the facts, Rule 23 grants courts no license to engage in

free-ranging merits inquiries at the certification stage.").

As the Second Circuit has declared, moreover, "if there is to be an error made, let it be in

favor and not against the maintenance of the class action, for it is always subject to modification

should later developments during the course of the trial so require." *Green*, 406 F.2d at 298.

"Accordingly, in an alleged securities fraud case, when a court is in doubt as to whether or not to

certify a class action, the court should err in favor of allowing the class to go forward." *Blech*, 187

F.R.D. at 102.

## B.      The Proposed Class Satisfies the Prerequisites of Rule 23(a)

Initially, class certification is proper because this case satisfies the prerequisites of Rule

23(a), which provides that:

> One or more members of a class may sue or be sued as representative parties on
> behalf of all members only if: (1) the class is so numerous that joinder of all
> members is impracticable; (2) there are questions of law or fact common to the
> class; (3) the claims or defenses of the representative parties are typical of the
> claims or defenses of the class; and (4) the representative parties will fairly and
> adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  These requirements are referred to as numerosity, commonality, typicality, and adequacy of representation, respectively.  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613 (1997).  The proposed class in this case easily satisfies these prerequisites.

### 1.    The Class is so Numerous that Joinder of All Class Members is Impracticable

Rule 23(a)(1) provides that class certification is appropriate where "the class is so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  "Impracticable does not mean impossible," and "[c]ourts have not required evidence of exact class size or identity of class members."  *Robidoux v. Celani*, 987 F.2d 931, 935 (2d Cir. 1993); *In re Aphria, Inc. Sec. Litig.*, 342 F.R.D. 199, 204 (S.D.N.Y. 2022).  In the Second Circuit, "numerosity is presumed at a level of 40 members."  *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995); *see also NIO*, 2023 WL 5048615, at *5 ("In this Circuit, [n]umerosity is presumed for classes larger than forty members.").

Additionally, "courts have acknowledged that numerosity in securities actions may be premised on a showing that a large number of shares were outstanding and traded during the relevant period."  *NIO*, 2023 WL 5048615, at *5; *see also McIntire*, 38 F. Supp. 3d at 423 ("In securities fraud class actions relating to publicly owned and nationally listed corporations, the numerosity requirement may be satisfied by a showing that a large number of shares were outstanding and traded during the relevant period."); *Deutsche Telekom*, 229 F. Supp. 2d at 280 ("Class certification is frequently appropriate in securities fraud cases involving a large number of shares traded publicly in an established market.").

Here, Kandi's common stock traded continuously on NASDAQ.  Sams Decl., Ex. A at ¶¶8, 14, 38, 40.  During the Class Period, Kandi's weekly trading volume ranged between 232,302 and 6,491,981 shares, and the average weekly trading volume of Kandi's stock during the Class Period

11

as a percentage of its stock outstanding was 4.4%. Sams Decl., Ex. A at ¶29. Additionally, Kandi's float establishes that the Class is likely composed of thousands of geographically dispersed investors, which further supports a finding of numerosity. Kandi's stock float averaged $233.5 million during the Class Period. Sams Decl., Ex. A at ¶106. While float excludes shares held by insiders and affiliated corporate entities, Kandi's stock float was still larger than the total market capitalization of at least 43% of all other publicly traded companies in the United States. *Id*. Thus, Plaintiff has demonstrated numerosity.

**2.     Questions of Law and Fact Are Common to Members of the Class**

The proposed class also satisfies the commonality requirement of Rule 23(a)(2). Class certification is proper under Rule 23(a)(2) if there are questions of law or fact common to the class that can "generate common answers apt to drive the resolution of the litigation" and that are "of such a nature that [they are] capable of classwide resolution." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (emphasis omitted). As the Supreme Court has recognized, "for purposes of Rule 23(a)(2) [e]ven a single [common] question will do." *Id.* at 359. "This is a low hurdle that requires only a showing that Plaintiff's claims depend upon a common contention that is of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *NIO*, 2023 WL 5048615, at \*5; *see also McIntire*, 38 F. Supp. 3d at 424 ("This requirement has been characterized as a low hurdle."). "The standard is particularly permissive in the context of securities fraud litigation." *NIO*, 2023 WL 5048615, at \*5. "Where plaintiffs allege that class members have been injured by similar material misrepresentations and omissions, the Commonality Requirement is satisfied." *McIntire*, 38 F. Supp. 3d at 424.

