# EXHIBIT A

Page 38

A. WERNER

(The reporter repeated the record as requested).

THE REPORTER:  Back on transcript 12:53.

MR. SAMS:  Same objection.

THE WITNESS:  Yes.

BY MR. LOMUSCIO:

Q   What would the source of that inflation be?

A   Well, again, to the -- I mean, for example -- so in your -- in your hypothetical, what could be -- an omission could be.

Q   In your report, did you consider this aspect of the decision in this case?

MR. SAMS:  Object to form.

A   I'm sorry.  I don't understand the question.

Q   It wasn't a great question.  So I'll rephrase.

Dr. Werner, in preparing your report, did you consider the Court's opinion and how it limited the allegations in the complaint in rendering your

Page 39

A. WERNER

opinion?

MR. SAMS:  Object to form.

A   Again, my opinion in this case is on market efficiency and whether or not a general damage methodology exists.  I believe the question you're asking refers to loss causation and specific damages.  If I'm asked to opine on that, I'll be able to more accurately answer that question for you or I'll be able to answer that question for you.

Q   I'd like to mark the second amended complaint as Werner Exhibit 3.

(Werner Exhibit 3 was marked for identification.)

A   Okay.  I have that.

Q   And, Dr. Werner, looking at this document, is this the document that's referenced in footnote 20 of your report?

A   Without going back to my report, if you're going to represent that it's in footnote 20, this is the second amended complaint that I referenced within my report.

Page 40

A. WERNER

Q   Please go to paragraph 49 of the complaint.  Dr. Werner, just let me know if you've read that.

A   Yeah, I'm there.  I'm there.

Q   Paragraph 49 of the complaint reads in its entirety "The class period begins" --

A   Oh, I'm sorry.  I'm sorry.  What paragraph --

Q   Forty-nine.

A   Oh, it is 49, yeah.  Okay.  Sorry.  When you said, "in its entirety," and then we're talking about a sentence, it just threw me off a little, but.

Q   Yeah, so my apologies.  Just --

A   Sorry.  I didn't mean to interrupt you.

Q   No, no worries.  No worries.

Do you see that that paragraph 49 reads in its entirety "The class period begins on June 10, 2015"?

A   I do.

Q   Your analysis of market efficiency in your report assumes a class

Page 41

A. WERNER

period that begins on June 10, 2015; is that correct?

A   That is correct.

Q   When you focused your event study analysis on the allegations in the complaint as we saw you did in paragraph 52 of your report, which allegations do you believe were causing inflation as of June 10, 2015?

MR. SAMS:  Object to form.

A   Again, that's -- that's not something that I was asked to opine upon.  That goes to loss causation.  If I'm asked to opine on loss causation at some date in the future, I'm more than willing to answer that question.

Q   So in this case, your mandate was strictly to focus on market efficiency; is that correct?

A   No.

MR. SAMS:  Object to form.

BY MR. LOMUSCIO:

Q   What was your mandate in this case?

11 (Pages 38 - 41)

Page 42

A. WERNER

MR. SAMS:  Same objection.

A   If we go back --

THE WITNESS:  I apologize, Ex Kano. I didn't mean to talk over you.

MR. SAMS:  No problem.

THE WITNESS:  If we go to my report, which, I believe, is Exhibit 1 to this proceeding -- this proceeding and my deposition, looking at paragraph 1 and paragraph 2, I was asked to opine on whether the publicly traded common stock of Kani Technologies Group, Incorporated traded in an efficient market during the period from June 10, 2015, through March 13, 2017, inclusive.

Here's the second half of that:  "In addition, I have been asked to opine on whether damages in this matter are subject to a common methodology that can be calculated on a class-wide basis for all class members in connection with their claims under section 10(b) and section 20(a) of the Securities Exchange Act of 1934, the Exchange Act, and U.S.

Page 43

A. WERNER

Securities and Exchange Commission, SEC, rule 10b-5, adopted thereunder, collectively section 10(b)."

BY MR. LOMUSCIO:

Q   So part of what you were looking at was also a damages metric; is that correct?

A   "Damages metric"?  I'm not quite sure what you mean by "damages metric."

Q   A method for calculating damages on a class-wide basis.  Is that fair?

A   I was asked to opine on whether damages in this matter are subject to a common methodology that can be calculated on a class-wide basis.

Q   And as part of that analysis, do you have to assess whether or not there were particular causes for those damages?

MR. SAMS:  Object to form.

A   I'm sorry.  I didn't understand your question.