12

Plaintiff alleges that Defendants engaged in a common scheme to defraud Kandi's investors. *See, e.g.*, ¶¶24, 86, 99, 105, 111. This scheme involved numerous common questions of law and fact, including, among others: (1) whether the federal securities laws were violated by Defendants' acts; (2) whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of the Company; and (3) to what extent the members of the Class have sustained damages and the proper measure of damages. ¶97. These types of common questions of law and fact routinely satisfy the commonality requirement. *See, e.g.*, *Wilson v. LSB Indus., Inc.*, No. 15CIV7614RAGWG, 2018 WL 3913115, at *4 (S.D.N.Y. Aug. 13, 2018) ("These questions are also susceptible to common answers because their resolution does not differ based on the identity of the plaintiff."); *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 312 F.R.D. 332, 341 (S.D.N.Y. 2015) ("Common questions of law and fact are present where the alleged fraud involves material misrepresentations and omissions in documents circulated to the investing public, press releases and statements provided to the investment community and the media, and investor conference calls."). Accordingly, Plaintiff has demonstrated commonality.

### 3.     Plaintiff's Claims Are Typical of Those of the Class

Class certification is appropriate under Rule 23(a)(3) if "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "Rule 23(a)(3)'s typicality requirement is satisfied when each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability." *Robidoux*, 987 F.2d at 936. "When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented,

the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims." *Id*. at 936-37; *NIO*, 2023 WL 5048615, at *6.

"In securities actions, in particular, typicality is not demanding." *Synchrony*, 2023 WL 1503032, at *4; *see also Martinek v. AmTrust Fin. Servs., Inc.*, No. 19 CIV. 8030 (KPF), 2022 WL 326320, at *6 (S.D.N.Y. Feb. 3, 2022) ("courts have made clear that [t]he typicality requirement is not demanding."). "As is true for commonality, typicality does not require the representative party's claims to be identical to those of all class members." *Wilson*, 2018 WL 3913115, at *4. "In securities cases alleging dissemination of allegedly false or misleading statements, the nature of the common injury generally satisf[ies] typicality." *Martinek*, 2022 WL 326320, at *6.

Plaintiff's claims here are typical of the claims of the Class because they all allege that they purchased the Company's securities at artificially inflated prices because of Defendants' material misstatements and omissions. Thus, the claims of both Plaintiff and the Class relate to Defendants' misrepresentations, and their claims will rely on the same facts and legal theories to establish liability. "So long as plaintiffs assert that defendants committed the same wrongful acts in the same manner, against all members of the class, they establish the necessary typicality." *Synchrony*, 2023 WL 1503032, at *4.

### 4. Plaintiff Will Fairly and Adequately Protect the Interests of the Class

Rule 23(a)(4) permits class certification when "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "Generally, adequacy of representation entails inquiry as to whether: 1) plaintiff's interests are antagonistic to the interest of other members of the class and 2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation." *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000); *NIO*, 2023 WL 5048615, at *8–9.