MR. LOMUSCIO:  Can you read it back?

THE REPORTER:  One second, sir.

//

Page 44

A. WERNER

(The reporter repeated the record as requested.)

THE REPORTER:  1:02, back on transcript.

MR. SAMS:  Same objection.

THE WITNESS:  Yeah, I still don't understand the question.

BY MR. LOMUSCIO:

Q   What don't you understand about the question?

A   I don't understand what the question is asking.  It doesn't make sense to me.

Q   Why doesn't it make sense to you?

A   As I sit here today, it doesn't make sense to me.  I don't know understand the question.  I'm not quite sure what else I can tell you about my misunderstanding or my -- if you want to ask it a different way or rephrase it, I just don't understand it.  I mean, if you -- we can parse it out if the court reporter wants to read it back and we can

Page 45

A. WERNER

go word by word.  I can attempt to tell you which part confuses me or which part I don't understand.

THE REPORTER:  Shall I read back again, sir?

MR. LOMUSCIO:  No, it's okay.

THE WITNESS:  Do you mind if I write this down so -- oh, we're not?  Okay.

BY MR. LOMUSCIO:

Q   What did you do in order to opine on whether damages in this matter are subject to a common methodology?

A   What did I do?  I read the complaint.  I -- to the extent that this was a 10b-5 case, I took that into consideration, and I determined that there was a common methodology that can be used to calculate damages for class members in this matter.

Q   And to the extent that the allegations of the complaint were altered by a subsequent decision by the Court, your analysis would not take that into consideration; is that fair?

12 (Pages 42 - 45)

Page 46

A. WERNER

MR. SAMS:  Object to form.

A   I don't -- I'm sorry.  I don't think that is correct.  The -- the question is whether or not a common methodology can be used to estimate damages in this case.  That's robust to -- to any of the Court's findings subsequent to that analysis.

Again, you're going to a specific damage calculation that might -- again, if I'm asked to opine on specific damages or calculate specific damages in this matter, I will do so, but a common methodology still exists that one could use to estimate damages in this matter, even in light of the Court's decision or opinions.

THE WITNESS:  Would -- would now be a good time to take a break?  We've been going for about an hour.

MR. SAMS:  Yeah, so it's just --

MR. LOMUSCIO:  Sure.  Sure.  That's fine, yeah.  I'm sorry.  I was just looking around.  Yeah, why don't we

Page 47

A. WERNER

take -- is five minutes good, Dr. Werner, ten minutes?

THE WITNESS:  That would be great.  Five minutes is fine unless anyone else needs ten minutes.

MR. LOMUSCIO:  The court reporter or --

THE REPORTER:  Off the record at 1:06 p.m.

(Off the record.)

THE REPORTER:  Clarification for the record, this proceeding started at 12:04 p.m. Eastern time/9:04 a.m. Pacific time where the witness is located.  Thank you.

It's 1:15 p.m.  Back on the record.

Counsel, you may proceed.

BY MR. LOMUSCIO:

Q   Dr. Werner, are you ready to proceed?

A   I am.  Thank you.

Q   I'd like to direct you to paragraph 114 of your report.  It's on page 44.

Page 48

A. WERNER

A   I'm sorry.  One-fourteen; correct?

Q   Yeah, 114 of page 44.  I'm sorry.  I was giving you both --

A   Yep, no, we're all good.  Okay.  I'm there.

Q   In this paragraph, you state "Out-of-pocket damages can be measured as the difference between the amount of security price inflation at purchase and the amount of inflation in the security price at sale taking into account formulaic prescriptions in relevant case law and statutes, including, for example, the Private Securities Litigation Reform Act of 1995 and the holding in Dura Pharmaceuticals, Inc. v. Broudou 504 U.S. 336, 2005."  Do you see that?

A   I do.

Q   What is the holding in Dura Pharmaceuticals that you reference here?

MR. SAMS:  Object to form.

A   As I -- as I sit here today, I would need to take a look at the Dura

Page 49

A. WERNER

opinion to refresh my recollection as to exactly what that states.

Q   And, Dr. Werner, you're not a lawyer; correct?

A   That is correct.

Q   And did you draft this paragraph of your report?

A   At some point in time I did, yes.

Q   And at that time would you have researched the PSLRA and the Dura decision?

A   Well, I would have a general layman's understanding of what those two things stated.  I mean, to the extent that I've -- I've calculated damages -- actual damages in hundreds of cases, I'm familiar with those two things, but I can't tell you them verbatim as I sit here today.