14

Plaintiff readily satisfies Rule 23(a)(4).  First, Plaintiff's interests are directly aligned with the interests of other Class members, who were all injured by the same materially false and misleading statements.  *See* Sams Decl., Exs. B & C.  Thus, in proving his own claims to establish liability, Plaintiff will also prove the claims of the Class.  Second, Plaintiff has demonstrated his adequacy by, among other things, stepping forward as a proposed class representative, filing a detailed amended complaint, largely defeating Defendants' motion to dismiss, propounding discovery, reviewing and analyzing more than 100,000 pages of documents produced by Defendants, and taking the depositions of each of the five Individual Defendants.  Plaintiff, moreover, will continue to vigorously prosecute this case on behalf of the Class.  Sams Decl., Ex. C.  Plaintiff has also retained counsel who are qualified, experienced, and able to conduct the litigation.  *See* Sams Decl., Ex. D.[6]  Accordingly, Plaintiff satisfies the adequacy requirement.[7]

### C.    The Proposed Class Satisfies Rule 23(b)(3)

In addition to meeting the prerequisites of Rule 23(a), this action also satisfies the requirements of Rule 23(b)(3).  Class certification is proper under Rule 23(b)(3) where "the

---

[6]    *See also Schaub v. Mullen Auto., Inc.*, No. CV223026DMGAGRX, 2022 WL 18277984, at *2 (C.D. Cal. Aug. 4, 2022) ("The Court is satisfied that Glancy Prongay & Murray LLP is experienced and qualified"); *Chauhan v. Intercept Pharms.*, No. 21-CV-00036 (LJL), 2021 WL 235890, at *7 (S.D.N.Y. Jan. 25, 2021) ("Glancy Prongay & Murray LLP" is "a firm highly experienced in securities class action litigation"); *Shah v. Zimmer Biomet Holdings, Inc.*, No. 3:16-CVR-815-PPS-MGG, 2020 WL 2570050, at *6 (N.D. Ind. May 21, 2020) ("Plaintiffs' counsel at Glancy Prongay & Murray LLP" are "experienced securities class action litigators and have shown their skill in this case at all stages"); *Wilson*, 2018 WL 3913115, at *18 ("GPM has had extensive experience serving as lead or co-lead counsel in class action securities litigation."); *Kinney v. Capstone Turbine Corp.*, No. CV158914DMGRAOX, 2016 WL 5341948, at *4 (C.D. Cal. Feb. 29, 2016) ("The Court is satisfied that the law firm of Glancy Prongay is well experienced and qualified and can adequately represent the class.").

[7]    Moreover, "a class is ascertainable if it is defined using objective criteria that establish a membership with definite boundaries." *In re Petrobras Sec.*, 862 F.3d 250, 257 (2d Cir. 2017).  Plaintiff has sufficiently defined the Class above.  *Wilson*, 2018 WL 3913115, at *7.

15

questions of law or fact common to class members predominate over any questions affecting only individual members" and where "a class action is superior to other available methods for fairly and effectively adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). These twin requirements are known as predominance and superiority. The proposed Class satisfies both requirements.

### 1. Common Questions of Law and Fact Predominate Over Individual Questions

The predominance inquiry of Rule 23(b)(3) "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623. The Supreme Court has recognized that the predominance requirement "is readily met" in securities fraud actions. *Id*. at 625. In a securities fraud case, elements such as "materiality," "loss causation and the falsity or misleading nature of the defendant's alleged statements or omissions are common questions that need not be adjudicated before a class is certified." *Amgen*, 568 U.S. at 475.

To facilitate securities class actions, the Supreme Court established a rebuttable presumption of class-wide reliance based on the fraud-on-the-market theory. *Basic Inc. v. Levinson*, 485 U.S. 224, 245-247 (1988). "The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business . . . . Misleading statements will therefore defraud purchasers of stock even if the purchases do not directly rely on the misstatements . . . ." *Id*. at 241-242. "The fraud-on-the-market premise is that the price of a security traded in an efficient market will reflect all publicly available information about a company; accordingly, a buyer of the security may be presumed to have relied on that information in purchasing the security." *Amgen*, 568 U.S. at 458.