Q   Is it your understanding if factors other than alleged fraud cause the decline in a stock price, there are no damages?

13 (Pages 46 - 49)

Page 50

A. WERNER

MR. SAMS:  Object to form.

A    So in -- in your hypothetical example, the decline in stock price was only caused by nonfraud-related factors; is that -- do I understand your hypothetical?

A    Yes, yes.

Q    If -- to the best of my understanding and to the extent I understand your hypothetical so that there was no price decline caused by the alleged fraud, I -- I believe there -- as I sit here today not fully understanding the hypothetical but based on my understanding as I sit here, I believe there would be no damages.

Oh, I'm sorry.  Can you repeat the question?  Now that I think about it, it's slightly more nuanced.

THE REPORTER:  One second sir.

MR. LOMUSCIO:  Sure.

If you'd read it back to him, that'd be great.  Thank you.

THE REPORTER:  Sure thing, sir.  One

Page 51

A. WERNER

second.  Stand by.

(The reporter repeated the record as requested.)

THE REPORTER:  Back on the record 1:21 p.m.

MR. SAMS:  Same objection.

THE WITNESS:  So does that -- under your definition of "alleged fraud," you're referring to omissions and -- and/or misstatements?

BY MR. LOMUSCIO:

Q    Yes.

A    Then my answer is -- is correct.

Q    When you say your answer is correct, under the hypothetical there would be no damages?  Is that what you're saying is correct?

A    To the best of my understanding of the hypothetical as I sit here today, yes, that is correct.

Q    In doing your analysis of Kani's stock price in your report, did you consider other factors that may have contributed to a decline in Kandi Stock

Page 52

A. WERNER

price on the alleged disclosure dates?

MR. SAMS:  Object to form.

A    Again, so it sounds to me like you're asking a question about loss causation, and I haven't been asked to opine on loss causation at this point in time.  I mean, I guess I should say my understanding of your question is that it goes to loss causation, and that has not been something I've been asked to opine upon at this time.

Q    And so I'm just -- is it your testimony that the existence of other factors affecting Kandi's securities price wouldn't affect your market efficiency analysis?

MR. SAMS:  Same objection.

A    Well, again, my -- the question in market efficiency in looking at all of these eight factors is basically "Does the stock price react to new news?"  So if you're saying that there are other types of news that affected the stock price, that would still be relevant to my

Page 53

A. WERNER

analysis, or if you're saying -- telling me that nonfraud-related news was moving the stock price, that might -- that informs my analysis as well.

Q    And in conducting your analysis of Kandi stock, did you consider all information relating to that stock or just information relating to disclosures by the company?

MR. SAMS:  Same objection.

A    I think by definition you would look at all information if you're trying to determine whether the stock traded in an efficient market.

Q    And as to Kandi stock -- strike that.  Excuse me.

With regard to your analysis of Kandi stock, what did you consider in addition to disclosures by the company in conducting your market efficiency analysis?

MR. SAMS:  Object to form.

A    All news that would be -- that might be relevant to investment.

14 (Pages 50 - 53)

Page 62

A. WERNER

claims possibly be confounding information? As I've defined "confounding" in -- in this paragraph, I mean, it's -- is it possible? It is possible as in, I mean, it's also possible that it's -- it's 90 degrees outside but -- here today but it's -- it's not actually. It's possible, but it's not -- so I don't know. Again, I -- I don't mean to get into, like, a philosophical conversation with you, but asking whether something is possible is an extremely broad question.

Q   So you didn't analyze the dismissed claims at all for your report; correct?

MR. SAMS:  Object to form.

A   Again, same answer as I previously said. I've been not -- I've not been asked to opine on loss causation and specific damages calculations. I've been asked to opine on market efficiency and whether a common damage methodology exists for calculating damages in this

Page 63

A. WERNER

matter for class members.

Q   As part of that analysis, would you analyze whether or not there were any corrected disclosures made by Kandi?

MR. SAMS:  Object to form.

A   Would I -- I'm sorry. I don't understand the question.

THE WITNESS:  Or could you reread the question? Maybe I just misunderstood it.

THE REPORTER:  One second, sir. Stand by.

(The reporter repeated the record as requested.)

THE REPORTER:  1:40, back on transcript.

MR. SAMS:  Same objection.

THE WITNESS:  Okay. And what analysis are you referring to?

BY MR. LOMUSCIO:

Q   The analysis that you did for this report.