"District courts in this Circuit . . . regularly consider the factors in *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989), and *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001), in

16

evaluating whether a particular security trades in an efficient market." *Synchrony*, 2023 WL 1503032, at *8.  In *Cammer*, the court established a five-factor test to determine market efficiency: (1) whether there "existed an average weekly trading volume during the class period in excess of a certain number of shares;" (2) whether "a significant number of securities analysts followed and reported on [the] company's stock during the class period;" (3) whether the company's stock "had numerous market makers;"[8] (4) whether "the Company was entitled to file an S-3 Registration Statement in connection with public offerings or, if ineligible, such ineligibility was only because of timing factors rather than because the minimum stock requirements set forth in the instructions to Form S-3 were not met;" and (5) whether "empirical facts show[] a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price." *Cammer*, 711 F. Supp. at 1286-87.  The market for Kandi's securities satisfies this test.

**(a)**     **The Company Had a High Trading Volume During the Class Period**

First, the Company's high weekly average trading volume supports a finding of market efficiency.  A significant level of average weekly trading volume "implies significant investor interest in the company," which "in turn[ ] implies a likelihood that many investors are executing trades on the basis of newly available or disseminated corporate information." *Cammer*, 711 F. Supp. at 1286; *NIO*, 2023 WL 5048615, at *11.  Courts have quantified what constitutes high trading volume, finding that "[t]urnover measured by average weekly trading of two percent or

---

[8]     A market maker is one who helps establish a market for securities by reporting bid-and-asked quotations (the price a buyer will pay for a security and the price a seller will sell a security) and who stands ready to buy or sell at these publicly quoted prices. *In re Xcelera.com Sec. Litig.*, 430 F.3d 503, 515 (1st Cir. 2005).

17

more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one." *Cammer*, 711 F. Supp. at 1286.

Here, Kandi's common stock traded continuously on NASDAQ. Sams Decl., Ex. A at ¶¶8, 14, 38, 40. During the Class Period, Kandi's weekly trading volume ranged between 232,302 and 6,491,981 shares. Sams Decl., Ex. A at ¶29. Additionally, the average weekly trading volume of Kandi's stock during the Class Period as a percentage of its stock outstanding was 4.4%. *Id*. This level of average weekly trading volume exceeds the *Cammer* benchmark of 2% necessary for a "strong presumption" of market efficiency and exceeds the benchmark of 1% necessary for a "substantial presumption" of market efficiency. *Id*.; *Cammer*, 711 F. Supp. at 1286, 1293; *see also Villella v. Chem. & Mining Co. of Chile Inc*., 333 F.R.D. 39, 52 (S.D.N.Y. 2019) (concluding that an average weekly trading volume of 4.4% indicated market efficiency). Thus, this factor supports a strong presumption of market efficiency.

**(b)     A Sufficient Number of Analysts Covered the Company to Support a Finding of Market Efficiency**

Second, a sufficient number of financial analysts covered the Company during the Class Period to support a finding of market efficiency. "The existence of such analysts would imply, for example, the [disclosures] were closely reviewed by investment professionals, who would in turn make buy/sell recommendations to client investors" and therefore cause the stock price to move in response to new information. *Cammer*, 711 F. Supp. at 1286; *NIO*, 2023 WL 5048615, at *11. During the Class Period, there were at least 46 analyst reports published by seven different firms. Sams Decl., Ex. A at ¶31. Such analyst coverage is sufficient to support a finding of market efficiency. *See, e.g.*, *Xcelera.com*, 430 F.3d at 515 (affirming grant of class certification where "[n]otwithstanding the presence of only one securities analyst" information about the company

18

"was widely distributed through news articles, press releases, television interviews and the Company's SEC filings and indirect coverage"); *NIO*, 2023 WL 5048615, at *11 (holding "this factor also supports a finding of market efficiency" where "Plaintiffs have identified five analysts following [the company] during the class period, publishing 26 reports and recommendations"); *Wilson*, 2018 WL 3913115, at *11 ("the fact that one large brokerage firm published reports strongly supports the notion of a functioning market in [the company's] stock"); *Cheney v. Cyberguard Corp.*, 213 F.R.D. 484, 499 (S.D. Fla. 2003) (holding that "the existence of two (2) analysts" does "not alone preclude a preliminary finding of efficiency upon a review of all other factors").[9]