A   I guess I -- I mean, I -- I don't know how else to state what I've been asked to opine upon in this matter.

Page 64

A. WERNER

I -- again, my understanding of your question goes to loss causation and specific damage calculations. If I'm asked to opine upon those things at some point in the future, I will do so, but my understanding is discovery hasn't been completed. Until there's a full record, it's difficult to opine upon those things, but, again, that's based on my understanding of your question. Maybe I'm misunderstanding your question.

Q   I'm just trying to understand what you would and would not have reviewed. So I appreciate your response.

For purposes of determining whether or not there's a methodology, you assume whatever is in the complaint is accurate; is that correct?

MR. SAMS:  Object to form.

A   I don't -- I'm not sure that's correct. I have no reason to think it's inaccurate.

Q   But does -- I'm just trying to understand. Whatever -- in your analysis,

Page 65

A. WERNER

did you assume that the allegations in the complaint were accurate?

MR. SAMS:  Same objection.

A   Right. So which analysis? In my market efficiency analysis?

Q   Well, we'll break it down. With regard to your market efficiency analysis, did you assume that the allegations in the complaint were accurate?

MR. SAMS:  Same objection.

A   I'm not sure that that would influence my market efficiency analysis. The question is whether or not the stock traded in an efficient market over the class period.

Q   I don't want to cut you off. Are you finished with that response, Dr. Werner?

A   I am.

Q   Okay. Thank you. For purposes of your damages methodology analysis, would you assume that the allegations in the complaint are accurate?

MR. SAMS:  Object to form.

17 (Pages 62 - 65)

Page 66

A. WERNER

A    So I -- I guess my -- the disconnect for me is your definition of "damages methodology," which is what I've laid out, and "analysis."  Which -- what analysis are you referring to?

Q    Well, I guess, maybe I was being -- all I want to know is, with regard to your damages methodology that you have identified in your report, did you assume that the allegations of the complaint are accurate?

MR. SAMS:  Object to form.

A    Yeah, again, I was asked to opine upon whether or not there was a common damage methodology.  I -- I opined that there was.  I -- I think that your question again goes to loss causation and a specific damage calculation in this case --

Q    Okay.  But I --

A    -- which is going to be based upon -- go ahead.

Q    I'm sorry.  I didn't mean to cut you off.  I'm sorry.

Page 67

A. WERNER

A    -- which is going to be based upon the end of discovery and all of the information that's turned over between now and then.  But have I -- have I reviewed all information in this case?  No, I have not, again, I -- because I have not been asked to opine upon a specific damage calculation.  The question is whether or not a common-depth damage methodology exists.  My opinion was there was one that exists.

Q    But that's independent of any specifics as to Kandi as a company; correct?

MR. SAMS:  Object to form.

A    So, I mean, I'm sorry.  I -- I really just don't understand your question.  I mean --

Q    And I'm really --

THE REPORTER:  One at a time, gentleman.  One at a time.  Thank you.

MR. LOMUSCIO:  All right.  I'm sorry.

THE WITNESS:  If we're going back to your hypothetical where there's no alleged

Page 68

A. WERNER

fraud -- so in your hypothetical you stated previously, assuming there's no alleged fraud, would there be damages?  In that hypothetical, I believe, as I sit here today, that there would be damages, but, I mean, there -- there could be a whole host of information that I'm not understanding about your question.

Now, I'd give the same answer to -- to the question you just asked.  If you're -- if the Court finds that there was no alleged fraud, would my damage methodology determine that there were no damages?  I believe that's correct -- or calculate no damages, I believe that's correct.  But, again, that's -- that's a hypothetical.

BY MR. LOMUSCIO:

Q    And I'm just saying your damages methodology, as I understand it, is agnostic to the underlying specifics of the trading or the actual events in this case; is that accurate?

MR. SAMS:  Object to form.

Page 69

A. WERNER

A    I -- I don't think that's accurate.

Q    Okay.  What do I have wrong?  I want to understand because you said a number of times now that, you know, you are opining about that a methodology exists.  I'm just trying to understand whether or not the existence of that methodology is dependent at all upon the allegations of the complaint.

MR. SAMS:  Same objection.

A    Is it dependent upon at all the allegations in the complaint?  Again, I -- I mean, your question goes to a specific damage calculation, which is not something I have been asked to opine upon at this point in time.  I have been asked to opine about whether or not a common damage methodology exists, and the answer to that question is "yes."

Q    But in answering that question "yes," is there any -- I'm sorry.  Strike that.