Additionally, various avenues of news media coverage also facilitate the flow of material information to the marketplace, which promotes efficiency. *Wilson*, 2018 WL 3913115, at *11; Sams Decl., Ex. A at ¶33. Such avenues of information dissemination include company press releases. *Id*. During the Class Period, over 190 news stories, press releases, and SEC filings featuring Kandi appeared in financial publications and newswires, including *Dow Jones Institutional News*, *PR Newswire*, and *Reuters*. *Id*. This wide dissemination of information about Kandi from company press releases and from well-regarded and widely-read sources in the news media such as *Dow Jones Institutional News*, *PR Newswire*, and *Reuters* supports a finding of market efficiency. *Id*.

         (c)       **The Company Had a Substantial Number of Market Makers**

---

[9]     Dr. Werner found that although the quantity of analyst coverage favors a finding that Kandi stock satisfied this *Cammer* factor, the quality of this coverage somewhat weakened this finding. Sams Decl., Ex. A at ¶32. Accordingly, to be conservative, Dr. Werner found this factor to be inconclusive considering the quality of coverage. *Id*.

Third, the existence of numerous market makers in Kandi's stock, the fact that the Company's stock traded on the NASDAQ, and the presence of institutional investors all demonstrate that the Company's stock traded in an efficient market. Sams Decl., Ex. A at ¶¶34-40. Market makers are financial intermediaries who trade in a particular security, standing ready to buy and sell with individual investors, institutions, and other market makers. Sams Decl., Ex. A at ¶35. A large number of market makers implies that many market participants are trading that particular stock, and generally provides a high degree of liquidity and lower transaction costs. *Id*. Thus, a large number of market makers for a particular security supports a finding of market efficiency. *Id*. "Ten market makers for a security would justify a substantial presumption that the market for the security is an efficient one; five market makers would justify a more modest presumption." *Cammer*, 711 F. Supp. at 1293.

During the Class Period, there were at least 100 market makers for Kandi stock, including well-known firms, such as: Goldman Sachs; J.P. Morgan; Morgan Stanley; and UBS. Sams Decl., Ex. A at ¶36; *see also Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 92 (S.D.N.Y. 2015) (noting that 51 active market makers supported a determination of an efficient market). Additionally, during the Class Period, at least 104 unique institutional investors owned Kandi common stock. *Id* at ¶40. That Kandi stock was listed and traded on the NASDAQ – combined with the presence of at least 104 sophisticated professional investors – strongly supports a finding that Kandi stock traded in an efficient market. *Id*.

### (d)    The Company Was Eligible to File Form S-3 Registration Statements

Fourth, the Company's eligibility to file Form S-3 registration statements also supports a finding of market efficiency. "[T]he existence of Form S-3 status is an important factor weighing

in favor of a finding that a market is efficient." *Cammer*, 711 F. Supp. at 1285.  Here, Kandi was eligible for S-3 registration throughout the Class Period.  Sams Decl., Ex. A at ¶43.  Kandi's float during the Class Period ranged in value from $120.6 million to $392.3 million, which was always above the minimum requirement for S-3 registration.  *Id*.  The Company also regularly filed financial reports with the SEC throughout the Class Period.  *Id*.  Thus, this factor also supports a finding of market efficiency.  *Id*.