And I'm not trying to be obtuse.

18 (Pages 66 - 69)

Page 70

A. WERNER

I'm really just curious. Your opinion is that a methodology exists; correct?

A    That is correct.

Q    And whether or not that methodology exists is independent of the allegations relating specifically to Kandi in this case; correct?

MR. SAMS: Object to form. Asked and answered.

A    All right. Again, I'm just -- I'm not trying to be obtuse.

Q    Yeah.

A    I'm not sure I understand your question. I -- I mean, is -- I'm answering the question to the best of my ability.

Q    I guess I just want to -- so your testimony is that a methodology exists to calculate damages on a class-wide basis with regard to Kandi stock; is that correct?

A    I believe that statement is accurate.

Q    And the -- but you're not

Page 71

A. WERNER

opining on whether or not there were damages in this particular case?

MR. SAMS: Object to form.

A    I mean, I'm not sure how else to put it. I haven't been asked to opine upon whether there are specific damages in this matter. If I am at some point retained and asked to do so, I will opine on that calculation or -- and that, I would consider it analysis.

Q    Okay. Thank you. I'm sorry it took a little while to get there, but I appreciate it. I appreciate your discourse.

If we go to paragraph eight of your report. Just let me know when you're there.

A    Okay. I'm there.

Q    In paragraph eight, you list nine bullet points summarizing your conclusion that Kandi stock traded in an efficient market; is that correct?

A    I'm sorry. Can you reread the question?

Page 72

A. WERNER

Q    Sure, sure, sure, sure. In paragraph eight, you list nine bullet points summarizing your conclusion that Kandi stock traded in an efficient market; is that correct?

A    Well, I -- I think it might -- a more eloquent way to put it is that my opinion -- and I'm -- now I'm reading from paragraph eight. "My opinion is based on the following observations, analyses, and findings from the class period."

Q    And what were your findings that you lay out here?

MR. SAMS: Object to form.

A    That Kandi stock traded in an efficient market throughout the class period.

Q    And as we saw earlier, the start date for that class period is June 10, 2015; is that correct?

A    I don't recall the exact date. I can -- if we go to my report -- I mean, I believe that's correct, but let's just, for accuracy sake -- June 10, 2015, that's

Page 73

A. WERNER

correct. I'm reading from paragraph one of my report.

Q    Okay. Thank you. Is it correct that every number that you lay out in paragraph eight would likely change if your analysis had the class period beginning on August 10, 2015?

MR. SAMS: Object to form.

A    Not necessarily. In fact, my guess is that's incorrect.

Q    Well, let's just take a look at paragraph 8b. In that paragraph, you indicate that "There were at least 190 new stories, press releases, and SEC filings published about the company during the class period." Do you see that?

A    I do.

Q    And if your analysis of the class period started a month later, isn't it possible that there could be additional news stories, press releases, and SEC filings that would have to be included?

MR. SAMS: Object to form.

A    I'm sorry. Now -- now I'm

19 (Pages 70 - 73)

Page 82

A. WERNER

THE REPORTER:  2:29 p.m., back on the record.

Counsel, you may proceed.

MR. LOMUSCIO:  While reserving our right to move as to the questions regarding Dr. Werner's ownership or potential ownership of Kandi stock, we have no further questions at this time and just appreciate you taking the time this morning.

EXAMINATION

BY MR. SAMS:

Q   And, Dr. Werner, I just have a couple of follow-up questions.  I'll be very brief.

I'd just like to direct your attention to paragraph 117 of your report.

A   Okay.

Q   And, Dr. Werner, do you recall counsel asking some questions in which you answered that your understanding was that those questions related to specific loss causation damage information in the case?

A   I do.

Page 83

A. WERNER

Q   And directing your attention to paragraph 117 of your report, your report states:  "I have not yet been asked to calculate damages or any other claims alleged on behalf of the class; however, the methodology described above is generally accepted and widely used for calculating damages under section 10b consistently on a class-wide basis in securities class actions.  To the extent that there are specific issues complicating the quantification of artificial inflation and damages, such as potential compound information, these issues relate to the merits of the damages model, not whether damages can be calculated on a class-wide basis pursuant to a common methodology of a class."

Do you see that?

A   I do.

Q   Does this paragraph accurately reflect your opinion on this matter?

A   It does.

MR. SAMS:  I have no further

Page 84

A. WERNER

questions.

MR. LOMUSCIO:  We have nothing else other than, Dr. Werner, thank you for your time.