> ### (e)    There Was a Cause and Effect Between The Company's News and Its Stock Price Movement

Finally, although not necessarily required, the immediate stock price fluctuations after Kandi's public disclosures also support a finding of market efficiency.  The Second Circuit has repeatedly declared that, in ruling on market efficiency, district courts must conduct "a holistic analysis based on the totality of the evidence presented" rather than a check-the-box approach to the various factors.  *Petrobras*, 862 F.3d at 277.  Indeed, the Second Circuit has "never suggested . . . that such [direct] evidence was the *only* way to prove market efficiency," (*id.* at 278), and has held "that a plaintiff seeking to demonstrate market efficiency need not always present direct evidence of price impact through event studies."  *Waggoner v. Barclays PLC*, 875 F.3d 79, 97 (2d Cir. 2017); *NIO*, 2023 WL 5048615, at *13.

Nevertheless, as established by Dr. Werner's Declaration, there was a clear cause-and-effect relationship between new, Company-specific information and Kandi's stock price, which demonstrates market efficiency.  Sams Decl., Ex. A at ¶¶44-100.  To study the Company's stock price reaction to news, Dr. Werner conducted an event study.  *Id*.[10]  The event study's detailed

---

[10]    Event studies are "regression analyses that seek to show that the market price of the defendant's stock tends to respond to pertinent publicly reported events." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 280 (2014).

21

statistical analysis shows a strong relationship between the price of Kandi's common stock during the Class Period and new, Company-specific information, thereby further supporting a finding of market efficiency. *Id*.

### (f)    Other Considerations Further Demonstrate Market Efficiency

Other factors also illustrate market efficiency. In *Krogman*, the court also examined the following factors to determine market efficiency: (1) "[m]arket capitalization, calculated as the number of shares multiplied by the prevailing share price;" (2) the "bid-ask spread," which is "the difference between the price at which investors are willing to buy the stock and the price at which current stockholders are willing to sell their shares;" and (3) the company's "float," which is "the percentage of shares held by the public, rather than insiders." 202 F.R.D. at 478.

Each of these factors also demonstrates market efficiency here. Sams Decl., Ex. A at ¶¶101-112. First, economists have often considered the market value of a firm and its relationship with market efficiency when attempting to determine market efficiency. *Id*. at ¶102. Larger companies tend to attract more analyst and news media coverage and gain the attention of greater numbers of investors, including very large institutional investors. *Id*. All these characteristics, which accompany a large market capitalization, promote market efficiency. *Id*. During the Class Period, Kandi's average market capitalization was $325.8 million, placing Kandi in the 6th decile of companies in the United States by size. *Id*. at ¶104. Kandi's market capitalization, therefore, was larger than the market capitalization of at least 49% of all other publicly traded companies in the United States. *Id*.; *see also McIntire*, 38 F. Supp. 3d at 433 (holding that a range of $292 million to $585 million in market capitalization was sufficient to support a finding of efficiency). Thus, Kandi's market capitalization throughout the Class Period is further evidence of market efficiency.

Second, a narrow bid-ask spread of a particular security is also often associated with efficiency. Sams Decl., Ex. A at ¶109. A narrow bid-ask spread implies that there is a large number of investors willing to buy or sell a security, thus the cost of executing a trade is lower, all else equal. *Id.* Here, the average bid-ask spread for Kandi's stock during the Class Period was 0.43%. *Id.* at ¶111. By comparison, the average month-end bid-ask spread over the course of the Class Period for all stocks in The Center for Research in Security Prices ("CRSP") database was 0.69%. *Id.* Thus, Kandi's average bid-ask spread was narrower than the average level among all other CRSP stocks, thereby supporting a finding of market efficiency. *Id.* at ¶112.

Finally, a company's float indicates market efficiency because a larger float suggests greater liquidity, making it easier to purchase and sell shares in the market. *Cheney*, 213 F.R.D. at 502. Here, Kandi's stock float averaged $233.5 million during the Class Period. Sams Decl., Ex. A at ¶106. While float excludes shares held by insiders and affiliated corporate entities, Kandi's stock float was still larger than the total market capitalization of at least 43% of all other publicly traded companies in the United States. *Id.* Thus, the size of Kandi's float is indicative of market efficiency. *Id.* Additionally, float can also be analyzed as a percentage of total shares outstanding as well as in absolute share and value terms. *Id.* at ¶107. On average during the Class Period, there were 34.0 million shares of stock in Kandi's float and 47.3 million shares of stock outstanding, resulting in an average float of 71.8% of stock outstanding. *Id.* As a result, the magnitude of Kandi's float is also indicative of market efficiency. *Id.*

For each of these reasons, the market for Kandi's securities was efficient during the Class Period, and the fraud-on-the-market doctrine applies.