And, Court Reporter, than you so much.

THE REPORTER:  Thank you, sir.

And the time is 2:32 p.m.  Testimony has ended.

All righty.  So, Mr. Lomuscio --

MR. LOMUSCIO:  Lomuscio.

THE REPORTER:.  Lomuscio.  I'm so sorry.  I just --

MR. LOMUSCIO:  No worries.

THE REPORTER:  Sorry.  Apologies.  I have you down for an original and a copy.  Read and sign -- no, no read and sign.  This is a federal.  Original and a copy and the exhibits normal delivery time; is that correct?

MR. LOMUSCIO:  That's correct.

THE REPORTER:  Great.  And, Mr. Sams, are you ordering an additional copy.

MR. SAMS:  Yes.

Page 85

A. WERNER

THE REPORTER:  Okay.  And a copy for Mr. Sams with exhibits and normal delivery time.  Is that okay?

MR. SAMS?  Yes.

THE REPORTER:  Great.

And it is 2:32 p.m.  The proceeding has concluded.  We're off record.

THE WITNESS:  Thank you.

(Whereupon, at 11:32 a.m. PST/2:32 p.m. EST, the proceeding was concluded.)

22 (Pages 82 - 85)

Page 2

APPEARANCES

ON BEHALF OF PLAINTIFFS SRINIVASAN VENKATARAMAN, INDIVIDUALLY, AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED:

EX KANO S. SAMS, II, ESQUIRE (by videoconference)
Glancy Prongay & Murray LLP
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
esams@glancylaw.com
310-201-9150

ON BEHALF OF DEFENDANTS KANDI TECHNOLOGIES GROUP, INC., XIAOMING HU, CHENG WANG, BING MEI, LIMING CHEN, JERRY LEWIN, and HENRY YU:

RICHARD R. L. LOMUSCIO, ESQUIRE (by videoconference)
JUAN OLIVO, ESQUIRE (by videoconference)
Tarter Krinsky & Drovin LLP
1350 Broadway, Suite 12
New York, NY 10018
rlomuscio@tarterkrinsky.com
jolivo@tarterkrinsky.com
212-216-8000
212-574-0329

Page 3

INDEX

EXAMINATION:                           PAGE
    By Mr. Lomuscio          6
    By Mr. Sams              82

EXHIBITS

NO.        DESCRIPTION              PAGE
Werner:
Exhibit 1    Declaration of
             Ex Kano S. Sams II in
             Support of Plaintiff's
             Motion for Class
             Certification          26
Exhibit 2    Opinion and Order      35
Exhibit 3    Second Amended Complaint
             for Violation of the
             Federal Securities Laws    39

QUESTIONS INSTRUCTED NOT TO ANSWER
        PAGE    LINE
        15      11
        16      18
        81      8

Page 4

A. WERNER

THE REPORTER:  Good afternoon.  My name is Jennifer C. Smetters; I am the reporter assigned by Veritext to take the record of this proceeding.  We are now on the record at 12:04 p.m.

This is the deposition of Adam Werner taken in the matter of Srinivasan Venkataraman, Individually and on Behalf of All Others Similarly Situated vs. Kandi Technologies Group, Inc., et al. on Monday, January 22, 2024, at 960 Wadsworth Avenue, Pismo Beach, CA 93449.

I am a notary authorized to take acknowledgments and administer oaths in New York.  The parties agree that I will swear in the witness remotely from New York.

Additionally, absent an objection on the record before the witness is sworn, all parties and the witness understand and agree that any certified transcript produced from the recording of this proceeding:

- is intended for all uses permitted

Page 5

A. WERNER

under applicable procedural and evidentiary rules and laws in the same manner as a deposition recorded by stenographic means; and

- shall constitute written stipulation of such.

At this time, starting with the plaintiff's attorney, will everyone in attendance please identify themselves for the record.

MR. SAMS:  Ex Kano Sams from Glancy Prongay & Murray on behalf of plaintiff.

MR. LOMUSCIO:  Richard Lomuscio of Tarter Krinsky & Drogin on behalf of the defendants.

MR. OLIVO:  Juan Olivo of Tarter Krinsky & Drogin on behalf of the defendants.

THE REPORTER:  Thank you.

Mr. Werner, will you please state your name for the record.

DR. WERNER:  Sure.  It's Dr. Adam Werner W-E-R-N-E-R.

THE REPORTER:  Thank you.

2 (Pages 2 - 5)