23

## 2. Damages Can Be Established on a Class-Wide Basis

Plaintiff will also be able to establish damages in this action on a class-wide basis. Here, damages are capable of measurement on a class-wide basis, and Plaintiff's proposed damages methodology at the certification stage is consistent with the class-wide theory of liability. Dr. Werner has opined that class-wide damages in response to the specific misrepresentations and omissions ultimately established by Plaintiff can be calculated in a straightforward manner common to all Class members. Sams Decl., Ex. A at ¶¶113-117. Dr. Werner has also opined that out-of-pocket damages can be measured as the difference between the amount of stock price inflation at purchase and the amount of inflation in the stock price at sale taking into account formulaic prescriptions in relevant case law and statutes. *Id*. Courts have overwhelmingly approved this methodology. *See, e.g.*, *Synchrony*, 2023 WL 1503032, at *12 (this "methodology relies on easily ascertainable data points for calculating the per share damages: the purchase date and sale date of [the company's] stock, which are directly linked with Plaintiffs underlying theory of liability"); *Wilson*, 2018 WL 3913115, at *17 ("This model of damages sufficiently measures damages resulting from plaintiffs' theory of liability.").

## 3. A Class Action is Superior to Other Methods of Adjudication

Rule 23(b)(3) also requires the Court to determine that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). In determining superiority, courts consider: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum;

24

and (D) the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3). These factors all demonstrate that a class action is superior to other methods of adjudication.

First, the Class consists of thousands of members – if not more – who do not have sufficient financial incentive to pursue individual actions. Thus, a class action is the only feasible method of adjudication where investors would face a disproportionate expense to pursue individual claims. Second, other than a potential derivative case that involves different claims, Plaintiff is not aware of other securities fraud class actions that have been brought against Defendants relating to the specific wrongs alleged in the Complaint. Third, concentrating the litigation in this Court will eliminate the risk of inconsistent adjudications and promote the efficient use of judicial resources. "In general, [s]ecurities suits easily satisfy the Superiority Requirement of Rule 23(b)(3) because the alternatives are either no recourse for thousands of stockholders or a multiplicity and scattering of suits with the inefficient administration of litigation which follows in its wake." *Synchrony*, 2023 WL 1503032, at \*13. Finally, there is no reason to expect any difficulties in the management of this case as a class action. Accordingly, a class action is the superior method of adjudication. *See NIO*, 2023 WL 5048615, at \*17 ("the court concludes that this case, like many other securities actions, would be best adjudicated as a class action").

## IV. CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court issue an Order: (1) certifying this case as a class action pursuant to Rule 23 and certifying the Class as defined herein; (2) appointing Tom Brooks as class representative; and (3) appointing Lead Counsel as Class Counsel.

DATED:  November 10, 2023           **GLANCY PRONGAY & MURRAY LLP**

By:  *s/ Ex Kano S. Sams II*
_____
Robert V. Prongay (admitted *pro hac vice*)
Ex Kano S. Sams II (admitted *pro hac vice*)
Charles H. Linehan (admitted *pro hac vice*)
Pavithra Rajesh (admitted *pro hac vice*)
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: clinehan@glancylaw.com

*Counsel for Lead Plaintiff Tom Brooks and the Class*

**LAW OFFICES OF HOWARD G. SMITH**
Howard G. Smith
3070 Bristol Pike, Suite 112
Bensalem, PA 19020
Telephone: (215) 638-4847
Facsimile: (215) 638-4867

*Additional Counsel*

26